# 14-1410-CV

## United States Court of Appeals

*for the*

## Second Circuit

In Re: ADVANCED BATTERY TECHNOLOGIES, INCORPORATED

RUBLE SANDERSON,

*Plaintiff-Appellant,*

JAMES QUAN, JAMES M. BURNS, ARNOLD COHEN, GEOFF CONNORS, GREGORY BONIN, Individually and on behalf of all others similarly situated,

*Plaintiffs,*

– v. –

ADVANCED BATTERY TECHNOLOGIES, INCORPORATED, ZHIGUO FU, GUOHUA WAN, DAN CHANG, BAGELL, JOSEPHS, LEVINE & CO., LLC, FRIEDMAN LLP, EFP ROTENBERG, LLP,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX

FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
(405) 235-1560

POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

THE ROSEN LAW FIRM P.A.
275 Madison Avenue, 34th Floor
New York, New York 10016
(212) 686-1060

*Attorneys for Plaintiff-Appellant*

*(For Continuation of Appearances See Inside Cover)*

HISCOCK & BARCLAY LLP
One Park Place
300 South State Street
Syracuse, New York 13202
(315) 425-2700

*Attorneys for Defendant-Appellee*
   *EFP Rotenberg, LLP*

MCLAUGHLIN & STERN LLP
260 Madison Avenue
New York, New York 10016
(212) 448-1100

*Attorneys for Defendants-Appellees*
   *Advanced Battery Technologies,*
   *Incorporated, Zhiguo Fu, Guohua Wan*
   *and Dan Chang*

WILSON ELSER MOSKOWITZ EDELMAN
   & DICKER LLP
1133 Westchester Avenue
White Plains, New York 10604
(914) 323-7000

*Attorneys for Defendants-Appellees*
   *Bagell, Josephs, Levine & Co., LLC*
   *and Friedman LLP*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Corrected First Amended Consolidated Class Action
    Complaint, dated September 29, 2011, with
    Attachment.............................................................. A-26

Decision and Order Denying the ABAT Defendants'
    Motion to Dismiss and Granting the Auditor
    Defendants' Motions to Dismiss, dated
    August 29, 2012...................................................... A-92

Memorandum of Law in Support of Motion for
    Leave to File Second Amended Consolidated
    Class Action Complaint, dated
    September 25, 2012

    Exhibit A to Motion -
    Proposed Second Amended Complaint ................. A-132

Decision and Order Denying Plaintiffs' Motion for
    Leave to File a Second Amended Complaint,
    dated July 18, 2013, Appealed From ..................... A-226

Notice of Appeal, dated April 22, 2014 ..................... A-243


STAYED,CLOSED,APPEAL,ECF,LEAD

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:11–cv–02279–CM

In re ADVANCED BATTERY TECHNOLOGIES, INC.
SECURITIES LITIGATION
Assigned to: Judge Colleen McMahon
Related Cases: 1:11–cv–02354–CM
              1:11–cv–03098–CM
              1:11–cv–04383–CM
              1:11–cv–02849–CM
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 04/01/2011
Date Terminated: 03/24/2014
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Lead Plaintiff**

| | | |
|---|---|---|
| **Ruble Sanderson** | represented by | **Marc Ian Gross** |
| | | Pomerantz LLP |
| | | 600 Third Avenue, 20th Floor |
| | | New York, NY 10016 |
| | | (212)661–1100 |
| | | Fax: (212) 661–8665 |
| | | Email: migross@pomlaw.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Murielle Jacqueline Steven** |
| | | Pomerantz LLP |
| | | 600 Third Avenue, 20th Floor |
| | | New York, NY 10016 |
| | | 212–661–1100 |
| | | Fax: 212–661–8665 |
| | | Email: mjsteven@pomlaw.com |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **James Quan** | represented by | **Timothy William Brown** |
| *Individually and on behalf of all others similarly situated* | | The Rosen Law Firm P.A. |
| | | 350 5th Avenue, Suite 5508 |
| | | New York, NY 10118 |
| | | (212)–686–1060 |
| | | Fax: (212)–202–3827 |
| | | Email: timbrown108@gmail.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Brian Philip Murray** |
| | | Glancy Binkow &Goldberg LLP |
| | | 122 East 42nd Street, Suite 2920 |
| | | New York, NY 10168 |
| | | 212–682–5340 |
| | | Fax: 212–884–0988 |
| | | Email: bmurray@glancylaw.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Laurence Matthew Rosen** |
| | | The Rosen Law Firm, P.A. |
| | | 350 5th Avenue, Suite 5508 |
| | | New York, NY 10118 |
| | | (212)–686–1060 |
| | | Fax: (212)–202–3827 |
| | | Email: lrosen@rosenlegal.com |
| | | *ATTORNEY TO BE NOTICED* |

**Phillip C. Kim**
The Rosen Law Firm P.A.
275 Madison Avenue
34th floor
New York, NY 10016
(212) 686–1060
Fax: (212) 202–3827
Email: pkim@rosenlegal.com
*ATTORNEY TO BE NOTICED*

V.

**Consolidated Plaintiff**

**James M. Burns**                          represented by  **Samuel Howard Rudman**
*Individually and on behalf of all others*                 Robbins Geller Rudman &Dowd LLP(LI)
*similarly situated*                                        58 South Service Road
                                                            Suite 200
                                                            Melville, NY 11747
                                                            (631) 367–7100
                                                            Fax: (631) 367–1173
                                                            Email: srudman@rgrdlaw.com
                                                            *ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Arnold Cohen**                            represented by  **Marc Ian Gross**
*Individually and on Behalf of All Other*                  (See above for address)
*Persons Similarly Situated*                               *ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Geoff Connors**                           represented by  **Jeremy Alan Lieberman**
*Individually and on behalf of all other*                  Pomerantz Haudek Block Grossman
*persons similarly situated*                               &Gross LLP
                                                            100 Park Avenue, 26th Floor
                                                            New York, NY 10017
                                                            (212)–661–1100
                                                            Fax: (212)–661–8665
                                                            Email: jalieberman@pomlaw.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Marc Ian Gross**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Bristol Investment Fund, Ltd.**           represented by  **William Bernard Federman**
                                                            Federman &Sherwood
                                                            10205 N. Pennsylvania
                                                            Oklahoma City, OK 73102
                                                            (405) 235–1560
                                                            Fax: (405) 239–2112
                                                            Email: wbf@federmanlaw.com
                                                            *ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Gregory Bonin**                           represented by  **William Bernard Federman**
*Individually and on behalf of all others*                 (See above for address)
*similarly situated*                                        *ATTORNEY TO BE NOTICED*

V.

**Movant**

**Gary Bleiweiss**                      represented by   **Curtis Victor Trinko**
                                                         Law Offices of Curtis V. Trinko, LLP
                                                         16 West 46th Street, Seventh Floor
                                                         New York, NY 10036
                                                         212–490–9550
                                                         Fax: 212–986–0158
                                                         Email: ctrinko@gmail.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Movant**</u>

**John R. Overton**                     represented by   **Mario Alba , Jr**
                                                         Robbins Geller Rudman &Dowd LLP(LI)
                                                         58 South Service Road
                                                         Suite 200
                                                         Melville, NY 11747
                                                         631–367–7100
                                                         Fax: 631–367–1173
                                                         Email: malba@rgrdlaw.com
                                                         *ATTORNEY TO BE NOTICED*

<u>**Movant**</u>

**Brian &Cheri Larkowski**              represented by   **Joseph R. Seidman**
                                                         Bernstein Liebhard, LLP
                                                         10 East 40th Street
                                                         22nd Floor
                                                         New York, NY 10016
                                                         (212)–779–1414
                                                         Fax: (212)–779–3218
                                                         Email: seidman@bernlieb.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Movant**</u>

**Federico Schmid**                     represented by   **Phillip C. Kim**
                                                         The Rosen Law Firm P.A.
                                                         350 5th Avenue, Suite 5508
                                                         New York, NY 10118
                                                         (212) 686–1060
                                                         Fax: (212) 202–3827
                                                         Email: pkim@rosenlegal.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Movant**</u>

**Jerry Pehlke, Jr.**                   represented by   **Albert Yong Chang**
                                                         Johnson Bottini, LLP
                                                         501 W. Broadway
                                                         Suite 1720
                                                         San Diego, CA 92101
                                                         (619) 230–0063
                                                         Fax: (619) 238–0622
                                                         Email: achang@cfsblaw.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Brian Philip Murray**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

<u>**Movant**</u>

**Bristol Investment Fund, Ltd.**       represented by

**William Bernard Federman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**Arnold L. Cohen**                    represented by  **Murielle Jacqueline Steven**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Advance Battery Technologies, Inc.**      represented by  **Lee Scott Shalov**
McLaughlin and Stern, LLP
260 Madison Ave
New York, NY 10016
212–448–1100
Fax: 212–448–0066
Email: lshalov@mclaughlinstern.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amalia Goldvaser**
McLaughlin &Stern,
260 Madison Ave.
New York, NY 10016
212 448–1100
Fax: 212 448–0066
Email: agoldvaser@mclaughlinstern.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Zhiguo Fu**                          represented by  **Lee Scott Shalov**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amalia Goldvaser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Guohua Wan**                         represented by  **Lee Scott Shalov**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amalia Goldvaser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dan Chang**                          represented by  **Lee Scott Shalov**
*TERMINATED: 11/04/2013*                        (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amalia Goldvaser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**
**Bagell, Josephs, Levine &Co., LLC**          represented by    **Peter Joseph Larkin**
*TERMINATED: 07/18/2013*                                         Wilson, Elser, Moskowitz, Edelman
                                                                &Dicker, L.L.P.
                                                                3 Gannett Drive
                                                                White Plains, NY 10604–5639
                                                                (914) 323–7000
                                                                Fax: (914)–323–7001
                                                                Email: peter.larkin@wilsonelser.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Benjamin Avi Tulis**
                                                                Wilson Elser,Moskowitz Edelman
                                                                &Dicker LLP(White Plains)
                                                                3 Gannett Drive
                                                                White Plains, NY 10604
                                                                (914)–872–7377
                                                                Fax: (914)–323–7001
                                                                Email: benjamin.tulis@wilsonelser.com
                                                                *ATTORNEY TO BE NOTICED*

                                                                **William J. Kelly**
                                                                Wilson Elser,Moskowitz Edelman
                                                                &Dicker LLP(White Plains)
                                                                3 Gannett Drive
                                                                White Plains, NY 10604
                                                                (914)323–7000
                                                                Fax: (914)323–7001
                                                                Email: william.kelly@wilsonelser.com
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**
**Friedman LLP**                              represented by    **Peter Joseph Larkin**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Benjamin Avi Tulis**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **William J. Kelly**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**
**EFP Rotenberg, LLP**                        represented by    **Gabriel Mark Nugent**
*TERMINATED: 07/18/2013*                                         Hiscock &Barclay, LLP (New York)
                                                                Seven Time Square
                                                                New York, NY 10036
                                                                (315)425–836
                                                                Fax: (315)703–0976
                                                                Email: gnugent@hblaw.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Paul Andrew Sanders**
                                                                Hiscock &Barclay, LLP (ROCH)
                                                                2000 HSBC Plaza, 20th Flr.
                                                                Rochester, NY 14604
                                                                (585)–325–7570
                                                                Fax: (585)–295–8422


Email: psanders@hblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas B. Cronmiller**
Hiscock &Barclay, LLP ( Rochester)
100 Chestnut St., Suite 2000
Rochester, NY 14604
(585)–295–4424
Fax: (585)–295–8407
Email: tcronmiller@hblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/01/2011 | 1 | COMPLAINT against Advance Battery Technologies, Inc., Dan Chang, Zhiguo Fu, Guohua Wan. (Filing Fee $ 350.00, Receipt Number 933758)Document filed by James Quan.(ama) (ama). (Entered: 04/04/2011) |
| 04/01/2011 | | SUMMONS ISSUED as to Advance Battery Technologies, Inc., Dan Chang, Zhiguo Fu, Guohua Wan. (ama) (Entered: 04/04/2011) |
| 04/01/2011 | | Magistrate Judge Debra C. Freeman is so designated. (ama) (Entered: 04/04/2011) |
| 04/01/2011 | | Case Designated ECF. (ama) (Entered: 04/04/2011) |
| 04/14/2011 | 2 | ORDER SCHEDULING AN INITIAL PRETRIAL CONFERENCE. If a conforming case management plan is timely submitted, the parties need not appear for an initial conference, unless there is a motion pending (see Paragraph 4). If the parties fail to agree upon such a plan or fail to submit the plan to the Court within the time provided (thirty days from the date of this order), the parties must appear for a conference on 6/17/2011 in courtroom 14C, 500 Pearl Street, New York, New York 10007 at 10:45 a.m. (Initial Conference set for 6/17/2011 at 10:45 AM in Courtroom 14C, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon.) (Signed by Judge Colleen McMahon on 4/14/11) (djc) Modified on 4/14/2011 (djc). (Entered: 04/14/2011) |
| 05/05/2011 | 3 | NOTICE OF APPEARANCE by Amalia Goldvaser on behalf of Advance Battery Technologies, Inc., Dan Chang, Zhiguo Fu, Guohua Wan (Goldvaser, Amalia) (Entered: 05/05/2011) |
| 05/05/2011 | 4 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Advance Battery Technologies, Inc..(Goldvaser, Amalia) (Entered: 05/05/2011) |
| 05/16/2011 | 5 | AMENDED CALENDAR NOTICE: Please take notice that the above captioned matter has been re–scheduled for a Rule (16) conference to Friday, June 24, 2011 at 9:30 A.M. before the Honorable Colleen McMahon, United States District Judge in Courtroom 14C, U.S. District Court, 500 Pearl Street, New York, New York, 10007. So Ordered. (Initial Conference set for 6/24/2011 at 09:30 AM in Courtroom 14C, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon) (Signed by Judge Colleen McMahon on 5/16/2011) (lnl) (Entered: 05/16/2011) |
| 05/19/2011 | 6 | NOTICE OF APPEARANCE by Lee Scott Shalov on behalf of Advance Battery Technologies, Inc., Dan Chang, Zhiguo Fu, Guohua Wan (Shalov, Lee) (Entered: 05/19/2011) |
| 05/31/2011 | 7 | MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel*. Document filed by Gary Bleiweiss.(Trinko, Curtis) (Entered: 05/31/2011) |
| 05/31/2011 | 8 | MEMORANDUM OF LAW in Support re: 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel*.. Document filed by Gary Bleiweiss. (Attachments: # 1 Text of Proposed Order)(Trinko, Curtis) (Entered: 05/31/2011) |

| 05/31/2011 | 9 | DECLARATION of Curtis V. Trinko in Support re: 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel.*. Document filed by Gary Bleiweiss. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Trinko, Curtis) (Entered: 05/31/2011) |
| 05/31/2011 | 10 | MOTION to Appoint Counsel., MOTION to Appoint John R. Overton to serve as lead plaintiff(s)., MOTION to Consolidate Cases. Document filed by John R. Overton. (Attachments: # 1 Exhibit A)(Alba, Mario) (Entered: 05/31/2011) |
| 05/31/2011 | 11 | MEMORANDUM OF LAW in Support re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases.. Document filed by John R. Overton. (Alba, Mario) (Entered: 05/31/2011) |
| 05/31/2011 | 12 | DECLARATION of Mario Alba Jr. in Support re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases.. Document filed by John R. Overton. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Alba, Mario) (Entered: 05/31/2011) |
| 05/31/2011 | 13 | MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–2849, 1:11–cv–3098., MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., MOTION to Appoint Counsel. Document filed by Brian &Cheri Larkowski. (Attachments: # 1 Proposed Order)(Seidman, Joseph) (Entered: 05/31/2011) |
| 05/31/2011 | 14 | MEMORANDUM OF LAW in Support re: 13 MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–2849, 1:11–cv–3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s).. Document filed by Brian &Cheri Larkowski. (Seidman, Joseph) (Entered: 05/31/2011) |
| 05/31/2011 | 15 | DECLARATION of Joseph R. Seidman, Jr. in Support re: 13 MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–2849, 1:11–cv–3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s).. Document filed by Brian &Cheri Larkowski. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Seidman, Joseph) (Entered: 05/31/2011) |
| 05/31/2011 | 16 | MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098., MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. Document filed by Ruble Sanderson. (Attachments: # 1 Text of Proposed Order)(Gross, Marc) (Entered: 05/31/2011) |
| 05/31/2011 | 17 | MEMORANDUM OF LAW in Support re: 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s).. Document filed by Ruble Sanderson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Gross, Marc) (Entered: 05/31/2011) |
| 05/31/2011 | 18 | MOTION to Appoint Counsel *Rosen Law Firm*., MOTION to Appoint Federico Schmid to serve as lead plaintiff(s)., MOTION to Consolidate Cases. Document filed by Federico Schmid. (Attachments: # 1 Text of Proposed Order)(Kim, Phillip) (Entered: 05/31/2011) |
| 05/31/2011 | 19 | MEMORANDUM OF LAW in Support re: 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases.. Document filed by Federico Schmid. (Kim, Phillip) (Entered: 05/31/2011) |
| 05/31/2011 | 20 | DECLARATION of Phillip Kim in Support re: 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases.. Document filed by Federico Schmid. |

| | | |
|---|---|---|
| | | (Attachments: #<u>1</u> Exhibit 1, #<u>2</u> Exhibit 2, #<u>3</u> Exhibit 3, #<u>4</u> Errata 4)(Kim, Phillip) (Entered: 05/31/2011) |
| 05/31/2011 | <u>21</u> | FILING ERROR – DEFICIENT DOCKET ENTRY – FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). Document filed by Jerry Pehlke, Jr. (Attachments: #<u>1</u> Affidavit, #<u>2</u> Exhibit Ex. A, #<u>3</u> Exhibit Ex. B, #<u>4</u> Exhibit Ex. C, #<u>5</u> Exhibit Ex. D)(Chang, Albert) Modified on 6/1/2011 (db). (Entered: 06/01/2011) |
| 06/01/2011 | <u>22</u> | FILING ERROR – DEFICIENT DOCKET ENTRY – MEMORANDUM OF LAW in Support re: <u>21</u> FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). Document filed by Jerry Pehlke, Jr. (Chang, Albert) Modified on 6/1/2011 (db). (Entered: 06/01/2011) |
| 06/01/2011 | | ***NOTE TO ATTORNEY TO RE–FILE DOCUMENT – DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Albert Yong Chang to RE–FILE Document <u>21</u> FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s).FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). ERROR(S): Supporting Documents are filed separately, each receiving their own document #. (db) (Entered: 06/01/2011) |
| 06/01/2011 | | ***NOTE TO ATTORNEY TO RE–FILE DOCUMENT – DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Albert Yong Chang to RE–FILE Document <u>22</u> Memorandum of Law in Support of Motion. ERROR(S): Document linked to filing error. (db) (Entered: 06/01/2011) |
| 06/01/2011 | <u>23</u> | MOTION to Consolidate Cases 11–cv–2354., MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s)., MOTION to Appoint Counsel *as Lead Counsel*. Document filed by Jerry Pehlke, Jr..(Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>24</u> | MEMORANDUM OF LAW in Support re: <u>23</u> MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*.. Document filed by Jerry Pehlke, Jr.. (Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>25</u> | DECLARATION of Albert Y. Chang in Support re: <u>23</u> MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*.. Document filed by Jerry Pehlke, Jr.. (Attachments: #<u>1</u> Exhibit A, #<u>2</u> Exhibit B, #<u>3</u> Exhibit C, #<u>4</u> Exhibit D)(Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>26</u> | MOTION to Consolidate Cases 11–cv–2849., MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s)., MOTION to Appoint Counsel *as Lead Counsel*. Document filed by Jerry Pehlke, Jr..(Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>27</u> | MEMORANDUM OF LAW in Support re: <u>26</u> MOTION to Consolidate Cases 11–cv–2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*.. Document filed by Jerry Pehlke, Jr.. (Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>28</u> | DECLARATION of Albert Y. Chang in Support re: <u>26</u> MOTION to Consolidate Cases 11–cv–2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*.. Document filed by Jerry Pehlke, Jr.. (Attachments: #<u>1</u> Exhibit A, #<u>2</u> Exhibit B, #<u>3</u> Exhibit C, #<u>4</u> Exhibit D)(Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>29</u> | MOTION to Consolidate Cases 11–cv–3098., MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s)., MOTION to Appoint Counsel *as Lead Counsel*. Document filed by Jerry Pehlke, Jr..(Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>30</u> | MEMORANDUM OF LAW in Support re: <u>29</u> MOTION to Consolidate Cases 11–cv–3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*.. Document filed by Jerry Pehlke, Jr.. (Chang, Albert) (Entered: 06/01/2011) |
| 06/01/2011 | <u>31</u> | DECLARATION of Albert Y. Chang in Support re: <u>29</u> MOTION to Consolidate Cases 11–cv–3098. MOTION to Appoint Counsel *as Lead Counsel*.. Document filed by |

Case: 14-1410    Document: 33    Page: 12    06/27/2014    1259435    248

A-9

| | | |
|---|---|---|
| | | Jerry Pehlke, Jr.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Chang, Albert) (Entered: 06/01/2011) |
| 06/06/2011 | 32 | CALENDAR NOTICE: Status Conference set for 6/17/2011 at 09:30 AM in Courtroom 14C, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon. (Signed by Judge Colleen McMahon on 6/6/11) (js) (Entered: 06/06/2011) |
| 06/06/2011 | 33 | ORDER Status Conference set for 6/17/2011 at 09:30 AM in Courtroom 14C, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon. (Signed by Judge Colleen McMahon on 6/6/11) (cd) (Entered: 06/06/2011) |
| 06/14/2011 | 34 | MEMORANDUM OF LAW in Opposition re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases., 13 MOTION to Consolidate Cases 1:11−cv−2279, 1:11−cv−2354, 1:11−cv−2849, 1:11−cv−3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 16 MOTION to Consolidate Cases 1:11−cv−2279; 1:11−cv−2354; 1:11−cv−2849; 1:11−cv−3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel*.. Document filed by Jerry Pehlke, Jr.. (Chang, Albert) (Entered: 06/14/2011) |
| 06/16/2011 | 35 | FILING ERROR − DEFICIENT DOCKET ENTRY − MEMORANDUM OF LAW in Opposition re: 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 26 MOTION to Consolidate Cases 11−cv−2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 21 FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s).FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s)., 16 MOTION to Consolidate Cases 1:11−cv−2279; 1:11−cv−2354; 1:11−cv−2849; 1:11−cv−3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., 29 MOTION to Consolidate Cases 11−cv−3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 23 MOTION to Consolidate Cases 11−cv−2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*. STATEMENT OF NON−OPPOSITION. Document filed by Brian &Cheri Larkowski. (Seidman, Joseph) Modified on 6/17/2011 (ldi). (Entered: 06/16/2011) |
| 06/16/2011 | 36 | MEMORANDUM OF LAW in Opposition re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases., 13 MOTION to Consolidate Cases 1:11−cv−2279, 1:11−cv−2354, 1:11−cv−2849, 1:11−cv−3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 26 MOTION to Consolidate Cases 11−cv−2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 16 MOTION to Consolidate Cases 1:11−cv−2279; 1:11−cv−2354; 1:11−cv−2849; 1:11−cv−3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., 29 MOTION to Consolidate Cases 11−cv−3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 23 MOTION to Consolidate Cases 11−cv−2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*. STATEMENT OF NON−OPPOSITION. Document filed by Gary Bleiweiss. (Trinko, Curtis) |

| | | (Entered: 06/16/2011) |
|---|---|---|
| 06/16/2011 | | ***NOTE TO ATTORNEY TO RE–FILE DOCUMENT – DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Joseph R. Seidman to RE–FILE Document 35 Memorandum of Law in Opposition to Motion. ERROR(S): Document linked to filing error. (ldi) (Entered: 06/17/2011) |
| 06/17/2011 | 37 | NOTICE of Non–Opposition re: 13 MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–2849, 1:11–cv–3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., 23 MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel.*. Document filed by John R. Overton. (Alba, Mario) (Entered: 06/17/2011) |
| 06/17/2011 | | Minute Entry for proceedings held before Judge Colleen McMahon: Initial Pretrial Conference held on 6/17/2011. Decision: Court held a conference. The Court set the following schedule for briefing:(1)Parties have 20 days following the appointment of lead counsel to file an amended pleading.(2)Parties have 20 days after that to file a motion to dismiss. A response to the motion to dismiss is due within 20 days of the motion being filed. A reply brief is due 10 days after the opposition brief is filed.(3)Following a ruling by the Court on the motion to dismiss, the parties have 20 days to complete discovery of the class plaintiff. At the end of the 20 days, a class certification motion should be filed. An opposition to the class certification motion is due 20 days after the motion is filed. A reply brief is due 10 days after the opposition brief is filed. (Submitted by V. Figueredo). (mde) (Entered: 06/17/2011) |
| 06/17/2011 | 38 | RESPONSE to Motion re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases., 13 MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–2849, 1:11–cv–3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 26 MOTION to Consolidate Cases 11–cv–2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 29 MOTION to Consolidate Cases 11–cv–3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 23 MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel.*. Document filed by Federico Schmid. (Kim, Phillip) (Entered: 06/17/2011) |
| 06/17/2011 | 39 | MEMORANDUM OF LAW in Opposition re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases., 13 MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–2849, 1:11–cv–3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 26 MOTION to Consolidate Cases 11–cv–2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to |

| | | |
|---|---|---|
| | | Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., 29 MOTION to Consolidate Cases 11–cv–3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 23 MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel.*. Document filed by Bristol Investment Fund, Ltd.. (Federman, William) (Entered: 06/17/2011) |
| 06/17/2011 | 40 | FILING ERROR – WRONG EVENT TYPE SELECTED FROM MENU – RESPONSE in Support re: 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s).. Document filed by Ruble Sanderson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Lieberman, Jeremy) Modified on 6/20/2011 (ldi). (Entered: 06/17/2011) |
| 06/17/2011 | | ***NOTE TO ATTORNEY TO RE–FILE DOCUMENT – EVENT TYPE ERROR. Note to Attorney Jeremy Alan Lieberman to RE–FILE Document 40 Response in Support of Motion. Use the event type Memorandum of Law in Support of Motion found under the event list Replies, Opposition and Supporting Documents. (ldi) (Entered: 06/20/2011) |
| 06/17/2011 | | Minute Entry for proceedings held before Judge Colleen McMahon: Status Conference held on 6/17/2011, Initial Pretrial Conference held on 6/17/2011. The Court set the following schedule for briefing:(1)Parties have 20 days following the appointment of lead counsel to file an amended pleading.(2)Parties have 20 days after that to file a motion to dismiss. A response to the motion to dismiss is due within 20 days of the motion being filed. A reply brief is due 10 days after the opposition brief is filed.(3)Following a ruling by the Court on the motion to dismiss, the parties have 20 days to complete discovery of the class plaintiff. At the end of the 20 days, a class certification motion should be filed. An opposition to the class certification motion is due 20 days after the motion is filed. A reply brief is due 10 days after the opposition brief is filed. (Submitted by V. Figueredo). (mde) (Entered: 06/28/2011) |
| 06/20/2011 | 41 | NOTICE OF APPEARANCE by William Bernard Federman on behalf of Bristol Investment Fund, Ltd. (Federman, William) (Entered: 06/20/2011) |
| 06/21/2011 | 42 | MEMORANDUM OF LAW in Support re: 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s).. Document filed by Ruble Sanderson. (Lieberman, Jeremy) (Entered: 06/21/2011) |
| 06/24/2011 | 43 | REPLY MEMORANDUM OF LAW in Support re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases., 13 MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–2849, 1:11–cv–3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 26 MOTION to Consolidate Cases 11–cv–2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel*. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., 29 MOTION to Consolidate Cases 11–cv–3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*., 23 MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel |

| | | |
|---|---|---|
| | | *as Lead Counsel.,* 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel..* Document filed by Jerry Pehlke, Jr.. (Chang, Albert) (Entered: 06/24/2011) |
| 06/27/2011 | 44 | REPLY MEMORANDUM OF LAW in Opposition re: 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases., 13 MOTION to Consolidate Cases 1:11–cv–2279, 1:11–cv–2354, 1:11–cv–3098. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint Brian &Cheri Larkowski to serve as lead plaintiff(s)., 18 MOTION to Appoint Counsel *Rosen Law Firm.* MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases., 26 MOTION to Consolidate Cases 11–cv–2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel.,* 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel.* MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s)., 29 MOTION to Consolidate Cases 11–cv–3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel.,* 23 MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel.,* 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel..* Document filed by Bristol Investment Fund, Ltd.. (Attachments: # 1 Exhibit 1 – Investor Certification)(Federman, William) (Entered: 06/27/2011) |
| 06/27/2011 | 45 | REPLY MEMORANDUM OF LAW in Support re: 16 MOTION to Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel.* MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s).. Document filed by Ruble Sanderson. (Attachments: # 1 Exhibit A)(Lieberman, Jeremy) (Entered: 06/27/2011) |
| 07/12/2011 | 46 | FILING ERROR – DEFICIENT DOCKET ENTRY – NOTICE OF APPEARANCE by Brian Philip Murray on behalf of James Quan (Murray, Brian) Modified on 7/18/2011 (gp). (Entered: 07/12/2011) |
| 07/12/2011 | 47 | NOTICE OF APPEARANCE by Brian Philip Murray on behalf of Jerry Pehlke, Jr. (Murray, Brian) (Entered: 07/12/2011) |
| 07/18/2011 | 48 | NOTICE of Withdrawal of Motion for Consolidation, Appointment of Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel. Document filed by Bristol Investment Fund, Ltd.. (Federman, William) (Entered: 07/18/2011) |
| 08/12/2011 | 49 | NOTICE OF APPEARANCE by Murielle Jacqueline Steven on behalf of Arnold L. Cohen (Steven, Murielle) (Entered: 08/12/2011) |
| 09/09/2011 | 50 | MEMORANDUM AND ORDER CONSOLIDATING RELATED ACTIONS, APPOINTING RUBLE SANDERSON AS LEAD PLAINTIFF, AND APPROVING LEAD PLAINTIFF'S SELECTION OF COUNSEL granting (23) Motion to Consolidate Cases ; denying (23) Motion to Appoint; denying (23) Motion to Appoint Counsel ; granting (26) Motion to Consolidate Cases ; denying (26) Motion to Appoint ; denying (26) Motion to Appoint Counsel ; granting (29) Motion to Consolidate Cases ; denying (29) Motion to Appoint ; denying (29) Motion to Appoint Counsel ; terminating (7) Motion to Appoint ; granting (13) Motion to Consolidate Cases ; denying (13) Motion to Appoint ; denying (13) Motion to Appoint Counsel ; granting (16) Motion to Consolidate Cases ; granting (16) Motion to Appoint ; granting (16) Motion to Appoint Counsel ; terminating (18) Motion to Appoint Counsel ; terminating (18) Motion to Appoint ; granting (18) Motion to Consolidate Cases in case 1:11–cv–02279–CM; terminating (13) Motion to Appoint in case 1:11–cv–02354–CM; terminating (10) Motion to Appoint in case 1:11–cv–02849–CM; terminating (9) Motion to Appoint in case 1:11–cv–03098–CM. For all the reasons set forth in this Memorandum and Order, Sanderson's motion for appointment of lead plaintiff and approval of lead plaintiff's |

| | | |
|---|---|---|
| | | selection of counsel is granted and Pehlke's identical motion is denied. The motions of all parties for consolidation of the related cases is granted. It is hereby ordered that: The above–captioned actions are hereby consolidated for all purposes into one action. These actions shall be referred to herein as the "Consolidated Actions." This Order shall apply to the Consolidated Actions and to each case that is subsequently filed in this Court that relates to the same subject matter as in the Consolidated Actions. Every pleading in this Consolidated Action shall bear the following Caption: In re Advanced Battery Technologies, Inc. Securities Litigation, and as further set forth in this order. The Master File shall be No. 11 Civ. 2279 (CM). The Court hereby appoints Ruble Sanderson ("Sanderson") as Lead Plaintiff, for the reasons set forth in this order. The Court hereby approves of Sanderson's selection of Pomerantz Haudek Grossman &Gross, LLP to serve as Lead Counsel in this action, for the reasons set forth in this order. (Signed by Judge Colleen McMahon on 9/9/2011) Filed In Associated Cases: 1:11–cv–02279–CM, 1:11–cv–02354–CM, 1:11–cv–02849–CM, 1:11–cv–03098–CM, 1:11–cv–03729–CM(lmb) (Entered: 09/12/2011) |
| 09/28/2011 | 51 | FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT amending 1 Complaint against Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, Bagell, Josephs, Levine &Co., LLC, Friedman LLP, EFP Rotenberg, LLP with JURY DEMAND.Document filed by Arnold L. Cohen, Ruble Sanderson. Related document: 1 Complaint filed by James Quan.(mro) (mro). (Entered: 09/29/2011) |
| 09/29/2011 | 52 | CORRECTED FIRST AMENDED COMPLAINT amending 51 Amended Complaint, against Advance Battery Technologies, Inc., Bagell, Josephs, Levine &Co., LLC, EFP Rotenberg, LLP, Zhiguo Fu, Guohua Wan with JURY DEMAND.Document filed by Arnold Cohen, Ruble Sanderson. Related document: 51 Amended Complaint, filed by Ruble Sanderson, Arnold L. Cohen. (Attachments: # 1 part 2)(mro) (Entered: 09/30/2011) |
| 10/12/2011 | 53 | STIPULATION EXTENDING TIME TO FILE MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT: Defendants and Plaintiffs, by and through their counsel of record, stipulate and agree as follows: 1. Defendants shall have until November 2, 2011, to file the Motion to Dismiss. 2. Plaintiffs shall have until December 2, 2011, to serve their papers in opposition to the Motion to Dismiss. 3. Defendants shall have until December 16, 2011 to serve their reply papers in further support of the Motion to Dismiss. ( Motions due by 11/2/2011.) (Signed by Judge Colleen McMahon on 10/12/2011) (lmb) (Entered: 10/12/2011) |
| 10/19/2011 | 54 | NOTICE OF APPEARANCE by William J. Kelly on behalf of Bagell, Josephs, Levine &Co., LLC, Friedman LLP (Kelly, William) (Entered: 10/19/2011) |
| 10/19/2011 | 55 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Bagell, Josephs, Levine &Co., LLC.(Kelly, William) (Entered: 10/19/2011) |
| 10/19/2011 | 56 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Friedman LLP.(Kelly, William) (Entered: 10/19/2011) |
| 10/19/2011 | 57 | NOTICE OF APPEARANCE by Benjamin Avi Tulis on behalf of Bagell, Josephs, Levine &Co., LLC, Friedman LLP (Tulis, Benjamin) (Entered: 10/19/2011) |
| 10/19/2011 | 58 | NOTICE OF APPEARANCE by Peter Joseph Larkin on behalf of Bagell, Josephs, Levine &Co., LLC, Friedman LLP (Larkin, Peter) (Entered: 10/19/2011) |
| 10/24/2011 | 59 | STIPULATION AND ORDER EXTENDING TIME TO FILE MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT: Defendants shall have until November 16, 2011, to file their response the Amended Complaint. Plaintiffs shall have until January 6, 2011, to serve their papers in opposition to any motion to dismiss by Defendants. Defendants shall have until January 20, 2011, to serve their reply papers in further support of the Motion to Dismiss. Advance Battery Technologies, Inc. answer due 11/16/2011; Bagell, Josephs, Levine &Co., LLC answer due 11/16/2011; EFP Rotenberg, LLP answer due 11/16/2011; Friedman LLP answer due 11/16/2011; Zhiguo Fu answer due 11/16/2011; Guohua Wan answer due 11/16/2011. (Signed by Judge Colleen McMahon on 10/24/2011) (jfe) (Entered: 10/24/2011) |

| | | |
|---|---|---|
| 10/25/2011 | 60 | NOTICE OF APPEARANCE by Paul Andrew Sanders on behalf of EFP Rotenberg, LLP (Attachments: # 1 Certificate of Service)Filed In Associated Cases: 1:11−cv−02279−CM, 1:11−cv−02354−CM, 1:11−cv−02849−CM, 1:11−cv−03098−CM, 1:11−cv−03729−CM(Sanders, Paul) (Entered: 10/25/2011) |
| 10/25/2011 | 61 | NOTICE OF APPEARANCE by Thomas B. Cronmiller on behalf of EFP Rotenberg, LLP (Attachments: # 1 Certificate of Service)Filed In Associated Cases: 1:11−cv−02279−CM, 1:11−cv−02354−CM, 1:11−cv−02849−CM, 1:11−cv−03098−CM, 1:11−cv−03729−CM(Cronmiller, Thomas) (Entered: 10/25/2011) |
| 10/25/2011 | 62 | NOTICE OF APPEARANCE by Gabriel Mark Nugent on behalf of EFP Rotenberg, LLP (Attachments: # 1 Certificate of Service)Filed In Associated Cases: 1:11−cv−02279−CM, 1:11−cv−02354−CM, 1:11−cv−02849−CM, 1:11−cv−03098−CM, 1:11−cv−03729−CM(Nugent, Gabriel) (Entered: 10/25/2011) |
| 10/26/2011 | 63 | SUMMONS RETURNED EXECUTED. Guohua Wan served on 10/18/2011, answer due 11/16/2011. Service was accepted by Davis He. Service was made by Mail. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 10/26/2011) |
| 10/26/2011 | 64 | SUMMONS RETURNED EXECUTED. Zhiguo Fu served on 10/18/2011, answer due 11/16/2011. Service was accepted by Davis He. Service was made by Mail. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 10/26/2011) |
| 10/26/2011 | 65 | SUMMONS RETURNED EXECUTED. Advance Battery Technologies, Inc. served on 10/18/2011, answer due 11/16/2011. Service was accepted by Davis He, Managing Agent. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 10/26/2011) |
| 10/27/2011 | 66 | STIPULATION EXTENDING TIME TO ANSWER OR FILE MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT. Defendant shall have until 11/23/2011, to answer or file a motion to dismiss. Plaintiffs shall have until 1/6/2012, to serve their papers in opposition to a motion to dismiss. Defendant shall have until 1/20/2012, to serve its reply papers in further support of a motion to dismiss. EFP Rotenberg, LLP answer due 11/23/2011. (Signed by Judge Colleen McMahon on 10/25/2011) (ft) (Entered: 10/27/2011) |
| 11/08/2011 | 67 | SUMMONS RETURNED EXECUTED. EFP Rotenberg, LLP served on 10/11/2011, answer due 11/1/2011. Service was accepted by Hope Dellestua, Authorized Agent. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 11/08/2011) |
| 11/16/2011 | 68 | MOTION to Dismiss *Plaintiff's Corrected First Amended Consolidated Class Action Complaint*. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan.(Shalov, Lee) (Entered: 11/16/2011) |
| 11/16/2011 | 69 | MEMORANDUM OF LAW in Support re: 68 MOTION to Dismiss *Plaintiff's Corrected First Amended Consolidated Class Action Complaint.*. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. (Shalov, Lee) (Entered: 11/16/2011) |
| 11/16/2011 | 70 | DECLARATION of Lee S. Shalov in Support re: 68 MOTION to Dismiss *Plaintiff's Corrected First Amended Consolidated Class Action Complaint.*. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. (Attachments: # 1 Exhibit 1 Part 1, # 2 Exhibit 1 Part 2, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13 Part 1, # 15 Exhibit 13 Part 2, # 16 Exhibit 13 Part 3, # 17 Exhibit 14, # 18 Exhibit 15 Part 1, # 19 Exhibit 15 Part 2, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18, # 23 Exhibit 19, # 24 Exhibit 20, # 25 Exhibit 21, # 26 Exhibit 22, # 27 Exhibit 23)(Shalov, Lee) (Entered: 11/16/2011) |
| 11/16/2011 | 71 | MOTION to Dismiss. Document filed by Bagell, Josephs, Levine &Co., LLC, Friedman LLP.(Tulis, Benjamin) (Entered: 11/16/2011) |

| 11/16/2011 | 72 | MEMORANDUM OF LAW in Support re: 71 MOTION to Dismiss.. Document filed by Bagell, Josephs, Levine &Co., LLC, Friedman LLP. (Tulis, Benjamin) (Entered: 11/16/2011) |
|---|---|---|
| 11/16/2011 | 73 | DECLARATION of William J. Kelly, Esq. in Support re: 71 MOTION to Dismiss.. Document filed by Bagell, Josephs, Levine &Co., LLC, Friedman LLP. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit E, # 7 Exhibit F)(Tulis, Benjamin) (Entered: 11/16/2011) |
| 11/23/2011 | 74 | MOTION to Dismiss. Document filed by EFP Rotenberg, LLP.(Nugent, Gabriel) (Entered: 11/23/2011) |
| 11/23/2011 | 75 | DECLARATION of Gabriel M. Nugent in Support re: 74 MOTION to Dismiss.. Document filed by EFP Rotenberg, LLP. (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E)(Nugent, Gabriel) (Entered: 11/23/2011) |
| 11/23/2011 | 76 | MEMORANDUM OF LAW in Support re: 74 MOTION to Dismiss.. Document filed by EFP Rotenberg, LLP. (Nugent, Gabriel) (Entered: 11/23/2011) |
| 12/13/2011 | 77 | ENDORSED LETTER addressed to Judge Colleen McMahon from Murielle J. Steven Walsh dated 12/12/2011 re: Counsel for the Lead Plaintiffs write to inform the Court that they believe a combined brief of no more than sixty pages would benefit the Court. To address Mr. Shalov's concern, Plaintiffs propose that the parties confer after Mr. Shalov has received and reviewed Plaintiffs' opposition brief to discuss whether any increase in the length of his reply brief is warranted. ENDORSEMENT: SO ORDERED. (Signed by Judge Colleen McMahon on 12/13/2011) (ft) (Entered: 12/13/2011) |
| 12/15/2011 | 78 | ENDORSED LETTER addressed to Judge Colleen McMahon from Lee S Shalov dated 12/13/2011 re: In response to yesterday's letter from Plaintiffs' counsel regarding the appropriate page limits for the parties' briefs re motion to dismiss amended complaint. ENDORSEMENT: Thank you for your comments. (Signed by Judge Colleen McMahon on 12/15/2011) (cd) (Entered: 12/21/2011) |
| 01/06/2012 | 79 | MEMORANDUM OF LAW in Opposition re: 71 MOTION to Dismiss., 74 MOTION to Dismiss., 68 MOTION to Dismiss *Plaintiff's Corrected First Amended Consolidated Class Action Complaint*.. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 01/06/2012) |
| 01/06/2012 | 80 | MOTION to Strike Document No. 69 . Document filed by Ruble Sanderson.(Steven, Murielle) (Entered: 01/06/2012) |
| 01/06/2012 | 81 | MEMORANDUM OF LAW in Support re: 80 MOTION to Strike Document No. 69 .. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 01/06/2012) |
| 01/17/2012 | 82 | ENDORSED LETTER addressed to Judge Colleen McMahon from Jon Paul Robbins dated 1/12/2012 re: I therefore request that Your Honor extend our clients' time to serve reply papers on their motion and papers opposing Lead Plaintiffs' motion to strike for 14 days, to February 3, 2012. I also request that Your Honor permit our clients to file a 15 page reply brief. ENDORSEMENT: OK. (Signed by Judge Colleen McMahon on 1/17/2012) (djc) (Entered: 01/17/2012) |
| 01/20/2012 | 83 | REPLY MEMORANDUM OF LAW in Support re: 74 MOTION to Dismiss.. Document filed by EFP Rotenberg, LLP. (Nugent, Gabriel) (Entered: 01/20/2012) |
| 01/20/2012 | 84 | REPLY MEMORANDUM OF LAW in Support re: 71 MOTION to Dismiss.. Document filed by Bagell, Josephs, Levine &Co., LLC, Friedman LLP. (Tulis, Benjamin) (Entered: 01/20/2012) |
| 02/03/2012 | 85 | REPLY MEMORANDUM OF LAW in Support re: 68 MOTION to Dismiss *Plaintiff's Corrected First Amended Consolidated Class Action Complaint*.. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. (Goldvaser, Amalia) (Entered: 02/03/2012) |
| 02/03/2012 | 86 | MEMORANDUM OF LAW in Opposition re: 80 MOTION to Strike Document No. 69 .. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. (Goldvaser, Amalia) (Entered: 02/03/2012) |

| 02/03/2012 | 87 | DECLARATION of Qian Hu in Opposition re: 80 MOTION to Strike Document No. 69 .. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. (Goldvaser, Amalia) (Entered: 02/03/2012) |
| --- | --- | --- |
| 02/10/2012 | 88 | REPLY MEMORANDUM OF LAW in Support re: 80 MOTION to Strike Document No. 69 . *And To Strike Certain of Defendants Evidence*. Document filed by Arnold Cohen, Ruble Sanderson. (Steven, Murielle) (Entered: 02/10/2012) |
| 08/01/2012 | 89 | NOTICE OF CHANGE OF ADDRESS by Marc Ian Gross on behalf of Ruble Sanderson. New Address: Pomerantz Grossman Hufford Dahlstrom &Gross LLP, 600 Third Avenue, 20th Floor, New York, New York, USA 10016, 212−661−1100. (Gross, Marc) (Entered: 08/01/2012) |
| 08/29/2012 | 90 | DECISION AND ORDER DENYING THE ABAT DEFENDANTS' MOTION TO DISMISS AND GRANTING THE AUDITOR DEFENDANTS' MOTIONS TO DISMISS. The ABAT Defendants' motion to dismiss Counts I and II are denied. Discovery will proceed on those Counts following a scheduling conference on Friday, September 21, 2012, at 10:00 am, in Courtroom 14C, 500 Pearl Street, New York, NY. Plaintiffs' motion to strike Exhibits 20 and 21 from the Shalov Declaration is granted. The ABAT Defendants are free to submit that evidence in admissible form on a motion for summary judgment. The Auditor Defendants' separate motions to dismiss Count III are granted; as against EFP, dismissal will be with prejudice unless, within 20 days, Plaintiffs file a motion for leave to amend and a proposed amended complaint. The Clerk of Court is directed to remove the motions at ECF Nos. 68, 71, 74 and 80 from the Court's list of open matters. Terminating (68) Motion to Dismiss; Terminating (71) Motion to Dismiss; Terminating (74) Motion to Dismiss; Terminating (80) Motion to Strike in case 1:11−cv−02279−CM. (Signed by Judge Colleen McMahon on 8/29/2012). Filed In Associated Cases: 1:11−cv−02279−CM, 1:11−cv−02354−CM, 1:11−cv−02849−CM, 1:11−cv−03098−CM, 1:11−cv−03729−CM Copies Sent By Chambers via ECF. (rjm) (Entered: 08/30/2012) |
| 08/29/2012 | | Set/Reset Hearings: Scheduling Conference set for 9/21/2012 at 10:00 AM in Courtroom 14C, U.S. Courthouse, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon. Associated Cases: 1:11−cv−02279−CM, 1:11−cv−02354−CM, 1:11−cv−02849−CM, 1:11−cv−03098−CM, 1:11−cv−03729−CM(rjm) (Entered: 08/30/2012) |
| 09/06/2012 | 91 | ENDORSED LETTER addressed to Judge Colleen McMahon from Murielle Steven Walsh dated 9/5/2012 re: Request to adjourn the 9/21/2012 conference. ENDORSEMENT: One week adjournment to 9/28/2012 @9:45 am. ( Status Conference reset for 9/28/2012 at 09:45 AM before Judge Colleen McMahon.) (Signed by Judge Colleen McMahon on 9/6/2012) (cd) (Entered: 09/06/2012) |
| 09/14/2012 | 92 | ENDORSED LETTER addressed to Judge Colleen McMahon from Lee S. Shalov dated 9/14/2012 re: request an extension of time to answer Plaintiffs' Corrected First Amended Consolidated Class Action Complaint to 10/5/20212. ENDORSEMENT: So Ordered. (Advance Battery Technologies, Inc. answer due 10/5/2012; Zhiguo Fu answer due 10/5/2012; Guohua Wan answer due 10/5/2012.) (Signed by Judge Colleen McMahon on 9/14/2012) (jar) (Entered: 09/14/2012) |
| 09/17/2012 | 93 | ENDORSED LETTER addressed to Judge Colleen McMahon from Murielle Steven Walsh dated 9/14/2012 re: Counsel respectfully requests a one−week extension to file plaintiffs' motion for leave to file an amended complaint as to the auditor defendants. ENDORSEMENT: OK. (Signed by Judge Colleen McMahon on 9/17/2012) (jfe) (Entered: 09/17/2012) |
| 09/18/2012 | 94 | MOTION to Certify Class. Document filed by Ruble Sanderson. (Attachments: # 1 Text of Proposed Order)(Steven, Murielle) (Entered: 09/18/2012) |
| 09/18/2012 | 95 | MEMORANDUM OF LAW in Support re: 94 MOTION to Certify Class.. Document filed by Ruble Sanderson. (Attachments: # 1 Exhibit A − Firm Bio, # 2 Exhibit B − Declaration of Jane D. Nettesheim)(Steven, Murielle) (Entered: 09/18/2012) |
| 09/25/2012 | 96 | MOTION to Amend/Correct *(Lead Plaintiff's Notice of Motion for Leave to File Second Amended Consolidated Class Action Complaint*. Document filed by Ruble Sanderson.(Steven, Murielle) Modified on 8/20/2013 (kw). (Entered: 09/25/2012) |

| 09/25/2012 | 97 | MEMORANDUM OF LAW in Support *of Motion for Leave to File Second Amended Consolidated Class Action Complaint*. Document filed by Ruble Sanderson. (Attachments: #_1 Exhibit A)(Steven, Murielle) (Entered: 09/25/2012) |
|---|---|---|
| 09/28/2012 | | Minute Entry for proceedings held before Judge Colleen McMahon: Interim Pretrial Conference held on 9/28/2012. Decision: Subsequent conference held. Defendants have an extra 14 days to respond to both the motion for class certification and the motion to amend the complaint. The Auditor Defendants have two weeks to depose the lead plaintiffs. That aside, all discovery is stayed until these motions are decided. The Courts decision on those motions will contain a scheduling order, if necessary.(Submitted By Benjamin T. Alden). (mde) (Entered: 09/28/2012) |
| 10/05/2012 | 98 | ANSWER to 52 Amended Complaint,. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan.(Goldvaser, Amalia) (Entered: 10/05/2012) |
| 10/11/2012 | 99 | ENDORSED LETTER: addressed to Judge Colleen McMahon from Peter J. Larkin dated 10/10/2012 re: Counsel write on behalf of all parties to request a stay of class discovery and class certification briefing pending Your Honor's determination of Plaintiffs' Motion for Leave to file a Second Amended Consolidated Class Action Complaint. ENDORSEMENT: OK. I will stay everything until I can take a look at the settlement proposed between ABAT Defendant's and the Plaintiff's. So Ordered. (Signed by Judge Colleen McMahon on 10/11/2012) (js) (Entered: 10/11/2012) |
| 10/22/2012 | 100 | MEMORANDUM OF LAW in Opposition *to Motion for Leave to Amend*. Document filed by EFP Rotenberg, LLP. (Attachments: #_1 Exhibit Exhibit 1, #_2 Exhibit Exhibit 2)(Nugent, Gabriel) (Entered: 10/22/2012) |
| 10/22/2012 | 101 | MEMORANDUM OF LAW in Opposition. Document filed by Bagell, Josephs, Levine &Co., LLC, Friedman LLP. (Tulis, Benjamin) (Entered: 10/22/2012) |
| 11/05/2012 | 102 | REPLY MEMORANDUM OF LAW in Support *of Motion for Leave to File Second Amended Consolidated Class Action Complaint*. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 11/05/2012) |
| 04/25/2013 | 103 | SETTLEMENT AGREEMENT *(Stipulation of Settlement)*. Document filed by Ruble Sanderson. (Attachments: #_1 Exhibit A – Proposed Preliminary Order, #_2 Exhibit A–1 Post Card Notice, #_3 Exhibit A–2 Long Notice, #_4 Exhibit A–3 Proof of Claim, #_5 Exhibit A–4 Summary Notice, #_6 Exhibit B – Proposed Final Order)(Steven, Murielle) (Entered: 04/25/2013) |
| 04/29/2013 | 104 | ENDORSED LETTER addressed to Judge Colleen McMahon from Murielle Steven Walsh dated 4/25/2013 re: We enclose today for the Court the executed Stipulation of Settlement and attached Exhibits, and as further set forth in this letter. ENDORSEMENT: When, at your request, we stayed this case in October, we did not realize that we were still supposed to decide the motion for leave to amend. Wish you had been more specific. We have done no work on it and are now involved in other matters. Will get to it when we can. (Signed by Judge Colleen McMahon on 4/29/2013) (cd) (Entered: 04/29/2013) |
| 05/03/2013 | 105 | ENDORSED LETTER addressed to Judge Colleen McMahon from William J. Kelly dated 5/3/2013 re: Regarding the settlement condition requiring the ABAT defendants to testify regarding the audits within the next 45 days. ENDORSEMENT: There is no pending motion to dismiss in this case. The PSLRA does not literally apply. I don't think much of its "spirit." There is no stay. And the ABAT defendants may make any witness available that they like. Right now you are not even in the case. (Signed by Judge Colleen McMahon on 5/3/2013) (cd) (Entered: 05/03/2013) |
| 07/18/2013 | 106 | DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT: For the reasons set forth above, Plaintiffs motion for leave to file a Second Amended Complaint is DENIED. Accordingly, no claims remain against the Auditor Defendants and they are dismissed from this case. Plaintiffs have informed the Court that they have a settlement in principle with the ABAT Defendants. In light of the settlement and the dismissal of the Auditor Defendants from this action, it is my understanding |

| | | |
|---|---|---|
| | | that I need not reach Plaintiffs' class certification motion (Docket No. 94). The parties have one week to apprise the Court if this is not the case, or the motion will be stricken from the Court's calendar. The Clerk of the Court is directed to remove the motion at Docket No. 96 from the Court's list of pending motions. (Signed by Judge Colleen McMahon on 7/18/2013) Filed In Associated Cases: 1:11–cv–02279–CM, 1:11–cv–02354–CM, 1:11–cv–02849–CM, 1:11–cv–03098–CM, 1:11–cv–03729–CM Copies Sent By Chambers. (cd) (Entered: 07/19/2013) |
| 07/30/2013 | 107 | ORDER striking (94) Motion to Certify Class in case 1:11–cv–02279–CM; striking [] Motion to Certify Class in case 1:11–cv–02354–CM; striking [] Motion to Certify Class in case 1:11–cv–02849–CM; striking [] Motion to Certify Class in case 1:11–cv–03098–CM; striking [] Motion to Certify Class in case 1:11–cv–03729–CM. Accordingly, the Clerk of the Court is directed to strike Plaintiffs' motion (Docket No. 94) from the Court's calendar without prejudice. (Signed by Judge Colleen McMahon on 7/30/2013) Filed In Associated Cases: 1:11–cv–02279–CM, 1:11–cv–02354–CM, 1:11–cv–02849–CM, 1:11–cv–03098–CM, 1:11–cv–03729–CM(cd) (Entered: 07/30/2013) |
| 08/19/2013 | 108 | NOTICE OF APPEAL from 106 Order on Motion to Amend/Correct,,,,,,,,,,,,,,,,,,,,,. Document filed by Ruble Sanderson. Filing fee $ 455.00, receipt number 0208–8796367. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Steven, Murielle) (Entered: 08/19/2013) |
| 08/19/2013 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 108 Notice of Appeal,. (nd) (Entered: 08/19/2013) |
| 08/21/2013 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 22 Memorandum of Law in Support of Motion filed by Jerry Pehlke, Jr., 77 Endorsed Letter,, 45 Reply Memorandum of Law in Support of Motion, filed by Ruble Sanderson, 42 Memorandum of Law in Support of Motion, filed by Ruble Sanderson, 73 Declaration in Support of Motion, filed by Friedman LLP, Bagell, Josephs, Levine &Co., LLC, 106 Order on Motion to Amend/Correct,,,,,,,,,,,,,,,,,,,,99 Endorsed Letter,, 82 Endorsed Letter, 104 Endorsed Letter,, 75 Declaration in Support of Motion filed by EFP Rotenberg, LLP, 50 Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Consolidate Cases, Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Counsel,, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead |

Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead
Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),,, Order
on Motion to Appoint Lead
Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead
Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead
Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead
Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead
Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead
Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead
Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead
Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead
Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead
Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead
Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s), Order on Motion to Appoint Lead
Plaintiff(s), Order on Motion to Appoint Lead Plaintiff(s),, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s),, Order
on Motion to Appoint Lead Plaintiff(s),, Order on Motion to Appoint Lead
Plaintiff(s),, Order on Motion to Appoint Lead Plaintiff(s),,, Order on Motion to
Appoint Lead Plaintiff(s),,, Order on Motion to Appoint Lead Plaintiff(s), 96
MOTION to Amend/Correct *(Lead Plaintiff's Notice of Motion for Leave to File
Second Amended Consolidated Class Action Complaint).* filed by Ruble Sanderson,
103 Settlement Agreement, filed by Ruble Sanderson, 36 Memorandum of Law in
Opposition to Motion,,,,, filed by Gary Bleiweiss, 94 MOTION to Certify Class.
filed by Ruble Sanderson, 70 Declaration in Support of Motion,,, filed by Advance
Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, 92 Endorsed Letter, Set
Deadlines,, 43 Reply Memorandum of Law in Support of Motion,,,,,, filed by Jerry
Pehlke, Jr., 13 MOTION to Consolidate Cases 1:11−cv−2279, 1:11−cv−2354,
1:11−cv−2849, 1:11−cv−3098. MOTION to Appoint Brian &Cheri Larkowski to
serve as lead plaintiff(s). MOTION to Appoint Counsel. MOTION to Appoint
Brian &Cheri Larkowski to serve as lead plaintiff(s). filed by Brian &Cheri
Larkowski, 9 Declaration in Support of Motion, filed by Gary Bleiweiss, 95
Memorandum of Law in Support of Motion filed by Ruble Sanderson, 105
Endorsed Letter,, 14 Memorandum of Law in Support of Motion, filed by Brian
&Cheri Larkowski, 100 Memorandum of Law in Opposition to Motion filed by
EFP Rotenberg, LLP, 80 MOTION to Strike Document No. 69 . filed by Ruble
Sanderson, 51 Amended Complaint, filed by Ruble Sanderson, Arnold L. Cohen,
52 Amended Complaint, filed by Ruble Sanderson, Arnold Cohen, 72
Memorandum of Law in Support of Motion filed by Friedman LLP, Bagell,
Josephs, Levine &Co., LLC, 53 Stipulation and Order, Set Deadlines,,,, 25
Declaration in Support of Motion, filed by Jerry Pehlke, Jr., 5 Order, Set
Deadlines/Hearings,,,, 39 Memorandum of Law in Opposition to Motion,,,,,, filed
by Bristol Investment Fund, Ltd., 4 Rule 7.1 Corporate Disclosure Statement filed
by Advance Battery Technologies, Inc., 97 Memorandum of Law in Support of
Motion filed by Ruble Sanderson, 69 Memorandum of Law in Support of Motion
filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, 44 Reply

Memorandum of Law in Oppisition to Motion,,,,,, filed by Bristol Investment Fund, Ltd., 89 Notice of Change of Address filed by Ruble Sanderson, 30 Memorandum of Law in Support of Motion, filed by Jerry Pehlke, Jr., 34 Memorandum of Law in Opposition to Motion,,,, filed by Jerry Pehlke, Jr., 79 Memorandum of Law in Opposition to Motion, filed by Ruble Sanderson, 60 Notice of Appearance filed by EFP Rotenberg, LLP, 26 MOTION to Consolidate Cases 11−cv−2849. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel*. filed by Jerry Pehlke, Jr., 35 Memorandum of Law in Opposition to Motion,,,, filed by Brian &Cheri Larkowski, 32 Order, Set Hearings, 101 Memorandum of Law in Opposition to Motion filed by Friedman LLP, Bagell, Josephs, Levine &Co., LLC, 15 Declaration in Support of Motion, filed by Brian &Cheri Larkowski, 83 Reply Memorandum of Law in Support of Motion filed by EFP Rotenberg, LLP, 67 Summons Returned Executed filed by Ruble Sanderson, 61 Notice of Appearance, filed by EFP Rotenberg, LLP, 57 Notice of Appearance filed by Friedman LLP, Bagell, Josephs, Levine &Co., LLC, 1 Complaint filed by James Quan, 74 MOTION to Dismiss. filed by EFP Rotenberg, LLP, 7 MOTION to Appoint Gary Bleiweiss to serve as lead plaintiff(s) *and Approval of Lead Plaintiff's Selection of Lead Counsel*. filed by Gary Bleiweiss, 78 Endorsed Letter, 68 MOTION to Dismiss *Plaintiff's Corrected First Amended Consolidated Class Action Complaint*. filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, 41 Notice of Appearance filed by Bristol Investment Fund, Ltd., 62 Notice of Appearance, filed by EFP Rotenberg, LLP, 12 Declaration in Support of Motion, filed by John R. Overton, 71 MOTION to Dismiss. filed by Friedman LLP, Bagell, Josephs, Levine &Co., LLC, 6 Notice of Appearance filed by Advance Battery Technologies, Inc., Dan Chang, Zhiguo Fu, Guohua Wan, 38 Response to Motion,,,,, filed by Federico Schmid, 63 Summons Returned Executed filed by Ruble Sanderson, 3 Notice of Appearance filed by Advance Battery Technologies, Inc., Dan Chang, Zhiguo Fu, Guohua Wan, 91 Endorsed Letter, Set Deadlines/Hearings,, 93 Endorsed Letter, 10 MOTION to Appoint Counsel. MOTION to Appoint John R. Overton to serve as lead plaintiff(s). MOTION to Consolidate Cases. filed by John R. Overton, 31 Declaration in Support of Motion, filed by Jerry Pehlke, Jr., 84 Reply Memorandum of Law in Support of Motion filed by Friedman LLP, Bagell, Josephs, Levine &Co., LLC, 47 Notice of Appearance filed by Jerry Pehlke, Jr., 37 Notice (Other), Notice (Other), Notice (Other), Notice (Other), Notice (Other) filed by John R. Overton, 33 Order, Set Deadlines/Hearings, 20 Declaration in Support of Motion, filed by Federico Schmid, 19 Memorandum of Law in Support of Motion filed by Federico Schmid, 11 Memorandum of Law in Support of Motion filed by John R. Overton, 90 Order on Motion to Dismiss,,, Order on Motion to Strike,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, ,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 108 Notice of Appeal, filed by Ruble Sanderson, 49 Notice of Appearance filed by Arnold L. Cohen, 18 MOTION to Appoint Counsel *Rosen Law Firm*. MOTION to Appoint Federico Schmid to serve as lead plaintiff(s). MOTION to Consolidate Cases. filed by Federico Schmid, 28 Declaration in Support of Motion, filed by Jerry Pehlke, Jr., 58 Notice of Appearance filed by Friedman LLP, Bagell, Josephs, Levine &Co., LLC, 102 Reply Memorandum of Law in Support of Motion filed by Ruble Sanderson, 64 Summons Returned Executed filed by Ruble Sanderson, 66 Stipulation and Order, Set Deadlines,, 85 Reply Memorandum of Law in Support of Motion filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, 98 Answer to Amended Complaint filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, 24 Memorandum of Law in Support of Motion, filed by Jerry Pehlke, Jr., 87 Declaration in Opposition to Motion filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, 27 Memorandum of Law in Support of Motion, filed by Jerry Pehlke, Jr., 8 Memorandum of Law in Support of Motion, filed by Gary Bleiweiss, 48 Notice (Other) filed by Bristol Investment Fund, Ltd., 86 Memorandum of Law in Opposition to Motion filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan, 21 FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s).FIRST MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). filed by Jerry Pehlke, Jr., 2 Order, Set Deadlines/Hearings,,,, 40 Response in Support of Motion,, filed by Ruble Sanderson, 76 Memorandum of Law in Support of Motion filed by EFP Rotenberg, LLP, 17 Memorandum of Law in Support of Motion, filed by Ruble Sanderson, 56 Rule 7.1 Corporate Disclosure Statement filed by Friedman LLP, 16 MOTION to

| | | |
|---|---|---|
| | | Consolidate Cases 1:11–cv–2279; 1:11–cv–2354; 1:11–cv–2849; 1:11–cv–3098. MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). MOTION to Appoint Counsel *Pomerantz Haudek Grossman &Gross LLP as Lead Counsel.* MOTION to Appoint Ruble Sanderson to serve as lead plaintiff(s). filed by Ruble Sanderson, 59 Stipulation and Order, Set Deadlines,,,,, 54 Notice of Appearance filed by Friedman LLP, Bagell, Josephs, Levine &Co., LLC, 55 Rule 7.1 Corporate Disclosure Statement filed by Bagell, Josephs, Levine &Co., LLC, 107 Order on Motion to Certify Class,,,,,,,,,,,,,88 Reply Memorandum of Law in Support of Motion filed by Ruble Sanderson, Arnold Cohen, 81 Memorandum of Law in Support of Motion filed by Ruble Sanderson, 29 MOTION to Consolidate Cases 11–cv–3098. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel.* filed by Jerry Pehlke, Jr., 23 MOTION to Consolidate Cases 11–cv–2354. MOTION to Appoint Jerry Pehlke, Jr. to serve as lead plaintiff(s). MOTION to Appoint Counsel *as Lead Counsel.* filed by Jerry Pehlke, Jr., 46 Notice of Appearance filed by James Quan, 65 Summons Returned Executed filed by Ruble Sanderson were transmitted to the U.S. Court of Appeals. (nd) (Entered: 08/21/2013) |
| 09/10/2013 | 109 | CALENDAR NOTICE: Status Conference set for 9/12/2013 at 10:30 AM in Courtroom 14C, U.S. District Court, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon. Any scheduling difficulties must be brought to the attention of the Court in writing and faxed to Chambers at (212) 805–6326. (Signed by Judge Colleen McMahon on 9/10/2013) (ft) (Entered: 09/10/2013) |
| 09/12/2013 | | Minute Entry for proceedings held before Judge Colleen McMahon: Status Conference held on 9/12/2013. Decision: Status conference held. See todays order for more details.(Submitted By Benjamin A. Gianforti). (mde) (Entered: 09/12/2013) |
| 09/12/2013 | 110 | ORDER: The Court is putting this action on an expedited trial schedule. The parties must be ready for trial by December 1, 2013. All discovery must be complete by November 15, 2013. Depositions and document productions may be taken on three days' notice. The parties must apprise the Court of any discovery disputes within 24 hours so that they may be referred to Magistrate Judge Debra Freeman. No extensions will be granted. Should all of the conditions for settlement be met in the interim, the Court will entertain a motion for approval of that settlement. Ready for Trial by 12/1/2013. Discovery due by 11/15/2013. (Signed by Judge Colleen McMahon on 9/12/2013) Filed In Associated Cases: 1:11–cv–02279–CM, 1:11–cv–02354–CM, 1:11–cv–02849–CM, 1:11–cv–03098–CM, 1:11–cv–03729–CM(ft) (Entered: 09/13/2013) |
| 09/26/2013 | 111 | MOTION for Reconsideration re: 110 Scheduling Order,,,. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan.(Shalov, Lee) (Entered: 09/26/2013) |
| 09/26/2013 | 112 | DECLARATION of Lee S. Shalov in Support re: 111 MOTION for Reconsideration re: 110 Scheduling Order,,,. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. (Shalov, Lee) (Entered: 09/26/2013) |
| 09/27/2013 | 113 | MEMO ENDORSEMENT terminating 111 Motion for Reconsideration. ENDORSEMENT: You don't seem to understand. This case has lingered overly long. You are now on EXPEDITED discovery. If you and your opponent agree you can extend the 3 day limit. You may NOT extend the final deadline no matter the cost to you of dealing with the Chinese. (Signed by Judge Colleen McMahon on 9/27/2013) (lmb) Modified on 9/27/2013 (lmb). (Entered: 09/27/2013) |
| 10/25/2013 | 114 | ENDORSED LETTER addressed to Judge Colleen McMahon from Lee S. Shalov dated 10/24/13 re: Counsel requests that the Court to terminate Dan Chang as a party to the above referenced action so as not to be forced to represent a non–party in the pending appeal. ENDORSEMENT: Response from plaintiff, please. (Signed by Judge Colleen McMahon on 10/24/2013) (mro) (Entered: 10/25/2013) |
| 11/04/2013 | 115 | ENDORSED LETTER addressed to Judge Colleen McMahon from Murielle Steven Walsh dated 11/1/2013 re: Counsel writes in response to the ABAT Defendants' October 24, 2013 letter request to the Court to terminate Dan Chang as a party to the litigation. ENDORSEMENT: The Complaint is dismissed against Mr. Dan Chang, defendant. Dan Chang terminated. (Signed by Judge Colleen |

| | | McMahon on 11/4/2013) (ft) (Entered: 11/04/2013) |
|---|---|---|
| 11/05/2013 | 116 | MOTION for Settlement *(Notice of Plaintiffs' Motion for Preliminary Approval of Settlement and Certification of Settlement Class)*. Document filed by Ruble Sanderson.(Steven, Murielle) (Entered: 11/05/2013) |
| 11/05/2013 | 117 | MEMORANDUM OF LAW in Support re: 116 MOTION for Settlement *(Notice of Plaintiffs' Motion for Preliminary Approval of Settlement and Certification of Settlement Class)*.. Document filed by Ruble Sanderson. (Attachments: # 1 Appendix 1: Stipulation of Settlement, # 2 Exhibit A: [Proposed] Order Preliminarily Approving Settlement and Providing for Notice, # 3 Exhibit A–1: Post Card Notice, # 4 Exhibit A–2: Notice of Pendency and Proposed Settlement of Class Action, # 5 Exhibit A–3: Proof of Claim and Release Form, # 6 Exhibit A–4: Summary Notice of Pendency and Proposed Settlement of Class Action and Settlement Hearing, # 7 Exhibit B: [Proposed] Order and Judgment of Final Approval, # 8 Appendix 2: Pomerantz Firm Resume)(Steven, Murielle) (Entered: 11/05/2013) |
| 11/12/2013 | 118 | ENDORSED LETTER addressed to Judge Colleen McMahon from Murielle Steven Walsh dated 11/11/2013 re: In light of the settlement, the parties jointly request a stay of proceedings while the Court considers whether to grant plaintiffs' motion for preliminary approval of the settlement. ENDORSEMENT: Stay granted. (Signed by Judge Colleen McMahon on 11/12/2013) (ft) (Entered: 11/12/2013) |
| 11/12/2013 | | Case Stayed (ft) (Entered: 11/12/2013) |
| 11/12/2013 | 119 | ENDORSED LETTER addressed to Judge Colleen McMahon from Joel Caplan dated 11/11/2013 re: I write to express why this Settlement is not only unfair but also, an absurd waste of the Court's time. ENDORSEMENT: I will treat this as an objection to the settlement. Forward to counsel. Keep w/settlement papers. (Signed by Judge Colleen McMahon on 11/12/2013) (ft) (Entered: 11/13/2013) |
| 11/26/2013 | 120 | ORDER PRELIMINARILY APPROVING SETTLEMENT AND PROVIDING FOR NOTICE granting 116 Motion for Settlement. In accordance with Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, and for settlement purposes only, a class (the "Settlement Class") is hereby certified as listed herein. The Court hereby preliminarily approves the Stipulation and the Settlement set forth therein, subject to further consideration at the Settlement Hearing described herein. A hearing (the "Settlement Hearing") shall be held before this Court, (which is no earlier than 100 days after the entry of this Order, on February 21, 2014, at 9:30 A.M., at the United States District Court for the Southern District of New York, 500 Pearl Street, Courtroom 14C, New York, New York 10007. (Signed by Judge Colleen McMahon on 11/26/2013) (ft) (Entered: 11/26/2013) |
| 11/26/2013 | | Set/Reset Hearings: Settlement Conference set for 2/21/2014 at 09:30 AM in Courtroom 14C of the United States District Court for the Southern District of New York, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon. (ft) (Entered: 11/26/2013) |
| 12/03/2013 | 121 | ENDORSED LETTER addressed to Judge Colleen McMahon from Paul A, Sanders dated 12/2/2013 re: EFP Rotenberg requests to be excused from the 2/21/2014 settlement conference. ENDORSEMENT: No problem. (Signed by Judge Colleen McMahon on 12/3/2013) (cd) (Entered: 12/03/2013) |
| 01/13/2014 | 122 | NOTICE OF CHANGE OF ADDRESS by Murielle Jacqueline Steven on behalf of Ruble Sanderson. New Address: Pomerantz LLP, 600 Third Avenue, 20th Floor, New York, NY, United States 10016, 2126611100. (Steven, Murielle) (Entered: 01/13/2014) |
| 01/13/2014 | 123 | NOTICE OF CHANGE OF ADDRESS by Marc Ian Gross on behalf of Ruble Sanderson. New Address: Pomerantz LLP, 600 Third Avenue, 20th Floor, New York, NY, United States 10016, 2126611100. (Gross, Marc) (Entered: 01/13/2014) |
| 01/13/2014 | 124 | LETTER addressed to Judge Colleen McMahon from Lee S. Shalov dated 1/13/14 re: December 13, 2013 hearing. Document filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Shalov, |

| | | |
|---|---|---|
| | | Lee) (Entered: 01/13/2014) |
| 01/15/2014 | 125 | MEMO ENDORSEMENT on 124 Letter filed by Advance Battery Technologies, Inc., Zhiguo Fu, Guohua Wan. ENDORSEMENT: Mr. Caplan is free to object to the settlement if he likes–as long as the deadline for objecting has not expired. (Signed by Judge Colleen McMahon on 1/14/2014) (ft) (Entered: 01/15/2014) |
| 01/24/2014 | 126 | ENDORSED LETTER (via Fax) addressed to Judge Colleen McMahon from Joel Caplan dated 1/24/2014 re: Your Honor, I would like to ask for a 1–2 business day extension to send our supporting Exhibits. The Exhibits which are about 80 pages will be sent today for arrival at the Clerk of Court on Monday January 27. ENDORSEMENT: If your mailing is post–marked with today's date, the Court will accept it. If you email or fax in your exhibits, the Court will not accept them. (Signed by Judge Colleen McMahon on 1/24/2014) (rjm) (Entered: 01/27/2014) |
| 01/30/2014 | 127 | ENDORSED LETTER addressed to Judge Colleen McMahon from Joel Caplan and Louis Duchesneau re: Counsel requests permission to mail the 30 items to the Court in hard copy. ENDORSEMENT: Mail them. (Signed by Judge Colleen McMahon on 1/30/2014) Copies Mailed By Chambers. (ft) (Entered: 01/30/2014) |
| 02/07/2014 | 128 | NOTICE of Lead Plaintiff's Motion for Final Approval of the Proposed Settlement and Reimbursement of Expenses. Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 02/07/2014) |
| 02/07/2014 | 129 | **FILING ERROR – WRONG EVENT TYPE SELECTED FROM MENU –** FINAL MOTION for Settlement *Approval and Reimbursement of Expenses*. Document filed by Ruble Sanderson. (Attachments: # 1 Exhibit A)(Steven, Murielle) Modified on 2/10/2014 (db). (Entered: 02/07/2014) |
| 02/10/2014 | | **\*\*\*NOTE TO ATTORNEY TO RE–FILE DOCUMENT – EVENT TYPE ERROR. Note to Attorney Murielle Jacqueline Steven to RE–FILE Document 129 FINAL MOTION for Settlement *Approval and Reimbursement of Expenses*. Use the event type Memorandum in Support of Motion found under the event list Replies, Opposition and Supporting Documents. \*\*\*REMINDER\*\*\*– First refile the 128 Notice AS THE MOTION for Settlement, then file and link any supporting documents. (db)** (Entered: 02/10/2014) |
| 02/10/2014 | 130 | FINAL MOTION for Settlement *Approval and Reimbursement of Expenses*. Document filed by Ruble Sanderson.(Steven, Murielle) (Entered: 02/10/2014) |
| 02/10/2014 | 131 | MEMORANDUM OF LAW in Support re: 130 FINAL MOTION for Settlement *Approval and Reimbursement of Expenses.*. Document filed by Ruble Sanderson. (Attachments: # 1 Exhibit A)(Steven, Murielle) (Entered: 02/10/2014) |
| 02/14/2014 | 132 | LETTER addressed to Judge Colleen McMahon from Murielle J. Steven Walsh dated February 14, 2014 re: In re Advanced Battery Technologies, Inc. Securities Litigation, Case No. 1:11–cv–2279–CM. Document filed by Ruble Sanderson.(Steven, Murielle) (Entered: 02/14/2014) |
| 02/21/2014 | | Minute Entry for proceedings held before Judge Colleen McMahon: Fairness Hearing held on 2/21/2014. Decision: Fairness hearing held. See transcript for details. Counsel in the shareholder class action (11–cv–2279) should advise the Court within 14 days whether they would like to go forward with their settlement. Counsel in the shareholder derivative suit (11–cv–4383) have 10 days to make any additional submissions to the Court in support of their settlement.(Submitted by Diana Conner). (Court Reporter Martha Drevis) (mde) (Entered: 02/21/2014) |
| 03/05/2014 | 133 | TRANSCRIPT of Proceedings re: CONFERENCE held on 2/21/2014 before Judge Colleen McMahon. Court Reporter/Transcriber: Martha Drevis, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/31/2014. Redacted Transcript Deadline set for 4/10/2014. Release of Transcript Restriction set for 6/6/2014.(McGuirk, Kelly) (Entered: 03/05/2014) |
| 03/05/2014 | 134 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 2/21/2014 has been |

| | | |
|---|---|---|
| | | filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 03/05/2014) |
| 03/07/2014 | 135 | ENDORSED LETTER addressed to Judge Colleen McMahon, from Murielle Steven Walsh, dated 3/7/2014, re: On February 21, 2014, this Court held a final settlement hearing with respect to both the settlement in the above action, as well as the settlements in the derivative actions as set forth herein. At the hearing Your Honor expressed serious reservations concerning the terms of the settlement of the Derivative Actions... We are amending the settlement documents accordingly, and will submit them to the Court shortly. ENDORSEMENT: OK. (Signed by Judge Colleen McMahon on 3/7/2014) (ja) (Entered: 03/10/2014) |
| 03/19/2014 | 136 | MEMORANDUM OF LAW in Support re: 130 FINAL MOTION for Settlement *Approval and Reimbursement of Expenses.*. Document filed by Ruble Sanderson. (Attachments: # 1 Exhibit A – Amended Declaration of Murielle J. Steven in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Reimbursement of Expenses, # 2 Exhibit 1 to Amended Declaration of Murielle J. Steven – Affidavit of Michael Rosenblum, # 3 Exhibit 2 to Amended Declaration of Murielle J. Steven – Pomerantz LLP Expense Report, # 4 Exhibit 3 to Amended Declaration of Murielle J. Steven – Pomerantz LLP Firm Resume, # 5 Exhibit 4 to Amended Declaration of Murielle J. Steven – Proposed Order and Judgment of Final Approval, # 6 Exhibit 5 to Amended Declaration of Murielle J. Steven – Amendment No. 1 to Stipulation of Settlement)(Steven, Murielle) (Entered: 03/19/2014) |
| 03/21/2014 | 137 | LETTER addressed to All Counsel In: In re ABAT Securities Litigation from Judge Colleen McMahon, dated 3/21/2014, re: Motion to Approve Settlement. (ja) (Entered: 03/21/2014) |
| 03/21/2014 | 138 | LETTER addressed to Judge Colleen McMahon from Murielle J. Steven Walsh dated March 21, 2014 re: In re Advanced Battery Technologies, Inc. Securities Litigation, Case No. 1:11–cv–2279–CM. Document filed by Ruble Sanderson.(Steven, Murielle) (Entered: 03/21/2014) |
| 03/24/2014 | 139 | MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SETTLEMENT APPROVAL AND REIMBURSEMENT OF EXPENSES 104098 granting (130 in 1:11–cv–02279–CM) FINAL MOTION for Settlement *Approval and Reimbursement of Expenses* filed by Ruble Sanderson. For the foregoing reasons, the Court hereby: (i) grants final approval of the Settlement and Plan of Allocation; (ii) finally certifies the Settlement Class for purposes of the Settlement; (iii) finds that notice to the Class satisfied due process; (iv) approves an award to the Lead Plaintiff in the amount of $3,000; and (v) approves Lead Counsel's request for reimbursement of expenses in the amount of $115,000. The Clerk of the Court is directed to remove Docket No. 130 from the Court's list of pending motions and to close the files (11–cv–2279, 11–cv–2354, 11–cv–2849, 11–cv–3098, and 11–cv–3729). (Signed by Judge Colleen McMahon on 3/24/2014) Filed In Associated Cases: 1:11–cv–02279–CM, 1:11–cv–02354–CM, 1:11–cv–02849–CM, 1:11–cv–03098–CM, 1:11–cv–03729–CM(ft) Modified on 3/28/2014 (nt). (Entered: 03/25/2014) |
| 03/26/2014 | 140 | MANDATE of USCA (Certified Copy) as to 108 Notice of Appeal, filed by Ruble Sanderson USCA Case Number 13–3173. The parties have filed a stipulation withdrawing this appeal pursuant to FRAP 42. The stipulation is hereby "So Ordered". Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 03/26/2014. (nd) (Entered: 03/26/2014) |
| 04/22/2014 | 141 | **FILING ERROR – NO ORDER SELECTED FOR APPEAL –** NOTICE OF APPEAL. Document filed by Ruble Sanderson. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Steven, Murielle) Modified on 4/23/2014 (tp). (Entered: 04/22/2014) |
| 04/23/2014 | | **\*\*\*NOTE TO ATTORNEY REGARDING DEFICIENT APPEAL. Note to Attorney Steven, Murielle to RE–FILE Document No. 141 Notice of Appeal. No Order being appealed was selected. Re–file the document as a Corrected** |

| | | |
|---|---|---|
| | | **Notice of Appeal event and select the correct Order being appealed. (tp)** (Entered: 04/23/2014) |
| 04/23/2014 | 142 | CORRECTED NOTICE OF APPEAL re: 108 Notice of Appeal, 106 Order on Motion to Amend/Correct,,,,,,,,,,,,,,,,,,,,,,,, 139 Memorandum &Opinion,,,,, Document filed by Ruble Sanderson. (Steven, Murielle) (Entered: 04/23/2014) |
| 04/24/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 142 Corrected Notice of Appeal. (tp) (Entered: 04/24/2014) |
| 04/24/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 142 Corrected Notice of Appeal filed by Ruble Sanderson were transmitted to the U.S. Court of Appeals. (tp) (Entered: 04/24/2014) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re ADVANCED BATTERY TECHNOLOGIES, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) |

**Master File No.: 11 Civ. 2279 (CM)**

**JURY TRIAL DEMANDED**

## CORRECTED FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Lead Plaintiff Ruble Sanderson and Plaintiff Arnold Cohen ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against the Defendants named herein ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, interviews of former Advanced Battery Technologies, Inc. ("ABAT" or the "Company") employees, ABAT customers, inspections of the Company's Chinese manufacturing facilities, review of publicly available court documents in China, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, various Chinese Administrations of Industry and Commerce ("AIC") filings, wire and press releases published by and regarding ABAT analysts' reports and advisories about the Company, information readily obtainable on the Internet, and other investigation to verify the accuracy of the Company's public statements. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased ABAT securities between May 15, 2007 and March 29, 2011, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     ABAT develops, manufactures, and distributes rechargeable polymer lithium-ion batteries.  The Company's products include rechargeable batteries for mine-use lamps, electric automobiles, motorcycles, cellular phones, notebook computers, and other personal electronic devices.

3.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically the Company: (i) reported inflated gross profits, net income, and profit margins for fiscal years ending December 31, 2007, December 31, 2008, and December 31, 2009; (ii) stated that it purchased a company called Shenzhen in 2010 for $20 million, but failed to disclose that Defendant Fu had actually purchased this company in 2008 for $1 million and was now selling it to ABAT for $20 million, and thus this was an undisclosed related party transaction; (iii) stated that it had acquired another company, Wuxi ZQ, for $22 million, but failed to disclose that Defendant Fu had a side deal with one of Wuxi's sellers to improperly split excess proceeds from the sale, and further, later represented to investors that it had only paid $12,870,000 for Wuxi, not $22 million; and (iv) misrepresented that it owned a Company subsidiary, Heilongjiang ZhongQiang Power-Tech Co., Ltd. ("HLJZQPT"), when it did not, or, alternatively, the Company failed to disclose that it entered into a related party

transaction with ABAT's Chairman and CEO which resulted in the owner of that subsidiary becoming the Chairman and CEO, and not ABAT.

4.     The truth began to publicly emerge on March 30, 2011, when Variant View Research ("Variant") published a report[1] detailing its investigation of the Company, concluding "that the financial statements and management of ABAT cannot be trusted . . ." Variant found, among other things, that: (i) ABAT's Chairman, Defendant Fu had transferred ownership of ABAT's key subsidiary, HLJZQPT, to himself without explanation or compensation; (ii) ABAT had reported inflated profits and net income in its SEC filings; whereas it reported significantly lower amounts in its filings with the Chinese securities authorities; (iii) and several of ABAT's distribution relationships are non-existent.  Variant concluded:

> A self-dealing management, falsely represented business description, serial equity issuances to acquire related or poor businesses, ludicrous profitability claims, customers that cannot be verified, multiple audit problems, the list goes on and on.  This company has the dubious honor of achieving every major red flag that one looks for in a Chinese RTO fraud.

5.     On this news, ABAT's shares declined $1.50 per share, or nearly 43%, to close on March 30, 2011, at $2.01 per share, on unusually heavy trading volume.

6.     On May 5, 2011 Prescience Investment Group, LLC and Kerrisdale Capital Management, LLC (collectively "Prescience") published a report[2] on ABAT, which corroborated and expanded many of Variant's claims.  Specifically, Prescience claimed, among other things, that there were material inaccuracies in ABAT's SEC filings.  Prescience's findings were based on its extensive investigation of the Company, including a comparison of ABAT's financial filings in China and the U.S., interviews with customers, suppliers and partners; site

---

[1] Variant View, *Advanced Battery Technologies:  An Egregious Chinese RTO*, Seeking Alpha, (March 30, 2011) http://seekingalpha.com/article/260883-advanced-battery-technologies-an-egregious-chinese-rto.

[2] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

visits to the Company's manufacturing facilities; a survey of the battery manufacturing sector; an examination of court filings against the Company; and other relevant resources.

7.      Plaintiffs have conducted their own independent investigation of the underlying facts concerning ABAT's public disclosures, including: interviewing customers and former employees, visiting certain ABAT production facilities in China, analyzing ABAT's SEC filings and the comparable Chinese AIC filings and reviewing court records.  As detailed herein, Plaintiffs' investigation has confirmed key charges made by Variant and Prescience.

8.      On April 6, 2011, ABAT issued a press release[3] ("ABAT Response"), which purported to explain some of the issues raised in the Variant Report.  However, as further detailed herein, not only did the ABAT Response fail to adequately defend the Company's public statements, it effectively admitted that some of the Company's statements were in fact false.  To date, ABAT has failed to issue any response to the Prescience Report.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as a substantial part of the conduct complained of herein occurred in this District. Moreover, ABAT's principal executive offices are located within this District.

---

[3] Advanced Battery Technologies, Inc., *Advanced Battery Technologies Responds to Allegations by Variant View Research*, NASDAQ OMX - GlobeNewswire, http://www.globenewswire.com/news.html?d=21807&topic=1024/.

4

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13.    Lead Plaintiff Ruble Sanderson, as set forth in the attached certification, filed on May 31, 2011, 11 Civ. 2279, docket entry #17, ex. 2, purchased ABAT securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.    Plaintiff Arnold Cohen, as set forth in the attached certification, filed on April 27, 2011, 11 Civ. 2279, docket entry #1, purchased ABAT securities at artificially inflated prices during the Class Period and has been damaged thereby.

15.    Defendant ABAT, which is a Delaware Corporation, has its principle executive offices located at 15 West 39th Street, Suite 14A, New York, NY 10018.    ABAT is a $250 million market cap company listed on the Nasdaq, which, through its subsidiaries, engages in the design, manufacture, and marketing of rechargeable polymer lithium-ion (PLI) batteries in the United States, Europe, and Asia. The Company's rechargeable PLI batteries are used in consumer products, such as portable computers, personal digital assistants, and cellular telephones. It also develops and manufactures various types of electric vehicles, including electric bicycles, electric scooters, and electric sports utility vehicles. ABAT is a holding company, which is structured as follows:



16.     In addition, ABAT owns a 49% interest in Beyond E-Tech, Inc. ("BET") which distributes cellular telephones in the United States.

17.     The Company originally went public through a reverse merger transaction with a shell company called Buy It Cheap.com in 2004.

18.     Defendant Zhiguo Fu ("Fu") at all relevant times herein was the Company's Chairman and Chief Executive Officer.

19.     Defendant Guohua Wan ("Wan") was the Company's Chief Financial Officer from September 14, 2004 until her resignation on April 20, 2007, and then again from March 1, 2009 until the present.

20.     The Defendants referenced above in ¶¶ 18-19 are sometimes referred to herein as the "Individual Defendants."

21.     Defendant Bagell, Josephs, Levine & Co., LLC ("Bagell Josephs"), located in Marlton, NJ, served as the Company's auditor from 2006 through 2010.  In 2010 Bagell Josephs merged into Friedman LLP.

---

[4] Harbin ZhongQian Power Tech Co., Ltd. ("HarbinZQ"), which manages the assets and operations of Heilongjiang ZhongQiang Power-Tech Co., Ltd. ("HLJ ZQPT") is engaged in the business of manufacturing and distributing electric vehicles that utilize batteries manufactured by HLJZQPT.  HLJZQPT manufactures and distributes polymer lithium-ion batteries.  In May 2009, ABAT completed the acquisition of Wuxi Angell Autocycle Co., Ltd. ("Wuxi").  Wuxi manufactures and distributes electric vehicles.

22.     Defendant Friedman LLP, headquartered in New York, served as the Company's auditor from January 1, 2010 until the Company announced its dismissal in an 8-K filed less than a year later on December 17, 2010, effective December 14, 2010.

23.     Defendant EFP Rotenberg, LLP, headquartered in Rochester, New York, has served as the Company's auditor from December 14, 2010 through the present.

24.     The Defendants referenced above in ¶¶ 21-23 are referred to herein as the "Auditor Defendants."

### SUBSTANTIVE ALLEGATIONS

### FACTUAL BACKGROUND

### Chinese Reverse Mergers

25.     Special purpose acquisition companies ("SPACs") enable foreign corporations to access capital markets in the United States without the rigors of an initial public offering ("IPO"). In this case, an IPO and its attendant regulatory strictures, which would subject the company to a thorough audit, were circumvented through the mechanism of a reverse merger with a domestic listed company. A "reverse merger," as used in this Amended Complaint, is the acquisition of a private operating company by a public shell company (the SPAC) that results in the private operating company having effective control of the combined company. The foreign corporation is either merged into or acquired by a shell listed on a U.S. exchange, giving the foreign company immediate "back door" access to the U.S. public securities market. As explained in an article published in the Wall Street Journal on June 3, 2011:[5]

---

[5] Michael Rapoport, *SEC Probes China Auditors*, (June, 3, 2011, as of 12:00 am) The Wall Street Journal online, http://online.wsj.com/article/SB10001424052702304563104576361422372121248.html.

> In reverse mergers, a foreign company is "bought" by a publicly traded
> U.S. shell company. But the foreign company assumes control and gets the
> shell's U.S. listing without the level of scrutiny that an initial public
> offering entails. Though companies from other countries also engage in
> reverse mergers, such deals are especially common among the Chinese.
> The PCAOB says nearly three-quarters of the 215 Chinese companies
> listing in the U.S. from 2007 to early 2010 did so via reverse merger.

Michael Rapoport, *SEC Probes China Auditors*, June 3, 2011.

26.    In recent years, suspicion of reverse mergers has increased due to the widespread

use of the device as a means of avoiding SEC scrutiny. According to one business columnist,

reverse mergers are "a course long favored by shady stock promoters." Floyd Norris, *The

Audacity of Chinese Frauds*, N.Y. Times, May 26, 2011.[6]

27.    A March 15, 2011 research note[7] released by the Public Company Accounting

Oversight Board ("PCAOB") expressed concern about the quality of audits conducted on the

financial statements of these reverse merger Chinese companies. In an April 26, 2011 statement[8]

before the U.S. Senate Subcommittee on Securities, Insurance and Investment, PCAOB

Chairman, James R. Doty, stated that there are:

> "significant risks associated with audits of operations of U.S. [listed]
> companies in China. For example, we are finding through our oversight of
> U.S. firms that even simple audit maxims, such as maintaining the auditor's
> control over bank confirmations, may not hold given the business culture in
> China."  Doty concluded that "[i]n light of these risks, the PCAOB's
> inability to inspect the work of registered firms from China is a gaping hole
> in investor protection."

---

[6] Floyd Norris, *The Audacity of Chinese Frauds*, (May 26, 2011), The New York Times online,
http://www.nytimes.com/2011/05/27/business/27norris.html?pagewanted=all.

[7] PCAOB, *PCAOB Issues first Research Note on Chinese Reverse Mergers*, (March 15, 2011), PCAOB,
http://pcaobus.org/News/Releases/Pages/03152011_ResearchNote.aspx.

[8] Statement of James R. Doty, Chairman, Public Accounting Oversight Board before the United States Senate
Committee on Banking, Housing and Urban Affairs Subcommittee on Securities, Insurance and Investment, Hearing
on the Roles of Accounting Profession in Preventing Another Financial Crisis, April 6, 2011, PCOAB,
www.pcoabus.org, (accessed 9/14/11).

28.     SEC Commissioner Luis A. Aguilar has also spoken out on the subject. In a speech on April 4, 2011,[9] he said that using reverse mergers as a form of "backdoor registration" was a "disturbing trend" in modern capital formation. He said, "a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud." The "billions in U.S. savings and investment dollars [that] have been entrusted with these companies" are, therefore, at risk.

29.     The May 26, 2011 New York Times article[10] blamed auditors and inadequate audit procedures for this disturbing trend. The New York Times revealed that another Chinese corporation, Longtop Financial Technologies, also recently became "worthless" because of allegations of fraud, including fraud relating to Longtop's purported cash balances in Chinese banks. Deloitte Touche Tomatsu resigned as Longtop's auditor after the fraud came to light but only after it had already given "clean audit opinions to Longtop for six consecutive years," according to the report.

30.     The May 26, 2011 New York Times article[11] also noted that the major auditing firms in China are not subject to the same type of inspections required of other accounting firms that perform audits for companies whose securities are traded in the U.S.:

>   The Chinese audit firms, while they are affiliated with major international audit networks, have never been inspected by the Public Company Accounting Oversight Board in the United States. The Sarbanes-Oxley Act requires those inspections for accounting firms that audit companies whose securities trade in the United States, but China has refused to allow inspections.

---

[9] Luis A. Aguilar, *Speech by SEC Commissioner: Facilitating Real Capital Formation*, (April 4, 2011), U.S. Securities and Exchange Commission, http://www.sec.gov/news/speech/2011/spch040411laa.htm.

[10] Floyd Norris, *The Audacity of Chinese Frauds*, (May 26, 2011), The New York Times online, http://www.nytimes.com/2011/05/27/business/27norris.html?pagewanted=all.

[11] *Id.*

9

> In a speech at a Baruch College conference earlier this month, James R. Doty, chairman of the accounting oversight board, called on the major firms to improve preventative global quality controls but said that actual inspections were needed. Two weeks ago, Chinese and American officials meeting in Washington said they would try to reach agreement on the oversight of accounting firms providing audit services for public companies in the two countries, so as to enhance mutual trust.

Floyd Norris, *The Audacity of Chinese Frauds*, N.Y. Times, May 26, 2011.[12]

31.    The June 3, 2011 Wall Street Journal article[13] also revealed that the SEC is now examining accounting and disclosure issues regarding Chinese companies that engaged in reverse mergers:

> People familiar with the matter say the investigation also includes auditors, which hadn't previously been known. As part of its inquiry, the SEC has suspended trading on some Chinese companies, questioning their truthfulness about their finances and operations. The Public Company Accounting Oversight Board, or PCAOB, the government's accounting regulator, said it is investigating some audit firms over whether their audits of Chinese clients are stringent enough.
>                               . . .
> "Right now, the auditing and regulation of U.S.-listed Chinese companies isn't working very well," said Paul Gillis, a visiting professor of accounting at Peking University's Guangha School of Management.
>                               …
> Since February, about 40 Chinese companies have either acknowledged accounting problems or seen the SEC or U.S. exchanges halt trading in their stocks because of accounting questions.

Michael Rapoport, *SEC Probes China Auditors*, Wall Street Journal, June 3, 2011.

32.    Confirming the fears of Messrs. Aguilar and Doty, more than 24 Chinese-based companies have filed 8-Ks disclosing auditor resignations, accounting problems, or both, since March 2011.[14]

---

[12] Floyd Norris, The Audacity of Chinese Frauds, (May 26, 2011), The New York Times online, http://www.nytimes.com/2011/05/27/business/27norris.html?pagewanted=all.

[13] Michael Rapoport, *SEC Probes China Auditors*, (June, 3, 2011, as of 12:00 am) The Wall Street Journal online, http://online.wsj.com/article/SB10001424052702304563104576361422372121248.html.

[14] Letter from SEC Chairman Mary L. Schapiro to the Honorable Patrick T. McHenry, April 27, 2011.

33.     On April 18, 2011, NASDAQ proposed a rule[15] concerning companies formed through reverse mergers. Proposed Rule 2011-056 would require, among other things, that a company formed pursuant to a reverse merger trade at least six months after the completion of the reverse merger, and that six months' worth of audited financial statements following the reverse merger be timely filed, prior to listing the company on the NASDAQ. In June 2011, the SEC issued an investor bulletin warning investors about fraud risks in reverse mergers.[16]

**Materially False and Misleading Statements Issued By Defendants During the Class Period**

**A.     Misrepresentations Concerning ABAT's Reported Revenues and Net Income**

34.     Throughout the Class Period, ABAT reported robust and increasing revenues, gross profits and net income.  In fact, as detailed in ¶ 64 herein, the Company sustained significant losses for the relevant periods.

35.     On May 15, 2007, the Company filed a quarterly report for the period ended March 31, 2007 on Form 10-Q with the SEC ("First Quarter 2007 10-Q") which reported net income of $1,338,038, or $0.027 per diluted income per share, and revenue of $5,363,923.  In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained signed certifications by Defendant Fu and Sharon Xiarong Tang ("CFO Tang"), the Company's Chief Financial Officer from April 20, 2007 until her resignation on May 13, 2008, stating that the financial information contained in the First Quarter 2007 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting ("SOX Certification").

---

[15] NASDAQ, *Self-Regulatory Organizations; The NASDAQ Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Additional Listing Requirements for Reverse Mergers,* (April 29, 2011), SECURITIES AND EXCHANGE COMMISSION, (Release No. 34-64371; File No. SR-NASDAQ-2011-056), www.sec.gov.

[16] SEC Office of Investor Education and Advocacy, *Investor Bulletin: Reverse Mergers,* (June 2011), www.investor.gov.

36.    On August 14, 2007, the Company filed a quarterly report for the period ended June 30, 2007 on Form 10-Q with the SEC ("Second Quarter 2007 10-Q") which reported net income of $3,284,948, or $0.07 diluted income per share, and revenue of $7,697,363.

37.    On November 9, 2007, the Company filed a quarterly report for the period ended September 30, 2007 ("Third Quarter 2007 10-Q"), which reported net income of $3,596,670, or $0.07 diluted income per share, and revenue of $8,573,009.

38.    On April 28, 2008, the Company filed an annual report for the period ended December 31, 2007 on Form 10KSB with the SEC ("2007 10KSB"), which reported net income of $10.2 million, or $0.22 per share and revenue of $31.9 million.  The 2007 10KSB also reflected restated net income of $8 million, or $0.17 per share, for the fiscal year ended December 31, 2006 as a result of ABAT's determination that under SFAS 142 it was not required to impair goodwill.  The 2007 10KSB was signed by Defendant Fu and CFO Tang and represented the Company's annual financial results and financial position.  In addition, the 2007 10KSB contained SOX certifications signed by Defendant Fu and CFO Tang.

39.    On May 12, 2008, the Company filed its quarterly report for the period ending March 31, 2008 ("First Quarter 2008 Form 10-Q").  The Company reported revenues of $10,031,969, and net income of $3,848,478, or $0.08 income per diluted share.  The First Quarter 2008 10-Q was signed by Defendant Fu and CFO Tang, and contained SOX certifications signed by both Defendant Fu and CFO Tang.

40.    On August 11, 2008, the Company filed its quarterly report for the period ending June 30, 2008 ("Second Quarter 2008 Form 10-Q").  The Company reported revenues of $11,748,284, and net income of $4,675,272, or $0.09 per diluted share. The Second Quarter 2008 Form 10-Q was signed by Defendant Fu and Taylor Dahe Zhang ("CFO Zhang"), the

Company's Chief Financial Officer from May 13, 2008 until his resignation on March 1, 2009, and contained SOX certifications signed both Defendant Fu and CFO Zhang.

41.    On November 10, 2008, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2008.  The November 10th Press Release stated that revenues had increased 47.7% year over year to $12.7 million, and that gross profits had increased 47.8% year over year to $5.9 million.  It further stated that net income had increased 21.6% year over year to $4.4 million.

42.    On November 12, 2008, the Company filed its quarterly report for the third quarter ended September 30, 2008 on Form 10-Q with the SEC ("Third Quarter 2008 10-Q"), which reported net income of $4.4 million, or $0.08 per diluted share and revenue of $12.7 million.  The Third Quarter 2008 10-Q was signed by Defendant Fu and CFO Zhang and represented the Company's quarterly financial results and financial position.  In addition, the Third Quarter 2008 10-Q contained SOX certifications signed by Defendant Fu and CFO Zhang.

43.    On March 16, 2009, the Company issued a press release announcing its financial results for the year ended December 31, 2008.  For the year, the Company reported a net income of $16.1 million, or $0.31 per diluted share and revenue of $45.2 million, as compared to a net income of $10.2 million, or $0.21 per diluted share and revenue of $13.9 million for the same period a year ago.[17]

44.    On March 16, 2009, the Company filed an annual report for the period ended December 31, 2008 on Form 10-K with the SEC ("2008 10-K"), which was signed by Defendants Fu and Wan and represented the Company's annual financial results and financial

---

[17] The numbers provided by the Company in the March 16, 2009 Press Release and the 2008 10-K were later restated in the Company's 2009 10-K/A, as indicated in ¶ 64 herein.

position.   In addition, the 2008 10-K contained SOX certifications signed by Defendants Fu and Wan.

45.     On May 11, 2009, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2009.  The Company reported a net income of $3.6 million, or $0.07 per diluted share and revenue of $10.7 million, as compared to a net income of $3.8 million, or $0.08 per diluted share and revenue of $10 million for the same period a year ago.

46.     On May 11, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on Form 10-Q with the SEC ("First Quarter 2009 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.  In addition, the First Quarter 2009 Form 10-Q contained SOX certifications signed by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

47.     On August 11, 2009, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2009.  The Company reported a net income of $8 million, or $0.14 per diluted share and revenue of $13.8 million, as compared to a net income of $4.7 million, or $0.09 per diluted share and revenue of $11.7 million for the same period a year ago.  In addition, the Company represented that "[b]attery backlog is approximately $53 million as of August 3, 2009, all of which is expected to be delivered in the next 12 months."

48.     On August 11, 2009, the Company filed a quarterly report for the period ended June 30, 2009 on Form 10-Q with the SEC ("Second Quarter 2009 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.   In addition, the Second Quarter 2009 10-Q contained signed certifications by

Defendants Fu and Wan, stating that the financial information contained in the filing was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

49.     On November 9, 2009, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2009.  The Company reported a net income of $4.8 million, or $0.08 per diluted share and revenue of $17.7 million, as compared to a net income of $4.4 million, or $0.08 per diluted share and revenue of $12.7 million for the same period a year ago.  In addition, the Company represented that "[a]s of October 30, 2009, the Company had a backlog of over $67 million including a battery backlog of approximately $55 million, all of which is expected to be delivered in the next 12 months."

50.     On November 9, 2009, the Company filed a quarterly report for the period ended September 30, 2009 on Form 10-Q with the SEC ("Third Quarter 2009 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.  In addition, pursuant to SOX, the Third Quarter 2009 10-Q contained signed certifications by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

51.     On March 31, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2009.  For the fourth quarter, the Company reported a net income of $9.2 million, $0.14 per diluted share and revenue of $21.4 million, compared to a net income of $16.1 million, or $0.31 per diluted share and revenue of $45.2 million, for the same period a year ago.  For the year, the Company reported a net income of $21.4 million, or $0.35 per diluted share and revenue of $63.6 million, as compared to a net income of $16.1 million, or $0.31 per diluted share and revenue of $45.2 million for the same

period a year ago.  In addition, the Company reported a "backlog of approximately $49.7 million for delivery throughout the next 12 months, including a battery backlog of approximately $44.3 million."

52.     On March, 30, 2010, the Company filed an annual report for the period ended December 31, 2009 on Form 10-K with the SEC ("2009 10-K"), which was signed by Defendants Fu and Wan and represented the Company's annual financial results and financial position.  In addition, pursuant to the SOX, the Form 10-K contained signed certifications by Defendants Fu and Wan, stating that the financial information contained in the Form 10-K was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

53.     On May 10, 2010, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2010.  The Company reported a net income of $7.5 million, or $0.11 per diluted share and revenue of $19.5 million, compared to a net income of $4.1 million, or $0.07 per diluted share and revenue of $10.7 million, for the same period a year ago.  In addition, the Company represented that it had a "backlog of around $65 million for delivery throughout the next 12 months, including a battery backlog of approximately $51.4 million."

54.     On May 10, 2010, the Company filed a quarterly report for the period ended March 31, 2010 on Form 10-Q with the SEC ("First Quarter 2010 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.  In addition, the First Quarter 2010 10-Q contained SOX Certifications signed by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

55.    On May 11, 2010 the Company issued a press release announcing its guidance for 2010.  Specifically, the Company stated, in relevant part:

> Management is providing revenue guidance of $100 to $110 million and net income guidance of $32 to $36 million for 2010. Growth is expected to be driven by enhanced distribution of its electric vehicles, battery capacity expansion and increased orders from domestic and international customers. This guidance excludes any impact from future acquisitions and fair value change of outstanding warrants.
>
> Mr. Zhiguo Fu, CEO of ABAT, stated, "Advanced Battery is acutely aware of the current global economic conditions and we have cautiously moved forward with our business plan. However, the momentum from electric vehicle business that has moved us ahead with double digit increases in revenue over the past several quarters gives us the confidence to become more aggressive and state our guidance for fiscal 2010. We are excited about our plans for continued capacity expansion as well as obtaining a greater global reach for the distribution of our electric vehicles."

56.    On August 9, 2010, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2010.  The Company reported a net income of $12.5 million, or $0.18 per diluted share and revenue of $22.8 million, compared to a net income of $3 million, or $0.05 per diluted share and revenue of $13.8 million, for the same period a year ago.  In addition, the Company represented that it had a "backlog of around $63.3 million for delivery throughout the next 12 months, including a battery backlog of approximately $50.5 million."

57.    On August 9, 2010, the Company filed a quarterly report for the period ended June 30, 2010 on Form 10-Q with the SEC ("Second Quarter 2010 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position. In addition, the Second Quarter 2010 10-Q contained SOX certifications signed by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was

accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

58.    On November 15, 2010, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2010.  The Company reported a net income of $11.1 million, or $0.16 per diluted share and revenue of $25.9 million, compared to a net income of $5.1 million, or $0.08 per diluted share and revenue of $17.7 million, for the same period a year ago.  In addition, the Company stated that it had a "backlog of approximately $55.4 million for delivery throughout the next 12 months, including a battery backlog of approximately $41.6 million."

59.    On November 15, 2010, the Company filed a quarterly report for the period ended September 30, 2010 on Form 10-Q with the SEC ("Third Quarter 2010 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.  In addition, the Third Quarter 2010 10-Q contained SOX certifications signed by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

60.    On March 16, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC ("2010 10-K"), which was signed by Defendants Fu and Wan and represented the Company's annual financial results and financial position.  In addition, the 2010 10-K contained SOX certifications signed by Defendants Fu and Wan, stating that the financial information contained in the 2010 10-K was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

61.    On March 21, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2010.  For the year, the Company

18

reported a net income of $36.7 million, or $0.48 per diluted share and revenue of $97.1 million, compared to a net income of $21.8 million, or $0.36 per diluted share and revenue of $63.6 million, for the same period a year ago.  For the fourth quarter, the Company reported a net income of $5.6 million, or $0.07 per diluted share and revenue of $28.8 million, compared to a net income of $9.2 million, $0.14 per diluted share and revenue of $21.4 million for the same period a year ago.

62.    The foregoing statements were false and/or misleading because, among other things, ABAT grossly overstated its net income and revenues during the Class Period.  In fact, a review of the Company's AIC filings reveals that, in stark contrast to the robust earnings reported to the SEC, ABAT was simultaneously reporting losses to the AIC.[18]

63.    For example, as the chart below reflects, for 2009 the Company reported revenues of over $63 million for 2009 in its SEC filings, but reported a substantially lower amount, only $1.89 million in revenues, in its AIC filings.

64.    Further, ABAT's AIC filings show that ABAT lost money every year from 2007 to 2009, in dramatic contrast to the consistently growing profits it claimed in its SEC filings:[19]

AIC

| USD | 2007 | 2008 | 2009 |
|------------|-------------|------------|--------------|
| Revenue | $145,116 | $938,154 | $1,891,976 |
| Net Income | -$1,006,269 | -$912,171 | -$3,938,921 |

SEC 10-K

| USD | 2007 (Restated) | 2008 (Restated) | 2009 (Restated) |
|------------|-----------------|-----------------|-----------------|
| Revenue | $31,897,618 | $45,172,111 | $63,561,925 |
| Net Income | $10,205,406 | $20,186,932 | $21,802,052 |

---

[18] The AIC has two main functions: 1) to administer the establishment and closing of companies, as well as to record corporate changes, such as a change in shareholders, capital amount and directors; and 2) to monitor compliance by companies with China's company laws and regulations. Under this regulatory power, the AIC conducts an annual examination of companies, usually in March and April of every year. Companies are required to file financial statements with the AIC as part of the annual examination.

[19] http://www.sec.gov/Archives/edgar/data/745651/000109690611000446/0001096906-11-000446-index.htm.

65.    Indeed, while the ABAT Response, issued on April 6, 2011, purported to explain away the misstatements Variant highlighted, it did not even attempt to defend against or explain the discrepancies between the AIC and SEC filings.

66.    The inference that ABAT's reported income and profits are inflated is heightened by the fact that ABAT claims unrealistically high profit margins, even though it sells a commodity and admittedly has no distinct competitive advantage in the market.    ABAT recognizes in its 2010 10-K that it has no special technology for its main products and that it could only gain an edge based on the quality and efficiency of its manufacturing facilities:

> The technology utilized in producing polymer lithium-ion batteries is widely available throughout the world, and is utilized by many competitors, both great and small. ZQ Power-Tech's patents give it some competitive advantage with respect to certain products. *However, the key to competitive success will be ZQ Power Tech's ability to deliver high quality products in a cost-efficient manner. This, in turn, will depend on the quality and efficiency of the assembly lines that we have been developing at our plant in Harbin.* (Emphasis added)

67.    As further detailed below at ¶¶ 71-77, Plaintiffs' investigation and other investigations have revealed that ABAT's Chinese manufacturing facilities are average in quality and efficiency.  Despite this, ABAT reported unrealistically high margins in 2010 that are nearly two to three times those reported by its Chinese competitors:

| Company | 2010 Operating Profit Margins |
|---|---|
| China BAK Battery, Inc. | -9.7% |
| BYD Company | 7.3% |
| SCUD Group Ltd | 5.8% |
| Coslight Technology | 9.1% |
| Tianneng Power | 14.3% |
| *ABAT* | *39.0%* |

68.    Similarly, ABAT reports substantially higher profit margins than its international competitors:

| Company | Operating Profit Margins |
|---------|--------------------------|
| FABRIC NAC ET-1 | 28.8% |
| NEW ENERGY SYSTE | 22.1% |
| EVE ENERGY -A | 21.8% |
| CHINA TMK BATTER | 18.3% |
| DRY CELL & STORA | 13.1% |
| *ABAT* | *39.0%* |

69.    Such disparities, despite its lack of any real competitive advantage, further support the allegations herein that Defendants inflated ABAT's revenues and profits.

70.    The Company has reported similarly inflated gross margins for 2008 (49%) and 2009 (44.7%). Notably, the ABAT Response does not adequately address the allegations that its reported margins are false. The Company merely states that they "have been audited by highly-reputable independent accounting firms."

### i. ABAT's Production and Customer Service Do Not Substantiate Its Reported Financial Results.

71.    As noted, an investigation of ABAT's production facilities in China undermined the veracity of the Company's reported financials. In fact, an inspection of ABAT's primary Harbin and Wuxi facilities in China by Plaintiffs' investigators revealed that both the Harbin and Wuxi facilities produce commodity, low margin products. Neither facility stands out among other enterprises in its respective local area. Further, interviews of government officials at the local economic development office in Shuangcheng City (which is part of Harbin City and where the Company is located) by Plaintiffs' investigators revealed that ABAT is far from the prominent company that it portrays itself to be.

72.    Based on visits by its investigators to the facilities, Prescience[20] similarly concluded that the unexceptional quality of the Company's facilities casts doubt on the veracity of ABAT's claimed exceptional margins:

> It appears that the Harbin plant is in operation, does produce cells, and has sales. The semi-automated processes... are more advanced than some of the battery companies of China, and far **less advanced than battery companies of international standing** such as ATL, Lishen, Samsung, LG Chem. It appears that they do some things well, and have some potential great strength, but appear to have limited ability and concepts in the marketing and sales of their product. Selling cells to packagers is a common business model for Asian battery factories, but not one that realizes as much profit. And I note that **the CTO acknowledged that the packagers and trading companies were making the entire margin and he was not**. Again, normal for Asian cell makers – but not a way to gain success.
>
> A proprietary BMS (Battery Management System) is essential for a successful battery company in the Light Electric Vehicle space. And the lack of such is a major handicap for Harbin. It appears to me that this company has a tiny business selling Li Ma or LFP (Lithium Iron Phosphate) cells to packagers for use in low priced battery packages sold to the domestic China market. **This is the least profitable business they could have**. The LI-Polymer cells are apparently not really in production (the normal issue with Li poly) due to high cost of materials and resulting high cost of the cells making them uninteresting to most applications. The LFP cells cannot be exported due to patent issues... So **the only apparent product for any significant sales would be Lithium Manganese cells, and for that to make money for Harbin they would, probably, need to develop their own BMS, become their own packager, and compete with Phylion, Zhenlong, AEE, MGL, LG Chem, Lishen, HYB, and others**.

73.    Prescience also cited interviews with ABAT customers who refuted the possibility that ABAT has the ability to manufacture a product capable of generating enough revenue or sales to justify its purported stellar profit margins:[21]

---

[20] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

[21] *Id.*

22

This customer had signed a contract to receive scooters from ABAT's Wuxi facility in 2009. After receiving defective product, the customer demanded to visit the Wuxi facility that had supposedly been manufacturing the scooters. During our conversation, the customer indicated that he had visited numerous other Chinese manufacturing facilities to which Wuxi could be compared, and he described the Wuxi facility as a "joke" multiple times. The facility was described as "four empty walls," the inadequacy of which made him suspect Wuxi was some sort of distributor operation rather than a manufacturing facility. Furthermore, the customer stated that he thought about contacting the SEC to report ABAT for fraudulent claims made in press releases. He said that "none of the stuff they put out was accurate."

74.    Prescience transcribed excerpts of its investigative conversation with the aforementioned customer which are included, in relevant part, below:[22]

... I think it was maybe 2009 – when we showed up to the factory, they weren't doing any manufacturing at all. There was nothing going on. They had a showroom, but it was an empty shell of a building.

\*\*\*

So [in] one building where they were supposed to be doing manufacturing, it was all these dust-covered frames in one corner, and it was obvious to tell that there was nothing going on there. Nothing going on. Their QC department was 3 or 4 dust-covered machines and 2 schleps sitting in an office where there was nothing happening.

\*\*\*

**Prescience** Are you comparing it to other companies that you visited?

\*\*\*

**Customer** Yes, legitimate companies.

\*\*\*

**Prescience** So there was a significant difference there?

\*\*\*

**Customer** Oh my god, yes. It was a joke. It was absolutely the biggest joke I'd ever seen. Any normal person that came through there would realize that it was a joke.

---

[22] *Id.*

23

75.    Plaintiffs' investigators visited the Wuxi facility in 2011.  Although the facility now appears to be conducting some manufacturing, Plaintiffs' investigators nonetheless concluded that the production capabilities of this facility were unexceptional, and certainly not sufficient to support the significant profit margins reported in ABAT's SEC filings.

76.    Prescience also quoted a conversation its investigator had with an executive at All-Power America, a company that ABAT announced it had contracted with in 2010 to re-enter the US market, expecting to deliver 2,000 electric scooter units to All-Power America for $1.1 million.  This customer stated that "every step of the way we had some serious QC issues… The licensing is the official word that we gave out to everybody because that was a very tangible problem that the retailer used to return the products. But licensing was a major part of it, they should have checked for licensing compliance before they sent it."  The customer stated that his company was "stuck" with inventory that he could not sell because of the quality problems.[23]

77.    The Company's SEC filings are additionally false and/or misleading, for the reasons indicated below.

**B.    Defendants' Misrepresentations Concerning The Shenzhen Acquisition**

78.    On December 20, 2010, ABAT filed an 8-K announcing that it would acquire "Shenzhen Zhongqiang New Energy Science & Technology Co., Ltd." for approximately $20 million:

> On December 20, 2010 Harbin Zhongqiang Power-Tech Co., Ltd. ("Harbin Zhongqiang"), which is a subsidiary of the Registrant, entered into an Acquisition Agreement with Shenzhen Zhongqiang New Energy Science & Technology Co., Ltd. ("Shenzhen Zhongqiang"). The Acquisition Agreement provides that on January 1, 2011 Harbin Zhongqiang will acquire all of the assets of Shenzhen Zhongqiang. In exchange for the assets of Shenzhen Zhongqiang, Harbin Zhongqiang will pay to Shenzhen Zhongqiang 135,000,000 Renminbi (approximately $20 million), of which 91,250,000 Renminbi will be used to satisfy the

---

[23] Id.

liabilities of Shenzhen Zhongqiang. The initial payment of 67,500,000 Renminbi is due three days after the agreement was signed. The balance (net of the deposit of 10 million Renminbi previously paid) is due thirty working days after the transfer of assets.

79.     Further, the Company's 2010 10-K stated:

On January 6, 2011, Harbin Zhongqiang, a subsidiary of the Company, completed the acquisition of all of the assets of Shenzhen Zhongqiang New Energy Science & Technology Co., Ltd. ("Shenzhen Zhongqiang") for a purchase consideration totaled RMB RMB135,000,000 (approximately $20 million). The Company made an initial payment plus deposit of $11,721,468 (equivalent to RMB 77,500,000) and $1,457,034 (equivalent to RMB 10 million) as of December 31, 2010 and 2009, respectively, and recorded as deposit for investment. The Company completed the acquisition in January 2011.

80.     The foregoing statements were false and/or misleading because Defendants failed to disclose that Defendant Fu had purchased Shenzhen in 2008, and that the current "acquisition" was actually a related party transaction between Fu and ABAT. Whereas Fu had paid only $1 million to acquire the company in 2008, he was now selling it to ABAT for $20 million.

81.     Documentary evidence obtained in various court filings shows that, in fact, Fu had purchased Shengxi Science and Technology Co., Ltd. for $1 million pursuant to an Acquisition Agreement dated August 31, 2008.[24] Specifically, court documents from a lawsuit filed in 2009 in which Shenzhen's CEO, Huang Suiyang, who became ABAT's Chief Technology Officer, sued ABAT in U.S. federal court over a payment dispute related to the 2008 acquisition, confirm that the company acquired in 2008 is in fact the same Shenzhen battery maker ABAT purported to acquire in 2010.[25] For example, a motion ABAT filed in the litigation, *Sue-Yang Huang v. Advanced Battery Technology, Inc.*, *1:09-cv-08297-HB, (S.D.N.Y)., document no. 12,* on December 7, 2009, states in relevant part:

---

[24] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

[25] *Id.*

25

> Plaintiffs' Employment Contract [dated August 30, 2008] was executed contemporaneously with the **acquisition of Huang's father's company, Shenzhen Shengxi Science and Technology Co., Ltd. ("Shenzhen SST"), by ABAT's Chief Executive Officer, Fu.** See Compl., ¶ 7 & Ex. A. Curiously, the Complaint refers to Shenzhen SST as "Luke Battery Corp.," Compl., ¶ 6 & Ex. A — a name appearing nowhere in the Acquisition Agreement. **The company was then renamed Shenzhen Zhongqiang Energy Science and Technology Co. Ltd., a name sometimes rendered in English as "Shenzhen ABAT"** or "SABAT." Fu Decl., ¶ 10. [Emphasis added]

(emphasis added).[26]  Huang Suiyang's father is Huang Youlin, the former legal representative of

Shenzhen, as explained in ¶ 82 supra.

82.     Further, the Shenzhen AIC registration website indicates that Zhiguo Fu, ABAT's

CEO, became the legal representative of Shenzhen years earlier than the announced acquisition

date, replacing Huang Youlin in September 2008.

83.     Thus, all evidence supports the conclusion that the $20 million "acquisition" in

2010 was actually a related party transaction involving Defendant Fu.   The Company's

December 20th representations concerning this alleged transaction and related financial

statements were a subterfuge for the Company to funnel $19 million to Fu.   None of this was

disclosed.

84.     The ABAT Response[27] admits that the AIC registration website's listing of Fu as

the legal representative is correct:

> The Variant View report notes that our Chairman, Fu Zhiguo, is identified as an officer and legal representative of Shenzhen ZQ in that company's government registration. That is correct. In order to register the acquisition of Shenzhen ZQ by Harbin ZQPT with the provincial government, Mr. Wang, the seller, gave Mr. Fu a power of attorney to represent the company before the government. This was solely an administrative convenience, as the purchase of Chinese companies cannot be completed without government registration performed in person.

_____

[26] *Id.*

[27] Advanced Battery Technologies, Inc., *Advanced Battery Technologies Responds to Allegations by Variant View Research*, NASDAQ OMX - GlobeNewswire, http://www.globenewswire.com/news.html?d=21807&topic=1024/.

However, ABAT fails to explain why this "administrative convenience" took place *years* before the 2010 "acquisition."

85.     The outrageous amount that ABAT paid for Shenzhen is further evidence of the sham nature of the transaction. Founded in 2007 with a registered capital of RMB 3 million, the Shenzhen company had been losing money since its inception. The AIC records indicated the financial results of the Shenzhen company as follows:

| RMB | 2007 | 2008 | 2009 |
|---|---|---|---|
| Revenue | ¥10,943.40 | ¥4,913,846.91 | ¥3,060,677.76 |
| Net Income | ¥-157,699.41 | ¥-113,268.23 | ¥-1,606,802.77 |
| USD | 2007 | 2008 | 2009 |
| Revenue | $1,439.92 | $710,093.48 | $448,122.66 |
| Net Income | -$20,749.92 | -$16,368.24 | -$235,256.63 |

Note: acquired in 2010, not consolidated in 2007-2009 financials

For a company established in 2007 and in the red since its inception, the stated purchase price was unreasonable on its face and lacked any reasonable basis.

**C.     Defendants' Misrepresentations Concerning Wuxi**

**i.     Failure to Disclose Material Facts Concerning ABAT's Acquisition of Wuxi.**

86.     In a press release and 10-Q filed on May 11, 2009, Defendants announced ABAT's acquisition of Wuxi.  In the press release, Defendants stated, in pertinent part:

> The Company signed a definitive acquisition agreement with Wuxi Angell
> Autocycle Co. Ltd. ("Wuxi Angell") on April 28, 2009 and closed the
> acquisition in early May.
> Mr. Zhiguo Fu, Chairman and CEO of Advanced Battery Technologies,
> commented, "We are excited to announce that we have completed the
> acquisition of Wuxi Angell.  The acquisition of Wuxi Angell provides the
> Company entry to the growing electric and hybrid-electric bike market.
> The benefits of our relationship with Wuxi Angell are evident in the
> introduction of three new hybrid motorcycles, which debuted in February
> 2009, and by our recently announced contracts for various types of electric
> vehicles and hybrid-electric vehicles, with an aggregate contract amount
> of $24 million."

87.     The foregoing statements were false and/or misleading because the press release failed to disclose that the Company paid an excessive amount to acquire Wuxi for illegitimate purposes as part of a kickback arranged with Defendant Fu, ABAT's Chairman and CEO.

88.     The exorbitant price directly benefited Chairman Fu.  A former member of ABAT's core management told Plaintiffs' investigators that he believed Defendant Fu caused ABAT to pay an inflated amount for Wuxi, because Fu had a side deal with Wuxi's sellers to share the excess proceeds with them.

89.     Indeed, the exorbitant amount paid for Wuxi seriously undermines the legitimacy of the transaction.  According to its Form 8-K filed with the SEC on April 30, 2009,  ABAT paid a total of approximately $22 million for Wuxi: $3.64 million cash, 70 million Chinese Renmimbi (approximately $10,248,902), plus 3 million ABAT common shares (valued at 9.9 million), to acquire Wuxi. The total price paid was over two times Wuxi's book value.  Wuxi had a net loss of $3.7 million in 2008, and a net loss of $1.1 million in 2007. Its gross profit declined by 35% from 2007 to 2008. Revenue was rapidly contracting: 2009 Q1 revenue was $0.75 million, or down 63% year over year.  Working capital position was negative $15 million. Cash flow from operations in the first quarter was negative $4.1 million.

90.     Further, when challenged on the legitimacy of the Wuxi transaction, Defendants changed their story, stating in  the ABAT Response[28] that ABAT had paid only $12,870,000, not $22 million as they had previously represented in the April 30, 2009 Form 8-K.

**Wuxi's Distribution Network.**

91.     Defendants' representations concerning the distribution network for Wuxi's product were also misleading. While ABAT represented that Wuxi's distribution network

---

[28] Advanced Battery Technologies, Inc., *Advanced Battery Technologies Responds to Allegations by Variant View Research*, NASDAQ OMX - GlobeNewswire, http://www.globenewswire.com/news.html?d=21807&topic=1024/.

"increased substantially" in 2010, a number of these purported distributors either appear to be fictitious or disclaimed any significant relationship with ABAT.   Specifically, ABAT's 2010 10-K represented that:

> Wuxi ZQ markets its electric vehicles primarily through a network of distributors in selected locations worldwide. Most of Wuxi ZQ's products carry both EEC and DOT(EPA) certification. During 2010, Wuxi ZQ recorded $22 million in sales abroad, to complement $27 million within China.
>
> The worldwide distribution network for Wuxi ZQ vehicles increased substantially during 2010:
>
> - On March 30 and 31, 2010 ZQ Power-Tech held a product promotion conference for its electric vehicles customers from both the domestic and the overseas markets. Approximately two hundred people participated in the conference, including customers from Netherlands, Chile, Canada, India, Afghanistan, and over a hundred Chinese companies.
>
> - In April 2010, during the International Bicycle Expo in Shanghai, ZQ Power-Tech signed sales contracts totaling approximately $1.7 million (or 2,500 electric scooters) with European customers, including customers located in Germany, Denmark and the Netherlands.
>
> - In May 2010 Wuxi ZQ signed an agreement with All-Power America to serve as the first U.S.-based distributor for Wuxi ZQ since the May 2009 acquisition.
>
> - In September 2010 Menzaghi Motors of Italy placed an order for the aluminum magnesium alloy electric scooters that Wuxi ZQ recently developed to meet demand for a lighter-weight vehicle with higher mileage
>
> - In October 2010 we signed an agreement with Kanuni Motorcycle, a well-known motorcycle producer in Turkey, under which Kanuni now sells three types of Wuxi ZQ scooters.
>
> In addition to the distributors noted above, Wuxi ZQ's roster of distributors now includes:
>
> - Hi Motors and Ampere Vehicles Pte. Ltd. in India;
> - Eco Style Di in Italy;
> - DMS Motorlu Araclarsanayi Vetica in Turkey;
> - Tinterparts Trading GmbH in Germany;

- Ersico Spol SRO in the Czech Republic;
- D.M.C. (DuurzaawMobiliteits) in the Netherlands;
- Floretti Europe BVBA in Belgium; and
- Autoplaza Holdings in the Philippines.

The 2010 10-K further states:

> In October 2009 ZQ Power-Tech entered into a one-year $7.8 million contract to provide 48V/15Ah and 72V/50Ah polymer lithium-ion phosphate batteries to U Long Run Sheng Technology Co., Ltd., a leading distributor of power management systems to the electric vehicle industry.

92.     The foregoing statements are false and/or misleading for the following reasons.

93.     Plaintiffs' investigation has uncovered that many of these companies identified by ABAT either appear to be fictitious or have minimal business with ABAT.   Investigative searches for the names of many of these supposed distributor companies did not yield any results aside from ABAT filings.   For instance, a search for stated distributor "Eco Style Di" in Italy reveals no such company.[29] The same is true of stated distributor "Auto Plaza Holding."

94.     Further, according to an interview by Plaintiffs' investigator, an executive from Kanuni Motors, another of ABAT's claimed distributors, did not recognize either Wuxi or Advanced Battery as one of Kanuni's suppliers.

95.     Similarly, another interview by Plaintiffs' investigator (with an  executive from Menzaghi Motors) revealed that while his company did have a business relationship with Wuxi, the relationship was "insignificant."[30]

---

[29] A company in Italy with a similar name called "Ecostyle," appears to be an unrelated business that, according to its website, "invent(s) and sell(s) products made in Polypropylene for retail merchandising displays and advertising concepts."

[30] Moreover, the executive that was interviewed refused to provide any details regarding the amount of purchases Menzaghi had made from Wuxi.

96.    Prescience[31] further undermines the significance of the ABAT- Menzaghi business dealings, stating that an interview with the CEO of Menzaghi Motors confirmed that Menzaghi has a minimal business relationship with ABAT, and that ABAT delivered inferior product relative to its competitors:

> We spoke with the CEO of Menzaghi Motors, Paolo Pinciroli. Pinciroli confirmed that they are a customer of Wuxi ZQ and have known them for "3 or 4 years." They've ordered approximately 100 scooters from them annually, providing further evidence that Wuxi is inflating its sales numbers. For Wuxi ZQ to meet its sales targets, it would need to export at least 30,000 scooters annually. We also got the following quote from Menzaghi Motors: "Sometimes when I [visit] this company, I see the people work. Some other times, the people don't work, I don't know why."
>
> Pinciroli compared Wuxi ZQ to other scooter suppliers that they use. It was clear that several of their other suppliers provided higher quality products and quickly corrected mistakes. For instance, Pinciroli said: "[The competitor] solves the problems in a short time. [Wuxi] takes too much time – these people don't understand the situation in the market. Of course, I see only the European market, but I cannot tell to our customer that you must wait 3 months, 4 months or 5 months before your problem is solved." We also asked whether Wuxi ZQ's scooters suffered from any quality control issues. His response: "I don't think that [Wuxi ZQ] have people to control quality because sometimes I see one man – the chief of the line of production – he tests a vehicle, but for 10 meters, not more [chuckle]. I don't think they have a serious quality control [department], like, for example, Jinstar, Iden, Sukida, Kai-sun. These other companies have special departments to control quality. [Wuxi ZQ] I don't think cares."

97.    The ABAT Response fails to demonstrate that these distributor relationships in fact exist and actually calls into the question the validity of Wuxi ZQ's sales results for 2010. The ABAT Response states in pertinent part:

> Our audited financial statements for 2010 show that Wuxi ZQ made $49 million in sales during the year. If its distributors are "fake," how did it do that?

---

[31] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

**D.    Defendants' Misrepresentations Concerning the Ownership of HLJ ZQPT**

98.    ABAT's 2008 10-K describes Heilongjiang ZhongQiang Power-Tech Co., Ltd., as the wholly owned subsidiary of Cashtech:

> Cashtech Investment Limited is also a holding company with only one subsidiary: Heilongjiang ZhongQiang Power-Tech Co., Ltd., a China limited liability company ("ZQ Power-Tech").

99.    Further, ABAT's 2007 10-K HLJ ZQPT is described as the 100% owned subsidiary of Cashtech.

> Prior to January 2006, Cashtech Investment Limited owned 70% of the capital stock of ZQ Power-Tech. In January 2006 our Chairman, Fu Zhiguo, transferred the remaining capital stock of ZQ Power Tech to Cashtech Investment Limited, so that it now owns 100% of ZQ Power-Tech.

100.    As late as ABAT's 10-Q filed on August 11, 2009, the Company continued to claim complete ownership of HLJ ZQPT.

101.    Yet, in the 2009 10-K, the Company suddenly discloses that HLJ ZQPT is actually owned by Defendant Fu, without any explanation of how he reacquired ownership:

> HLJ ZQPT is owned by our Chairman, Mr. Fu and other individuals but controlled by Harbin ZQPT through a series of contractual arrangements that transferred all of the benefits and all of the responsibilities for the operations of HLJ ZQPT to Harbin ZQPT.

102.    The foregoing statements were false and/or misleading.  Either the SEC filings are accurate and Defendant Fu transferred ownership of the Company's sole operating subsidiary to himself without explanation or compensation, as required under PCAOB standards, or the filings are inaccurate, and the Company falsely represented that it previously owned 100% of HLJ ZQPT, when in fact it did not, despite having issued millions of shares to Fu supposedly in exchange for his holdings of HLJ ZQPT.

103.    In the ABAT Response, the Company effectively admits that it did not actually

own HLJ ZQPT from 2004 through 2009:

> Heilongjiang ZQPT, the referenced subsidiary, has been owned by 16
> investors, including Chairman Fu, since it was organized in 2002. In 2004
> the owners of Heilongjiang ZQPT transferred all of the benefits and
> obligations of ownership of Heilongjiang ZQPT to Harbin ZQPT, a
> subsidiary of ABAT. Under U.S. GAAP, the transfer of those benefits and
> obligations meant that the balance sheet and financial results of
> Heilongjiang ZQPT must be consolidated with those of ABAT as if it
> were a subsidiary. Thus, for accounting purposes, ABAT reported in its
> SEC filings from 2004 to 2009 that it "owned" Heilongjiang ZQPT. In
> 2009 ABAT decided that it would be more appropriate to explain the
> relationship in detail, which accounts for what Variant View mistakenly
> refers to what "appears" to it to be a transfer of ownership.
>
> In sum, there has been no transfer of ownership of Heilongjiang ZQPT, to
> our Chairman or otherwise. All that occurred was a change in how ABAT
> characterized the relationship in its filings…

### False and Misleading Statements Made
### by the Auditor Defendants During the Class Period

104.    On March 28, 2008, the Company filed its Form 10KSB for the year ended

December 31, 2007 ("2007 10KSB"), which included the following Auditors' Report issued by

Defendant Bagell Josephs:

> The Board of Directors and Stockholders Advanced Battery Technologies, Inc.
> We have audited the accompanying consolidated balance sheets of Advanced
> Battery Technologies, Inc. and its subsidiaries as of December 31, 2007 and 2006
> and the related consolidated statements of income, changes in stockholders'
> equity, and cash flows for each of the two years ended December 31, 2007 and
> 2006. These consolidated financial statements are the responsibility of the
> Company's management. Our responsibility is to express an opinion on these
> financial statements based on our audits.
>
> We conducted our audits in accordance with standards established by the Public
> Company Accounting Oversight Board (United States). Those standards require
> that we plan and perform the audits to obtain reasonable assurance about whether
> the financial statements are free of material misstatement. The Company is not
> required to have, nor were we engaged to perform, an audit of its internal control
> over financial reporting. Our audits included consideration of internal control over
> financial reporting as a basis for designing audit procedures that are appropriate in
> the circumstances, but not for the purpose of expressing an opinion on the

effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc. and its subsidiaries as of December 31, 2007 and 2006 and the results of its operations, changes in stockholders' equity, and cash flows for each of the two years ended December 31, 2007 and 2006 in conformity with accounting principles generally accepted in the United States of America.

105. As previously detailed herein at ¶ 44, on March 16, 2009, ABAT filed a Form 10-K with the SEC for the year ended December 31, 2008. The 2008 10-K included Bagell Josephs' Independent Auditors' Report, dated March 12, 2009. The Auditors' Report stated:

We have audited the accompanying consolidated balance sheets of Advanced Battery Technologies, Inc. (the "Company") as of December 31, 2008 and 2007, and the related consolidated statements of income and comprehensive income, changes in stockholders' equity and cash flows for each of the three years in the period ended December 31, 2008. We have also audited the Company's internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission. (COSO).* *

*   *   *

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).

*   *   *

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc. as of December 31, 2008, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2008, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control – Integrated Framework issued by the

34

Committee of Sponsoring Organizations of the Treadway Commission (COSO).

106.    As previously detailed herein at ¶ 52, on March 30, 2010, ABAT filed a Form 10-K with the SEC for the year ended December 31, 2009 ("2009 10-K").  The Form 10-K included Friedman's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated March 29, 2010.  The Auditors' Report stated:

> We have audited the accompanying balance sheets of Advanced Battery Technologies, Inc as of December 31, 2009, and the related statements of income, stockholders' equity and comprehensive income, and cash flows for the year ended December 31, 2009. We also have audited Advanced Battery Technologies, Inc's internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control— Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> \* \* \*
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).
>
> \* \* \*
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc as of December 31, 2009, and the results of its operations and its cash flows for the year ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, Advanced Battery Technologies, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

107.    As previously detailed herein at ¶ 60, on March 16, 2011, ABAT filed a Form 10-K with the SEC for the year ended December 31, 2010 ("2010 10-K").  The Form 10-K included Friedman's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated March 16, 2011.  As detailed below, Friedman's Auditors' Report noted several material internal control weaknesses, but nonetheless opined that the Company's financial statements were free of material misstatement:

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).

\* \* \*

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. *The following material weaknesses have been identified and included in Management's Report on Internal Control over Financial Reporting: (a) a lack of expertise in identifying and addressing complex accounting issues under U.S. Generally Accepted Accounting Principles among the personnel in the Company's accounting department, which has resulted in errors in accounting that necessitated a restatement of the financial statements for 2008 and 2009 and (b) inadequate review by management personnel of the Company's reports prior to filing, which resulted in errors in prior filings that necessitated the filing of amendments to the 2009 Annual Report and the Quarterly Reports through the quarter ended September 30, 2010. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2010 financial statements.*

*In our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Advanced Battery Technologies, Inc. has not maintained effective internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc. as of December 31, 2010, and the results of its operations and its cash flows for the year ended December 31, 2010 in conformity with accounting principles generally accepted in the United States of America.

(Emphasis supplied).

108.   Except for the statements identifying the Company's material internal weaknesses, the Auditor Defendants' Auditors' Reports for fiscal years ended December 31, 2007, December 31, 2008, December 31, 2009, and December 31, 2010 attesting to their performance of audits in accordance with the standards of the PCAOB and representing that

36

ABAT's financial statements conformed to GAAP were materially false and misleading when made. The Auditors' Reports were false and/or misleading because:

1.  The Auditor Defendants' audits were not conducted in accordance with PCAOB standards; and

2.  ABAT's financial statements did not fairly present the financial position of and results of operations for ABAT for fiscal years ended December 31, 2007, December 31, 2008, December 31, 2009, and December 31, 2010 in conformity with GAAP.

3.  As a result of the Auditor Defendants' failure to perform its audits in accordance with PCAOB standards, its audits did not provide a reasonable basis for its opinions.

109.   By issuing unqualified Auditors' Reports for these years, the Auditor Defendants violated Statement of Accounting Standard ("SAS") 98 entitled, "Reports on Audited Financial Statements," which states:

> The auditor's standard report states that the financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flow in conformity with generally accepted accounting principles. This conclusion may be expressed only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards. AU § 508.07.

110.   The Auditor Defendants acted with knowledge of or reckless indifference as to the falsity of the representations in the Auditors' Reports, as already detailed.

### THE TRUTH BEGINS TO EMERGE

111.   On March 30, 2011, Variant published a report entitled "Advanced Battery Technologies. An Egregious Chinese RTO."[32]

112.   The report made the following conclusions, among others:

1.  The Chairman appears to have transferred ownership of ABAT's key subsidiary to himself without explanation or compensation;

---

[32] Variant View, *Advanced Battery Technologies: An Egregious Chinese RTO*, Seeking Alpha, (March 30, 2011) http://seekingalpha.com/article/260883-advanced-battery-technologies-an-egregious-chinese-rto.

2.  ABAT claims unrealistic margins in what it admits is a commodity market;

3.  ABAT claims to have increased revenue from $4.2 million to $97.1 million from 2005 to 2010 while decreasing its employee count;

4.  ABAT claims distribution relationships which appear to be fake;

5.  ABAT spent $20 million to acquire a company linked to the Chairman without disclosing the relationship;

6.  ABAT spent $22 million or 7x sales to acquire a failing and possibly related company;

7.  ABAT issued 11 million shares to the Chairman and other individuals to repay a "loan" which appears to be entirely fabricated.

113.    On this news, the Company's shares plummeted $1.50 or nearly 48%, to close on March 30, 2011 at $2.01 per share, on unusually heavy trading volume.

114.    On May 5, 2011, Prescience published another report[33] on ABAT, corroborating and expanding many of Variant's claims.  Specifically, Prescience asserted, among other things, that:

1.  ABAT reported significantly lower revenue and profit in its AIC filings as compared to its SEC filings;

2.  ABAT claims unreasonably high margins in an established industry with strong competitors;

3.  ABAT paid $20 million for an entity, Shenzhen, that it had previously acquired in 2008.

115.    As noted, ABAT issued its April 6th response to the Variant Report, which purported to defend against the Variant allegations. As detailed herein however, Plaintiffs' investigation has confirmed massive discrepancies between ABAT's SEC filings and the AIC filings with respect to reported revenues and earnings, as well as confirming other material

---

[33] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

38

misrepresentations. The ABAT response is merely another attempt to continue its deceit on investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

116. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ABAT securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

117. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ABAT securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ABAT or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

118. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

119. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

120.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.    Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ABAT;

- whether the Individual Defendants caused ABAT to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ABAT securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.    There will be no difficulty in the management of this action as a class action.

122.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the ABAT shares traded on the Nasdaq, an efficient market, and was covered by multiple analysts;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold ABAT securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

123.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against ABAT and the Individual Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

124.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

125.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

126.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ABAT securities; and (iii) cause Plaintiffs and other members of the Class to purchase ABAT securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein.

127.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ABAT securities and options.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ABAT's finances and business prospects.

128.   By virtue of their positions at ABAT, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

129.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of ABAT securities from their personal portfolios.

130.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of ABAT, the Individual Defendants had knowledge of the details of ABAT internal affairs.

131.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ABAT.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ABAT's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ABAT securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning ABAT's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased ABAT securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

132.    During the Class Period, ABAT securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of ABAT securities and options at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares and options, or would not have purchased them at the inflated prices that were paid.  At the time of

43

the purchases by Plaintiffs and the Class, the true value of ABAT securities and options were substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of ABAT securities and options declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

133.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

135.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

136.    During the Class Period, the Individual Defendants participated in the operation and management of ABAT, and conducted and participated, directly and indirectly, in the conduct of ABAT's business affairs. Because of their senior positions, they knew the adverse non-public information about ABAT's misstatement of income and expenses and false financial statements.

137.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ABAT's

financial condition and results of operations, and to correct promptly any public statements issued by ABAT which had become materially false or misleading.

138.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ABAT disseminated in the marketplace during the Class Period concerning ABAT's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ABAT to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ABAT within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ABAT securities and options.

139.    Each of the Individual Defendants, therefore, acted as a controlling person of ABAT.  By reason of their senior management positions and/or being directors of ABAT, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ABAT to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of ABAT and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

140.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ABAT.

## COUNT III

### (Against The Auditor Defendants for Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder)

141.    Plaintiffs bring this claim on behalf of all members of the Class who purchased ABAT common stock during the period from May 15, 2007 and March 29, 2011.

142.    Plaintiffs incorporate by reference all of the foregoing paragraphs as if realleged herein.

143.    Defendant Bagell Josephs served as ABAT's independent auditor from December 28, 2006 through January 1, 2010, when it was acquired by Friedman LLP.  Friedman served as ABAT's auditor until it was dismissed on December 14, 2010, less than a year later.  From December 14, 2010 until the present, EFP Rotenberg has served as ABAT's auditor.

144.    In their capacity as ABAT's auditors, the Auditor Defendants were required to audit the Company's financial statements in accordance with standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"), and to report the results of those audits to ABAT, its Board of Directors and the investing public.

**A.**    **The Auditor Defendants Ignored or Recklessly Disregarded Red Flags.**

145.    The Auditor Defendants ignored or recklessly disregarded numerous red flags that should have alerted them to ABAT's fraudulent financial statements.  Specifically, the Auditor Defendants ignored or recklessly disregarded that:

> a.    ABAT went public by virtue of a reverse merger, a mechanism commonly used to avoid SEC scrutiny;
>
> b.    ABAT's reported SEC and AIC financial results during the Class Period differed materially;
>
> c.    ABAT claimed to acquire a company for $20 million in 2010 that had in fact acquired for $1 million in 2008;
>
> d.    ABAT did not in fact own HLJ ZQPT between 2004 and 2009;

46

    e.  ABAT reported unreasonably high margins without plausible justification;

    f.  ABAT engaged in related party transactions without the required disclosures; and

    g.  ABAT had high rates of auditor and CFO turnover, common signals of fraud.

**B.    The Auditor Defendants Failed to Properly Conduct Their Audits in Accordance with PCAOB Standards.**

146.    The Public Company Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that must be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date.

147.    Under PCAOB standards, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud. The Auditor Defendants repeatedly and materially violated PCAOB standards in each of their audits, failed to properly plan and perform their audits to obtain reasonable assurance that ABAT's financial statements were free of material misstatements, and, therefore, had no basis on which to state that ABAT's financial statements were presented in conformity with GAAP.

**i.    The Auditor Defendants Failed to Exercise Due Professional Care.**

148.    Auditors are required to adhere to certain standards in every audit they conduct. The Auditor Defendants failed to follow the most basic PCAOB requirements in auditing ABAT's financial statements during the Class Period. Specifically, the Auditor Defendants failed to exercise professional skepticism and collect sufficient audit evidence in violation of AU Section 230. AU Section 230 provides in relevant part:

> Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.

Due Professional Care in the Performance of Work, AU Section 230.07.

> Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.

*Id.* at 230.08.

> The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.

*Id.* at 230.09.

149.    In violating AU Sections 230.07-230.09, the Auditor Defendants failed to ensure that ABAT's financial statements were free of material misstatements and/or omissions. The duty to follow these requirements is more pronounced when an auditor is considering fraud risks:

> Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU Section 316.13.  Here, the risk of fraud was so great given the number of red flags, as

explained in ¶ 145, that the Auditor Defendants were duty bound to conduct careful

diligence and properly collect competent audit evidence pursuant to AS Section 15.15:

> Inspection involves examining records or documents, whether internal or
> external, in paper form, electronic form, or other media, or physically
> examining an asset. Inspection of records and documents provides audit
> evidence of varying degrees of reliability, depending on their nature and
> source and, in the case of internal records and documents, on the
> effectiveness of the controls over their production. An example of
> inspection used as a test of controls is inspection of records for evidence
> of authorization.

150.    For example, with regard to the Shenzhen acquisition, the Auditor Defendants

were required to collect and evaluate documentation concerning the transaction and to verify

relevant details with third parties.  Had they done so, the Auditor Defendants would have easily

uncovered that the transaction was a sham designed to siphon money from the Company.

Similarly, a review of relevant documentation would have shown that ABAT did not own HLJ

ZQPT between 2004 and 2009, despite representations to the contrary in its filings.

151.    The Auditor Defendants also violated PCAOB standards by failing to gather audit

evidence to substantiate ABAT's claimed customer relationships.  AU Section 316.53 provides

that auditors must "Mak[e] oral inquiries of major customers and suppliers in addition to sending

written confirmations, or sending confirmation requests to a specific party within an

organization."  Such inquiries are necessary to ensure that sales and revenues are accurately

reported.  An investigation regarding ABAT's customers would have also revealed information

regarding the poor quality of the product and the deficiencies in the ABAT facilities as ABAT's

customers have observed, (see ¶ 73), which would have also alerted the Auditor Defendants to

the improbability of ABAT's reported margins.  The Auditor Defendants should have known and

therefore recklessly disregarded that ABAT's customer relationships were misrepresented in its SEC filings. See ¶¶ 71-77.

152.    In addition, ABAT should have included ABAT's AIC filings in its compilation of audit evidence. Even the most cursory review of these filings would have revealed the discrepancy between the revenues and net income reported in the SEC and AIC filings as detailed above in ¶¶ 34-66, and would have alerted the Auditor Defendants to the pervasive fraud infecting those filings. See also Consideration of Fraud in a Financial Statement Audit AU Section 316.41.[34]

153.    The vast discrepancies between ABAT's reported revenues in the U.S. versus those reported in China cannot be explained by variances between U.S. and Chinese accounting standards.    Under U.S. GAAP, revenue can only be recognized when (i) collectability is reasonably assured, (ii) delivery has occurred, (iii) persuasive evidence of an arrangement exists, and (iv) there is a fixed or determinable price.  Chinese rules apply the more lenient standard that revenue may be recognized when (i) risks and rewards have been transferred, (ii) the issuer "ceases control" on the goods sold, and (iii) the revenue (and associated costs) can be measured reliably.

154.    Given this, the fact that ABAT's U.S. reported revenues were significantly greater than those reported in China was a huge red flag that the Company was falsifying its SEC filings.

**ii.    The Auditor Defendants Failed to Gain An Understanding of ABAT and its Environment.**

155.    The Auditor Defendants also violated AU Sections 311 and 314 by failing to obtain a proper understanding of ABAT and its environment.

---

[34] Material misstatements due to fraudulent financial reporting often result from an overstatement of revenues (for example, through premature revenue recognition or recording fictitious revenues) or an understatement of revenues (for example, through improperly shifting revenues to a later period). Therefore, the auditor should ordinarily

156.    AU Section 311 is the overall planning standard that must be followed in all audits.   Under this standard an auditor must obtain an understanding of the entity and its environment in order to properly plan an audit.   Specifically, AU Section 311.03 provides:

> Obtaining an understanding of the entity and its environment, including its internal control, is an essential part of planning and performing an audit in accordance with generally accepted auditing standards.   The auditor must plan the audit so that it is responsive to the assessment of the risk of material misstatement based on the auditor's understanding of the entity and its environment, including its internal control.   Planning is not a discrete phase of the audit, but rather an iterative process that begins with engagement acceptance and continues throughout the audit as the auditor performs audit procedures and accumulates sufficient appropriate audit evidence to support the audit opinion.   As a result of performing planned audit procedures, the auditor may obtain disconfirming evidence that might cause the auditor to revise the overall audit strategy.

Planning and Supervision, AU Section 311.   In order to properly understand ABAT and its environment the Auditor Defendants were required to follow the criteria set forth in AU Section 314 which details what an auditor must do to satisfy AU Section 311.

157.    AU Section 314 provides:

> .21    The auditor's understanding of the entity and its environment consists of an understanding of the following aspects:
>
> a.    Industry, regulatory, and other external factors.
>
> b.    Nature of the entity.
>
> c.    Objectives and strategies and the related business risks that may result in material misstatement of the financial statements.
>
> d.    Measurement and review of the entity's financial performance.
>
> e.    Internal control, which includes the selection and application of accounting policies.
>
> .24    The auditor should obtain an understanding of relevant industry, regulatory, and other external factors.   These factors include industry conditions, such as the competitive environment, supplier and customer relationships, and technological developments; the regulatory environment encompassing, among other matters, relevant accounting pronouncements, the legal and political environment, and environmental requirements

---

presume that there is a risk of material misstatement due to fraud relating to revenue recognition.

affecting the industry and the entity; and other external factors, such as general economic conditions.

.26    The auditor should obtain an understanding of the nature of the entity.  The nature of an entity refers to the entity's operations, its ownership, governance, the types of investments that it is making and plans to make, the way that the entity is structured, and how it is financed. An understanding of the nature of an entity enables the auditor to understand the classes of transactions, account balances, and disclosures to be expected in the financial statements.

.27    The entity may have a complex structure with subsidiaries or other components in multiple locations.  In addition to the difficulties of consolidation in such cases, other issues with complex structures that may give rise to risks of material misstatement include the allocation of goodwill to subsidiaries, and its impairment; whether investments are joint ventures, subsidiaries, or investments accounted for using the equity method; and whether special-purpose entities are accounted for appropriately.

Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement, AU Section 314.

158.    Pursuant to the foregoing paragraphs, the Auditor Defendants were required to gain an understanding of the nature of ABAT, its operations, its ownership, and its structure along with the relevant industry and competitive environment in order to ensure that the Company's filings were accurate.  With regard to ABAT's structure, the Auditor Defendants were required to verify which subsidiaries ABAT owned and when they were acquired.  The Auditor Defendants failed to do so or they would have known that the 2010 acquisition of Shenzhen was a farce designed to conceal the funneling of funds for another purpose.  The Auditor Defendants also should have known that the financial statements they audited misrepresented the ownership status of HLJ ZQPT between 2004 and 2009.

159.    The Auditor Defendants violated AU Sections 311 and 314 because had they gained a proper understanding of ABAT and its environment, they would have learned that ABAT did not in fact product cutting edge technology that would substantiate their reported high margins, but in fact produced a commodity that did not provide it with a unique advantage above

its competitors.  In fact AU Section 316.72 recognizes the importance of evaluating an entity's

competitors to properly evaluate risks of fraud and misstatement:

> A comparison of the entity's profitability to industry trends, which management cannot manipulate, may indicate trends or differences for further consideration when identifying risks of material misstatement due to fraud.

**iii.    The Auditor Defendants Failed to Determine the Existence of Related Parties.**

1.    The Auditor Defendants violated AU Section 334, which provides in relevant

part:

**Determining the Existence of Related Parties**

The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity. Certain relationships, such as parent-subsidiary or investor-investee, may be clearly evident. Determining the existence of others requires the application of specific audit procedures, which may include the following:

*a.*    Evaluate the company's procedures for identifying and properly accounting for related party transactions.

*b.*    Request from appropriate management personnel the names of all related parties and inquire whether there were any transactions with these parties during the period.

*c.*    Review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions.

*d.*    Determine the names of all pension and other trusts established for the benefit of employees and the names of their officers and trustees.

*e.*    Review stockholder listings of closely held companies to identify principal stockholders.

*f.*    Review prior years' working papers for the names of known related parties.

g. Inquire of predecessor, principal, or other auditors of related entities concerning their knowledge of existing relationships and the extent of management involvement in material transactions.

h. Review material investment transactions during the period under audit to determine whether the nature and extent of investments during the period create related parties.

Related Parties, AU Section 334.07.

### Identifying Transactions With Related Parties

The following procedures are intended to provide guidance for identifying material transactions with parties known to be related and for identifying material transactions that may be indicative of the existence of previously undetermined relationships:

a. Provide audit personnel performing segments of the audit or auditing and reporting separately on the accounts of related components of the reporting entity with the names of known related parties so that they may become aware of transactions with such parties during their audits.

b. Review the minutes of meetings of the board of directors and executive or operating committees for information about material transactions authorized or discussed at their meetings.

c. Review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties.

d. Review conflict-of-interests statements obtained by the company from its management.

e. Review the extent and nature of business transacted with major customers, suppliers, borrowers, and lenders for indications of previously undisclosed relationships.

f. Consider whether transactions are occurring, but are not being given accounting recognition, such as receiving or providing accounting, management or other services at no charge or a major stockholder absorbing corporate expenses.

g. Review accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period.

*h.*  Review confirmations of compensating balance arrangements for indications that balances are or were maintained for or by related parties.

*i.*  Review invoices from law firms that have performed regular or special services for the company for indications of the existence of related parties or related party transactions.

*j.*  Review confirmations of loans receivable and payable for indications of guarantees. When guarantees are indicated, determine their nature and the relationships, if any, of the guarantors to the reporting entity.

*Id.* at 334.08.

### Examining Identified Related Party Transactions

After identifying related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. The procedures should be directed toward obtaining and evaluating sufficient appropriate evidential matter and should extend beyond inquiry of management. Procedures that should be considered include the following:

*a.*  Obtain an understanding of the business purpose of the transaction.

*b.*  Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

*c.*  Determine whether the transaction has been approved by the board of directors or other appropriate officials.

*d.*  Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements.

*e.*  Arrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.

*f.*  Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

*Id.* at 334.09.

160.    The Auditor Defendants violated the foregoing standards by failing to determine and disclose that: 1) the Shenzhen transaction was a related party transaction and Shenzhen had in fact been acquired years earlier; 2) the Defendants failed to disclose the actual Purchase Price and other material information regarding this transaction; and 3) the transfers of ownership involving HLJ ZQPT were related party transactions between Defendant Fu and ABAT.

161.    As a result of the Auditor Defendants' false and misleading statements and omissions, the market price of ABAT common stock was artificially inflated throughout the Class Period.

162.    In ignorance of the false and misleading nature of the representations and omissions described above and the deceptive and manipulative devices employed by the Auditor Defendants, plaintiffs and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of the Auditor Defendants, purchased ABAT publicly traded securities at artificially inflated prices and were damaged thereby.

163.    Had plaintiffs and the other members of the Class known of the material adverse information not disclosed by the Auditor Defendants, or been aware of the truth behind the Auditor Defendants' material misstatements, they would not have purchased ABAT's publicly traded securities at artificially inflated prices, if at all.

164.    By virtue of the foregoing, the Auditor Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demands a trial by jury.

Dated: September 29, 2011

POMERANTZ HAUDEK
GROSSMAN & GROSS, LLP

Marc I. Gross
Murielle Steven Walsh
Tamar A. Weinrib
Fei-Lu Qian
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

William B. Federman
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK  73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
       - and -
2926 Maple Avenue, Suite 200
Dallas, Texas  75201

Laurence Rosen
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Facsimile:  (212) 202-3827

**CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS**

1. I, Ruble Sanderson, make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Advanced Battery Technologies, Inc. ("ABAT"), and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3. I did not purchase ABAT securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased ABAT during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in ABAT securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed ___May 24, 2011___, at ___415 CHURCH ST, SUITE 3015___
         (Date)             ___NASHVILLE, TN. 37219___
                                            (City, State)

                                            (Signature)

                                ROBLE SANDERSON
                                      (Type or Print Name)

**ADVANCED BATTERY TECHS INC**
**CLASS PERIOD:  NOV 24 2008 through MAR 29 2011**
**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|-----------------|-------------------|-----------------|
| 9/14/2010 | PUR | 1,000 | $3.5600 |
| 9/14/2010 | PUR | 1,000 | $3.5600 |
| 9/20/2010 | PUR | 2,000 | $3.4500 |
| 9/20/2010 | PUR | 1,000 | $3.3999 |
| 9/28/2010 | PUR | 3,000 | $3.5600 |
| 9/30/2010 | PUR | 2,000 | $3.5800 |
| 10/1/2010 | PUR | 4,000 | $3.6100 |
| 10/4/2010 | PUR | 1,000 | $3.6300 |
| 10/6/2010 | PUR | 3,000 | $3.6299 |
| 10/6/2010 | PUR | 2,000 | $3.6100 |
| 10/12/2010 | SLD | (600) | $3.7700 |
| 10/12/2010 | SLD | (1,400) | $3.7701 |
| 10/14/2010 | PUR | 4,000 | $3.9600 |
| 10/14/2010 | PUR | 3,000 | $3.9399 |
| 10/18/2010 | PUR | 5,000 | $3.9500 |
| 10/19/2010 | PUR | 500 | $4.0400 |
| 10/19/2010 | PUR | 3,100 | $4.0577 |
| 10/19/2010 | PUR | 400 | $4.0600 |
| 10/20/2010 | PUR | 200 | $3.9499 |
| 10/20/2010 | PUR | 5,800 | $3.9500 |
| 10/21/2010 | PUR | 10,000 | $4.0300 |
| 10/21/2010 | PUR | 5,000 | $3.9700 |
| 10/22/2010 | PUR | 5,000 | $3.9700 |
| 10/29/2010 | PUR | 5,000 | $3.9500 |
| 11/1/2010 | PUR | 4,600 | $3.9400 |
| 11/1/2010 | PUR | 400 | $3.9399 |
| 11/2/2010 | PUR | 10,000 | $3.9000 |
| 11/3/2010 | PUR | 10,000 | $3.8900 |
| 11/9/2010 | PUR | 5,000 | $3.9500 |
| 11/9/2010 | PUR | 5,000 | $3.9400 |
| 11/16/2010 | PUR | 20,000 | $4.0200 |
| 11/16/2010 | PUR | 19,747 | $3.9640 |
| 11/16/2010 | PUR | 253 | $3.9900 |
| 11/16/2010 | PUR | 9,319 | $3.9981 |
| 11/16/2010 | PUR | 10,681 | $4.0200 |
| 11/16/2010 | PUR | 10,000 | $3.9800 |
| 11/16/2010 | PUR | 10,000 | $3.9700 |
| 11/16/2010 | PUR | 10,000 | $3.9600 |

**ADVANCED BATTERY TECHS INC**
**CLASS PERIOD:  NOV 24 2008 through MAR 29 2011**
**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 11/16/2010 | PUR | 2,200 | $3.9400 |
| 11/16/2010 | PUR | 10,801 | $3.9500 |
| 11/16/2010 | PUR | 6,999 | $3.9699 |
| 11/16/2010 | SLD | (6,619) | $4.0800 |
| 11/16/2010 | SLD | (3,100) | $4.0700 |
| 11/16/2010 | SLD | (2,500) | $4.0600 |
| 11/16/2010 | SLD | (15,400) | $4.0300 |
| 11/16/2010 | SLD | (1,078) | $4.0500 |
| 11/16/2010 | SLD | (6,100) | $4.0200 |
| 11/16/2010 | SLD | (6,220) | $4.0400 |
| 11/16/2010 | SLD | (53,883) | $4.0000 |
| 11/16/2010 | SLD | (5,000) | $4.0100 |
| 11/16/2010 | SLD | (100) | $4.0097 |
| 11/17/2010 | SLD | (19,400) | $4.0400 |
| 11/17/2010 | SLD | (600) | $4.0425 |
| 11/18/2010 | PUR | 20,000 | $3.9700 |
| 11/22/2010 | SLD | (10,000) | $4.0400 |
| 11/23/2010 | PUR | 20,000 | $4.0400 |
| 11/23/2010 | PUR | 17,467 | $4.0100 |
| 11/23/2010 | SLD | (15,300) | $4.0701 |
| 11/23/2010 | SLD | (4,700) | $4.0700 |
| 11/23/2010 | SLD | (2,000) | $4.1301 |
| 11/23/2010 | SLD | (3,838) | $4.1300 |
| 11/23/2010 | SLD | (200) | $4.1350 |
| 11/23/2010 | SLD | (13,962) | $4.1200 |
| 11/23/2010 | SLD | (17,194) | $4.1402 |
| 11/23/2010 | SLD | (200) | $4.1300 |
| 11/23/2010 | SLD | (2,606) | $4.1301 |
| 11/23/2010 | SLD | (20,000) | $4.1000 |
| 11/24/2010 | SLD | (20,000) | $4.1200 |
| 11/24/2010 | SLD | (17,467) | $4.1148 |
| 11/24/2010 | SLD | (685) | $4.1200 |
| 11/24/2010 | SLD | (19,100) | $4.1105 |
| 11/24/2010 | SLD | (215) | $4.1100 |
| 11/26/2010 | PUR | 10,000 | $4.2500 |
| 11/29/2010 | PUR | 20,000 | $4.2700 |
| 11/29/2010 | PUR | 1,300 | $4.2400 |
| 11/29/2010 | PUR | 10,000 | $4.3100 |

**ADVANCED BATTERY TECHS INC**
**CLASS PERIOD:  NOV 24 2008 through MAR 29 2011**
**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 11/29/2010 | PUR | 18,700 | $4.2900 |
| 11/30/2010 | PUR | 20,000 | $3.9800 |
| 11/30/2010 | PUR | 20,000 | $3.9800 |
| 11/30/2010 | PUR | 20,000 | $3.9800 |
| 11/30/2010 | PUR | 20,000 | $3.8005 |
| 11/30/2010 | PUR | 20,000 | $3.8000 |
| 11/30/2010 | PUR | 20,000 | $3.8300 |
| 11/30/2010 | SLD | (20,000) | $3.7900 |
| 12/1/2010 | PUR | 10,000 | $3.8000 |
| 12/22/2010 | PUR | 10,000 | $3.8600 |
| 12/22/2010 | PUR | 10,000 | $3.8500 |
| 12/23/2010 | PUR | 6,178 | $3.8500 |
| 12/29/2010 | PUR | 100 | $3.8600 |
| 12/29/2010 | PUR | 3,722 | $3.8699 |
| 1/31/2011 | PUR | 10,000 | $3.7800 |
| 1/31/2011 | PUR | 10,000 | $3.7100 |
| 2/8/2011 | SLD | (10,000) | $3.7900 |
| 2/10/2011 | PUR | 4,000 | $3.7100 |
| 2/15/2011 | PUR | 6,000 | $3.7100 |
| 2/15/2011 | SLD | (10,000) | $3.7900 |
| 2/15/2011 | SLD | (8,417) | $3.8200 |
| 2/15/2011 | SLD | (1,583) | $3.8101 |
| 2/15/2011 | SLD | (11,546) | $3.8700 |
| 2/15/2011 | SLD | (2,300) | $3.8600 |
| 2/15/2011 | SLD | (6,154) | $3.8601 |
| 2/17/2011 | PUR | 10,000 | $3.7900 |
| 2/17/2011 | PUR | 10,000 | $3.7700 |
| 2/22/2011 | PUR | 10,000 | $3.7900 |
| 2/23/2011 | PUR | 10,000 | $3.7300 |
| 2/23/2011 | PUR | 10,000 | $3.7100 |
| 2/25/2011 | SLD | (10,000) | $3.8100 |
| 2/25/2011 | SLD | (10,000) | $3.8300 |
| 2/28/2011 | SLD | (10,000) | $3.8800 |
| 3/1/2011 | PUR | 10,000 | $3.7700 |
| 3/1/2011 | PUR | 166 | $3.7300 |
| 3/1/2011 | PUR | 9,834 | $3.7400 |
| 3/1/2011 | PUR | 10,000 | $3.7100 |
| 3/8/2011 | PUR | 10,000 | $3.6900 |

Page 3

**ADVANCED BATTERY TECHS INC**
**CLASS PERIOD: NOV 24 2008 through MAR 29 2011**
**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 3/8/2011 | SLD | (10,000) | $3.7800 |
| 3/8/2011 | SLD | (10,000) | $3.8100 |
| 3/9/2011 | PUR | 10,000 | $3.8200 |
| 3/9/2011 | SLD | (10,000) | $3.9000 |
| 3/9/2011 | SLD | (10,000) | $3.9500 |
| 3/10/2011 | PUR | 10,000 | $3.7700 |
| 3/10/2011 | PUR | 8,020 | $3.7300 |
| 3/11/2011 | PUR | 1,980 | $3.7200 |
| 3/14/2011 | PUR | 10,000 | $3.6800 |
| 3/14/2011 | PUR | 10,000 | $3.6800 |
| 3/14/2011 | SLD | (10,000) | $3.7800 |
| 3/15/2011 | PUR | 10,000 | $3.6400 |
| 3/15/2011 | PUR | 10,000 | $3.6300 |

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, *Arnold Cohen*                , make this declaration pursuant to Section 21D(a)(2) of

the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Advanced Battery Technologies, Inc. ("ABAT"),

and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase ABAT securities at the direction of plaintiffs' counsel or in order to participate

in any private action arising under the Securities Exchange Act of 1934.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased

ABAT during the class period, including providing testimony at deposition and trial, if necessary.  I

understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in ABAT

securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws, except as

follows:

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ___*Apoil 26, 2011*___ , at ___*Bronx, N.Y.*___
                    (Date)                              (City, State)

___*Arnold Cohen*___
                                    (Signature)

___*Arnold Cohen*___
                            (Type or Print Name)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————X       No. 11 Civ. 2279 (CM)

In re ADVANCED BATTERY TECHNOLOGIES, INC.
SECURITIES LITIGATION                               CLASS ACTION

———————————————————————

THIS DOCUMENT RELATES TO:                           ALL ACTIONS

———————————————————————X


### DECISION AND ORDER DENYING THE ABAT DEFENDANTS' MOTION TO DISMISS AND GRANTING THE AUDITOR DEFENDANTS' MOTIONS TO DISMISS

McMahon, J.:

> USDS SDN
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 8/29/12

### I. INTRODUCTION

Lead Plaintiffs Ruble Sanderson and Arnold Cohen, through their attorneys at Pomerantz

Haudek Grossman & Gross LLP, bring this action on behalf of the class of people who bought

shares of Defendant Advanced Battery Technologies ("ABAT") between the dates of May 15,

2007, and March 29, 2011, inclusive (the "Class Period"). (Compl. ¶ 1.)  Plaintiffs allege that

ABAT and two of its officers – Defendant Zhiguo Fu, ABAT's Chairman and CEO during the

relevant time period, and Defendant Guohua Wan, its CFO (Fu and Wan, together with ABAT,

are referred to as the "ABAT Defendants" herein) – made false or misleading statements that

induced Plaintiffs and others similarly situated to purchase ABAT shares; when the truth became

known, the price of ABAT shares dropped precipitously, causing Plaintiffs to suffer economic

damage. See Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b); 17 C.F.R.

§ 240.10b–5.

Plaintiffs also assert claims against ABAT's outside auditors.  The first of these,

Defendant Bagell, Josephs Levine & Co., was ABAT's auditor from 2006 to 2010; although the

firm merged into another entity, Friedman LLP in 2010, I refer to this Defendant as "Bagell Josephs" whether we are talking about the period before or after the merger.  Defendant EFP Rotenberg ("EFP") replaced Bagell Josephs as ABAT's auditor at the end of 2010.  I refer to Bagell Josephs and EFP together as the "Auditor Defendants."  Plaintiffs allege that the Auditor Defendants made false and misleading statements in their annual certifications of ABAT's financial reports, and that Plaintiffs and others similarly situated relied on those misrepresentations to their detriment.

The ABAT Defendants, Joseph Bagells, and EFP have made separate motions to dismiss. For the reasons discussed below, the ABAT Defendants' motion is DENIED.  The Auditor Defendants' motions are GRANTED, and the claims against them are DISMISSED.

## II.  BACKGROUND

The following facts are alleged in Plaintiffs' "Corrected First Amended Consolidated Class Action Complaint" (the "Complaint" herein).

ABAT is a Delaware corporation.  It is in the business of selling polymer lithium-ion batteries for use in light vehicles, such as motor scooters. (Compl. ¶ 15.)  ABAT was founded and began operations in China; in 2004 it was "acquired," via reverse merger, by a publicly traded shell corporation in the United States. (Id. ¶ 17.)  Companies that gain access to the United States capital markets through these transactions have recently come under increased scrutiny, in part because the reverse merger allows a company to become listed on a stock exchange with less regulatory attention than it would face through an initial public offering. (Compl. ¶¶ 25-33.)

2

A. Allegations pertinent to the ABAT Defendants' motion to dismiss

Plaintiffs allege that Fu, with the help of Wan and the Auditor Defendants, used ABAT to enrich himself by artificially inflating the company's value through false earnings reports and then diverting money to himself through a series of related party transactions.

While the allegations of the Complaint are diffuse, it appears that plaintiffs included in their pleading many facts that are merely evidentiary; I say this because, in their opposition to the ABAT Defendants' motion to dismiss, Plaintiffs address only four specific misrepresentations made in the course of this alleged scheme to support their securities fraud claims. As I can sustain the Complaint against a motion to dismiss by discussing only two of those four purported misrepresentations, I need not reach, and do not discuss, whether the other misrepresentations are adequately pleaded. No one should assume that, by not reaching them, I have thrown them out of the case; I have not.

1. *Inflated earning*

Plaintiffs allege that ABAT grossly overstated its revenue and operating margins in a series of publicly filed documents. (See Compl. ¶ 34.)

In particular, the Complaint details ABAT's reported financial results as reflected in each quarterly 10-Q, and each annual 10-K, issued during the Class Period, many of which were signed by Defendants Fu and Wan, and several press releases that trumpeted these earnings to investors. (Id. ¶¶ 34-61.) For example, the annual SEC reports indicated revenues increasing from $31M in 2007, to $61M in 2009, with net income increasing from $11M to $25M over the same period. (Id. ¶ 64.)

Plaintiffs allege that these statements were false and misleading because they grossly overstated the actual revenue and profits ABAT earned during the Class Period. (Id. ¶ 62.)

3

In support of its allegation that these figures are overstatements, Plaintiffs rely principally on data filed contemporaneously by ABAT with China's Administration of Industry and Commerce ("AIC"). According to Plaintiffs, the AIC has two functions: (1) to administer the establishment and closing of companies, and to record corporate changes, such as changes in shareholders, capital amounts, and directors; and (2) to monitor compliance by companies with China's company laws and regulations. Pursuant to its regulatory power, the AIC conducts an annual review of companies, and the companies submit financial reports to the AIC as part of this review.

Plaintiffs allege that the revenue and net income that ABAT reported to the AIC differs greatly from that reported in its SEC filings. For example, ABAT reported to the AIC that its 2007 revenue was $145K, while it reported in its SEC filing that its revenue was $31M. It reported to AIC that it suffered an operating loss in 2007 of $1M, while it reported in the SEC filing that it earned a profit of $10M. These huge discrepancies continue for each reported year during the Class Period. (Id. ¶ 64 (charting discrepancies year-to-year).)

Plaintiffs specifically allege that these discrepancies cannot be accounted for by differences between AIC and SEC accounting practices. If anything, they allege, AIC practices are more lenient towards recognizing revenue than are U.S. generally accepted accounting procedures ("GAAP") (Id.)

Plaintiffs also support their contention that ABAT's SEC filings contained false and misleading revenue and profit reports by asserting that ABAT's claimed operating margins far exceeded those of ABAT's domestic and international competitors. As noted above, ABAT manufactures and sells polymer lithium-ion batteries, primarily for use in small electric vehicles. In its 2010 SEC 10-K, ABAT acknowledged that battery manufacturing is a commodity-based

4

business, with raw components equally available to its competitors. Thus, ABAT's competitive advantage, if any, must come from more efficient operations, such as assembly lines and distribution. (Id. ¶ 66.)

Plaintiffs claim to have sent investigators to China, who visited ABAT's plants and talked with local Chinese officials. Their investigation revealed that ABAT's Chinese operations are of average quality and efficiency. (Id. ¶ 71.) Nevertheless, during the Class Period ABAT reported profit margins of nearly 40%, while its Chinese competitors reported margins between negative-9.7% and 14%, and competitors from other countries reported margins between 13% and 29%. Because, according to Plaintiffs, this wide discrepancy in profitability cannot be readily explained by differences in business model or operations, one can conclude (and plaintiffs do conclude) that ABAT's earnings figures must have been artificially inflated during the Class Period. (Id. ¶¶ 66-70.)

Plaintiffs also plead the existence of an investigatory report prepared by a group called Prescience Investment Group/Kerrisdale Capital ("Prescience"). Prescience concluded that ABAT's earning figures during the Class Period could not have been accurate. (Id. ¶¶ 71-78.) This report was not published until after the Class Period; plaintiffs allege that it confirms conclusions reached by others during the Class Period.

2. *The Shenzhen acquisition*

The second misrepresentation upon which Plaintiffs rely involves ABAT's acquisition of another company, Shenzhen ZhongQiang New Energy Science & Technology Co., Ltd. ("Shenzhen"). Plaintiffs allege that ABAT failed to disclose that Fu, its Chairman and CEO, was the owner of Shenzhen when ABAT bought it, and that ABAT paid a grossly inflated price in order to enrich Fu.

ABAT announced the Shenzhen acquisition in an 8-K filing dated December 20, 2010. It said that an ABAT subsidiary would purchase Shenzhen for approximately $20M, with a portion of that price to go toward retiring Shenzhen's debt. ABAT's 2010 10-K reported that the deal closed on January 6, 2011. (Id. ¶¶ 78-79.)

What ABAT allegedly failed to disclose was that Fu, ABAT's CEO, had himself purchased Shenzhen just two years earlier, and for just $1M. The omission of this material fact was misleading, Plaintiffs say, because it allowed Fu to reap personally a $19M profit, without ABAT's shareholders becoming aware of his undisclosed interest in the transaction. (Id. ¶ 80.)

Plaintiffs support their allegation that Fu bought Shenzhen in 2008 for $1M by relying on documents filed in an unrelated lawsuit involving an employment dispute between Shenzhen and the former Chief Technology Officer of Shenzhen. Those documents reveal that Fu personally acquired Shenzhen on August 31, 2008. Plaintiffs incorporate into their Complaint Exhibit A from an affidavit that was filed in that lawsuit on January 20, 2011. Exhibit A appears to be an acquisition agreement between Fu and Shenzhen, which shows that Fu paid $1M for the company in September 2008. (See Shalov Decl. Ex. 13, at 19; Compl. ¶ 81.) In addition, Plaintiffs cite to AIC filings, which show that a man named Huang Youlin was Shenzhen's "legal representative" on August 30, 2008, but that Fu became Shenzhen's legal representative as of September 2008 – the day after the August 31, 2008 acquisition date. (Compl. ¶ 82.) Plaintiffs suggest that the position of "legal representative" is analogous to that of an owner or chairperson (id. ¶ 81-84), an allegation supported by the court filings upon which Plaintiffs rely.

As discussed in greater detail below, ABAT issued a press release on April 6, 2011 in response to the initial disclosure that Fu had taken a personal interest in Shenzen back in 2008. In that press release, ABAT admitted that Fu became the legal representative of Shenzhen in

6

September 2008, but explained that this was merely an "administrative convenience" intended to facilitate the January 2011 acquisition of Shenzen by ABAT. (See Shalov Decl. Ex 11, incorporated into Complaint at ¶ 84.) This is not the explanation offered by the ABAT Defendants in support of their motion to dismiss to explain the alleged implausibility of Plaintiffs' allegations of fraud.

Plaintiffs also allege that the price ABAT paid for Shenzen was greatly inflated, which diverted ABAT resources to Fu personally. Shenzhen was founded in 2007. (Compl. ¶ 85.) According to AIC filings, the company operated at a loss every year until it was "acquired" by ABAT in 2011. (Id.) Shenzen was losing money after Fu purchased it in 2008. Plaintiffs allege that the exorbitant price paid for the failing company is another reason to find that Fu, through ABAT, had a motive and opportunity to enrich himself by hiding his prior relationship with Shenzhen.

### 3. Other alleged misstatements

In their opposition to the motion to dismiss, Plaintiffs identify two other set of misrepresentations that are pleaded in the Complaint.

One involves ABAT's acquisition of a company called Wuxi Angell Autocycle Co., Ltd. ("Wuxi"). In a press release and 10-Q disclosure filed on May 11, 2009, ABAT announced that it acquired Wuxi in early May of that year for $24M. Plaintiffs allege that this statement was false and misleading because, "A former member of ABAT's core management told Plaintiffs' investigator that he believed Defendant Fu caused ABAT to pay an inflated price for Wuxi, because Fu had a side deal with Wuxi's sellers to share the excess proceeds with them." (Compl. ¶¶ 87-88.) Plaintiffs also allege that the price paid for Wuxi was too high given Wuxi's past

performance and prospects, relying heavily on the various short seller reports discussed below. (Id. ¶¶ 89-97.)

Plaintiffs also allege that ABAT made misstatements about the ownership of a company called Heilongiang ZhongQuiang Powertech Co., Ltd. ("HLJ ZQPT"). In its Forms 10-K for 2007 and 2008, ABAT identified HLJZQPT as a wholly-owned subsidiary of Cashtech, which was itself a wholly owned ABAT subsidiary. However, in its 2009 Form 10-K, which was filed on March 30, 2010, ABAT disclosed that HLJ ZQPT was actually owned by Fu and several other investors. In the 10-K itself, and in its April 6, 2011 response to allegations of wrongdoing, ABAT explained that it was required to account for HLJZQPT as though it were a wholly owned subsidiary because Fu and his co-investors had transferred all of the "benefits and . . . obligations" of HJL ZQPT to ABAT. In 2009, ABAT decided to make its disclosures in this regard more precisely correct, so it identified Fu and the others as the *de jure* owner of the company, while ABAT was identified as its *de facto* owner.


B.  Allegations pertinent to the motions for the Auditor Defendants

Plaintiffs assert securities fraud claims against the two accounting firms that audited ABAT's financial statements from 2007 through 2010 – Joseph Bagells and EFP. The auditors are alleged to have made material misstatements in SEC form 10-KSBs, where they attested to having audited ABAT's results over the preceding year in accordance with GAAP and certified that ABAT's results accurately reflected the financial condition of the company. (Compl. ¶¶ 104-09.) We can infer that the Auditor Defendants made these statements with fraudulent intent, Plaintiffs say, because the Auditor Defendants failed so egregiously in their responsibilities as auditors that they effectively performed "no audit at all." Put otherwise, plaintiffs allege that the

8

Auditor Defendants acted recklessly with respect to the falsity of their statements. (Id. ¶¶ 109-10.)

To support their allegation that the auditors acted with a sufficiency culpable mental state, Plaintiffs identify the following "red flags" that would have put the Auditor Defendants on notice of ABAT's fraudulent behavior if the Auditor Defendants had not been reckless in issuing their false statements:

1. ABAT went public through a reverse merger, which should have indicated to the Auditor Defendants that it was avoiding SEC scrutiny;

2. ABAT's AIC and SEC filings differed so widely as to call into serious doubt the accuracy of one or the other;

3. ABAT acquired Shenzhen in a related party transaction that the Auditor Defendants had a professional duty to uncover;

4. ABAT mischaracterized its ownership interest in HLJ ZQPT from 2004 until 2009;

5. ABAT claimed unrealistically high operating margins; and

6. ABAT had a high turnover of CFOs and outside auditors, one of the hallmarks of accounting fraud.

(Compl. ¶ 145.)

By ignoring these reds flags, Plaintiffs allege, the Auditor Defendants violated a number of professional standards, as reflected in GAAP, GAAS and the AU standards issued by the Public Company Accounting Oversight Board.


C.  The Variant View report

According to Plaintiffs, the truth about ABAT came to light on March 30, 2011, when an anonymous blogger/analyst, using the rubric "Variant View Research," posted a report in which he concluded that ABAT engaged in widespread fraud.  On the day the Variant View report was

9

posted, the price of ABAT's shares plummeted nearly 48%, to roughly $2/share, on unusually heavy volume. (Compl. ¶¶ 112-13.)

The introduction to the Variant View report summarizes its pertinent findings:

I am short [ABAT] for the following reasons:

> 1. The Chairman appears to have transferred ownership of ABAT's key subsidiary [HLJ ZQPT] to himself without explanation or compensation;

> 2. ABAT leads investors to think that it makes cutting-edge electric cars, when it fact it produces cheap scooters and bicycles;

> 3. ABAT claims unrealistic margins in what it admits is a commodity space;

> 4. ABAT claims to have increased revenue from $4.2 million to $97.1 million from 2005 to 2010 while DECREASING its employee headcount;

> 5. ABAT claims distribution relationships which appear to be fake;

> 6. ABAT is a serial issuer of equity at low prices;

> 7. ABAT spent $20 million to acquire a company [Shenzhen] linked to the Chairman [Fu] without disclosing the relationship;

> 8. ABAT spent $22 million or 7x sales to acquire a failing and possibly related company [Wuxi] . . .

> In short, I think the financial statements and management of ABAT cannot be trusted and therefore the stock is worth zero.

(Shalov Decl. Ex. 8; Compl. ¶ 112.)

Variant View was just the first analyst to question ABAT's situation. On May 5, 2011, an enterprise known as Prescience Investment Group revealed that it, too, had gone short ABAT stock and explained why. Prescience revealed that ABAT had reported revenue and net income to AIC in China that was a fraction of that reported to the SEC. The Prescience report also related findings made after a visit to one of ABAT's China plants and interviews with ABAT customers and business partners. Based on this investigation, plus examination of public

10

documents filed by ABAT and its competitors, Prescience concurred in Variant View's opinion

that ABAT's financial statements were fraudulent and that the company's shares were worthless.

(Shalov Decl. Ex. 13.)


D.  Procedural history

Five related actions were filed against the ABAT Defendants – the earliest on April 1,

2011, two days after the publication of the Variant View report.  Competing motions for

consolidation and appointment of Lead Plaintiff and Lead Counsel ensued; those were decided

on September 9, 2011. (See ECF No. 50.)  In that Order, I appointed Plaintiffs and their

attorneys, and I instructed them to file the consolidated Complaint that is the subject of

Defendants' pending motions.


**III.  ANALYSIS**

A.  Standard of review

The standard for resolving a motion to dismiss under Rule 12(b)(6) is familiar, and need

not be elaborated on at length here.  The Court must accept the factual allegations set forth in the

complaint as true and draw all reasonable inferences in favor of the plaintiff. See Cleveland v.

Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).  "To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face." Ashcroft v. Iqbal, 556 U.S. 662 (2009).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Id.  The complaint must consist of more than

"labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Unless a plaintiff's well-pleaded allegations have

"nudged [its] claims across the line from conceivable to plausible," the complaint must be dismissed. Id. at 570.

Allegations of fraud must meet the heightened pleading standard of Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). "The complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" In re Beacon Assoc. Litig., 745 F. Supp. 2d 386, 403 (S.D.N.Y. 2010) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)); see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004).

"[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." Beacon, 745 F. Supp. 2d at 403 (quoting O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991) (internal citations omitted)); see generally Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007). As discussed further below, Plaintiffs must plead facts that give rise to a "strong inference" that Defendants acted with the requisite mental state. See Eternity, 375 F.3d at 187 (citing Acito v. IMCERA Grp., Inc., 47 F.3d 47 (2d Cir. 1995)); Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

B. Pleading securities fraud

Plaintiffs must plead the following elements of their section 10(b) claim in order to survive Defendants' motions to dismiss: (1) a material misrepresentation, or omission, (2) made

in connection with the purchase or sale of a security, (3) upon which Plaintiffs reasonably relied in purchasing the security, (4) "scienter," i.e., "defendant's intention 'to deceive, manipulate, or defraud,'" Tellabs, 551 U.S. at 313-14, and (5) "loss causation," i.e., that Plaintiffs' reliance on Defendants' misrepresentation directly caused Plaintiffs' economic loss. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007); Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005); Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp., No. 07 Civ. 7402, 2010 WL 3910211, at *5-6 (S.D.N.Y. Sept. 30, 2010).

Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77z–1, 78u–4. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); Novak, 216 F.3d at 307-08. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, with intent "to deceive, manipulate or defraud." 15 U.S.C. § 78u–4(b)(1), (2). "Therefore, 'While we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008)); see generally Beacon, 745 F. Supp. 2d at 404.

Notwithstanding the heightened pleading standards of the PSLRA and Rule 9(b), "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to

13

dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, 551 U.S. at 322 (citing Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993)).

C.  Plaintiffs' motion to strike

        Before reaching the merits of Defendants' various motions to dismiss, I first address Plaintiffs' motion to strike.

        In support of their motion to dismiss, the ABAT Defendants try to dispel the inference that fraud was afoot in ABAT's acquisition of Shenzhen in 2010.  To do so, they attach Exhibits 19-21 to their motion.  Exhibit 19 is the December 20, 2010 form 8-K that first disclosed the Shenzhen acquisition, to which ABAT had attached the acquisition agreement.  The acquisition agreement shows that Fu acted as the legal representative of the ABAT subsidiary that acquired Shenzhen, and that one Changhe Wang acted as Shenzhen's legal representative. (See Shalov Decl. Ex. 19.)  Exhibit 20 is an untranslated screen shot, together with an uncertified translation thereof, which purports to show that on January 8, 2009, Huang Youlin transferred 100% of the shares of Shenzhen to Wang. (Id. Ex. 20.)  Finally, Exhibit 21 is another untranslated screen shot, with another uncertified translation, this one purporting to show that on November 12, 2008, Fu transferred the title of legal representative of Shenzhen to Wang. (Id. Ex. 21.)

        Plaintiffs argue that I should strike and refuse to consider  Exhibits 20 and 21 in resolving the motion to dismiss because they are not incorporated into or fairly comprehended by the Complaint and because Plaintiffs did not rely on them in bringing their lawsuit.  I agree.  Furthermore, I will not convert this motion to one for summary judgment in order to consider them – no one asks that I do so and I do not consider it an appropriate course of action,

14

especially since the ABAT Defendants failed to provide certified translations of the screen shots. Therefore, the motion to strike Exhibits 20 and 21 is granted.

On a motion to dismiss under Rule 12(b)(6), the Court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Beacon, 745 F. Supp. 2d at 403 (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)). The untranslated screen shots and uncertified translations thereof do not fit this description.

Defendants argue that because Plaintiffs rely in their Complaint on some information that was obtained from the AIC website – e.g., the revenue filings ABAT filed with the AIC – all other information on that website somehow qualifies as "documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing the suit." That, however, is nonsense. I would imagine that a great deal of information is no doubt filed with the AIC every year, at least some of which ends up on the agency's web site; but that does not incorporate everything on the AIC website into any and every pleading that makes reference to some discrete item on the web site. Indeed, there is no suggestion in the record that Plaintiffs or their counsel ever saw Exhibits 20 and 21 when they were crafting their pleading. Rather, Plaintiffs "rely" on reports prepared by analysts like Variant View and Prescience, which in turn relied on certain information that they derived from the AIC website – information that is not necessarily found in the challenged exhibits. Compare Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

Furthermore, the Complaint does not "stand or fall" on the strength of the documents the ABAT Defendants would have me consider. See Key Items, Inc. v. Ultima Diamonds, Inc., 09

15

Civ. 3729, 2010 WL 3291582, at *5 (S.D.N.Y. Aug. 17, 2010).  This is not a case where, for

example, a plaintiff alleges a material fact was undisclosed by the company, and the defendant

produces a publicly filed SEC document reflecting disclosure of that fact.  See Roth v. Jennings,

489 F.3d 499, 509 (2d Cir. 2007).

I could, of course, consider these documents if I were to convert this motion to one for

summary judgment *sua sponte*, but I see no reason to do so.  In the event I refuse to consider the

exhibits under 12(b)(6), Defendants' stated preference is that I *not* convert the motion.  "[I]f the

Court is disinclined to [consider the exhibits], the ABAT Defendants respectfully withdraw their

request that the Court consider the Exhibits rather than convert the Motion to Dismiss into a

motion for summary judgment." (ABAT's Mot. Strike Br. at 10.)  Even if I were so inclined, I

could not consider these Exhibits because they are not presented in admissible form.  The fact

that the ABAT Defendants failed to provide certified translations of the words that appear on the

screen shots precludes my consideration of them.

D.  The Complaint states a claim against the ABAT Defendants

1.  *Falsity*

Plaintiffs allege that ABAT overstated its revenue and profits during the Class Period in

order to raise money from its shareholders and then divert that money to its insiders through

undisclosed related party transactions, including the Shenzhen acquisition.  This scheme

involved several well-pleaded misrepresentations – that ABAT was earning the money it said it

was – and at least one material omission – Fu's prior involvement either owning or managing

Shenzhen.  Thus, the first element of Plaintiffs' claim – a false or misleading statement of

omission – has been adequately pleaded.

The ABAT Defendants' motion to dismiss rests primarily on their assertion that the things they said were true: that the SEC documents are accurate, and that the Shenzhen acquisition was totally benign, rather than being an undisclosed related-party transaction.  But this is not an appropriate argument to make on a motion to dismiss a Complaint that alleges falsity; it is a defense on the merits.  "The truth of the [Variant View] report . . . is a factual dispute not appropriate for resolution at [the pleading] stage." Henning v. Orient Paper, Inc., 10 Civ. 5887, 2011 U.S. Dist. LEXIS 79135, at *11 (C.D. Cal. July 20, 2011).

"Under the PSLRA, a well-pled allegation of falsity must identify (1) each false statement alleged to have been misleading; (2) the reasons why those statements are misleading; and (3) if the allegation is made on information and belief, the particular facts that give rise to the belief." Dean v. Chinese Agritech Inc., 11 Civ. 1331, 2011 U.S. Dist. LEXIS 124264, at *7-8 (C.D. Cal. Oct. 27, 2011).  Plaintiffs' allegations that the statements identified are false meet this standard,

Plaintiffs allege (1) that the statements were false, (2) how those statements were misleading in the context of ABAT's alleged fraud, and (3) facts that support those allegations.  Specifically, Plaintiffs point to the AIC filings and the public records in other lawsuits, which give their accusations of falsity plausibility and weight.  The AIC filings strongly suggest that ABAT kept two sets of books – one for its Chinese regulator and one for the Americans.  Defendants suggest competing inferences that might be drawn, but reaching the conclusions ABAT posits would require resort to evidence that has not yet been adduced.  For example, Defendants suggest that only ABAT's China operations are reported to the AIC, but there is no way to distill that from the Complaint; and since ABAT's operations allegedly take place inside of China, it is difficult to reconcile that argument with the facts disclosed in its U.S. public

17

filings.  Defendants also suggest that Chinese and U.S. accounting practices may differ, but establishing that would require extensive evidence from experts – especially since Plaintiffs allege that the only relevant difference is that the Chinese have a more lenient standard for recognizing revenue.  The fact that defendants try to bolster their position by attaching blogs and other evidence (not necessarily admissible evidence) to their motion to dismiss – which is patently improper – only reinforces the impossibility of their position in the procedural posture of the pending motion.

In <u>Dean</u>, virtually identical allegations sufficed to plead the falsity of SEC filings in a remarkably similar securities fraud case.  <u>Id.</u> at *8-9; <u>see also</u> <u>Henning</u>, 2011 U.S. Dist. LEXIS 79135, at *11.  There, defendant was a Chinese company that, like ABAT, had entered the U.S. capital markets through a reverse merger and reported financial results to the Chinese regulator that were a fraction of those reported to the SEC.  As here, the plaintiffs alleged that the results reported in China were accurate, and the SEC results grossly overstated.  Judge Gary Klausner of the Central District of California denied a motion to dismiss the complaint, holding that this allegation alone sufficed to plead falsity against the corporate defendant.

Plaintiffs have also adequately alleged a material omission with respect to the Shenzhen transaction.  The inference that Fu engaged in a related party transaction with Shenzhen is not just plausible; on the facts pleaded, it is compelling.  The Complaint alleges that Fu bought the company in 2008, and public documents attached to the Complaint support this allegation.  While Fu now says he did so only as a convenience, it is at least as plausible that he set someone else up as the legal representative in order to hide his interest from ABAT's shareholders.  If there is a benign explanation for this series of transactions, Defendants are free to present it as a

defense on the merits; but at this stage the allegations of the Complaint sufficiently allege false statements and material omissions.

### 2. *Scienter*

"As set out in § 21D(b)(2) of the PSLRA, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Tellabs</u>, 551 U.S. at 314 (quoting 15 U.S.C. § 78u–4(b)(2)). The Supreme Court elaborated on what is meant by a "strong inference" in <u>Tellabs</u>, where it explained:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.

<u>Id.</u> at 323-24 (emphasis added). "In sum," the Supreme Court concluded, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" <u>Id.</u>; <u>see</u> <u>also</u> <u>ATSI</u>, 493 F.3d at 99.

In this Circuit, a strong inference of scienter can be shown by (1) demonstrating that a defendant had motive and opportunity to commit fraud, or (2) providing evidence of conscious recklessness. <u>See</u> <u>Beacon</u>, 745 F. Supp. 2d at 404 (citing <u>South Cherry St., LLC v. Hennessee Grp. LLC</u>, 573 F.3d 98, 108–09 (2d Cir. 2009)).

19

Here, Plaintiffs have adequately pleaded a strong inference of scienter. Taking it as true that ABAT grossly overstated its earnings and used the shareholder money raised thereby to fund undisclosed related party transactions between ABAT and its Chairman and CEO Fu, the inference that it did so with fraudulent intent is not merely strong, it is inescapable. This is not the securities fraud complaint that alleges that poor business decisions were made, leading to a drop in the price of the stock. Rather, the theory underlying Plaintiffs' well-pleaded allegations is that ABAT itself was a fraud, backdoored into the U.S. equity markets in order to raise money that it promptly diverted to a handful of insiders. See Dean, 2011 U.S. Dist. LEXIS 124264, at *9-13. These are not far-fetched or absurd allegations, and they are well supported by the specific allegations of fact in the Complaint. Those allegations may ultimately prove not to be true; but if they are true, then quite obviously the inference could be made that Defendants failed to disclose relevant facts about the operations of this enterprise with a sufficiently culpable mental state. "When managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws." Novak, 216 F.3d at 312; see also Henning, 2011 U.S. Dist. LEXIS 79135, at *12-13.

### 3. *Loss causation*

The ABAT Defendants argue that Plaintiffs have failed to plead loss causation, because the discrepancies between the financial statements filed with the AIC and SEC were not revealed until after the close of the proposed Class Period (which ends on March 30, 2011) – first in an April 15, 2011 blog post, and then when the Prescience Report was published in May 2011. This argument is flawed, because plaintiffs do not rely on either of those publications to plead loss causation. The report on which they do rely – the Variant View report – preceded the fall in

20

ABAT's stock price. The other two reports simply offer additional evidence that Variant View's market-moving conclusions were correct.

The requirement of proving "loss causation" in securities fraud cases is akin to the proximate cause requirement of common law deceit or fraudulent misrepresentation claims. Dura, 544 U.S. at 343-44. In a "fraud on the market" case like this one, loss causation essentially means that, when the truth concealed by the fraudulent misrepresentation or omission becomes known, the stock price suffers as a result. This direct causal relationship between the deceit and the plaintiff's economic loss is an essential element of the fraud cause of action, and has been codified in the PSLRA. Id.; Lentell, 396 F.3d at 172-73; Beacon, 745 F. Supp. 2d at 413. In short, "loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." Lentell, 396 F.3d at 174 (citing Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 198-99 (2d Cir. 2003)).

Defendants argue that Plaintiffs' allegations of discrepancies between ABAT's earnings as reported to US and Chinese authorities cannot form the basis for the securities fraud claim because they only came to light after the precipitous stock decline that caused Plaintiffs' losses. The price of ABAT's stock fell as soon as the Variant View report was made public. But while the Variant View report concluded that ABAT's earnings were inflated, it did not announce to the public the best evidence of that fact, which is that ABAT had been reporting much lower earnings figures to the AIC at the very same time it was reporting higher figures to the U.S. investing public. Noting (correctly) that the revelation of this damning evidence did not result in any further decline in the stock price, Defendants conclude that the information about the

21

discrepancy between its Chinese and U.S. earnings reports could not possibly have caused Plaintiffs' losses, or those of other parties who lost money during the proposed Class Period.

However, the fact that additional evidence tending to support the Variant View report came to light after the close of the Class Period does not change the fact that once Variant View published its conclusion that ABAT's earnings reports were inflated – based on whatever evidence was available to Variant View at the time – ABAT's stock price fell. And it is the Variant View report, not the subsequent Prescience Report, that plaintiffs identify as the "corrective disclosure" that caused the market to move. (See Shalov Decl. Ex. 8; Compl. ¶ 112.) Prescience's confirmatory evidence was indeed not the cause of the market movement; it simply made clear that the market had reacted correctly to the earlier, less complete information provided by Variant. But that does not negate loss causation. That is not to say that Prescience's information is irrelevant – it is highly relevant, precisely because it confirms Variant's earlier report – but Plaintiffs have not argued that Prescience was the reason the market moved. The publication of Variant View's report was followed immediately by the steep decrease in ABAT's stock price. At the pleading stage, this is sufficient to plead loss causation.

There is no reason why the post-Class Period discovery of additional evidence that bolsters a truth-revealing disclosure should have any impact on the loss causation analysis at all. To analogize: If, during the discovery phase of this lawsuit, Plaintiffs discover falsified invoices, fake sales contracts, or other evidence of misstated revenue, it would obviously not change the fact that, as soon as the Variant View report hit the street, ABAT's stock price fell precipitously.

The same reasoning applies with regard to the misrepresentations or omissions surrounding the Shenzhen acquisition. The Variant View report revealed that this was a related-party transaction. As soon as that information hit the street, ABAT's stock fell by nearly 50%.

22

Over time, more and more information about Shenzen became public – via blog posts, and then the Prescience report – but the precipitating factor that, at least at the pleading stage, appears to correlate with the drop in the stock price was the publication of Variant View's analysis. Plaintiffs do not allege otherwise.

The ABAT Defendants rely on the rule that a securities fraud plaintiff who alleges loss causation based on a "corrective disclosure" – or, as here, a substitute for a corrective disclosure, like the Variant View report – must "disaggregate" other potential confounding factors in the decline of the stock's price. See, e.g., In re Omnicom Grp., Inc. Secs. Litig., 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008). But this rule is not applicable to this case. Plaintiffs allege that there were no confounding factors; as soon as the Variant View report was released, the stock dropped almost 50% on heavy trading. Meanwhile, Plaintiffs allege that the rest of the market rose. There is no requirement at the pleading stage that Plaintiffs disaggregate potential confounding factors that they allege do not exist.

Defendants' arguments might appropriately be made on a motion for summary judgment – assuming, of course, that there is evidence that some other phenomenon might have caused the stock price to move as it did. For example, if Defendants convince me that only *some* of the statements Plaintiffs rely on were false, a disaggregation argument may be apt. In that case, the effect of the revelation of the false statements will have to be disaggregated from the effects of Variant View's misreporting on ABAT's true statements.

If, however, all of the "misrepresentations" revealed by Variant View were in fact false, then Plaintiffs have alleged a sufficient causal link between the misstatements and their ultimate losses; at this stage, they need not further parse the report. A heightened pleading standard there may be in PSLRA cases, but Congress has not required Plaintiffs to prove their case on the day

they file their Complaint – only to plead enough supporting factual information to make their ultimate allegations of fraud plausible.  This Plaintiffs have done – in spades.

To support the adequacy of their pleading, Plaintiffs rely on three cases from the Central District of California with closely analogous facts.  All three involve Chinese reverse merger transactions, huge discrepancies between AIC and SEC filings not obviously explained by differences in reporting requirements, and undisclosed related party transactions. See Dean, 2011 U.S. Dist. LEXIS 124264, at *1; Henning, 2011 U.S. Dist. LEXIS 79135, at *1; China Ed. Alliance, Inc., 10 Civ. 9239, 2011 U.S. Dist. LEXIS 117416, at *1 (C.D. Cal. Oct. 11, 2011).  In each case, the court denied a motion to dismiss and rejected the defendant's argument that the plaintiffs failed to plead falsity, scienter, and/or loss causation.  I find these cases persuasive.

3. *Other alleged misstatements as bases for securities fraud claims*

Because there are at least two theories under which Plaintiffs have adequately alleged a securities fraud claim against the ABAT Defendants, it is not necessary to rule, at this stage, on whether any of the other misrepresentations Plaintiffs allege could also support their claims.  As noted above, my refusal to reach these unnecessary questions should in no way suggest that they are no longer part of the case.  They are, and when it is necessary to reach them, I will.

4. *Control person liability*

Finally, the ABAT Defendants move to dismiss Count II of the Complaint, which asserts a claim under section 20(a) of the Securities and Exchange Act of 1934 against Defendants Fu and Wan.  That motion is denied as well.

In order to state a control person claim pursuant to § 20(a), Plaintiffs must allege facts showing (1) "a primary violation by the controlled person," (2) "control of the primary violator by the targeted defendant," and (3) that the "controlling person was in some meaningful sense a

culpable participant in the fraud perpetrated." <u>Beacon</u>, 745 F. Supp. 2d at 411 (quoting <u>ATSI</u>, 493 F.3d at 108).

The only basis for the ABAT Defendants' motion to dismiss Plaintiffs' claims under § 20(a) is their argument that Plaintiffs failed to allege a primary violation by ABAT. (<u>See</u> ABAT's Br. at 25.)  For the reasons already discussed, I reject that argument.  There being no other basis to dismiss this claim, I decline to do so.

Thus, Plaintiffs have adequately stated a claim for relief in Counts I and II, and the ABAT Defendants' motion to dismiss is therefore DENIED.


<u>E.  The Complaint does not state a claim against the Auditor Defendants</u>

I reach a different conclusion with respect to Count III, which alleges a § 10(b) claim against the Auditor Defendants.

As the Second Circuit has explained, section "10(b) imposes liability only on a person who makes a material misstatement or omission, and . . . there is therefore no liability for aiding and abetting." <u>Lattanzio</u>, 476 F.3d at 153 (citing <u>Cent. Bank of Denver v. First Interstate Bank of Denver</u>, 511 U.S. 164, 177 (1994)).  Thus, "to state a § 10(b) claim against an issuer's accountant, a plaintiff must allege a misstatement that is attributed to the accountant 'at the time of its dissemination,' and cannot rely on the accountant's alleged assistance in the drafting or compilation of a filing." <u>Id.</u> (quoting <u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 174 (2d Cir. 1998)).

Here, Plaintiffs identify as actionable misstatements the Auditor Defendants' annual certifications, in which the Auditor Defendants attested to having performed their audits in accordance with professional standards, and to their opinions that ABAT's SEC filings accurately

25

reflected its financial condition during the audited period. Plaintiffs allege that these statements were false and misleading because the Auditor Defendants did not, in fact, conduct audits that conformed to professional standards, and because the SEC filings grossly misrepresented ABAT's financial condition.

As discussed already, I assume that Plaintiffs' allegations of falsity are correct. That is, I assume that the SEC filings do *not* accurately reflect ABAT's financial performance. The bases for this allegation of falsity are sufficiently stated, for the reasons discussed in connection with the ABAT Defendants' motion.

The question is whether Plaintiffs have also adequately pleaded the remaining elements. For the reasons discussed below, I find they have not.

I discuss the sufficiency of the pleadings with respect to each of the Auditor Defendants separately.

### 1. *Bagell Josephs*

Bagell Josephs premises its motion to dismiss on the argument that Plaintiffs have failed to adequately allege either scienter or loss causation with respect to any false statements it may have made. Because I agree with Bagell Josephs on the issue of scienter, I need not reach its second argument.

As Courts in this District have repeatedly recognized, "The standard for pleading auditor scienter is demanding." Beacon, 745 F. Supp. 2d at 415 (quoting In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007)). Ordinarily, independent outside auditors will have no "motive" to commit fraud, so a plaintiff often must proceed on a theory of "conscious misbehavior or recklessness" in order to raise a "strong inference" of scienter. See In re AOL Time Warner, Inc. Secs. and "ERISA" Litig., 381 F. Supp. 2d 192, 239 (S.D.N.Y. 2004).

26

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).

Here, Plaintiffs make no effort to allege that Bagell Josephs had a motive to assist ABAT in its fraud; they rely instead on a theory of recklessness. But Plaintiffs must allege reckless conduct so egregious as to approximate an actual intent to aid the fraud being committed by the audited company. See Beacon, 745 F. Supp. 2d at 415 (citing Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)); see also Stephenson v. PricewaterhouseCoopers, LLP, 768 F. Supp. 2d 562, 571-72 (S.D.N.Y. 2011). As the Second Circuit explained in Rothman,

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

220 F.3d at 98. Or, as another common formulation has it:

> [P]laintiff must allege that the accounting practices were so deficient that the "audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."

In re Tremont Secs. Law, State Law and Ins. Litig., 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010) (quoting Scottish Re, 524 F. Supp. 2d at 385); see also Beacon, 745 F. Supp. 2d at 415-16; In re IMAX Secs. Litig., 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008)); In re MRU Holdings Secs. Litig., 769 F. Supp. 2d 500, 518 (S.D.N.Y. 2011). Negligence alone, or a "shoddy audit," will not suffice. MRU, 769 F. Supp. 2d at 518 (citing Tremont, 703 F. Supp. 2d at 371).

"Under this 'demanding' standard, 'failures to comply with [GAAP] or other such irregularities are insufficient to establish recklessness.'" Stephenson, 768 F. Supp. 2d at 572 (quoting W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp., 344 Fed. Appx. 717, 720 (2d Cir. 2009)); see also IMAX, 587 F. Supp. 2d at 483. Such violations may support a strong inference of scienter if coupled with so-called "reds flags" that the auditor ignored. See Beacon, 745 F. Supp. 2d at 416 (citing AOL, 381 F. Supp. 2d at 240). "'A complaint might reach the "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" Stephenson, 768 F. Supp. 2d at 573 (quoting Tremont, 703 F. Supp. 2d at 370). But scienter is not sufficiently alleged simply because an audit failed to detect a fraud.

Defendant Bagell Josephs audited ABAT's financial statements for the years 2007, 2008, and 2009. Plaintiffs allege that these audits were not conducted in accordance with professional standards, and that Bagell Josephs ignored several red flags that should have alerted it to the fraudulent nature of ABAT's business. See AOL, 381 F. Supp. 2d at 239 (quoting Rothman, 220 F.3d at 98).

A "red flag" is a sign consciously disregarded by the auditor that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." IMAX, 587 F. Supp. 2d at 483-84 (quoting AOL, 381 F. Supp. 2d at 240 n.51). In order for a red flag to support a strong inference of scienter, the auditor must have actually been aware of its existence; "merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient." IMAX, 587 F. Supp. 2d at 484; see also Novak, 216 F.3d at 309 (citing Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d

28

Cir. 1996)).  After all, "an unseen red flag cannot be heeded," Stephenson, 768 F. Supp. 2d at

573; and, as another court put it, "merely because a person has broad access to every book in a

library does not mean that the person has read and chosen to ignore facts contained in a

particular book in the library." In re aaiPharma Inc. Secs. Litig., 521 F.Supp.2d 507, 513

(E.D.N.C. 2007) (quoted in Tremont, 703 F. Supp. at 370-71).

    Bagell Josephs argues that Plaintiffs have failed to plead red flags of the quality and

quantity necessary to support the inference that Bagell Josephs made its alleged misstatements

with fraudulent intent.  I agree.  With one exception, the "red flags" on which Plaintiffs rely are

either (1) not red flags at all, or (2) not alleged to have been known to, and disregarded by,

Bagell Josephs.  And the one possible exception – the re-characterization of ABAT's interest in

HLJ ZQPT – is not sufficient, even in combination with alleged violations of professional

standards, to support a "strong inference" of fraudulent intent.

    a.  *Discrepancies between AIC and SEC filings, and other non-red flags*

    The first "red flag" on which Plaintiffs rely is the huge discrepancy between ABAT's

results as reported to the AIC in China and the SEC in the United States.  If Bagell Josephs had

reviewed ABAT's AIC filings, the argument goes, it would have concluded that ABAT was

"engaged in wrongdoing to the detriment of its investors." IMAX, 587 F. Supp. 2d at 183-84.

    The argument does not support a strong inference of scienter because it omits a critical

premise: that Bagell Josephs was actually aware of the AIC filings and the discrepancies they

reflected, and chose to disregard them.  Nowhere in the Complaint is it alleged that Bagell

Josephs actually reviewed the AIC filings at all. (See Compl. ¶ 152-53); compare In re Philip

Servs. Corp. Secs. Litig., 383 F. Supp. 2d 463, 471-72 (S.D.N.Y. 2004); In re Complete Mgmt.

Inc. Secs. Litig., 153 F. Supp. 2d 314, 334-35 (S.D.N.Y. 2001).  Merely alleging that an auditor

29

had access to documents that reveal fraudulent financial reporting, and that the auditor "should have" reviewed them, or "would have" reviewed them if the auditor did its job properly, is not sufficient to plead the recklessness necessary to give rise to a strong inference of auditor scienter. See MRU, 769 F. Supp. 2d at 518-19 (citing In re Doral Financial Corp. Secs. Litig., 563 F. Supp. 2d 461, 465 (S.D.N.Y. 2008)); Stephenson, 768 F. Supp. 2d at 580 (citing South Cherry, 573 F.3d at 98); see also Rothman, 220 F.3d at 98. Thus, Plaintiffs' failure to plead that Bagell Josephs actually reviewed the AIC filings is critical.

A complaint may survive despite the absence of an allegation that the auditor "actually reviewed" the allegedly damning documents, but only where the complaint gives rise to an inference that the auditor "must have" reviewed them. See, e.g., Philip Services, 383 F. Supp. 2d at 475; see also Kalnit, 264 F.3d at 142 (citing In Re Carter–Wallace, Inc. Secs. Litig., 220 F.3d 36, 39 (2d Cir. 2000)). This is not such a case. Plaintiffs do not allege, for example, that Bagell Joseph was involved in preparing ABAT's AIC filings, or that it advised ABAT with respect to its overseas subsidiary's accounting. Compare IMAX, 587 F. Supp. 2d at 484-85. Indeed, Plaintiffs even fail to allege that no reasonable auditor would fail to obtain these filings and reconcile them with SEC filings.

Rather, the most Plaintiffs allege is that if Bagell Josephs had been more diligent, it "would have" seen the AIC filings, i.e., that the failure to discover the AIC filings was negligent. But negligence, or a "shoddy audit," is not enough. MRU, 769 F. Supp. 2d at 518-19 (citing cases). Thus, as the Court recognized in Stephenson:

> [T]he Second Circuit has affirmed the dismissal of a complaint "replete with allegations that [a firm] 'would' have learned the truth as to those aspects of the [fraudulent] funds if [it] had performed the 'due diligence' it promised" and that "[i]f [the firm] had asked various questions earlier, it would have further questioned the [fraudulent fund's] financial records or recognized the need to ask further questions."

30

768 F. Supp. 2d at 573-74 (quoting South Cherry, 573 F.3d at 112). Under this controlling precedent, Plaintiffs' allegation that Bagell Josephs negligently failed to learn the truth is insufficient to support a strong inference of scienter under a "red flag" theory.

> As for the remaining purported "red flags":
>
> Merely labeling allegations as red flags . . . is insufficient to make those allegations relevant to a defendant's scienter. Rather, plaintiffs must plead "facts which come to a defendant's attention that would place a reasonable party in defendant's position on notice that the audited company was engaged in wrongdoing to the detriment of its investors."

In re Marsh & Mclennan Cos., Inc. Secs. Litig., 501 F. Supp. 2d 452, 487 (S.D.N.Y. 2006) (quoting In re WorldCom, 346 F. Supp. 2d 628, 672 (S.D.N.Y. 2004)). For all but one of the "red flags" identified in the Complaint, Plaintiffs fail to explain what should have made Bagell Josephs suspicious.

### i. High CFO turnover

One of the "red flags" Plaintiffs rely on is what they describe as a high turnover among ABAT's CFOs. Specifically, the Complaint alleges that "ABAT had high rates of auditor and CFO turnover, common signals of fraud." (Compl. ¶ 145.g.) Plaintiffs drop any reliance on auditor turnover in this opposition to Bagell Josephs' motion. This is, perhaps, due to the fact that at the time Bagell Josephs served as ABAT's auditor, it was the only firm ever to have done so. In other words, there was no auditor turnover.

Instead, Plaintiffs rely on the fact that ABAT had three different CFOs between 2004 and the end of the Class Period in March 2011: Defendant Wan, who served twice, from September 2004 through April 2007, and again, from March 2009 through the present (Compl. ¶ 19); Sharon Tang, a nonparty, who served from April 2007 through May 2008 (id. ¶ 35); and Taylor Zhange, who served from May 2008 through March 2009 (id. ¶ 40).

31

However, turnover at the CFO position is not *necessarily* indicative of fraudulent accounting, and Plaintiffs plead no facts tending to show that it was indicative of fraud in this case. Plaintiffs make no effort to tie the CFO changes to any fraudulent purpose or practice. Plaintiffs do not allege whether Tang and Zhange resigned or were fired, or under what circumstances. In short, Plaintiff alleges nothing about the turnover that should have put Bagell Josephs on notice that fraud was afoot.

The Fourth Circuit recently rejected the bare allegation of rapid growth and high CFO turnover as a basis for inferring auditor scienter:

> Plaintiffs allege that facts like the high CFO turnover at USF and USF's rapid growth should have alerted Deloitte U.S. that there was fraud afoot, but they do not explain why this was the only conclusion Deloitte U.S. could have drawn without being reckless. There are many possible reasons other than fraud for high personnel turnover – personality conflicts, lack of opportunities for advancement, salary and compensation disputes, to name a few.

Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305 (4th Cir. 2009). Here, Plaintiffs plead no more than did the plaintiff whose complaint was dismissed in Deloitte. Thus, this is not the sort of disregarded "red flag" necessary to support the requisite "strong inference" of fraudulent intent.

### ii. High profit margin

Plaintiffs next rely on ABAT's claimed profit margins, which exceeded those of its Chinese and international competitors and were difficult to explain in a commodity-based business with no obvious advantage in operations or distribution. I noted, in connection with the ABAT Defendants' motion, that these margins lent some heft to Plaintiffs' allegations that ABAT had misrepresented its financial results in SEC filings – particularly when considered in combination with the rest of the Complaint's allegations of falsity. See supra. But this does not mean that high profit margins should have alerted Bagell Josephs to the existence of fraud,

particularly in the absence of any allegation that Bagell Josephs was aware of other indicia of fraud. Rather, the question is whether ABAT's claims of rapidly climbing revenue, and industry-leading operating margins, should have alerted Bagell Josephs that ABAT was a fraud designed to enrich insiders through related party deals. I agree with Bagell Josephs that the claimed results are not, of themselves, of such a suspicious character.

It has been held repeatedly in the courts of this Circuit that unprecedented operating success alone is not sufficient to put an auditor on reasonable notice of fraud. See, e.g., Novak, 216 F.3d at 309; Chill, 101 F.3d at 270. Indeed, the far more suspicious success of Bernard Madoff's investment fund has been found by several Judges of this District not to constitute a "red flag" for outside auditors. See, e.g., Stephenson, 768 F. Supp. 2d at 579-80. Of course, this case differs somewhat because Bagell Josephs audited ABAT directly, while the auditor defendants in the cited Madoff cases audited funds that invested with Madoff. But this is not a difference that makes a difference. Here, as in the Madoff cases, Plaintiffs allege that Bagell Josephs had access to documents that would have revealed the unlikelihood, and even impossibility, of the claimed success – the AIC filings and competitors' operating margins. Of course Plaintiffs do not allege how Bagell Josephs would or even could have had access to the operating margin information about ABAT's overseas competitors; that is not something auditors are normally required to analyze. However, the failure to do so suggests negligence, at worst, not recklessness approaching an intent to assist in the continuation of the fraud.

### iii. Shenzhen acquisition

Plaintiffs' reliance on the suspicious circumstances of the Shenzhen acquisition – particularly, Defendant Fu's undisclosed interest in Shenzhen – is misplaced for a more

fundamental reason: that transaction closed in January 2011, more than a year after the last period audited by Bagell Josephs, which ended December 31, 2009.

Perhaps recognizing this, Plaintiffs do not rely heavily on the Shenzhen acquisition in their opposition to Bagell Josephs' motion. They do point out, however, that a deposit was made toward the Shenzhen purchase in 2009. But this is not sufficient to place Bagell Josephs on notice of the suspicious circumstances surrounding the acquisition. In 2009, no purchase price had been announced, and there was no certainty that the transaction would actually close, and on what terms. Plaintiffs do not allege that Bagell Josephs had a duty to audit a transaction that was not even formally announced until a year after their last audit closed. Thus, Plaintiffs allege nothing about the Shenzhen acquisition that should have made Bagell Josephs suspicious.

### iv. **Wuxi transaction**

Plaintiffs face similar problems with their reliance on yet another purportedly related party transaction, this one involving a firm called Wuxi. As noted above, the only indication that this was a "related party" transaction comes from an unsubstantiated confidential source, who revealed no more than his "belief" that Fu had secret kickback arrangements with people at Wuxi. There is no allegation that Bagell Josephs actually knew of any alleged kickbacks, or had any reasonable means to discover them.

Doral Financial Corp., 563 F. Supp. 2d at 461, is analogous. There, as here, the plaintiffs alleged that the audited company's fraud consisted of a series of secret side arrangements, known only to top management. The district court held that those very allegations defeated the inference that the auditor concealed the fraud with fraudulent intent:

> In the Complaint itself, however, these agreements are alleged to be "secret side agreements" concealed from anyone but management. Similarly, the Complaint alleges that Doral engaged in "a deliberate practice of conscious misconduct at the highest levels of [its] management . . . designed to surreptitiously mask the true

34

terms and conditions of transactions."   Taken as a whole, these allegations
themselves suggest that [the auditor] did not discover the fraud, not because of
recklessness, but because Doral's management hid the fraud from [the auditor]
just as it did from the public at large.

Id. at 465 (internal citations omitted).  The Second Circuit adopted that reasoning when it

affirmed the dismissal of the complaint:

In this case, the opposing inference – that Doral concealed its fraud from [the
auditor] just as it concealed its fraud from investors – is objectively more
compelling than plaintiffs' allegations of recklessness.  For example, plaintiffs
allege that [the auditor] was reckless when it failed to uncover secret side
agreements that altered the terms of a sale of securities.  But as the plaintiffs
themselves allege, these agreements were a tightly-held secret – only a few
managers knew of them.  If these agreements were kept secret even from Doral's
employees, it seems more plausible that Doral's managers concealed them from
[the auditor] than that [the auditor] recklessly failed to discover them.

W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp., 344 Fed. Appx. 717, 720 (2d Cir. 2009).

Here, as in Doral,  the only allegation going to Wuxi (and Shenzhen, for that matter) is

that top management concealed secret interests in ABAT's acquisitions that would enrich them

personally.  The inference that Bagell Josephs was kept as much in the dark as the  investors is

more compelling than the inference that Bagell Josephs recklessly disregarded clear signs of

fraud.

### v.  Chinese reverse merger

Plaintiffs rely on the fact that ABAT went public through a reverse merger transaction,

but they fail to allege facts from which one could infer that this was a suspicious circumstance

during Bagell Josephs' tenure as auditor.  According to the Complaint, Chinese reverse mergers

first came under heightened scrutiny in early 2011, right around the time ABAT's alleged fraud

was revealed.  There is no allegation that it was industry standard to view reverse mergers,

particularly those involving China-based operations, with skepticism from 2007-2009, the only

dates relevant to Bagell Josephs.  Rather, there were, and still are, completely legitimate reasons

for a small company to access the equity markets through a reverse merger, e.g., to avoid the
legal and banking fees associated with a conventional IPO.  Reverse mergers themselves are
hardly a new phenomenon.

Thus, leaving aside whether a reverse merger could be a "red flag" for auditors working
today, there is no allegation from which I could conclude that it was a red flag for Bagell Josephs
while it served as ABAT's auditor.

b. *One potential red flag: HLJ ZQPT recharacterization*

Although Plaintiffs relegate it to a footnote in their opposition papers, the HLJ ZQPT re-
characterization is probably their likeliest candidate for a bona fide red flag.  As discussed briefly
above, ABAT's financial statements for the periods covering 2004 through 2008 reported that
HLJ ZQPT was a fully owned ABAT subsidiary.  In its 2009 10-K (published in early 2010),
however, ABAT corrected this disclosure and revealed that, in fact, Fu and sixteen other
investors were the true owners of HLJ ZQPT, and always had been. (See Compl. ¶¶ 98-103.)
Plaintiffs argue that there is something "off" about this piece of accounting.

Defendants insist that there is a perfectly innocent explanation for this corrected
disclosure: Through a series of "contracts" with Fu and his fellow investors, ABAT assumed all
of the benefits and responsibilities of owning HLJ ZQPT, and by 2009 Defendants concluded
that they had to identify Fu and his fellow investors as the record owners of the corporation, even
though they were not the "actual" owners.  But that does nothing to explain why the accountants
either should have been aware of the actual ownership of HLJ ZQPT earlier than they became
aware of it, or why learning about this fact should have automatically alerted Bagell Josephs to
the numerous other erroneous disclosures about ABAT, its subsidiary corporations, and its
earnings.  Learning, as Bagell Josephs did in 2009, that a company failed to disclose its CEO's

36

record ownership interest in a subsidiary might well prompt a prudent auditor to ask a few more questions during its next visit, if only to see whether the client was properly reporting other subsidiaries' related party transactions. But nothing in the complaint suggests, let alone asserts, that Bagell Josephs did not do so.

One missed red flag can perhaps be enough to conclude that an accountant's audit was a "farce." But in this case, this particular red flag is not sufficiently egregious to raise that inference. "Even if the court could infer that [the auditor] was aware of the red flags set forth herein, which is no small leap, the red flags are not so egregious as to render [the auditor]'s audit a farce." In re Priceline.com Inc. Secs. Litig., 342 F. Supp. 2d 33, 57 (D. Conn. 2004). The question on this motion is whether learning that Fu and his co-investors were the record owners of HLJ ZQPT should have led Bagell Josephs to suspect that ABAT was inflating its earnings, or that Fu was also the secret owner of Shenzhen, or that Fu had "secret side deals" with the owners of Wuxi. Frankly, the inference that Bagell Joseph was reckless for failing to deduce ABAT's many alleged frauds from this single piece of information is far from compelling. The Shenzhen transaction was still in the future at the time ABAT clarified the ownership of HLJ ZQPT; thus, Bagell Josephs could not have been wary of a deal that did not yet exist. And Bagell Josephs could have reasonably taken the HLJ ZQPT re-characterization as evidence that ABAT was committed to accurately describing its interests in subsidiaries and revealing any related party transactions, and so was unlikely to be planning or concealing others. Certainly, that inference is at least as compelling as the inference that ABAT came clean about HLJ ZQPT as a ruse to hide other related party deals or adverse earnings information from the public.

While the auditing judgments leading up to the re-characterization may have been questionable, they do not, even in combination with the other allegations of GAAP and GAAS

37

violations, give rise to a strong inference that Bagell Josephs' audits were "no audits at all," "pretend audits," or that Bagell Josephs' recklessness was so extreme as to approximate an intent to assist ABAT in its alleged fraud. Rather, at best, Plaintiffs' allegations give rise to the inference that Bagell Josephs would have become aware of ABAT's alleged fraud if it had not performed its audit in a negligent or shoddy manner. This is insufficient as a matter of law. Stephenson, 768 F. Supp. 2d at 579-80.

 2. *EFP*

 Plaintiffs' allegations of scienter against EFP are deficient for many of the same reasons. One (potentially) important difference is that EFP, unlike Bagell Josephs, audited ABAT's 2010 financial statements that announced the Shenzhen acquisition. EFP's duty to familiarize itself with the particulars of that transaction thus differ in important respects from Bagell Josephs' duty. See supra.

 However, Plaintiffs have a much more fundamental problem with their claim against EFP: they failed to plead that any of EFP's alleged misstatements was made "in connection with the purchase or sale of securities." This is for the simple reason that, according to the Complaint, both of the named Plaintiffs purchased their ABAT shares before EFP issued its audit of ABAT's 2010 financial results on March 16, 2011. Specifically, Plaintiff Sanderson purchased ABAT shares between September 14, 2010 and March 15, 2011 (Nugent Decl., B); Plaintiff Cohen purchased on July 14 and 16, 2010. However, as noted, the only alleged misstatements made by EFP were made on March 16, 2011, when it certified ABAT's form 10-K for the 2010 fiscal year.

 "Allegedly false statements made after the named plaintiff's last stock purchase are not actionable because the plaintiff could not possibly have relied on such statements in purchasing

38

the stock." Zucker v. Sasaki, 963 F. Supp. 301, 306 (S.D.N.Y. 1997) (citing Denny v. Barber,

576 F.2d 465, 468 (2d Cir. 1978)).  Plaintiffs effectively concede, as they must, that this is fatal

to their standing to pursue claims against EFP on behalf of the Class, and that the claims against

EFP must be dismissed.  "Moreover, because . . . the named plaintiff[] has no standing to assert

such claims, she cannot assert them on behalf of a class of shareholders." Zucker, 963 F. Supp. at

307 n.7; see also In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig., 272 F. Supp. 2d

243, 255 (S.D.N.Y. 2003).

In a footnote, Plaintiffs ask for leave to replead in order to identify a third Class

Representative who purchased after March 16, 2011.  EFP resists Plaintiffs' request, pointing out

the issue of who would serve as lead plaintiff has already been fully and fairly adjudicated.  EFP

points out that the Court resolved competing motions, and appointed Plaintiff Sanderson as Lead

Plaintiff, and his lawyers at Pomerantz as Lead Counsel, on the finding that Sanderson was the

"most adequate" to serve. (See ECF No. 50.)

I do not understand EFP to argue that my prior order somehow bars Plaintiffs from

repleading to identify an additional suitable class member who purchased after March 16, 2011,

and who therefore has standing to sue EFP and represent the class of shareholders who share that

standing.  Nor is this a case where Plaintiffs were previously made aware of the pleading

deficiencies, and failed to remedy them. Compare DeSilva v. North Shore–Long Island Jewish

Health System, Inc., 10 Civ. 1341, 2012 WL 748760, at *12 (E.D.N.Y. Mar. 17, 2012)

(collecting cases).  Thus, EFP has presented me with no reason why I should not allow EFP to

name an additional plaintiff, one capable of pleading a stock purchase made after March 16,

2011 in reliance on EFP's allegedly false statements.

However, in view of the Complaint's additional deficiencies with respect to the issue of EFP's scienter – which, as noted, are largely the same as those identified with respect to Bagell Josephs – I will not grant leave to replead against EFP unless Plaintiffs demonstrate that amendment would not be futile.  Plaintiffs will have to follow the usual course of filing a motion for leave to amend to which an amended complaint is attached if they wish to have this option considered – and if, as I suspect will prove to be the case, they are unable to bolster significantly their allegations, so that they allege more than a negligent audit, amendment will be deemed futile.

## IV.  CONCLUSION

The ABAT Defendants' motion to dismiss Counts I and II are denied.  Discovery will proceed on those Counts following a scheduling conference on Friday, September 21, 2012, at 10am, in Courtroom 14C, 500 Pearl Street, New York, NY.

Plaintiffs' motion to strike Exhibits 20 and 21 from the Shalov Declaration is granted. The ABAT Defendants are free to submit that evidence in admissible form on a motion for summary judgment.

The Auditor Defendants' separate motions to dismiss Count III are granted; as against EFP, dismissal will be with prejudice unless, within 20 days, Plaintiffs file a motion for leave to amend and a proposed amended complaint.

The Clerk of Court is directed to remove the motions at ECF Nos. 68, 71, 74 and 80 from the Court's list of open matters.

Dated: August 29, 2012

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

40

Case 1:11-cv-02279-CM   Document 97-1   Filed 09/25/12   Page 1 of 94

# EXHIBIT  A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re ADVANCED BATTERY TECHNOLOGIES, INC. SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>)    **Master File No.: 11 Civ. 2279 (CM)**<br><br>   **JURY TRIAL DEMANDED** |

## [PROPOSED] SECOND AMENDED CONSOLIDATED
## CLASS ACTION COMPLAINT

Lead Plaintiff Ruble Sanderson and Plaintiff Federico Schmid ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against the Defendants named herein ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, interviews of former Advanced Battery Technologies, Inc. ("ABAT" or the "Company") employees, ABAT customers, inspections of the Company's Chinese manufacturing facilities, review of publicly available court documents in China, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, various Chinese Administrations of Industry and Commerce ("AIC") filings, wire and press releases published by and regarding ABAT analysts' reports and advisories about the Company, information readily obtainable on the Internet, and other investigation to verify the accuracy of the Company's public statements. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased ABAT securities between May 15, 2007 and March 29, 2011, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    ABAT develops, manufactures, and distributes rechargeable polymer lithium-ion batteries.  The Company's products include rechargeable batteries for mine-use lamps, electric automobiles, motorcycles, cellular phones, notebook computers, and other personal electronic devices.

3.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically the Company: (i) reported inflated gross profits, net income, and profit margins for fiscal years ending December 31, 2007, December 31, 2008, and December 31, 2009; (ii) stated that it purchased a company called Shenzhen in 2010 for $20 million, but failed to disclose that Defendant Fu had actually purchased this company in 2008 for $1 million and was now selling it to ABAT for $20 million, and thus this was an undisclosed related party transaction; (iii) stated that it had acquired another company, Wuxi ZQ, for $22 million, but failed to disclose that Defendant Fu had a side deal with one of Wuxi's sellers to improperly split excess proceeds from the sale, and further, later represented to investors that it had only paid $12,870,000 for Wuxi, not $22 million; and (iv) misrepresented that it owned a Company subsidiary, Heilongjiang ZhongQiang Power-Tech Co., Ltd. ("HLJZQPT"), when it did not, or, alternatively, the Company failed to disclose that it entered into a related party

2

transaction with ABAT's Chairman and CEO which resulted in the owner of that subsidiary becoming the Chairman and CEO, and not ABAT.

4.      The truth began to publicly emerge on March 30, 2011, when Variant View Research ("Variant") published a report[1] detailing its investigation of the Company, concluding "that the financial statements and management of ABAT cannot be trusted . . ."  Variant found, among other things, that: (i) ABAT's Chairman, Defendant Fu had transferred ownership of ABAT's key subsidiary, HLJZQPT, to himself without explanation or compensation; and (ii) several of ABAT's distribution relationships are non-existent.  Variant concluded:

> A self-dealing management, falsely represented business description, serial equity issuances to acquire related or poor businesses, ludicrous profitability claims, customers that cannot be verified, multiple audit problems, the list goes on and on.  This company has the dubious honor of achieving every major red flag that one looks for in a Chinese RTO fraud.

5.      On this news, ABAT's shares declined $1.50 per share, or nearly 43%, to close on March 30, 2011, at $2.01 per share, on unusually heavy trading volume.

6.      On May 5, 2011 Prescience Investment Group, LLC and Kerrisdale Capital Management, LLC (collectively "Prescience") published a report[2] on ABAT, which corroborated and expanded many of Variant's claims.  Specifically, Prescience claimed, among other things, that there were material inaccuracies in ABAT's SEC filings.  Prescience's findings were based on its extensive investigation of the Company, including a comparison of ABAT's financial filings in China and the U.S., interviews with customers, suppliers and partners; site visits to the Company's manufacturing facilities; a survey of the battery manufacturing sector; an examination of court filings against the Company; and other relevant resources.

---

[1] Variant View, *Advanced Battery Technologies:  An Egregious Chinese RTO*, Seeking Alpha, (March 30, 2011) http://seekingalpha.com/article/260883-advanced-battery-technologies-an-egregious-chinese-rto.

[2] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

7.    Plaintiffs have conducted their own independent investigation of the underlying facts concerning ABAT's public disclosures, including: interviewing customers and former employees, visiting certain ABAT production facilities in China, analyzing ABAT's SEC filings and the comparable Chinese AIC filings and reviewing court records.   As detailed herein, Plaintiffs' investigation has confirmed key charges made by Variant and Prescience.

8.    On April 6, 2011, ABAT issued a press release[3] ("ABAT Response"), which purported to explain some of the issues raised in the Variant Report.   However, as further detailed herein, not only did the ABAT Response fail to adequately defend the Company's public statements, it effectively admitted that some of the Company's statements were in fact false.   To date, ABAT has failed to issue any response to the Prescience Report.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

11.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as a substantial part of the conduct complained of herein occurred in this District. Moreover, ABAT's principal executive offices are located within this District.

---

[3] Advanced Battery Technologies, Inc., *Advanced Battery Technologies Responds to Allegations by Variant View Research*, NASDAQ OMX - GlobeNewswire, http://www.globenewswire.com/news html?d=21807&topic=1024/.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Lead Plaintiff Ruble Sanderson, as set forth in the attached certification, filed on May 31, 2011, 11 Civ. 2279 (Dkt. # 17-2), purchased ABAT securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Plaintiff Federico Schmid, as set forth in the attached certification, filed in connection with the Motion of Federico Schmid to Consolidate Related Cases, Appoint Lead Plaintiff, and Approve Lead Counsel, at 3. (Dkt. # 20-2), purchased ABAT securities at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant ABAT, which is a Delaware Corporation, has its principle executive offices located at 15 West 39th Street, Suite 14A, New York, NY 10018.   ABAT is a $250 million market cap company listed on the Nasdaq, which, through its subsidiaries, engages in the design, manufacture, and marketing of rechargeable polymer lithium-ion (PLI) batteries in the United States, Europe, and Asia. The Company's rechargeable PLI batteries are used in consumer products, such as portable computers, personal digital assistants, and cellular telephones. It also develops and manufactures various types of electric vehicles, including electric bicycles, electric scooters, and electric sports utility vehicles. ABAT is a holding company, which is structured as follows:



16.    In addition, ABAT owns a 49% interest in Beyond E-Tech, Inc. ("BET") which distributes cellular telephones in the United States.

17.    The Company originally went public through a reverse merger transaction with a shell company called Buy It Cheap.com in 2004.

18.    Defendant Zhiguo Fu ("Fu") at all relevant times herein was the Company's Chairman and Chief Executive Officer.

19.    Defendant Guohua Wan ("Wan") was the Company's Chief Financial Officer from September 14, 2004 until her resignation on April 20, 2007, and then again from March 1, 2009 until the present.

20.    The Defendants referenced above in ¶¶ 18-19 are sometimes referred to herein as the "Individual Defendants."

21.    Defendant Bagell, Josephs, Levine & Co., LLC ("Bagell Josephs"), located in Marlton, New Jersey, served as the Company's auditor from 2006 through 2010.  In 2010 Bagell Josephs merged into Friedman LLP.

---

[4] Harbin ZhongQian Power Tech Co., Ltd. ("HarbinZQ"), which manages the assets and operations of Heilongjiang ZhongQiang Power-Tech Co., Ltd. ("HLJ ZQPT") is engaged in the business of manufacturing and distributing electric vehicles that utilize batteries manufactured by HLJZQPT.  HLJZQPT manufactures and distributes polymer lithium-ion batteries.  In May 2009, ABAT completed the acquisition of Wuxi Angell Autocycle Co., Ltd. ("Wuxi").  Wuxi manufactures and distributes electric vehicles.

22.    Defendant Friedman LLP, headquartered in New York, served as the Company's auditor from January 1, 2010 until the Company announced its dismissal in an 8-K filed less than a year later on December 17, 2010, effective December 14, 2010.

23.    Defendant EFP Rotenberg, LLP, headquartered in Rochester, New York, has served as the Company's auditor from December 14, 2010 through the present.

24.    The Defendants referenced above in ¶¶ 21-23 are referred to herein as the "Auditor Defendants."

<u>SUBSTANTIVE ALLEGATIONS</u>

<u>FACTUAL BACKGROUND</u>

<u>Chinese Reverse Mergers</u>

25.    Special purpose acquisition companies ("SPACs") enable foreign corporations to access capital markets in the United States without the rigors of an initial public offering ("IPO"). In this case, an IPO and its attendant regulatory strictures, which would subject the company to a thorough audit, were circumvented through the mechanism of a reverse merger with a domestic listed company. A "reverse merger," as used in this Amended Complaint, is the acquisition of a private operating company by a public shell company (the SPAC) that results in the private operating company having effective control of the combined company. The foreign corporation is either merged into or acquired by a shell listed on a U.S. exchange, giving the foreign company immediate "back door" access to the U.S. public securities market. As explained in an article published in the Wall Street Journal on June 3, 2011:[5]

---

[5] Michael Rapoport, *SEC Probes China Auditors*, (June, 3, 2011, as of 12:00 am) The Wall Street Journal online, http://online.wsj.com/article/SB10001424052702304563104576361422372121248 html.

> In reverse mergers, a foreign company is "bought" by a publicly traded
> U.S. shell company. But the foreign company assumes control and gets the
> shell's U.S. listing without the level of scrutiny that an initial public
> offering entails. Though companies from other countries also engage in
> reverse mergers, such deals are especially common among the Chinese.
> The PCAOB says nearly three-quarters of the 215 Chinese companies
> listing in the U.S. from 2007 to early 2010 did so via reverse merger.

Michael Rapoport, *SEC Probes China Auditors*, June 3, 2011.

26.    In recent years, suspicion of reverse mergers has increased due to the widespread

use of the device as a means of avoiding SEC scrutiny. According to one business columnist,

reverse mergers are "a course long favored by shady stock promoters." Floyd Norris, *The

Audacity of Chinese Frauds*, N.Y. Times, May 26, 2011.[6]

27.    A March 15, 2011 research note[7] released by the Public Company Accounting

Oversight Board ("PCAOB") expressed concern about the quality of audits conducted on the

financial statements of these reverse merger Chinese companies. In an April 26, 2011 statement[8]

before the U.S. Senate Subcommittee on Securities, Insurance and Investment, PCAOB

Chairman, James R. Doty, stated that there are:

> "significant risks associated with audits of operations of U.S. [listed]
> companies in China. For example, we are finding through our oversight of
> U.S. firms that even simple audit maxims, such as maintaining the auditor's
> control over bank confirmations, may not hold given the business culture in
> China."  Doty concluded that "[i]n light of these risks, the PCAOB's
> inability to inspect the work of registered firms from China is a gaping hole
> in investor protection."

---

[6] Floyd Norris, *The Audacity of Chinese Frauds*, (May 26, 2011), The New York Times online,
http://www.nytimes.com/2011/05/27/business/27norris.html?pagewanted=all.

[7] PCAOB, *PCAOB Issues first Research Note on Chinese Reverse Mergers*, (March 15, 2011), PCAOB,
http://pcaobus.org/News/Releases/Pages/03152011_ResearchNote.aspx.

[8] Statement of James R. Doty, Chairman, Public Accounting Oversight Board before the United States Senate
Committee on Banking, Housing and Urban Affairs Subcommittee on Securities, Insurance and Investment, Hearing
on the Roles of Accounting Profession in Preventing Another Financial Crisis, April 6, 2011, PCOAB,
www.pcoabus.org, (accessed 9/14/11).

28.     SEC Commissioner Luis A. Aguilar has also spoken out on the subject. In a speech on April 4, 2011,[9] he said that using reverse mergers as a form of "backdoor registration" was a "disturbing trend" in modern capital formation. He said, "a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud." The "billions in U.S. savings and investment dollars [that] have been entrusted with these companies" are, therefore, at risk.

29.     The May 26, 2011 New York Times article[10] blamed auditors and inadequate audit procedures for this disturbing trend. The New York Times revealed that another Chinese corporation, Longtop Financial Technologies, also recently became "worthless" because of allegations of fraud, including fraud relating to Longtop's purported cash balances in Chinese banks. Deloitte Touche Tomatsu resigned as Longtop's auditor after the fraud came to light but only after it had already given "clean audit opinions to Longtop for six consecutive years," according to the report.

30.     The May 26, 2011 New York Times article[11] also noted that the major auditing firms in China are not subject to the same type of inspections required of other accounting firms that perform audits for companies whose securities are traded in the U.S.:

> The Chinese audit firms, while they are affiliated with major international audit networks, have never been inspected by the Public Company Accounting Oversight Board in the United States. The Sarbanes-Oxley Act requires those inspections for accounting firms that audit companies whose securities trade in the United States, but China has refused to allow inspections.

---

[9] Luis A. Aguilar, *Speech by SEC Commissioner: Facilitating Real Capital Formation*, (April 4, 2011), U.S. Securities and Exchange Commission, http://www.sec.gov/news/speech/2011/spch040411aa htm.

[10] Floyd Norris, *The Audacity of Chinese Frauds*, (May 26, 2011), The New York Times online, http://www.nytimes.com/2011/05/27/business/27norris.html?pagewanted=all.

[11] *Id.*

> In a speech at a Baruch College conference earlier this month, James R. Doty, chairman of the accounting oversight board, called on the major firms to improve preventative global quality controls but said that actual inspections were needed. Two weeks ago, Chinese and American officials meeting in Washington said they would try to reach agreement on the oversight of accounting firms providing audit services for public companies in the two countries, so as to enhance mutual trust.

Floyd Norris, *The Audacity of Chinese Frauds*, N.Y. Times, May 26, 2011.[12]

31.     The June 3, 2011 Wall Street Journal article[13] also revealed that the SEC is now examining accounting and disclosure issues regarding Chinese companies that engaged in reverse mergers:

> People familiar with the matter say the investigation also includes auditors, which hadn't previously been known. As part of its inquiry, the SEC has suspended trading on some Chinese companies, questioning their truthfulness about their finances and operations. The Public Company Accounting Oversight Board, or PCAOB, the government's accounting regulator, said it is investigating some audit firms over whether their audits of Chinese clients are stringent enough.
>                                     . . .
> "Right now, the auditing and regulation of U.S.-listed Chinese companies isn't working very well," said Paul Gillis, a visiting professor of accounting at Peking University's Guangha School of Management.
>                                     …
> Since February, about 40 Chinese companies have either acknowledged accounting problems or seen the SEC or U.S. exchanges halt trading in their stocks because of accounting questions.

Michael Rapoport, *SEC Probes China Auditors*, Wall Street Journal, June 3, 2011.

32.     Confirming the fears of Messrs. Aguilar and Doty, more than 24 Chinese-based companies have filed 8-Ks disclosing auditor resignations, accounting problems, or both, since March 2011.[14]

---

[12] Floyd Norris, The Audacity of Chinese Frauds, (May 26, 2011), The New York Times online, http://www.nytimes.com/2011/05/27/business/27norris.html?pagewanted=all.

[13] Michael Rapoport, *SEC Probes China Auditors*, (June, 3, 2011, as of 12:00 am) The Wall Street Journal online, http://online.wsj.com/article/SB10001424052702304563104576361422372121248 html.

[14] Letter from SEC Chairman Mary L. Schapiro to the Honorable Patrick T. McHenry, April 27, 2011.

33.    On April 18, 2011, NASDAQ proposed a rule[15] concerning companies formed through reverse mergers. Proposed Rule 2011-056 would require, among other things, that a company formed pursuant to a reverse merger trade at least six months after the completion of the reverse merger, and that six months' worth of audited financial statements following the reverse merger be timely filed, prior to listing the company on the NASDAQ. In June 2011, the SEC issued an investor bulletin warning investors about fraud risks in reverse mergers.[16]

**Materially False and Misleading Statements Issued By Defendants During the Class Period**

**A.    Misrepresentations Concerning ABAT's Reported Revenues and Net Income**

34.    Throughout the Class Period, ABAT reported robust and increasing revenues, gross profits and net income.    In fact, as detailed in ¶ 64 herein, the Company sustained significant losses for the relevant periods.

35.    On May 15, 2007, the Company filed a quarterly report for the period ended March 31, 2007 on Form 10-Q with the SEC ("First Quarter 2007 10-Q") which reported net income of $1,338,038, or $0.027 per diluted income per share, and revenue of $5,363,923.   In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained signed certifications by Defendant Fu and Sharon Xiarong Tang ("CFO Tang"), the Company's Chief Financial Officer from April 20, 2007 until her resignation on May 13, 2008, stating that the financial information contained in the First Quarter 2007 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting ("SOX Certification").

---

[15] NASDAQ, *Self-Regulatory Organizations; The NASDAQ Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Additional Listing Requirements for Reverse Mergers,* (April 29, 2011), SECURITIES AND EXCHANGE COMMISSION, (Release No. 34-64371; File No. SR-NASDAQ-2011-056), www.sec.gov.

[16] SEC Office of Investor Education and Advocacy, *Investor Bulletin: Reverse Mergers*, (June 2011), www.investor.gov.

36.     On August 14, 2007, the Company filed a quarterly report for the period ended June 30, 2007 on Form 10-Q with the SEC ("Second Quarter 2007 10-Q") which reported net income of $3,284,948, or $0.07 diluted income per share, and revenue of $7,697,363.

37.     On November 9, 2007, the Company filed a quarterly report for the period ended September 30, 2007 ("Third Quarter 2007 10-Q"), which reported net income of $3,596,670, or $0.07 diluted income per share, and revenue of $8,573,009.

38.     On April 28, 2008, the Company filed an annual report for the period ended December 31, 2007 on Form 10KSB with the SEC ("2007 10KSB"), which reported net income of $10.2 million, or $0.22 per share and revenue of $31.9 million.  The 2007 10KSB also reflected restated net income of $8 million, or $0.17 per share, for the fiscal year ended December 31, 2006 as a result of ABAT's determination that under SFAS 142 it was not required to impair goodwill.  The 2007 10KSB was signed by Defendant Fu and CFO Tang and represented the Company's annual financial results and financial position.  In addition, the 2007 10KSB contained SOX certifications signed by Defendant Fu and CFO Tang.

39.     On May 12, 2008, the Company filed its quarterly report for the period ending March 31, 2008 ("First Quarter 2008 Form 10-Q").  The Company reported revenues of $10,031,969, and net income of $3,848,478, or $0.08 income per diluted share.  The First Quarter 2008 10-Q was signed by Defendant Fu and CFO Tang, and contained SOX certifications signed by both Defendant Fu and CFO Tang.

40.     On August 11, 2008, the Company filed its quarterly report for the period ending June 30, 2008 ("Second Quarter 2008 Form 10-Q").  The Company reported revenues of $11,748,284, and net income of $4,675,272, or $0.09 per diluted share. The Second Quarter 2008 Form 10-Q was signed by Defendant Fu and Taylor Dahe Zhang ("CFO Zhang"), the

Company's Chief Financial Officer from May 13, 2008 until his resignation on March 1, 2009, and contained SOX certifications signed both Defendant Fu and CFO Zhang.

41.    On November 10, 2008, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2008.  The November 10th Press Release stated that revenues had increased 47.7% year over year to $12.7 million, and that gross profits had increased 47.8% year over year to $5.9 million.  It further stated that net income had increased 21.6% year over year to $4.4 million.

42.    On November 12, 2008, the Company filed its quarterly report for the third quarter ended September 30, 2008 on Form 10-Q with the SEC ("Third Quarter 2008 10-Q"), which reported net income of $4.4 million, or $0.08 per diluted share and revenue of $12.7 million.  The Third Quarter 2008 10-Q was signed by Defendant Fu and CFO Zhang and represented the Company's quarterly financial results and financial position.  In addition, the Third Quarter 2008 10-Q contained SOX certifications signed by Defendant Fu and CFO Zhang.

43.    On March 16, 2009, the Company issued a press release announcing its financial results for the year ended December 31, 2008.  For the year, the Company reported a net income of $16.1 million, or $0.31 per diluted share and revenue of $45.2 million, as compared to a net income of $10.2 million, or $0.21 per diluted share and revenue of $13.9 million for the same period a year ago.[17]

44.    On March 16, 2009, the Company filed an annual report for the period ended December 31, 2008 on Form 10-K with the SEC ("2008 10-K"), which was signed by Defendants Fu and Wan and represented the Company's annual financial results and financial

---

[17] The numbers provided by the Company in the March 16, 2009 Press Release and the 2008 10-K were later restated in the Company's 2009 10-K/A, as indicated in ¶ 64 herein.

position.   In addition, the 2008 10-K contained SOX certifications signed by Defendants Fu and Wan.

45.     On May 11, 2009, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2009.  The Company reported a net income of $3.6 million, or $0.07 per diluted share and revenue of $10.7 million, as compared to a net income of $3.8 million, or $0.08 per diluted share and revenue of $10 million for the same period a year ago.

46.     On May 11, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on Form 10-Q with the SEC ("First Quarter 2009 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.  In addition, the First Quarter 2009 Form 10-Q contained SOX certifications signed by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

47.     On August 11, 2009, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2009.  The Company reported a net income of $8 million, or $0.14 per diluted share and revenue of $13.8 million, as compared to a net income of $4.7 million, or $0.09 per diluted share and revenue of $11.7 million for the same period a year ago.  In addition, the Company represented that "[b]attery backlog is approximately $53 million as of August 3, 2009, all of which is expected to be delivered in the next 12 months."

48.     On August 11, 2009, the Company filed a quarterly report for the period ended June 30, 2009 on Form 10-Q with the SEC ("Second Quarter 2009 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.   In addition, the Second Quarter 2009 10-Q contained signed certifications by

Defendants Fu and Wan, stating that the financial information contained in the filing was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

49.     On November 9, 2009, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2009.  The Company reported a net income of $4.8 million, or $0.08 per diluted share and revenue of $17.7 million, as compared to a net income of $4.4 million, or $0.08 per diluted share and revenue of $12.7 million for the same period a year ago.  In addition, the Company represented that "[a]s of October 30, 2009, the Company had a backlog of over $67 million including a battery backlog of approximately $55 million, all of which is expected to be delivered in the next 12 months."

50.     On November 9, 2009, the Company filed a quarterly report for the period ended September 30, 2009 on Form 10-Q with the SEC ("Third Quarter 2009 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.  In addition, pursuant to SOX, the Third Quarter 2009 10-Q contained signed certifications by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

51.     On March 31, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2009.  For the fourth quarter, the Company reported a net income of $9.2 million, $0.14 per diluted share and revenue of $21.4 million, compared to a net income of $16.1 million, or $0.31 per diluted share and revenue of $45.2 million, for the same period a year ago.  For the year, the Company reported a net income of $21.4 million, or $0.35 per diluted share and revenue of $63.6 million, as compared to a net income of $16.1 million, or $0.31 per diluted share and revenue of $45.2 million for the same

15

period a year ago.  In addition, the Company reported a "backlog of approximately $49.7 million

for delivery throughout the next 12 months, including a battery backlog of approximately $44.3

million."

52.     On March, 30, 2010, the Company filed an annual report for the period ended

December 31, 2009 on Form 10-K with the SEC ("2009 10-K"), which was signed by

Defendants Fu and Wan and represented the Company's annual financial results and financial

position.  In addition, pursuant to the SOX, the Form 10-K contained signed certifications by

Defendants Fu and Wan, stating that the financial information contained in the Form 10-K was

accurate, and that they disclosed any material changes to the Company's internal controls over

financial reporting.

53.     On May 10, 2010, the Company issued a press release announcing its financial

results for the first quarter ended March 31, 2010.  The Company reported a net income of $7.5

million, or $0.11 per diluted share and revenue of $19.5 million, compared to a net income of

$4.1 million, or $0.07 per diluted share and revenue of $10.7 million, for the same period a year

ago.  In addition, the Company represented that it had a "backlog of around $65 million for

delivery throughout the next 12 months, including a battery backlog of approximately $51.4

million."

54.     On May 10, 2010, the Company filed a quarterly report for the period ended

March 31, 2010 on Form 10-Q with the SEC ("First Quarter 2010 10-Q"), which was signed by

Defendants Fu and Wan and represented the Company's quarterly financial results and financial

position.   In addition, the First Quarter 2010 10-Q contained SOX Certifications signed by

Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was

accurate, and that they disclosed any material changes to the Company's internal controls over

financial reporting.

55.    On May 11, 2010 the Company issued a press release announcing its guidance for

2010.  Specifically, the Company stated, in relevant part:

> Management is providing revenue guidance of $100 to $110 million and
> net income guidance of $32 to $36 million for 2010. Growth is expected to
> be driven by enhanced distribution of its electric vehicles, battery capacity
> expansion and increased orders from domestic and international
> customers. This guidance excludes any impact from future acquisitions
> and fair value change of outstanding warrants.
>
> Mr. Zhiguo Fu, CEO of ABAT, stated, "Advanced Battery is acutely
> aware of the current global economic conditions and we have cautiously
> moved forward with our business plan. However, the momentum from
> electric vehicle business that has moved us ahead with double digit
> increases in revenue over the past several quarters gives us the confidence
> to become more aggressive and state our guidance for fiscal 2010. We are
> excited about our plans for continued capacity expansion as well as
> obtaining a greater global reach for the distribution of our electric
> vehicles."

56.    On August 9, 2010, the Company issued a press release announcing its financial

results for the second quarter ended June 30, 2010.  The Company reported a net income of

$12.5 million, or $0.18 per diluted share and revenue of $22.8 million, compared to a net income

of $3 million, or $0.05 per diluted share and revenue of $13.8 million, for the same period a year

ago.  In addition, the Company represented that it had a "backlog of around $63.3 million for

delivery throughout the next 12 months, including a battery backlog of approximately $50.5

million."

57.    On August 9, 2010, the Company filed a quarterly report for the period ended

June 30, 2010 on Form 10-Q with the SEC ("Second Quarter 2010 10-Q"), which was signed by

Defendants Fu and Wan and represented the Company's quarterly financial results and financial

position. In addition, the Second Quarter 2010 10-Q contained SOX certifications signed by

Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was

accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

58.    On November 15, 2010, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2010.  The Company reported a net income of $11.1 million, or $0.16 per diluted share and revenue of $25.9 million, compared to a net income of $5.1 million, or $0.08 per diluted share and revenue of $17.7 million, for the same period a year ago.  In addition, the Company stated that it had a "backlog of approximately $55.4 million for delivery throughout the next 12 months, including a battery backlog of approximately $41.6 million."

59.    On November 15, 2010, the Company filed a quarterly report for the period ended September 30, 2010 on Form 10-Q with the SEC ("Third Quarter 2010 10-Q"), which was signed by Defendants Fu and Wan and represented the Company's quarterly financial results and financial position.  In addition, the Third Quarter 2010 10-Q contained SOX certifications signed by Defendants Fu and Wan, stating that the financial information contained in the Form 10-Q was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

60.    On March 16, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC ("2010 10-K"), which was signed by Defendants Fu and Wan and represented the Company's annual financial results and financial position.  In addition, the 2010 10-K contained SOX certifications signed by Defendants Fu and Wan, stating that the financial information contained in the 2010 10-K was accurate, and that they disclosed any material changes to the Company's internal controls over financial reporting.

61.     On March 21, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2010.  For the year, the Company reported a net income of $36.7 million, or $0.48 per diluted share and revenue of $97.1 million, compared to a net income of $21.8 million, or $0.36 per diluted share and revenue of $63.6 million, for the same period a year ago.  For the fourth quarter, the Company reported a net income of $5.6 million, or $0.07 per diluted share and revenue of $28.8 million, compared to a net income of $9.2 million, $0.14 per diluted share and revenue of $21.4 million for the same period a year ago.

62.     The foregoing statements were false and/or misleading because, among other things, ABAT grossly overstated its net income and revenues during the Class Period.  In fact, a review of the Company's AIC filings reveals that, in stark contrast to the robust earnings reported to the SEC, ABAT was simultaneously reporting losses to the AIC.[18]

63.     For example, as the chart below reflects, for 2009 the Company reported revenues of over $63 million for 2009 in its SEC filings, but reported a substantially lower amount, only $1.89 million in revenues, in its AIC filings.

64.     Further, ABAT's AIC filings show that ABAT lost money every year from 2007 to 2009, in dramatic contrast to the consistently growing profits it claimed in its SEC filings:[19]

---

[18] The AIC has two main functions: 1) to administer the establishment and closing of companies, as well as to record corporate changes, such as a change in shareholders, capital amount and directors; and 2) to monitor compliance by companies with China's company laws and regulations. Under this regulatory power, the AIC conducts an annual examination of companies, usually in March and April of every year. Companies are required to file financial statements with the AIC as part of the annual examination.

[19] http://www.sec.gov/Archives/edgar/data/745651/000109690611000446/0001096906-11-000446-index.htm.

19

**AIC**

| USD | 2007 | 2008 | 2009 |
|---|---|---|---|
| Revenue | $145,116 | $938,154 | $1,891,976 |
| Net Income | -$1,006,269 | -$912,171 | -$3,938,921 |

**SEC 10-K**

| USD | 2007 (Restated) | 2008 (Restated) | 2009 (Restated) |
|---|---|---|---|
| Revenue | $31,897,618 | $45,172,111 | $63,561,925 |
| Net Income | $10,205,406 | $20,186,932 | $21,802,052 |

65.     Indeed, while the ABAT Response, issued on April 6, 2011, purported to explain away the misstatements Variant highlighted, it did not even attempt to defend against or explain the discrepancies between the AIC and SEC filings.

66.     The inference that ABAT's reported income and profits are inflated is heightened by the fact that ABAT claims unrealistically high profit margins, even though it sells a commodity and admittedly has no distinct competitive advantage in the market.   ABAT recognizes in its 2010 10-K that it has no special technology for its main products and that it could only gain an edge based on the quality and efficiency of its manufacturing facilities:

> The technology utilized in producing polymer lithium-ion batteries is widely available throughout the world, and is utilized by many competitors, both great and small. ZQ Power-Tech's patents give it some competitive advantage with respect to certain products. *However, the key to competitive success will be ZQ Power Tech's ability to deliver high quality products in a cost-efficient manner. This, in turn, will depend on the quality and efficiency of the assembly lines that we have been developing at our plant in Harbin.* (Emphasis added)

67.     As further detailed below at ¶¶ 71-77, Plaintiffs' investigation and other investigations have revealed that ABAT's Chinese manufacturing facilities are average in quality and efficiency.   Despite this, ABAT reported unrealistically high margins in 2010 that are nearly two to three times those reported by its Chinese competitors:

| Company | 2010 Operating Profit Margins |
|---|---|
| China BAK Battery, Inc. | -9.7% |
| BYD Company | 7.3% |
| SCUD Group Ltd | 5.8% |
| Coslight Technology | 9.1% |
| Tianneng Power | 14.3% |
| *ABAT* | *39.0%* |

68.　Similarly, ABAT reports substantially higher profit margins than its international competitors:

| Company | Operating Profit Margins |
|---|---|
| FABRIC NAC ET-1 | 28.8% |
| NEW ENERGY SYSTE | 22.1% |
| EVE ENERGY -A | 21.8% |
| CHINA TMK BATTER | 18.3% |
| DRY CELL & STORA | 13.1% |
| *ABAT* | *39.0%* |

69.　Such disparities, despite its lack of any real competitive advantage, further support the allegations herein that Defendants inflated ABAT's revenues and profits.

70.　The Company has reported similarly inflated gross margins for 2008 (49%) and 2009 (44.7%).  Notably, the ABAT Response does not adequately address the allegations that its reported margins are false. The Company merely states that they "have been audited by highly-reputable independent accounting firms."

**i.  ABAT's Production and Customer Service Do Not Substantiate Its Reported Financial Results.**

71.　As noted, an investigation of ABAT's production facilities in China undermined the veracity of the Company's reported financials.  In fact, an inspection of ABAT's primary

21

Harbin and Wuxi facilities in China by Plaintiffs' investigators revealed that both the Harbin and

Wuxi facilities produce commodity, low margin products.  Neither facility stands out among

other enterprises in its respective local area.  Further, interviews of government officials at the

local economic development office in Shuangcheng City (which is part of Harbin City and where

the Company is located) by Plaintiffs' investigators revealed that ABAT is far from the

prominent company that it portrays itself to be.

72.    Based on visits by its investigators to the facilities, Prescience[20] similarly

concluded that the unexceptional quality of the Company's facilities casts  doubt on the veracity

of ABAT's claimed exceptional margins:

> It appears that the Harbin plant is in operation, does produce cells, and has
> sales. The semi-automated processes… are more advanced than some of
> the battery companies of China, and far **less advanced than battery
> companies of international standing** such as ATL, Lishen, Samsung, LG
> Chem. It appears that they do some things well, and have some potential
> great strength, but appear to have limited ability and concepts in the
> marketing and sales of their product. Selling cells to packagers is a
> common business model for Asian battery factories, but not one that
> realizes as much profit. And I note that **the CTO acknowledged that the
> packagers and trading companies were making the entire margin and
> he was not**. Again, normal for Asian cell makers – but not a way to gain
> success.
>
> A proprietary BMS (Battery Management System) is essential for a
> successful battery company in the Light Electric Vehicle space. And the
> lack of such is a major handicap for Harbin. It appears to me that this
> company has a tiny business selling Li Ma or LFP (Lithium Iron
> Phosphate) cells to packagers for use in low priced battery packages sold
> to the domestic China market. **This is the least profitable business they
> could have.** The LI-Polymer cells are apparently not really in production
> (the normal issue with Li poly) due to high cost of materials and resulting
> high cost of the cells making them uninteresting to most applications. The
> LFP cells cannot be exported due to patent issues… **So the only apparent
> product for any significant sales would be Lithium Manganese cells,
> and for that to make money for Harbin they would, probably, need to**

---

[20] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.*
http://presciencefunds.com/documents/ABATFinalReport.pdf.

**develop their own BMS, become their own packager, and compete with Phylion, Zhenlong, AEE, MGL, LG Chem, Lishen, HYB, and others.**

73.    Prescience also cited interviews with ABAT customers who refuted the possibility that ABAT has the ability to manufacture a product capable of generating enough revenue or sales to justify its purported stellar profit margins:[21]

> This customer had signed a contract to receive scooters from ABAT's Wuxi facility in 2009. After receiving defective product, the customer demanded to visit the Wuxi facility that had supposedly been manufacturing the scooters. During our conversation, the customer indicated that he had visited numerous other Chinese manufacturing facilities to which Wuxi could be compared, and he described the Wuxi facility as a "joke" multiple times. The facility was described as "four empty walls," the inadequacy of which made him suspect Wuxi was some sort of distributor operation rather than a manufacturing facility. Furthermore, the customer stated that he thought about contacting the SEC to report ABAT for fraudulent claims made in press releases. He said that "none of the stuff they put out was accurate."

74.    Prescience transcribed excerpts of its investigative conversation with the aforementioned customer which are included, in relevant part, below:[22]

> **…** I think it was maybe 2009 – when we showed up to the factory, they weren't doing any manufacturing at all. There was nothing going on. They had a showroom, but it was an empty shell of a building.
>
> ***
>
> So [in] one building where they were supposed to be doing manufacturing, it was all these dust-covered frames in one corner, and it was obvious to tell that there was nothing going on there. Nothing going on. Their QC department was 3 or 4 dust-covered machines and 2 schleps sitting in an office where there was nothing happening.
>
> ***
>
> **Prescience** Are you comparing it to other companies that you visited?
>
> ***
>
> **Customer** Yes, legitimate companies.

---

[21] *Id.*

[22] *Id.*

\*\*\*

**Prescience** So there was a significant difference there?

\*\*\*

**Customer** Oh my god, yes. It was a joke. It was absolutely the biggest joke I'd ever seen. Any normal person that came through there would realize that it was a joke.

75.    Plaintiffs' investigators visited the Wuxi facility in 2011.  Although the facility now appears to be conducting some manufacturing, Plaintiffs' investigators nonetheless concluded that the production capabilities of this facility were unexceptional, and certainly not sufficient to support the significant profit margins reported in ABAT's SEC filings.

76.    Prescience also quoted a conversation its investigator had with an executive at All-Power America, a company that ABAT announced it had contracted with in 2010 to re-enter the US market, expecting to deliver 2,000 electric scooter units to All-Power America for $1.1 million.  This customer stated that "every step of the way we had some serious QC issues… The licensing is the official word that we gave out to everybody because that was a very tangible problem that the retailer used to return the products. But licensing was a major part of it, they should have checked for licensing compliance before they sent it."  The customer stated that his company was "stuck" with inventory that he could not sell because of the quality problems.[23]

77.    The Company's SEC filings are additionally false and/or misleading, for the reasons indicated below.

**B.    Defendants' Misrepresentations Concerning The Shenzhen Acquisition**

78.    On December 20, 2010, ABAT filed an 8-K announcing that it would acquire "Shenzhen Zhongqiang New Energy Science & Technology Co., Ltd." for approximately $20 million:

---

[23] *Id.*

24

On December 20, 2010 Harbin Zhongqiang Power-Tech Co., Ltd.
("Harbin Zhongqiang"), which is a subsidiary of the Registrant, entered
into an Acquisition Agreement with Shenzhen Zhongqiang New Energy
Science & Technology Co., Ltd. ("Shenzhen Zhongqiang"). The
Acquisition Agreement provides that on January 1, 2011 Harbin
Zhongqiang will acquire all of the assets of Shenzhen Zhongqiang. In
exchange for the assets of Shenzhen Zhongqiang, Harbin Zhongqiang will
pay to Shenzhen Zhongqiang 135,000,000 Renminbi (approximately $20
million), of which 91,250,000 Renminbi will be used to satisfy the
liabilities of Shenzhen Zhongqiang. The initial payment of 67,500,000
Renminbi is due three days after the agreement was signed. The balance
(net of the deposit of 10 million Renminbi previously paid) is due thirty
working days after the transfer of assets.

79.    Further, the Company's 2010 10-K stated:

On January 6, 2011, Harbin Zhongqiang, a subsidiary of the Company,
completed the acquisition of all of the assets of Shenzhen Zhongqiang
New Energy Science & Technology Co., Ltd. ("Shenzhen Zhongqiang")
for a purchase consideration totaled RMB RMB135,000,000
(approximately $20 million). The Company made an initial payment plus
deposit of $11,721,468 (equivalent to RMB 77,500,000) and $1,457,034
(equivalent to RMB 10 million) as of December 31, 2010 and 2009,
respectively, and recorded as deposit for investment. The Company
completed the acquisition in January 2011.

80.    The foregoing statements were false and/or misleading because Defendants failed

to disclose that Defendant Fu had purchased Shenzhen in 2008, and that the current "acquisition"

was actually a related party transaction between Fu and ABAT. Whereas Fu had paid only $1

million to acquire the company in 2008, he was now selling it to ABAT for $20 million.

81.    Documentary evidence obtained in various court filings shows that, in fact, Fu

had purchased Shengxi Science and Technology Co., Ltd. for $1 million pursuant to an

Acquisition Agreement dated August 31, 2008.[24]  Specifically, court documents from a lawsuit

filed in 2009 in which Shenzhen's CEO, Huang Suiyang, who became ABAT's Chief

Technology Officer, sued ABAT in U.S. federal court over a payment dispute related to the 2008

---

[24] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.*
http://presciencefunds.com/documents/ABATFinalReport.pdf.

25

acquisition, confirm that the company acquired in 2008 is in fact the same Shenzhen battery maker ABAT purported to acquire in 2010.[25]   For example, a motion ABAT filed in the litigation, *Sue-Yang Huang v. Advanced Battery Technology, Inc.*, *1:09-cv-08297-HB, (S.D.N.Y.).*, *document no. 12,* on December 7, 2009, states in relevant part:

> Plaintiffs' Employment Contract [dated August 30, 2008] was executed contemporaneously with the ***acquisition of Huang's father's company, Shenzhen Shengxi Science and Technology Co., Ltd. ("Shenzhen SST"), by ABAT's Chief Executive Officer, Fu.*** See Compl., ¶ 7 & Ex. A. Curiously, the Complaint refers to Shenzhen SST as "Luke Battery Corp.," Compl., ¶ 6 & Ex. A — a name appearing nowhere in the Acquisition Agreement. ***The company was then renamed Shenzhen Zhongqiang Energy Science and Technology Co. Ltd., a name sometimes rendered in English as "Shenzhen ABAT"*** or "SABAT." Fu Decl., ¶ 10. [Emphasis added]

(emphasis added).[26]   Huang Suiyang's father is Huang Youlin, the former legal representative of Shenzhen, as explained in ¶ 82 supra.

82.    Further, the Shenzhen AIC registration website indicates that Zhiguo Fu, ABAT's CEO, became the legal representative of Shenzhen years earlier than the announced acquisition date, replacing Huang Youlin in September 2008.

83.    Thus, all evidence supports the conclusion that the $20 million "acquisition" in 2010 was actually a related party transaction involving Defendant Fu.  The Company's December 20th representations concerning this alleged transaction and related financial statements were a subterfuge for the Company to funnel $19 million to Fu.  None of this was disclosed.

84.    The ABAT Response[27] admits that the AIC registration website's listing of Fu as the legal representative is correct:

---

[25] *Id.*

[26] *Id.*

[27] Advanced Battery Technologies, Inc., *Advanced Battery Technologies Responds to Allegations by Variant View*

The Variant View report notes that our Chairman, Fu Zhiguo, is identified as an officer and legal representative of Shenzhen ZQ in that company's government registration. That is correct. In order to register the acquisition of Shenzhen ZQ by Harbin ZQPT with the provincial government, Mr. Wang, the seller, gave Mr. Fu a power of attorney to represent the company before the government. This was solely an administrative convenience, as the purchase of Chinese companies cannot be completed without government registration performed in person.

However, ABAT fails to explain why this "administrative convenience" took place *years* before the 2010 "acquisition."

85.    The outrageous amount that ABAT paid for Shenzhen is further evidence of the sham nature of the transaction. Founded in 2007 with a registered capital of RMB 3 million, the Shenzhen company had been losing money since its inception. The AIC records indicated the financial results of the Shenzhen company as follows:

| RMB | **2007** | **2008** | **2009** |
|---|---|---|---|
| Revenue | ¥10,943.40 | ¥4,913,846.91 | ¥3,060,677.76 |
| Net Income | ¥-157,699.41 | ¥-113,268.23 | ¥-1,606,802.77 |
| USD | **2007** | **2008** | **2009** |
| Revenue | $1,439.92 | $710,093.48 | $448,122.66 |
| Net Income | -$20,749.92 | -$16,368.24 | -$235,256.63 |

Note: acquired in 2010, not consolidated in 2007-2009 financials

For a company established in 2007 and in the red since its inception, the stated purchase price was unreasonable on its face and lacked any reasonable basis.

C.    **Defendants' Misrepresentations Concerning Wuxi**

i.    **Failure to Disclose Material Facts Concerning ABAT's Acquisition of Wuxi.**

86.    In a press release and 10-Q filed on May 11, 2009, Defendants announced ABAT's acquisition of Wuxi. In the press release, Defendants stated, in pertinent part:

---

*Research*, NASDAQ OMX - GlobeNewswire, http://www.globenewswire.com/news html?d=21807&topic=1024/.

> The Company signed a definitive acquisition agreement with Wuxi Angell
> Autocycle Co. Ltd. ("Wuxi Angell") on April 28, 2009 and closed the
> acquisition in early May.
> Mr. Zhiguo Fu, Chairman and CEO of Advanced Battery Technologies,
> commented, "We are excited to announce that we have completed the
> acquisition of Wuxi Angell.  The acquisition of Wuxi Angell provides the
> Company entry to the growing electric and hybrid-electric bike market.
> The benefits of our relationship with Wuxi Angell are evident in the
> introduction of three new hybrid motorcycles, which debuted in February
> 2009, and by our recently announced contracts for various types of electric
> vehicles and hybrid-electric vehicles, with an aggregate contract amount
> of $24 million."

87.     The foregoing statements were false and/or misleading because the press release
failed to disclose that the Company paid an excessive amount to acquire Wuxi for illegitimate
purposes as part of a kickback arranged with Defendant Fu, ABAT's Chairman and CEO.

88.     The exorbitant price directly benefited Chairman Fu.  A former member of
ABAT's core management told Plaintiffs' investigators that he believed Defendant Fu caused
ABAT to pay an inflated amount for Wuxi, because Fu had a side deal with Wuxi's sellers to
share the excess proceeds with them.

89.     Indeed, the exorbitant amount paid for Wuxi seriously undermines the legitimacy
of the transaction.  According to its Form 8-K filed with the SEC on April 30, 2009,   ABAT
paid a total of approximately $22 million for Wuxi: $3.64 million cash, 70 million Chinese
Renmimbi (approximately $10,248,902), plus 3 million ABAT common shares (valued at 9.9
million), to acquire Wuxi. The total price paid was over two times Wuxi's book value.   Wuxi
had a net loss of $3.7 million in 2008, and a net loss of $1.1 million in 2007. Its gross profit
declined by 35% from 2007 to 2008. Revenue was rapidly contracting: 2009 Q1 revenue was
$0.75 million, or down 63% year over year.  Working capital position was negative $15 million.
Cash flow from operations in the first quarter was negative $4.1 million.

90.    Further, when challenged on the legitimacy of the Wuxi transaction, Defendants changed their story, stating in the ABAT Response[28] that ABAT had paid only $12,870,000, not $22 million as they had previously represented in the April 30, 2009 Form 8-K.

**Wuxi's Distribution Network.**

91.    Defendants' representations concerning the distribution network for Wuxi's product were also misleading. While ABAT represented that Wuxi's distribution network "increased substantially" in 2010, a number of these purported distributors either appear to be fictitious or disclaimed any significant relationship with ABAT.  Specifically, ABAT's 2010 10-K represented that:

> Wuxi ZQ markets its electric vehicles primarily through a network of distributors in selected locations worldwide. Most of Wuxi ZQ's products carry both EEC and DOT(EPA) certification. During 2010, Wuxi ZQ recorded $22 million in sales abroad, to complement $27 million within China.
>
> The worldwide distribution network for Wuxi ZQ vehicles increased substantially during 2010:
>
> ▪ On March 30 and 31, 2010 ZQ Power-Tech held a product promotion conference for its electric vehicles customers from both the domestic and the overseas markets. Approximately two hundred people participated in the conference, including customers from Netherlands, Chile, Canada, India, Afghanistan, and over a hundred Chinese companies.
>
> ▪ In April 2010, during the International Bicycle Expo in Shanghai, ZQ Power-Tech signed sales contracts totaling approximately $1.7 million (or 2,500 electric scooters) with European customers, including customers located in Germany, Denmark and the Netherlands.
>
> ▪ In May 2010 Wuxi ZQ signed an agreement with All-Power America to serve as the first U.S.-based distributor for Wuxi ZQ since the May 2009 acquisition.

---

[28] Advanced Battery Technologies, Inc., *Advanced Battery Technologies Responds to Allegations by Variant View Research*, NASDAQ OMX - GlobeNewswire, http://www.globenewswire.com/news html?d=21807&topic=1024/.

29

- In September 2010 Menzaghi Motors of Italy placed an order for the aluminum magnesium alloy electric scooters that Wuxi ZQ recently developed to meet demand for a lighter-weight vehicle with higher mileage

- In October 2010 we signed an agreement with Kanuni Motorcycle, a well-known motorcycle producer in Turkey, under which Kanuni now sells three types of Wuxi ZQ scooters.

In addition to the distributors noted above, Wuxi ZQ's roster of distributors now includes:

- Hi Motors and Ampere Vehicles Pte. Ltd. in India;
- Eco Style Di in Italy;
- DMS Motorlu Araclarsanayi Vetica in Turkey;
- Tinterparts Trading GmbH in Germany;
- Ersico Spol SRO in the Czech Republic;
- D.M.C. (DuurzaawMobiliteits) in the Netherlands;
- Floretti Europe BVBA in Belgium; and
- Autoplaza Holdings in the Philippines.

The 2010 10-K further states:

In October 2009 ZQ Power-Tech entered into a one-year $7.8 million contract to provide 48V/15Ah and 72V/50Ah polymer lithium-ion phosphate batteries to U Long Run Sheng Technology Co., Ltd., a leading distributor of power management systems to the electric vehicle industry.

92.    The foregoing statements are false and/or misleading for the following reasons.

93.    Plaintiffs' investigation has uncovered that many of these companies identified by ABAT either appear to be fictitious or have minimal business with ABAT.   Investigative searches for the names of many of these supposed distributor companies did not yield any results aside from ABAT filings.  For instance, a search for stated distributor "Eco Style Di" in Italy reveals no such company.[29] The same is true of stated distributor "Auto Plaza Holding."

---

[29] A company in Italy with a similar name called "Ecostyle," appears to be an unrelated business that, according to its website, "invent(s) and sell(s) products made in Polypropylene for retail merchandising displays and advertising concepts."

94.     Further, according to an interview by Plaintiffs' investigator, an executive from Kanuni Motors, another of ABAT's claimed distributors, did not recognize either Wuxi or Advanced Battery as one of Kanuni's suppliers.

95.     Similarly, another interview by Plaintiffs' investigator (with an executive from Menzaghi Motors) revealed that while his company did have a business relationship with Wuxi, the relationship was "insignificant."[30]

96.     Prescience[31] further undermines the significance of the ABAT- Menzaghi business dealings, stating that an interview with the CEO of Menzaghi Motors confirmed that Menzaghi has a minimal business relationship with ABAT, and that ABAT delivered inferior product relative to its competitors:

> We spoke with the CEO of Menzaghi Motors, Paolo Pinciroli. Pinciroli confirmed that they are a customer of Wuxi ZQ and have known them for "3 or 4 years." They've ordered approximately 100 scooters from them annually, providing further evidence that Wuxi is inflating its sales numbers. For Wuxi ZQ to meet its sales targets, it would need to export at least 30,000 scooters annually.  We also got the following quote from Menzaghi Motors: "Sometimes when I [visit] this company, I see the people work. Some other times, the people don't work, I don't know why."
>
> Pinciroli compared Wuxi ZQ to other scooter suppliers that they use. It was clear that several of their other suppliers provided higher quality products and quickly corrected mistakes. For instance, Pinciroli said: "[The competitor] solves the problems in a short time. [Wuxi] takes too much time – these people don't understand the situation in the market. Of course, I see only the European market, but I cannot tell to our customer that you must wait 3 months, 4 months or 5 months before your problem is solved." We also asked whether Wuxi ZQ's scooters suffered from any quality control issues. His response: "I don't think that [Wuxi ZQ] have people to control quality because sometimes I see one man – the chief of the line of production – he tests a vehicle, but for 10 meters, not more

---

[30] Moreover, the executive that was interviewed refused to provide any details regarding the amount of purchases Menzaghi had made from Wuxi.

[31] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

31

[chuckle]. I don't think they have a serious quality control [department], like, for example, Jinstar, Iden, Sukida, Kai-sun. These other companies have special departments to control quality. [Wuxi ZQ] I don't think cares."

97.    The ABAT Response fails to demonstrate that these distributor relationships in fact exist and actually calls into the question the validity of Wuxi ZQ's sales results for 2010. The ABAT Response states in pertinent part:

Our audited financial statements for 2010 show that Wuxi ZQ made $49 million in sales during the year. If its distributors are "fake," how did it do that?

## D.    Defendants' Misrepresentations Concerning the Ownership of HLJ ZQPT

98.    ABAT's 2008 10-K describes Heilongiang ZhongQiang Power-Tech Co., Ltd., as the wholly owned subsidiary of Cashtech:

Cashtech Investment Limited is also a holding company with only one subsidiary: Heilongjiang ZhongQiang Power-Tech Co., Ltd., a China limited liability company ("ZQ Power-Tech").

99.    Further, ABAT's 2007 10-K HLJ ZQPT is described as the 100% owned subsidiary of Cashtech.

Prior to January 2006, Cashtech Investment Limited owned 70% of the capital stock of ZQ Power-Tech. In January 2006 our Chairman, Fu Zhiguo, transferred the remaining capital stock of ZQ Power Tech to Cashtech Investment Limited, so that it now owns 100% of ZQ Power-Tech.

100.    As late as ABAT's 10-Q filed on August 11, 2009, the Company continued to claim complete ownership of HLJ ZQPT.

101.    Yet, in the 2009 10-K, the Company suddenly discloses that HLJ ZQPT is actually owned by Defendant Fu, without any explanation of how he reacquired ownership:

HLJ ZQPT is owned by our Chairman, Mr. Fu and other individuals but controlled by Harbin ZQPT through a series of contractual arrangements that transferred all of the benefits and all of the responsibilities for the operations of HLJ ZQPT to Harbin ZQPT.

32

102.    The foregoing statements were false and/or misleading.  Either the SEC filings are accurate and Defendant Fu transferred ownership of the Company's sole operating subsidiary to himself without explanation or compensation, as required under PCAOB standards, or the filings are inaccurate, and the Company falsely represented that it previously owned 100% of HLJ ZQPT, when in fact it did not, despite having issued millions of shares to Fu supposedly in exchange for his holdings of HLJ ZQPT.

103.    In the ABAT Response, the Company effectively admits that it did not actually own HLJ ZQPT from 2004 through 2009:

> Heilongjiang ZQPT, the referenced subsidiary, has been owned by 16 investors, including Chairman Fu, since it was organized in 2002. In 2004 the owners of Heilongjiang ZQPT transferred all of the benefits and obligations of ownership of Heilongjiang ZQPT to Harbin ZQPT, a subsidiary of ABAT. Under U.S. GAAP, the transfer of those benefits and obligations meant that the balance sheet and financial results of Heilongjiang ZQPT must be consolidated with those of ABAT as if it were a subsidiary. Thus, for accounting purposes, ABAT reported in its SEC filings from 2004 to 2009 that it "owned" Heilongjiang ZQPT. In 2009 ABAT decided that it would be more appropriate to explain the relationship in detail, which accounts for what Variant View mistakenly refers to what "appears" to it to be a transfer of ownership.
>
> In sum, there has been no transfer of ownership of Heilongjiang ZQPT, to our Chairman or otherwise. All that occurred was a change in how ABAT characterized the relationship in its filings…

**False and Misleading Statements Made
by the Auditor Defendants During the Class Period**

104.    On March 28, 2008, the Company filed its Form 10KSB for the year ended December 31, 2007 ("2007 10KSB"), which included the following Auditors' Report issued by Defendant Bagell Josephs:

> The Board of Directors and Stockholders Advanced Battery Technologies, Inc.
> We have audited the accompanying consolidated balance sheets of Advanced Battery Technologies, Inc. and its subsidiaries as of December 31, 2007 and 2006 and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the two years ended December 31, 2007 and

2006. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with standards established by the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc. and its subsidiaries as of December 31, 2007 and 2006 and the results of its operations, changes in stockholders' equity, and cash flows for each of the two years ended December 31, 2007 and 2006 in conformity with accounting principles generally accepted in the United States of America.

105.    As previously detailed herein at ¶ 44, on March 16, 2009, ABAT filed a Form 10-K with the SEC for the year ended December 31, 2008. The 2008 10-K included Bagell Josephs' Independent Auditors' Report, dated March 12, 2009. The Auditors' Report stated:

We have audited the accompanying consolidated balance sheets of Advanced Battery Technologies, Inc. (the "Company") as of December 31, 2008 and 2007, and the related consolidated statements of income and comprehensive income, changes in stockholders' equity and cash flows for each of the three years in the period ended December 31, 2008. We have also audited the Company's internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission. (COSO).* *

*   *   *

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).

34

* * *

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc. as of December 31, 2008, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2008, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

106.    As previously detailed herein at ¶ 52, on March 30, 2010, ABAT filed a Form 10-K with the SEC for the year ended December 31, 2009 ("2009 10-K").  The Form 10-K included Friedman LLP's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated March 29, 2010.  The Auditors' Report stated:

> We have audited the accompanying balance sheets of Advanced Battery Technologies, Inc as of December 31, 2009, and the related statements of income, stockholders' equity and comprehensive income, and cash flows for the year ended December 31, 2009. We also have audited Advanced Battery Technologies, Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

* * *

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).

* * *

> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc as of December 31, 2009, and the results of its operations and its cash flows for the year ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, Advanced Battery Technologies, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

107.     As previously detailed herein at ¶ 60, on March 16, 2011, ABAT filed a Form 10-K with the SEC for the year ended December 31, 2010 ("2010 10-K"). The Form 10-K included EFP Rotenberg's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated March 16, 2011. As detailed below, EFP Rotenberg's Auditors' Report noted several material internal control weaknesses, but nonetheless opined that the Company's financial statements were free of material misstatement:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).
>
> * * *
>
> A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. *The following material weaknesses have been identified and included in Management's Report on Internal Control over Financial Reporting: (a) a lack of expertise in identifying and addressing complex accounting issues under U.S. Generally Accepted Accounting Principles among the personnel in the Company's accounting department, which has resulted in errors in accounting that necessitated a restatement of the financial statements for 2008 and 2009 and (b) inadequate review by management personnel of the Company's reports prior to filing, which resulted in errors in prior filings that necessitated the filing of amendments to the 2009 Annual Report and the Quarterly Reports through the quarter ended September 30, 2010. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2010 financial statements.*
>
> *In our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Advanced Battery Technologies, Inc. has not maintained effective internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Advanced Battery Technologies, Inc. as of December 31, 2010, and the results of its operations and its cash flows for the year ended December 31, 2010 in

conformity with accounting principles generally accepted in the United States of America.

(Emphasis supplied).

108.    Except for the statements identifying the Company's material internal weaknesses, the Auditor Defendants' Auditors' Reports for fiscal years ended December 31, 2007, December 31, 2008, December 31, 2009, and December 31, 2010 attesting to their performance of audits in accordance with the standards of the PCAOB and representing that ABAT's financial statements conformed to generally accepted accounting principles (or "GAAP") were materially false and misleading when made.  The Auditors' Reports were false and/or misleading because:

1.    The Auditor Defendants' audits were not conducted in accordance with PCAOB standards; and

2.    ABAT's financial statements did not fairly present the financial position of and results of operations for ABAT for fiscal years ended December 31, 2007, December 31, 2008, December 31, 2009, and December 31, 2010 in conformity with GAAP.

3.    As a result of the Auditor Defendants' failure to perform its audits in accordance with PCAOB standards, its audits did not provide a reasonable basis for its opinions.

109.    By issuing unqualified Auditors' Reports for these years, the Auditor Defendants violated Statement of Accounting Standard ("SAS") 98 entitled, "Reports on Audited Financial Statements," which states:

The auditor's standard report states that the financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flow in conformity with generally accepted accounting principles. This conclusion may be expressed only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards. AU § 508.07.

110.    The Auditor Defendants acted with knowledge of or reckless indifference as to the falsity of the representations in the Auditors' Reports, as already detailed.

37

## THE TRUTH BEGINS TO EMERGE

111.    On March 30, 2011, Variant published a report entitled "Advanced Battery Technologies. An Egregious Chinese RTO."[32]

112.    The report made the following conclusions, among others:

1.  The Chairman appears to have transferred ownership of ABAT's key subsidiary to himself without explanation or compensation;

2.  ABAT claims unrealistic margins in what it admits is a commodity market;

3.  ABAT claims to have increased revenue from $4.2 million to $97.1 million from 2005 to 2010 while decreasing its employee count;

4.  ABAT claims distribution relationships which appear to be fake;

5.  ABAT spent $20 million to acquire a company linked to the Chairman without disclosing the relationship;

6.  ABAT spent $22 million or 7x sales to acquire a failing and possibly related company;

7.  ABAT issued 11 million shares to the Chairman and other individuals to repay a "loan" which appears to be entirely fabricated.

113.    On this news, the Company's shares plummeted $1.50 or nearly 48%, to close on March 30, 2011 at $2.01 per share, on unusually heavy trading volume.

114.    On May 5, 2011, Prescience published another report[33] on ABAT, corroborating and expanding many of Variant's claims. Specifically, Prescience asserted, among other things, that:

1.  ABAT reported significantly lower revenue and profit in its AIC filings as compared to its SEC filings;

---

[32] Variant View, *Advanced Battery Technologies: An Egregious Chinese RTO*, Seeking Alpha, (March 30, 2011) http://seekingalpha.com/article/260883-advanced-battery-technologies-an-egregious-chinese-rto.

[33] Prescience Investment Group and Kerrisdale Capital, *Advanced Battery Technologies, Inc.* http://presciencefunds.com/documents/ABATFinalReport.pdf.

2.  ABAT claims unreasonably high margins in an established industry with strong competitors;

3.  ABAT paid $20 million for an entity, Shenzhen, that it had previously acquired in 2008.

115.   As noted, ABAT issued its April 6th response to the Variant Report, which purported to defend against the Variant allegations. As detailed herein however, Plaintiffs' investigation has confirmed massive discrepancies between ABAT's SEC filings and the AIC filings with respect to reported revenues and earnings, as well as confirming other material misrepresentations.  The ABAT response is merely another attempt to continue its deceit on investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

116.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ABAT securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

117.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ABAT securities were actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ABAT or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

118.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

119.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

120.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ABAT;

- whether the Individual Defendants caused ABAT to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ABAT securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

122.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the ABAT shares traded on the Nasdaq, an efficient market, and was covered by multiple analysts;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold ABAT securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

123.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## <u>COUNT I</u>

### <u>(Against ABAT and the Individual Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)</u>

124.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

125.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

126.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ABAT securities; and (iii) cause Plaintiffs and other members of the Class to purchase ABAT securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein.

127.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ABAT securities and options.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ABAT's finances and business prospects.

128.    By virtue of their positions at ABAT, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the

statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

129.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of ABAT securities from their personal portfolios.

130.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of ABAT, the Individual Defendants had knowledge of the details of ABAT internal affairs.

131.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ABAT.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ABAT's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ABAT securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning ABAT's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased ABAT securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

132.   During the Class Period, ABAT securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of ABAT securities and options at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares and options, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiffs and the Class, the true value of ABAT securities and options were substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of ABAT securities and options declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

133.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

135.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

44

136.    During the Class Period, the Individual Defendants participated in the operation and management of ABAT, and conducted and participated, directly and indirectly, in the conduct of ABAT's business affairs.  Because of their senior positions, they knew the adverse non-public information about ABAT's misstatement of income and expenses and false financial statements.

137.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ABAT's financial condition and results of operations, and to correct promptly any public statements issued by ABAT which had become materially false or misleading.

138.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ABAT disseminated in the marketplace during the Class Period concerning ABAT's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ABAT to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ABAT within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ABAT securities and options.

139.    Each of the Individual Defendants, therefore, acted as a controlling person of ABAT.  By reason of their senior management positions and/or being directors of ABAT, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ABAT to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of ABAT and possessed the

power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

140.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ABAT.

## COUNT III

**(Against The Auditor Defendants –Bagell Josephs and ETF Rotenberg, Collectively and Severally, as Specified Herein – for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

141.    Plaintiffs bring this claim on behalf of all members of the Class who purchased ABAT common stock during the period from May 15, 2007 and March 29, 2011.

142.    Plaintiffs incorporate by reference all of the foregoing paragraphs as if realleged herein.

143.    Defendant Bagell Josephs served as ABAT's independent auditor from December 28, 2006 through January 1, 2010, when it was acquired by Friedman LLP (hereinafter "Friedman").  Friedman served as ABAT's auditor until it was dismissed on December 14, 2010, less than a year later.

144.    Defendant EFP Rotenberg has served as ABAT's auditor from December 14, 2010 until the present.

145.    In their capacity as ABAT's auditors during the Class Period, the Auditor Defendants were collectively required to audit the Company's financial statements in accordance with standards promulgated by the PCAOB and to report the results of those audits to ABAT, its Board of Directors and the investing public.

146.    According to a former senior auditor for Bagell Josephs, Bagell Josephs auditors, including several native Chinese staffers, traveled to the ABAT facility located in Harbin in

Northern China between January and March of 2008.  The Bagell Josephs auditors engaged in auditing activities while there, and had ready access to ABAT's records.

147.    The audit work performed by Bagell Josephs was grossly deficient, and, as a result, Bagell Josephs did not have reasonable bases for the opinions they rendered on the consolidated ABAT financial statements for the years 2006 through 2009, when the revenues, profits and assets ABAT reported to the SEC were largely nonexistent and fabricated.  The Bagell Josephs auditors failed to perform many basic procedures and to respond to numerous anomalies, attention to which would have, as early as its completion of its audit of the 2006 ABAT financial statements, provided ABAT investors with the necessary insights and warnings to have spurred actions that would have reduced the material risks of investment losses ultimately suffered.

148.    Plaintiffs' expert with respect to Plaintiffs' allegations against the Auditor Defendants, Dr. Barry Jay Epstein, Ph.D., CPA, CFF, has worked in the accounting and finance fields for over 40 years.  Over the course of his career, Dr. Epstein has served as an expert witness and litigation consultant in numerous matters involving accounting and auditing issues. Dr. Epstein possesses significant accounting-firm experience in the development of auditing programs and procedures, including sampling applications and other advanced auditing techniques; advising on and monitoring of compliance with professional accounting and auditing standards; providing expert testimony on the application of accounting principles and auditing standards, development of economic damage models and other litigation support services; development and presentation of technical training for professionals both within and outside the firms at which he worked; providing client consultation on technical matters in accounting and financial reporting; and the development and presentation of training on transactions in securities and financial derivatives.  Dr. Epstein has also served as a university-level instructor on

accounting and auditing issues and is the author of numerous publications in that field.  Dr. Epstein's resume is appended hereto as Exhibit A.   Dr. Epstein's analyses are incorporated with respect to all allegations regarding the Auditor Defendants set forth below.

149.    According to Dr. Epstein, no reasonable auditor would have failed to obtain ABAT's AIC filings and reconcile them with ABAT's wildly divergent SEC filings.  Bagell Josephs' failure to do so was an extreme departure from the reasonable standards of care it was obligated to meet as ABAT's auditor and constituted a willful disregard of the professional standards and a breach of the duty to conduct the examinations with due professional care and attitude of professional skepticism.

150.    Further, Bagell Josephs' ignorance of the contradictory AIC filings was particularly inexcusable given that ABAT is a Chinese company having virtually all its activities in Mainland China, and which derived most of its revenues from its Chinese operations during the Class Period.

151.    Indeed, as noted above, Bagell Josephs' employees actually visited ABAT's Harbin, China facilities during the relevant time period, performed auditing work there and had ready access to ABAT's financial records.

152.    Had Bagell Josephs undertaken the basic task of reviewing AIC filings it would have discovered that the Company was reporting – *for the same entity and operations* – significantly lower revenues and assets, and large losses, for those same periods to the AIC.  The discovery of the disparate financial reports would have obligated Bagell Josephs to expand its audit work.  Had it done so, it would have easily uncovered a gross and longstanding fraud by the ABAT Defendants.

153.    In sum, the anomalous financial reports cited above would have, if given the appropriate audit attention as demanded under the PCAOB auditing standards and U.S. generally

48

accepted auditing standards (or "GAAS"), caused the auditors to expand testing, as necessary, until truthful information could have been developed and uncovered, and no reasonable auditor would have failed to do so.

154.    Had this been done, the financial statements certified by the auditors as being fairly presented in accordance with U.S. GAAP could not have been given the all-important "clean opinions" that were bestowed on them, year after year.

155.    Defendant EFP Rotenberg audited ABAT's 2010 financial statements that announced the Shenzhen transaction discussed above, which was an undisclosed related party transaction engineered to benefit Defendant Fu personally.  As detailed below, EFP Rotenberg's audit of these financials failed to meet basis auditing standards with respect to its duty to identifying transactions with related parties, in particular the Shenzhen transaction.

156.    The specific failures of the Auditor Defendants are further detailed in the following paragraphs.

**A.    The Auditor Defendants Ignored or Recklessly Disregarded Red Flags.**

157.    The Auditor Defendants ignored or recklessly disregarded numerous red flags that should have alerted them to ABAT's fraudulent financial statements.  Specifically, the Auditor Defendants ignored or recklessly disregarded that:

      a.  ABAT's reported SEC and AIC financial results during the Class Period differed materially; and

      b.  ABAT engaged in related party transactions, such as the Shenzhen transaction, without making the disclosures required by relevant financial reporting standards.

**B.    The Auditor Defendants Failed to Properly Conduct Their Audits in Accordance with PCAOB Standards.**

158.    The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that must be followed by

registered public accounting firms in the conduct of audits of the financial statements of issuers. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, GAAS and related interpretations in existence on that date.

159.    Under PCAOB standards, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.    The Auditor Defendants repeatedly and materially violated PCAOB standards in each of their audits, failed to properly plan and perform their audits to obtain reasonable assurance that ABAT's financial statements were free of material misstatements, and, therefore, had no basis upon which to state that ABAT's financial statements were fairly presented in conformity with GAAP.

### i.    The Auditor Defendants Failed to Exercise Due Professional Care.

160.    Auditors are required to adhere to certain standards in every audit they conduct. The Auditor Defendants failed to follow the most basic PCAOB requirements in auditing ABAT's financial statements during the Class Period.    Specifically, the Auditor Defendants failed to exercise professional skepticism and collect sufficient competent audit evidence in violation of AU Section 230.  AU Section 230 provides in relevant part:

> Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.

Due Professional Care in the Performance of Work, AU Section 230.07.

> Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.

*Id*. at 230.08.

> The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.

*Id*. at 230.09.

161.    In violating AU Sections 230.07-230.09, the Auditor Defendants failed to ensure that ABAT's financial statements were free of material misstatements and/or omissions. The duty to follow these requirements is more pronounced when an auditor is considering fraud risks:

> Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU Section 316.13. Here, the Auditor Defendants were duty bound to conduct careful diligence and properly collect competent audit evidence pursuant to AU Section 326, and in particular evidence concerning compliance with all the laws and regulations to which ABAT was subject, including those of Chinese regulatory agencies, as those matters could potentially have affected the disclosure of contingencies and even have thrown into question the applicability of the going concern assumption,[34] without which reporting under US GAAP would not have even been valid. For example, AU Section 326.15(b)(iii) requires evidence addressing completeness of all presented liabilities, which implicitly refers to the need for accrual of fines or penalties that could

---

[34] Meaning that the entity in question will continue in operation for the foreseeable future and will be able to realize assets and discharge liabilities in the normal course of operations.

be levied by regulatory authorities, including those in China, if required filings were not timely and accurately made.  That same sub-section of AU Section 326 also refers to the assertions made concerning valuations and allocations; were Chinese regulatory filings not timely and properly made, the continued existence of ABAT could have been called into question, such that the fundamental going concern assumption underlying US GAAP would no longer be valid, thus requiring possible material adjustments to, *e.g.,* carrying values of various assets.

162.    In gathering audit evidence, auditors apply a range of tools and strategies, among which are inquiry and inspection of documents.  Regarding inquiry, AU Section 326.31 states that "[i]nquiry consists of seeking information of knowledgeable persons, both financial and nonfinancial, inside or outside the entity. Inquiry is an audit procedure that is used extensively throughout the audit and often is complementary to performing other audit procedures. Inquiries may range from formal written inquiries to informal oral inquiries. Evaluating responses to inquiries is an integral part of the inquiry process."  Furthermore, "[i]n some cases, responses to inquiries provide a basis for the auditor to modify or perform additional audit procedures. The auditor should resolve any significant inconsistencies in the information obtained."  AU Section 325.34.  A subset of the general audit tool inquiry is confirmation.  "Confirmation, which is a specific type of inquiry, is the process of obtaining a representation of information or of an existing condition directly from a third party." AU Section 326.37.

163.    Regarding inspection of documents, '[i]nspection consists of examining records or documents, whether internal or external, in paper form, electronic form, or other media. Inspection of records and documents provides audit evidence of varying degrees of reliability, depending on their nature and source. . . ." AU Section 326.27.  Inspection would include, *inter alia*, reviewing all regulatory and other important filings which contain, or could be expected to

contain, information that might corroborate or refute assertions being made in the entity's financial statements upon which the auditors are expecting to opine.

164.    According to Dr. Epstein, Bagell Josephs should have included ABAT's AIC filings in its   compilation of audit evidence, and its failure to do so constituted an extreme departure from the standards of reasonable care for this auditor.

165.    Had Bagell Josephs included the AIC filings in its audit evidence, it would have easily uncovered ABAT's fraudulent financial reporting.  Even the most cursory review of these filings would have revealed the discrepancy between the revenues and net income reported in the SEC and AIC filings as detailed above, and would have alerted Bagell Josephs to the pervasive fraud infecting those filings. See also Consideration of Fraud in a Financial Statement Audit AU Section 316.41.[35]

166.    Aside from the actual evidence of fraud made apparent by ABAT's AIC filings, Bagell Josephs employees were personally present at ABAT's Chinese offices during their audit work for ABAT, and presumably relied on the same underlying financial records and data, such as documents necessary to substantiate ABAT's claimed revenues, that had formed the basis for ABAT's AIC filings.  However, the same underlying financial records and data inexplicably yielded dramatically different results for ABAT's U.S. SEC filings.

167.    The vast discrepancies between ABAT's reported revenues in the U.S. versus those reported in China cannot be explained by variances between U.S. and Chinese accounting standards.   Under U.S. GAAP, revenue can only be recognized when (i) collectability is reasonably assured, (ii) delivery has occurred, (iii) persuasive evidence of an arrangement exists,

---

[35] Material misstatements due to fraudulent financial reporting often result from an overstatement of revenues (for example, through premature revenue recognition or recording fictitious revenues) or an understatement of revenues (for example, through improperly shifting revenues to a later period). Therefore, the auditor should ordinarily presume that there is a risk of material misstatement due to fraud relating to revenue recognition.

and (iv) there is a fixed or determinable price. Chinese rules apply the more lenient standard that revenue may be recognized when (i) risks and rewards have been transferred, (ii) the issuer "ceases control" on the goods sold, and (iii) the revenue (and associated costs) can be measured reliably. Yet, ABAT's U.S. filings – and not its China filings – were inflated.

168. In addition, with regard to the Shenzhen acquisition, Defendant EFP Rotenberg was required to collect and evaluate basic documentation concerning the transaction and to verify relevant details with third parties. As already detailed, had it done so, EFP Rotenberg would have easily uncovered that the transaction was a sham designed to siphon money from the Company.

169. Similarly, and with respect to Bagell Josephs, a review of relevant documentation would have shown that ABAT did not own HLJ ZQPT between 2004 and 2009, despite representations to the contrary in its filings.

170. Bagell Josephs also violated PCAOB standards by failing to gather audit evidence to substantiate ABAT's claimed customer relationships. AU Section 316.53 provides that auditors must "Mak[e] oral inquiries of major customers and suppliers in addition to sending written confirmations, or sending confirmation requests to a specific party within an organization." Such inquiries are necessary to ensure that sales and revenues are accurately reported.

171. An investigation regarding ABAT's customers would have also revealed information regarding the poor quality of the product and the deficiencies in the ABAT facilities as ABAT's customers have observed, (*see* ¶ 73), which would have also alerted Bagell Josephs to the improbability of ABAT's reported margins. The Auditor Defendants should have known and therefore recklessly disregarded that ABAT's customer relationships were misrepresented in its SEC filings. *See* ¶¶ 71-76.

172.    SAS No. 99 provides that "[t]he auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."[36]  Although fraud actually requires a legal determination, which auditors are not qualified to render, the standard states that "*fraud* is an intentional act that results in a material misstatement in financial statements that are the subject of an audit."[37]  Of particular interest are those instances of suspected fraud that are misstatements arising from fraudulent financial reporting, defined as "intentional misstatements or omissions of amounts or disclosures in financial statements designed to deceive financial statement users where the effect causes the financial statements not to be presented, in all material respects, in conformity with GAAP.[38]

173.    In evaluating the risk of fraudulent financial reporting in a given circumstance, auditors are often guided by the so-called *fraud triangle*.[39]  In the classic fraud model, three factors or conditions tend to exist, although not always in equal proportion: *incentive/pressure* to perpetrate fraud, an *opportunity* to carry out the fraud, and *attitude/rationalization* to justify the fraudulent action.  SAS No. 99 implicitly endorses this model, although other formulations could also be conceived and used.[40]  Auditors must assess fraud risk as a part of the audit planning process, and adjust the nature, timing and/or extent of planned substantive auditing procedures to

---

[36] *U.S. Auditing Standards*, AU §316, at para. 1.

[37] *U.S. Auditing Standards*, AU §316, at para. 5.

[38] *U.S. Auditing Standards*, AU §316, at para. 6.

[39] The well-known "fraud triangle" was first propounded by Donald R. Cressey (Other People's Money: A Study in the Social Psychology of Embezzlement; Patterson Smith, 1973) and later widely cited.  *See, e.g.,* "Auditors' Responsibility for Fraud Detection," Michael Ramos, Journal of Accountancy, January 2003. The various factors falling into each of the three conditions are extensively considered in the Appendix to *U.S. Auditing Standards*, AU §316.

[40] *U.S. Auditing Standards*, AU §316, at para. 35.

deal with these assessments on a financial statement assertion level.  Factors such as the entity's size, complexity, and ownership attributes influence fraud risk, as does the nature and effectiveness of controls that have been implemented.

174.    Importantly, SAS No. 99 stipulates that "[m]aterial misstatements due to fraudulent financial reporting often result from an overstatement of revenues (for example, through premature revenue recognition or recording fictitious revenues) or an understatement of revenues (for example, through improperly shifting revenues to a later period).  Therefore, the auditor should ordinarily presume that there is a risk of material misstatement due to fraud relating to revenue recognition."[41]  If revenue is misstated, of course, receivables and possibly other accounts would also of necessity be improperly reported.  Specific procedures are suggested by SAS No. 99 regarding the assessment of risk relative to revenue recognition, as are responses that auditors should make when risk of fraud is found to be more than negligible.[42]  For example, when the identified risk pertains to the assertions regarding receivables, confirmations could be modified to confirm not merely the balances, but also the entire set of arrangements between the company and its customers (*e.g.*, delayed payment terms, unlimited right to return), and more effort could be devoted to resolving non-responses than is sometimes exerted in routine confirm situations.  Also, financial statement assertions that are based on "soft" information, such as management estimates, could be given greater scrutiny, including recalculation, to address suspected biases or other distortions.

---

[41]  *U.S. Auditing Standards*, AU §316, at para. 41.

[42]  *U.S. Auditing Standards*, AU §316, at paras. 53–54.

175.    According to Dr. Epstein, the nature and magnitude of the alleged fraudulent financial reporting at ABAT were such that there is the strongest implication that the auditors failed utterly to assess the risk of fraud as required under GAAS.

176.    In addition, Bagell Josephs, specifically and individually, failed to comply with U.S. Statement on Auditing Standards AU §230, *Due Professional Care in the Performance of Work, supra*.

177.    The PCAOB has not adopted a unique standard to address this topic, and has instead imposed as an interim standard the corresponding standard under U.S. GAAS, as set forth at AU §230.

178.    One of the most important requirements set forth under U.S. GAAS pertains to what is widely known as "due care" in the conduct of the audit.  This is codified in U.S. GAAS as follows:

General Standards - 3.  Due professional care is to be exercised in the performance of the audit and the preparation of the report.

179.    This third general standard requires the independent auditors to plan and perform work with due professional care – which refers to *what* the auditors do and *how well* they do it.[43] The auditors should be knowledgeable about the client and the relevant professional accounting and auditing standards that apply to that client.[44]  Auditors must exercise *professional skepticism* to critically assess evidence gathered throughout the entire audit process – *i.e.,* questioning whether the audit evidence is sufficient and appropriate under the circumstances, or determining that the evidence is less than persuasive.[45]   Ultimately, the auditors' objective is to obtain

---

[43] *U.S. Auditing Standards*, AU §§230.02, 230.04.

[44] *U.S. Auditing Standards*, AU §230.06.

[45] *U.S. Auditing Standards*, AU §§230.07–.09.

57

sufficient competent evidential matter to provide them with a reasonable basis for forming an opinion. As such, audit judgment must be exercised throughout the audit, when selecting data for testing, interpreting the test results, or evaluating the reasonableness of accounting estimates.[46]

180.    It is required that *due professional care* be exercised throughout the conduct of the work.[47]  Under GAAS, the auditors having responsibility for the engagement and their assistants should be knowledgeable about the relevant professional accounting and auditing standards and about the client's operations and its financial reporting practices.  Furthermore, GAAS requires that the engagement be diligently performed, in good faith and with integrity, including the processes of gathering and objectively evaluating audit evidence.[48]

181.    The exercise of professional skepticism is a cornerstone of the art of auditing. "Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence.  The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence."[49]

182.    Bagell Josephs ignored information indicating that the financial statements were potentially materially misstated in years 2006 through 2009.  For example, ABAT's reported growth in revenues and profits were remarkable by any reasonableness test.  ABAT's reported margins were even more remarkable – approximately six times that of the average of larger,

---

[46] *U.S. Auditing Standards*, AU §230.11.

[47] *U.S. Auditing Standards*, AU §230.01.  Amendments to this section made prior to the first audit at issue in this case (for the year 2002) made explicit the need to exercise due care in the *planning* as well as the performance of the audit.

[48] *U.S. Auditing Standards*, AU §230.03.

[49] *U.S. Auditing Standards*, AU §230.07.

longer-established producers of the same or similar products.  On its face, such alleged facts would have to be view skeptically, which in turn would have demanded expanded audit testing. The fact that the ABAT financial statements have been found to have been materially misstated strongly suggests that expanded audit testing was not carried out.

183.    Given the above, the fact that ABAT's U.S. reported revenues were significantly greater than those reported in China (*i.e.*, to the AIC) was a huge red flag that the Company was falsifying its SEC filings, and could not have plausibly escaped Bagell Josephs' notice.

184.    The Auditor Defendants also failed to determine the existence of related parties. Specifically in this regard, the Auditor Defendants violated AU Section 334, which provides in relevant part:

> **Determining the Existence of Related Parties**
>
> The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity. Certain relationships, such as parent-subsidiary or investor-investee, may be clearly evident. Determining the existence of others requires the application of specific audit procedures, which may include the following:
>
> *a.* Evaluate the company's procedures for identifying and properly accounting for related party transactions.
>
> *b.* Request from appropriate management personnel the names of all related parties and inquire whether there were any transactions with these parties during the period.
>
> *c.* Review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions.
>
> *d.* Determine the names of all pension and other trusts established for the benefit of employees and the names of their officers and trustees.
>
> *e.* Review stockholder listings of closely held companies to identify principal stockholders.
>
> *f.* Review prior years' working papers for the names of known related parties.

*g.* Inquire of predecessor, principal, or other auditors of related entities concerning their knowledge of existing relationships and the extent of management involvement in material transactions.

*h.* Review material investment transactions during the period under audit to determine whether the nature and extent of investments during the period create related parties.

Related Parties, AU Section 334.07.

### Identifying Transactions With Related Parties

The following procedures are intended to provide guidance for identifying material transactions with parties known to be related and for identifying material transactions that may be indicative of the existence of previously undetermined relationships:

*a.* Provide audit personnel performing segments of the audit or auditing and reporting separately on the accounts of related components of the reporting entity with the names of known related parties so that they may become aware of transactions with such parties during their audits.

*b.* Review the minutes of meetings of the board of directors and executive or operating committees for information about material transactions authorized or discussed at their meetings.

*c.* Review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties.

*d.* Review conflict-of-interests statements obtained by the company from its management.

*e.* Review the extent and nature of business transacted with major customers, suppliers, borrowers, and lenders for indications of previously undisclosed relationships.

*f.* Consider whether transactions are occurring, but are not being given accounting recognition, such as receiving or providing accounting, management or other services at no charge or a major stockholder absorbing corporate expenses.

*g.* Review accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period.

*h.* Review confirmations of compensating balance arrangements for indications that balances are or were maintained for or by related parties.

    *i.*  Review invoices from law firms that have performed regular or special services for the company for indications of the existence of related parties or related party transactions.

    *j.*  Review confirmations of loans receivable and payable for indications of guarantees. When guarantees are indicated, determine their nature and the relationships, if any, of the guarantors to the reporting entity.

*Id*. at 334.08.

### Examining Identified Related Party Transactions

After identifying related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. The procedures should be directed toward obtaining and evaluating sufficient appropriate evidential matter and should extend beyond inquiry of management. Procedures that should be considered include the following:

    *a.*  Obtain an understanding of the business purpose of the transaction.

    *b.*  Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

    *c.*  Determine whether the transaction has been approved by the board of directors or other appropriate officials.

    *d.*  Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements.

    *e.*  Arrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.

    *f.*  Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

*Id*. at 334.09.

185.   Defendant EFP Rotenberg violated the foregoing standards by failing to determine and disclose that: 1) the Shenzhen transaction was a related party transaction and Shenzhen had in fact been acquired years earlier; and 2) EFP Rotenberg failed to disclose the actual Purchase Price and other material information regarding this transaction.

186.    For example, the 2010 10-K, which EPF Rotenberg signed off on, states as follows:

> On January 6, 2011, the Company, through its subsidiary, Harbin ZQPT, acquired all of the assets of Shenzhen Zhongqiang New Energy Science & Technology Co., Ltd. ("Shenzhen Zhongqiang"). In exchange for the assets of Shenzhen Zhongqiang, Harbin ZQPT will pay to Shenzhen Zhongqiang 135,000,000 Renminbi (approximately $20 million), of which 91,250,000 Renminbi are being used to satisfy the liabilities of Shenzhen Zhongqiang. The initial payment in addition to a deposit of previously paid, totaled $11,721,468, or 77,500,000 Renminbi has already been completed, and is recorded as deposit for investment as of December 31, 2010. The remaining balance has been paid subsequent to year end. [p. F-79]

187.    While the above purports to recite the details of the Shenzhen acquisition, it fails to disclose that Shenzhen was a related-party transaction. Had EPF Rotenberg conducted the most basic of audit duties with professional skepticism it was required to apply, for instance, reviewing the relevant documentation concerning the transaction and verified actual counterparties to the Shenzhen transaction, it would have easily uncovered that ABAT had in fact acquired Shenzhen from Defendant Fu, who had himself acquired the company in 2008 for millions less than what ABAT was paying now to acquire it, and that the Shenzhen "acquisition" was in fact a related party transaction designed to siphon millions of dollars from ABAT to Defendant Fu.

188.    Bagell Josephs violated the foregoing standards by failing to determine and disclose that the transfers of ownership involving HLJ ZQPT were related party transactions between Defendant Fu and ABAT.

189.    As a result of the Auditor Defendants' collective false and misleading statements and omissions, the market price of ABAT common stock was artificially inflated throughout the Class Period.

190.    In ignorance of the false and misleading nature of the representations and omissions described above and the deceptive and manipulative devices employed by the Auditor Defendants, Plaintiffs and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of the Auditor Defendants, purchased ABAT publicly traded securities at artificially inflated prices and were damaged thereby.

191.    Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by the Auditor Defendants, or been aware of the truth behind the Auditor Defendants' material misstatements, they would not have purchased ABAT's publicly traded securities at artificially inflated prices, if at all.

192.    By virtue of the foregoing, the Auditor Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  September 25, 2012

POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS LLP

/s/ Murielle Steven Walsh
Marc I. Gross
Murielle Steven Walsh
Marie L. Oliver
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile : (212) 661-8665

William B. Federman
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK  73120
Telephone:  (405) 235-1560
Facsimile: (405) 239-2112
     - and -
2926 Maple Avenue, Suite 200
Dallas, Texas  75201

Laurence Rosen
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Facsimile:  (212) 202-3827

*Lead Counsel and Proposed Class Counsel*

**CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS**

1.    I, Ruble Sanderson, make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Advanced Battery Technologies, Inc. ("ABAT"), and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.    I did not purchase ABAT securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased ABAT during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in ABAT securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Case 1:11-cv-02279-CM   Document 97-1   Filed 09/25/12   Page 67 of 94

Executed __May 24, 2011__, at
(Date)

415 CHURCH ST, SUITE 3015

NASHVILLE, TN. 37219
(City, State)

_Ruble Sanderson_
(Signature)

RUBLE SANDERSON
(Type or Print Name)

ADVANCED BATTERY TECHS INC
CLASS PERIOD: NOV 24 2008 through MAR 29 2011
LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 9/14/2010 | PUR | 1,000 | $3.5600 |
| 9/14/2010 | PUR | 1,000 | $3.5600 |
| 9/20/2010 | PUR | 2,000 | $3.4500 |
| 9/20/2010 | PUR | 1,000 | $3.3999 |
| 9/28/2010 | PUR | 3,000 | $3.5600 |
| 9/30/2010 | PUR | 2,000 | $3.5800 |
| 10/1/2010 | PUR | 4,000 | $3.6100 |
| 10/4/2010 | PUR | 1,000 | $3.6300 |
| 10/6/2010 | PUR | 3,000 | $3.6299 |
| 10/6/2010 | PUR | 2,000 | $3.6100 |
| 10/12/2010 | SLD | (600) | $3.7700 |
| 10/12/2010 | SLD | (1,400) | $3.7701 |
| 10/14/2010 | PUR | 4,000 | $3.9600 |
| 10/14/2010 | PUR | 3,000 | $3.9399 |
| 10/18/2010 | PUR | 5,000 | $3.9500 |
| 10/19/2010 | PUR | 500 | $4.0400 |
| 10/19/2010 | PUR | 3,100 | $4.0577 |
| 10/19/2010 | PUR | 400 | $4.0600 |
| 10/20/2010 | PUR | 200 | $3.9499 |
| 10/20/2010 | PUR | 5,800 | $3.9500 |
| 10/21/2010 | PUR | 10,000 | $4.0300 |
| 10/21/2010 | PUR | 5,000 | $3.9700 |
| 10/22/2010 | PUR | 5,000 | $3.9700 |
| 10/29/2010 | PUR | 5,000 | $3.9500 |
| 11/1/2010 | PUR | 4,600 | $3.9400 |
| 11/1/2010 | PUR | 400 | $3.9399 |
| 11/2/2010 | PUR | 10,000 | $3.9000 |
| 11/3/2010 | PUR | 10,000 | $3.8900 |
| 11/9/2010 | PUR | 5,000 | $3.9500 |
| 11/9/2010 | PUR | 5,000 | $3.9400 |
| 11/16/2010 | PUR | 20,000 | $4.0200 |
| 11/16/2010 | PUR | 19,747 | $3.9640 |
| 11/16/2010 | PUR | 253 | $3.9900 |
| 11/16/2010 | PUR | 9,319 | $3.9981 |
| 11/16/2010 | PUR | 10,681 | $4.0200 |
| 11/16/2010 | PUR | 10,000 | $3.9800 |
| 11/16/2010 | PUR | 10,000 | $3.9700 |
| 11/16/2010 | PUR | 10,000 | $3.9600 |

ADVANCED BATTERY TECHS INC
CLASS PERIOD: NOV 24 2008 through MAR 29 2011
LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 11/16/2010 | PUR | 2,200 | $3.9400 |
| 11/16/2010 | PUR | 10,801 | $3.9500 |
| 11/16/2010 | PUR | 6,999 | $3.9699 |
| 11/16/2010 | SLD | (6,619) | $4.0800 |
| 11/16/2010 | SLD | (3,100) | $4.0700 |
| 11/16/2010 | SLD | (2,500) | $4.0600 |
| 11/16/2010 | SLD | (15,400) | $4.0300 |
| 11/16/2010 | SLD | (1,078) | $4.0500 |
| 11/16/2010 | SLD | (6,100) | $4.0200 |
| 11/16/2010 | SLD | (6,220) | $4.0400 |
| 11/16/2010 | SLD | (53,883) | $4.0000 |
| 11/16/2010 | SLD | (5,000) | $4.0100 |
| 11/16/2010 | SLD | (100) | $4.0097 |
| 11/17/2010 | SLD | (19,400) | $4.0400 |
| 11/17/2010 | SLD | (600) | $4.0425 |
| 11/18/2010 | PUR | 20,000 | $3.9700 |
| 11/22/2010 | SLD | (10,000) | $4.0400 |
| 11/23/2010 | PUR | 20,000 | $4.0400 |
| 11/23/2010 | PUR | 17,467 | $4.0100 |
| 11/23/2010 | SLD | (15,300) | $4.0701 |
| 11/23/2010 | SLD | (4,700) | $4.0700 |
| 11/23/2010 | SLD | (2,000) | $4.1301 |
| 11/23/2010 | SLD | (3,838) | $4.1300 |
| 11/23/2010 | SLD | (200) | $4.1350 |
| 11/23/2010 | SLD | (13,962) | $4.1200 |
| 11/23/2010 | SLD | (17,194) | $4.1402 |
| 11/23/2010 | SLD | (200) | $4.1300 |
| 11/23/2010 | SLD | (2,606) | $4.1301 |
| 11/23/2010 | SLD | (20,000) | $4.1000 |
| 11/24/2010 | SLD | (20,000) | $4.1200 |
| 11/24/2010 | SLD | (17,467) | $4.1148 |
| 11/24/2010 | SLD | (685) | $4.1200 |
| 11/24/2010 | SLD | (19,100) | $4.1105 |
| 11/24/2010 | SLD | (215) | $4.1100 |
| 11/26/2010 | PUR | 10,000 | $4.2500 |
| 11/29/2010 | PUR | 20,000 | $4.2700 |
| 11/29/2010 | PUR | 1,300 | $4.2400 |
| 11/29/2010 | PUR | 10,000 | $4.3100 |

ADVANCED BATTERY TECHS INC
CLASS PERIOD: NOV 24 2008 through MAR 29 2011
LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 11/29/2010 | PUR | 18,700 | $4.2900 |
| 11/30/2010 | PUR | 20,000 | $3.9800 |
| 11/30/2010 | PUR | 20,000 | $3.9800 |
| 11/30/2010 | PUR | 20,000 | $3.9800 |
| 11/30/2010 | PUR | 20,000 | $3.8005 |
| 11/30/2010 | PUR | 20,000 | $3.8000 |
| 11/30/2010 | PUR | 20,000 | $3.8300 |
| 11/30/2010 | SLD | (20,000) | $3.7900 |
| 12/1/2010 | PUR | 10,000 | $3.8000 |
| 12/22/2010 | PUR | 10,000 | $3.8600 |
| 12/22/2010 | PUR | 10,000 | $3.8500 |
| 12/23/2010 | PUR | 6,178 | $3.8500 |
| 12/29/2010 | PUR | 100 | $3.8600 |
| 12/29/2010 | PUR | 3,722 | $3.8699 |
| 1/31/2011 | PUR | 10,000 | $3.7800 |
| 1/31/2011 | PUR | 10,000 | $3.7100 |
| 2/8/2011 | SLD | (10,000) | $3.7900 |
| 2/10/2011 | PUR | 4,000 | $3.7100 |
| 2/15/2011 | PUR | 6,000 | $3.7100 |
| 2/15/2011 | SLD | (10,000) | $3.7900 |
| 2/15/2011 | SLD | (8,417) | $3.8200 |
| 2/15/2011 | SLD | (1,583) | $3.8101 |
| 2/15/2011 | SLD | (11,546) | $3.8700 |
| 2/15/2011 | SLD | (2,300) | $3.8600 |
| 2/15/2011 | SLD | (6,154) | $3.8601 |
| 2/17/2011 | PUR | 10,000 | $3.7900 |
| 2/17/2011 | PUR | 10,000 | $3.7700 |
| 2/22/2011 | PUR | 10,000 | $3.7900 |
| 2/23/2011 | PUR | 10,000 | $3.7300 |
| 2/23/2011 | PUR | 10,000 | $3.7100 |
| 2/25/2011 | SLD | (10,000) | $3.8100 |
| 2/25/2011 | SLD | (10,000) | $3.8300 |
| 2/28/2011 | SLD | (10,000) | $3.8800 |
| 3/1/2011 | PUR | 10,000 | $3.7700 |
| 3/1/2011 | PUR | 166 | $3.7300 |
| 3/1/2011 | PUR | 9,834 | $3.7400 |
| 3/1/2011 | PUR | 10,000 | $3.7100 |
| 3/8/2011 | PUR | 10,000 | $3.6900 |

**ADVANCED BATTERY TECHS INC**
**CLASS PERIOD: NOV 24 2008 through MAR 29 2011**
**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 3/8/2011 | SLD | (10,000) | $3.7800 |
| 3/8/2011 | SLD | (10,000) | $3.8100 |
| 3/9/2011 | PUR | 10,000 | $3.8200 |
| 3/9/2011 | SLD | (10,000) | $3.9000 |
| 3/9/2011 | SLD | (10,000) | $3.9500 |
| 3/10/2011 | PUR | 10,000 | $3.7700 |
| 3/10/2011 | PUR | 8,020 | $3.7300 |
| 3/11/2011 | PUR | 1,980 | $3.7200 |
| 3/14/2011 | PUR | 10,000 | $3.6800 |
| 3/14/2011 | PUR | 10,000 | $3.6800 |
| 3/14/2011 | SLD | (10,000) | $3.7800 |
| 3/15/2011 | PUR | 10,000 | $3.6400 |
| 3/15/2011 | PUR | 10,000 | $3.6300 |

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Advanced Battery Technologies, Inc. ("ABAT"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against ABAT and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in ABAT securities during the class period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

See Attached list transactions.

5.      I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws:

6.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _16_ day of May, 2011.

**REDACTED**

Signature: _____
Name:     Federico Schmid
Address:
E-mail:

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

**A-204**

| Date | Number Bought | Price Per Share | Date | Number Sold | Price Per Share |
|---|---|---|---|---|---|
| 1/6/2010 | 900 | ($4.5000) | 1/12/2010 | 5,000 | $4.4400 |
| 1/6/2010 | 5,000 | ($4.5600) | 2/17/2010 | 5,000 | $3.7300 |
| 1/6/2010 | 5,000 | ($4.5200) | 2/17/2010 | 3,000 | $3.7808 |
| 1/6/2010 | 2,500 | ($4.5500) | 2/18/2010 | 3,300 | $3.9900 |
| 1/6/2010 | 2,500 | ($4.5300) | 2/18/2010 | 2,500 | $4.0600 |
| 1/7/2010 | 4,100 | ($4.4100) | 2/18/2010 | 3,000 | $3.9400 |
| 1/12/2010 | 5,000 | ($4.3300) | 2/25/2010 | 3,000 | $3.9200 |
| 1/13/2010 | 5,000 | ($4.2580) | 3/1/2010 | 2,499 | $3.9900 |
| 1/21/2010 | 3,500 | ($3.9400) | 3/2/2010 | 3,300 | $4.0400 |
| 2/9/2010 | 5,000 | ($3.5100) | 3/29/2010 | 2,500 | $3.9900 |
| 2/19/2010 | 3,300 | ($3.8900) | 5/11/2010 | 2,500 | $3.5700 |
| 2/24/2010 | 3,000 | ($3.7700) | 5/17/2010 | 2,500 | $3.4700 |
| 3/18/2010 | 3,300 | ($4.0200) | 6/11/2010 | 2,500 | $3.5500 |
| 3/25/2010 | 2,500 | ($3.8700) | 6/11/2010 | 5,000 | $3.4400 |
| 3/31/2010 | 2,000 | ($3.8700) | 6/18/2010 | 2,000 | $3.5700 |
| 5/14/2010 | 2,500 | ($3.4000) | 7/23/2010 | 4,000 | $3.3493 |
| 5/19/2010 | 2,500 | ($3.3700) | 7/27/2010 | 2,500 | $3.5700 |
| 5/19/2010 | 5,000 | ($3.3000) | 7/27/2010 | 2,500 | $3.5800 |
| 6/25/2010 | 975 | ($3.3800) | 8/9/2010 | 2,500 | $3.5300 |
| 7/1/2010 | 2,500 | ($3.1600) | 8/10/2010 | 2,500 | $3.8100 |
| 7/8/2010 | 4,525 | ($3.1900) | 8/10/2010 | 3,750 | $3.6900 |
| 8/10/2010 | 2,500 | ($3.7100) | 8/16/2010 | 3,750 | $3.6900 |
| 8/10/2010 | 4,000 | ($3.7000) | 8/18/2010 | 3,750 | $3.7900 |
| 8/11/2010 | 3,750 | ($3.5300) | 10/21/2010 | 5,000 | $4.0500 |
| 8/31/2010 | 3,750 | ($3.5500) | 10/29/2010 | 4,000 | $3.9800 |
| 8/31/2010 | 4,000 | ($3.4800) | 11/4/2010 | 7,500 | $3.9700 |
| 9/7/2010 | 2,500 | ($3.5700) | 11/10/2010 | 4,000 | $3.8600 |
| 9/9/2010 | 6,250 | ($3.5297) | 11/11/2010 | 5,000 | $4.0200 |
| 9/16/2010 | 5,000 | ($3.4000) | 11/12/2010 | 5,000 | $3.9900 |
| 10/6/2010 | 10,000 | ($3.6000) | 12/2/2010 | 5,000 | $3.8500 |
| 10/19/2010 | 5,000 | ($3.9600) | 12/13/2010 | 5,000 | $3.9600 |
| 10/21/2010 | 5,000 | ($3.9000) | 1/14/2011 | 5,000 | $3.7800 |
| 11/9/2010 | 7,500 | ($3.9100) | 3/28/2011 | 2,500 | $3.5600 |
| 11/10/2010 | 4,000 | ($3.8000) | 3/30/2011 | 5,000 | $2.0500 |
| 11/12/2010 | 5,000 | ($3.9200) | 3/30/2011 | 5,000 | $2.0000 |
| 11/16/2010 | 25,000 | ($3.9900) | 3/30/2011 | 20,000 | $2.0100 |
| 11/16/2010 | 4,000 | ($3.9700) | 3/30/2011 | 20,000 | $2.0000 |
| 11/18/2010 | 5,000 | ($4.0100) | 3/31/2011 | 25,000 | $1.6156 |
| 11/23/2010 | 7,000 | ($4.0300) | 3/31/2011 | 50,000 | $1.6000 |
| 11/24/2010 | 5,000 | ($4.1100) | 3/31/2011 | 50,000 | $1.6543 |
| 11/26/2010 | 2,500 | ($4.2900) | 3/31/2011 | 5,000 | $1.6300 |
| 11/29/2010 | 5,000 | ($4.2500) | 3/31/2011 | 15,000 | $1.6500 |
| 11/29/2010 | 5,000 | ($4.2900) | 4/5/2011 | 3,750 | $2.0830 |
| 11/30/2010 | 5,000 | ($3.7900) | 4/6/2011 | 1,500 | $2.2300 |
| 11/30/2010 | 1,500 | ($3.7800) | 4/6/2011 | 3,750 | $2.3993 |
| 12/1/2010 | 5,000 | ($3.7500) | 8/10/2011 | 4,000 | $3.7900 |
| 12/2/2010 | 1,000 | ($3.8500) | | | |
| 12/3/2010 | 5,000 | ($3.9100) | | | |
| 12/7/2010 | 5,000 | ($3.8600) | | | |
| 12/8/2010 | 5,000 | ($3.8300) | | | |
| 12/8/2010 | 5,000 | ($3.8200) | | | |
| 12/20/2010 | 5,000 | ($3.9100) | | | |
| 12/29/2010 | 5,000 | ($3.8700) | | | |
| 1/7/2011 | 3,000 | ($3.7600) | | | |
| 1/7/2011 | 2,000 | ($3.6800) | | | |
| 1/10/2011 | 5,000 | ($3.5500) | | | |
| 1/13/2011 | 5,000 | ($3.7300) | | | |
| 1/13/2011 | 5,000 | ($3.7200) | | | |
| 1/13/2011 | 2,000 | ($3.7800) | | | |
| 1/14/2011 | 5,000 | ($3.7100) | | | |
| 1/19/2011 | 5,000 | ($3.8100) | | | |
| 1/31/2011 | 1,500 | ($3.7300) | | | |
| 2/17/2011 | 2,500 | ($3.8100) | | | |
| 2/17/2011 | 5,000 | ($3.8800) | | | |
| 2/17/2011 | 2,500 | ($3.7798) | | | |
| 2/17/2011 | 2,500 | ($3.8300) | | | |
| 2/17/2011 | 2,500 | ($3.7700) | | | |
| 2/19/2011 | 2,499 | ($3.8700) | | | |
| 3/9/2011 | 5,000 | ($3.8400) | | | |
| 3/10/2011 | 2,500 | ($3.7800) | | | |
| 3/18/2011 | 2,500 | ($3.6700) | | | |
| 3/22/2011 | 5,000 | ($3.6900) | | | |
| 3/23/2011 | 5,000 | ($3.6900) | | | |
| 3/23/2011 | 5,000 | ($3.6600) | | | |
| 3/23/2011 | 1,000 | ($3.7000) | | | |
| 3/23/2011 | 1,500 | ($3.6700) | | | |
| 3/28/2011 | 2,500 | ($3.4200) | | | |
| 3/28/2011 | 5,000 | ($3.5200) | | | |
| 3/28/2011 | 5,000 | ($3.4100) | | | |
| 3/28/2011 | 400 | ($3.4100) | | | |
| 3/29/2011 | 2,500 | ($3.5100) | | | |

### FEDERICO SCHMID LOSS CHART

| Date | Number Bought | Price Per Share | Cost | Date | Number Sold | Price Per Share | Proceeds | Held Shares | Value Held | Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/6/2010 | 900 | ($4.5000) | ($4,050.00) | 1/12/2010 | 5,000 | $4.4400 | $22,200.00 | | | |
| 1/6/2010 | 5,000 | ($4.5500) | ($22,500.00) | 2/17/2010 | 5,000 | $3.7300 | $18,650.00 | | | |
| 1/6/2010 | 5,000 | ($4.5200) | ($22,600.00) | 2/17/2010 | 3,000 | $3.7808 | $11,342.40 | | | |
| 1/6/2010 | 2,500 | ($4.5500) | ($11,375.00) | 2/18/2010 | 3,300 | $3.9900 | $13,167.00 | | | |
| 1/6/2010 | 2,500 | ($4.5300) | ($11,325.00) | 2/18/2010 | 2,000 | $4.0600 | $10,150.00 | | | |
| 1/7/2010 | 4,100 | ($4.4100) | ($18,081.00) | 2/18/2010 | 3,000 | $3.9400 | $11,820.00 | | | |
| 1/12/2010 | 5,000 | ($4.3300) | ($21,650.00) | 2/25/2010 | 3,000 | $3.9200 | $11,760.00 | | | |
| 1/13/2010 | 5,000 | ($4.2580) | ($21,290.00) | 3/1/2010 | 2,499 | $3.9900 | $9,971.01 | | | |
| 1/21/2010 | 3,500 | ($3.9400) | ($13,790.00) | 3/2/2010 | 3,300 | $4.0400 | $13,332.00 | | | |
| 2/9/2010 | 5,000 | ($3.4700) | ($17,350.00) | 3/29/2010 | 2,500 | $3.9900 | $9,975.00 | | | |
| 2/19/2010 | 3,300 | ($3.8900) | ($12,837.00) | 5/11/2010 | 2,500 | $3.5700 | $8,925.00 | | | |
| 2/24/2010 | 3,000 | ($3.7700) | ($11,310.00) | 5/17/2010 | 2,500 | $3.4700 | $8,675.00 | | | |
| 3/18/2010 | 3,300 | ($4.0200) | ($13,266.00) | 6/11/2010 | 2,500 | $3.5000 | $8,750.00 | | | |
| 3/25/2010 | 2,500 | ($3.8700) | ($9,675.00) | 6/11/2010 | 5,000 | $3.4400 | $17,200.00 | | | |
| 3/31/2010 | 2,000 | ($3.8700) | ($7,740.00) | 6/18/2010 | 2,000 | $3.5700 | $7,140.00 | | | |
| 5/14/2010 | 2,500 | ($3.4000) | ($8,500.00) | 7/23/2010 | 4,000 | $3.3493 | $13,397.28 | | | |
| 5/19/2010 | 2,500 | ($3.3700) | ($8,425.00) | 7/27/2010 | 2,500 | $3.5700 | $8,925.00 | | | |
| 5/19/2010 | 5,000 | ($3.3000) | ($16,500.00) | 7/27/2010 | 2,500 | $3.5300 | $8,825.00 | | | |
| 6/25/2010 | 975 | ($3.3800) | ($3,295.50) | 8/9/2010 | 2,500 | $3.5300 | $8,825.00 | | | |
| 7/1/2010 | 2,500 | ($3.1600) | ($7,900.00) | 8/10/2010 | 2,500 | $3.8100 | $9,525.00 | | | |
| 7/8/2010 | 4,525 | ($3.1900) | ($14,434.75) | 8/10/2010 | 3,750 | $3.6900 | $13,837.50 | | | |
| 8/10/2010 | 2,500 | ($3.7100) | ($9,275.00) | 8/16/2010 | 3,750 | $3.6900 | $13,837.50 | | | |
| 8/10/2010 | 4,000 | ($3.7000) | ($14,800.00) | 8/18/2010 | 3,750 | $3.7900 | $14,212.50 | | | |
| 8/11/2010 | 3,750 | ($3.5300) | ($13,237.50) | 10/21/2010 | 5,000 | $4.0500 | $20,250.00 | | | |
| 8/31/2010 | 3,750 | ($3.5500) | ($13,312.50) | 10/29/2010 | 4,000 | $3.9800 | $15,920.00 | | | |
| 8/31/2010 | 4,000 | ($3.4800) | ($13,920.00) | 11/4/2010 | 7,500 | $3.9700 | $29,775.00 | | | |
| 9/7/2010 | 2,500 | ($3.5700) | ($8,925.00) | 11/10/2010 | 4,000 | $3.8600 | $15,440.00 | | | |
| 9/9/2010 | 6,250 | ($3.5292) | ($22,060.63) | 11/11/2010 | 5,000 | $4.0200 | $20,100.00 | | | |
| 9/16/2010 | 5,000 | ($3.4800) | ($17,400.00) | 11/12/2010 | 5,000 | $3.9900 | $19,950.00 | | | |
| 10/6/2010 | 10,000 | ($3.6600) | ($36,600.00) | 12/2/2010 | 5,000 | $3.8500 | $19,250.00 | | | |
| 10/19/2010 | 5,000 | ($3.9600) | ($19,800.00) | 12/13/2010 | 5,000 | $3.9600 | $19,800.00 | | | |
| 10/21/2010 | 5,000 | ($3.9800) | ($19,900.00) | 1/14/2011 | 5,000 | $3.7800 | $18,900.00 | | | |
| 11/9/2010 | 7,500 | ($3.9100) | ($29,325.00) | 3/28/2011 | 2,500 | $3.5600 | $8,900.00 | | | |
| 11/10/2010 | 4,000 | ($3.8000) | ($15,200.00) | 3/30/2011 | 5,000 | $2.0500 | $10,250.00 | | | |
| 11/12/2010 | 5,000 | ($3.9200) | ($19,600.00) | 3/30/2011 | 5,000 | $2.0000 | $10,000.00 | | | |
| 11/16/2010 | 25,000 | ($3.9900) | ($99,750.00) | 3/30/2011 | 20,000 | $2.0100 | $40,200.00 | | | |
| 11/16/2010 | 4,000 | ($3.9700) | ($15,880.00) | 3/30/2011 | 20,000 | $2.0000 | $40,000.00 | | | |
| 11/18/2010 | 5,000 | ($3.9210) | ($20,050.00) | 3/31/2011 | 25,000 | $1.6156 | $40,390.00 | | | |
| 11/23/2010 | 7,000 | ($3.8000) | ($26,210.00) | 3/31/2011 | 50,000 | $1.6000 | $80,000.00 | | | |
| 11/24/2010 | 5,000 | ($4.1100) | ($20,550.00) | 3/31/2011 | 50,000 | $1.6543 | $82,715.00 | | | |
| 11/26/2010 | 2,500 | ($4.2900) | ($10,725.00) | 3/31/2011 | 5,000 | $1.6300 | $8,150.00 | | | |
| 11/29/2010 | 5,000 | ($4.2500) | ($21,250.00) | 3/31/2011 | 15,000 | $1.6500 | $24,750.00 | | | |
| 11/29/2010 | 5,000 | ($4.2900) | ($21,450.00) | 4/5/2011 | 3,750 | $2.0830 | $7,811.25 | | | |
| 11/30/2010 | 5,000 | ($3.7900) | ($18,950.00) | 4/6/2011 | 1,500 | $2.2300 | $3,345.00 | | | |
| 11/30/2010 | 1,500 | ($3.7800) | ($5,670.00) | 4/6/2011 | 3,750 | $2.3993 | $8,997.38 | | | |
| 12/1/2010 | 5,000 | ($3.7500) | ($18,750.00) | 8/10/2011 | 4,000 | $3.7900 | $15,160.00 | | | |
| 12/1/2010 | 1,000 | ($3.8500) | ($3,850.00) | | | | | | | |
| 12/2/2010 | 5,000 | ($3.9100) | ($19,550.00) | | | | | | | |
| 12/3/2010 | 5,000 | ($3.9100) | ($19,550.00) | | | | | | | |
| 12/7/2010 | 5,000 | ($3.6600) | ($19,900.00) | | | | | | | |
| 12/8/2010 | 5,000 | ($3.8100) | ($19,150.00) | | | | | | | |
| 12/8/2010 | 5,000 | ($3.8200) | ($19,100.00) | | | | | | | |
| 12/20/2010 | 5,000 | ($3.9100) | ($19,550.00) | | | | | | | |
| 12/29/2010 | 5,000 | ($3.8700) | ($19,350.00) | | | | | | | |
| 1/7/2011 | 3,000 | ($3.7600) | ($11,280.00) | | | | | | | |
| 1/7/2011 | 2,000 | ($3.6800) | ($7,360.00) | | | | | | | |
| 1/10/2011 | 5,000 | ($3.5500) | ($17,750.00) | | | | | | | |
| 1/13/2011 | 5,000 | ($3.7300) | ($18,650.00) | | | | | | | |
| 1/13/2011 | 5,000 | ($3.7200) | ($18,600.00) | | | | | | | |
| 1/13/2011 | 2,000 | ($3.7800) | ($7,560.00) | | | | | | | |
| 1/14/2011 | 5,000 | ($3.7100) | ($18,550.00) | | | | | | | |
| 1/31/2011 | 5,000 | ($3.8100) | ($19,050.00) | | | | | | | |
| 1/31/2011 | 1,500 | ($3.7900) | ($5,595.00) | | | | | | | |
| 2/17/2011 | 2,500 | ($3.8100) | ($9,525.00) | | | | | | | |
| 2/17/2011 | 5,000 | ($3.8800) | ($19,400.00) | | | | | | | |
| 2/17/2011 | 2,500 | ($3.2798) | ($9,049.50) | | | | | | | |
| 2/17/2011 | 5,000 | ($3.8300) | ($19,150.00) | | | | | | | |
| 2/17/2011 | 2,500 | ($3.7700) | ($9,425.00) | | | | | | | |
| 2/19/2011 | 2,499 | ($3.8700) | ($9,671.13) | | | | | | | |
| 3/9/2011 | 5,000 | ($3.8400) | ($19,200.00) | | | | | | | |
| 3/10/2011 | 2,500 | ($3.7800) | ($9,450.00) | | | | | | | |
| 3/18/2011 | 2,500 | ($3.6700) | ($9,175.00) | | | | | | | |
| 3/22/2011 | 5,000 | ($3.6900) | ($18,450.00) | | | | | | | |
| 3/23/2011 | 5,000 | ($3.6900) | ($18,450.00) | | | | | | | |
| 3/23/2011 | 5,000 | ($3.6600) | ($18,300.00) | | | | | | | |
| 3/23/2011 | 1,000 | ($3.7000) | ($3,700.00) | | | | | | | |
| 3/23/2011 | 1,500 | ($3.6700) | ($5,505.00) | | | | | | | |
| 3/28/2011 | 2,500 | ($3.4700) | ($8,650.00) | | | | | | | |
| 3/28/2011 | 5,000 | ($3.5200) | ($17,600.00) | | | | | | | |
| 3/28/2011 | 5,000 | ($3.4100) | ($17,050.00) | | | | | | | |
| 3/28/2011 | 400 | ($3.6100) | ($1,760.00) | | | | | | | |
| 3/29/2011 | 2,500 | ($3.5100) | ($8,775.00) | | | | | | | |
| TOTAL | 333,749 | | ($1,278,844.51) | | 328,849 | | $834,620.82 | 4,900 | $9,114.00 | ($435,109.69) |

# EXHIBIT A

Résumé of
**BARRY JAY EPSTEIN, Ph.D., CPA, CFF**

Director - Litigation Consulting Services
SS&G, Inc.
225 West Illinois Street
Suite 300
Chicago, Illinois  60654
(312) 222-1400
BEpstein@SSandG.com

**PROFESSIONAL EXPERIENCE:**

2012 – current     Director – Litigation Consulting/Forensic Accounting
                   SS&G, Inc.
                   (Successor firm to Russell Novak & Company LLP)

        See entry immediately below.

2003 - 2011     Partner - Litigation Consulting Services
                Russell Novak & Company LLP
                Chicago, Illinois 60610

        Expert witness and consultant regarding generally accepted accounting principles
        (GAAP), generally accepted auditing standards (GAAS), accountants liability,
        economic damages, and related forensic accounting investigations.  Recent work has
        pertained to contractual disputes, SEC and CFTC accountants' liability matters,
        white collar defense, and class action suits.

1999 - 2003     Partner - Litigation Consulting Services
                Gleeson, Sklar, Sawyers & Cumpata LLP
                Chicago, Illinois 60602

        Expert witness and consultant regarding generally accepted accounting principles
        (GAAP), generally accepted auditing standards (GAAS), accountants liability,
        economic damages, and related investigative.  Typical work pertained to *Winstar*
        litigation, commercial contractual disputes, mergers and acquisitions, and financial
        derivatives matters.  Also served as arbitrator in commercial dispute.

1997 - 1999     Partner - Litigation Consulting Services
                BDO Seidman LLP
                Chicago, Illinois 60601

        Same as above.

1

1996 - 1997        Partner - Litigation Services and Investigative Accounting
                   Checkers Simon & Rosner LLP
                   Chicago, Illinois 60606
                   (now McGladrey & Pullen LLP)

        Same as above.


1986 - 1996        Partner In Charge - Quality Management
                   Checkers Simon & Rosner LLP

                   Responsibilities as chief technical officer of major regional CPA firm (later acquired
                   by American Express and subsequently merged into McGladrey & Pullen):
                   development of auditing programs and procedures, including sampling applications
                   and other advanced auditing techniques; advising on and monitoring of compliance
                   with professional accounting and auditing standards; providing expert testimony on
                   the application of accounting principles and auditing standards, development of
                   economic damage models and other litigation support services; development and
                   presentation of technical training for professionals both within and outside the firm;
                   providing client consultation on technical matters in accounting and financial
                   reporting; and the development and presentation of training on transactions in
                   securities and financial derivatives for both the Federal Deposit Insurance
                   Corporation (FDIC) and the Resolution Trust Corporation (RTC).

1982 - 1986        Quality Control Partner - Blackman, Kallick & Co., Ltd.
                   (now Blackman Kallick, LLP)
                   Chicago, Illinois

                   Responsibilities similar to those listed above, including litigation consultation.


1975-1982          National Office Technical Projects Manager - Alexander Grant & Co.
                     (now Grant Thornton)
                   Chicago, Illinois

                   Responsibilities included technical support in accounting and audit areas for all
                   operating offices of the firm; development of firm training and technical guidance
                   materials; development of audit sampling methodology; and management of special
                   client engagements, including a large-scale program of Department of Energy price
                   control audits in the late 1970s.


1973 - 1975        Director of Accounting Operations *and*
                   Manager of Financial Reporting - Cummins Engine Co., Inc.
                   Columbus, Indiana

A-209

**TEACHING EXPERIENCE:**

| | |
|---|---|
| 1994 | Instructor in Accounting |
| | Northwestern University |
| | Medill School of Journalism |
| | Graduate Program in Integrated Marketing Communications |
| | Evanston, Illinois |
| | |
| 1979 - 1980 | Assistant Professor of Accounting |
| | DePaul University |
| | College of Commerce |
| | Chicago, Illinois |
| | |
| 1978 | Instructor in Accounting |
| | Columbia College Chicago |
| | Arts Management Program |
| | Chicago, Illinois |
| | |
| 1973 | Instructor in Financial Analysis |
| | University of Pittsburgh |
| | Graduate School of Business |
| | Pittsburgh, Pennsylvania |
| | |
| 1969 - 1973 | Assistant Professor of Accounting |
| | West Liberty State College |
| | West Liberty, West Virginia |

**UNIVERSITIES ATTENDED:**

University of Pittsburgh
    Ph.D. - 1979
    Information Systems, Statistical Decision Theory, and Finance

University of Chicago
    M.B.A. - 1969
    Accounting, Economics and Behavioral Sciences

DePaul University - with high honors
    B.S.C. - 1967
    Accounting and Finance

C.P.A., Illinois, 1967 - winner of national and state honors

**PROFESSIONAL AFFILIATIONS:**

Illinois CPA Society (former chairman, Accounting Principles Committee)

American Institute of Certified Public Accountants (former member, Board of Examiners, and chair of the Auditing Subcommittee of the Board)

American Mensa, Ltd.

**PUBLICATIONS (Partial listing):**

Author, *Handbook of Accounting and Auditing*, (current, from 1998; Warren, Gorham & Lamont [division, Research Institute of America])

Lead co-author, *Wiley GAAP: Interpretation and Application of Generally Accepted Accounting Principles* (annual editions, 1985-2010; John Wiley & Sons, Inc.).

Lead co-author, *Wiley IFRS: Interpretation and Application of International Accounting Standards* (annual editions, 1997-2010; John Wiley & Sons, Inc.).

Lead co-author, *Wiley IFRS Policies and Procedures* (2008; John Wiley & Sons, Inc.).

Lead co-author, Wiley GAAP: Practical Implementation Guide and Workbook. (2010; John Wiley & Sons, Inc.).

Co-author, *Goodwill and Other Intangible Assets: An Update*, Chapter 20 in *Accountants' Handbook* by D. R. Carmichael and Paul H. Rosenfield, 11th edition Cumulative Supplement, 2008.  (John Wiley & Sons, Inc.).

Earlier publications included authorship and co-authorship of other books; also authorship or co-authorship of numerous professional journal articles.

Recent articles include the following:

"The Repatriate Act:  GAAP vs. IFRS and the Treatment of Foreign Earnings," *Accounting Today*, May 2011.

"SEC, Fannie and Freddie: MD&A Overload?" (co-authored) published in *Law360.com*, April 15, 2011.

"Considering Another Tax Holiday for Foreign Earnings," *Law360.com*, March 31, 2011.

"The Differential Influence of U.S. GAAP and IFRS on Corporations' Decisions to Repatriate Earnings of Foreign Subsidiaries," (co-authored) published in *International Tax Journal*, a bi-monthly journal published by CCH, a Wolters Kluwer business.

4

"Roundtable: International Financial Reporting Standards," (panelist) *Financier Worldwide Magazine*, February 2011.

"Who's At Fault? NY Court Ruling Shelters Auditors," *Chicago Lawyer* Year in Review 2010, Law Bulletin Publishing Company, December, 2010.

"Auditor Malpractice: Five Things Litigators Should Know About Generally Accepted Auditing Standards," (co-authored) published in *Chicago Lawyer Magazine*, Litigation Support Special Section, Law Bulletin Publishing Company, October, 2010.

"Nine steps to optimization of the audit committee," (co-authored) published in *Westlaw Journal Corporate Officers & Directors Liability*, Volume 26, Issue 5 / August 30, 2010.

Occupational Fraud: A Productive Area for Counsel's Attention. (co-authored) published in *Chicago Lawyer* Magazine, Corporate Counsel Special Section, Law Bulletin Publishing Company, August, 2010.

"IFRS for SMEs - An Option for U.S. Private Entities?" (co-authored) published in *The Review of Business Journal*, St. John's University, Spring 2010, Volume 30, Number 2.

"GAAP to IFRS," *Inside GRC*, Spring 2010, Issue 2, Volume 2.

"5 Ways Audit Committees Can Rebuild Public Trust," (co-authored) published in *Law360.com*, June 30, 2010.

"Litigation Risks in the SEC's IFRS Plan: What Attorneys Need to Know," *The International Law Quarterly*, published by the International Law Section of The Florida Bar, Spring/Summer 2010, Vol. XXV, No. 1.

"Buyers Beware: Relaxing Due Diligence Could be Fatal," (co-authored) published in *Law360.com*, April 23, 2010.

"Avoiding Litigation as Businesses Transition from GAAP to IFRS," (co-authored) published in the newsletter of the ABA International Litigation Committee, ABA Section on Litigation, April, 2010.

"This Way Please," (co-authored) published in *Insight*, the magazine of the Illinois CPA Society, February/March 2010.

"Four Key Provisions for every Earn-Out Agreement," (co-authored) published in *Law360.com*, March 23, 2010.

"A Guide for Directors: Four Considerations in Assessing Management's Responses to New Accounting Standards," (co-authored) published in *Westlaw Corporate Officers & Directors Liability Journal*, Volume 25, Issue 16, February 1, 2010.

"2009 Financial Reporting Year in Review: Changes in Practices and Rules, and More on the Way," (co-authored) published in *Chicago Lawyer* 2009 Year in Review Supplement, December 2009.

"Two Threats to Sound Accounting by Banks and Thrifts," *The CPA Journal*, published by the New York State Society of CPAs, September, 2009.

"Federal Takeover of Financial Reporting Standards," (co-authored) published in *Law360*, July 9, 2009.

"The Problems with the Mortgage Bailout Plan," (co-authored) published in *Law360*, April 17, 2009.

"IFRS Converges to U.S. GAAP on Segment Reporting," (co-authored) published in Journal of Accountancy, April. 2009.

"The Coming Transition from U.S. GAAP to IFRS: Implications for Attorneys," (co-authored) published in *NY Business Law Journal*, published by the New York State Bar Association, Spring, 2009.

"Debt is in the Details—What CFOs and Attorneys Need to Know about Securitization Accounting and Recent Amendments to FAS 140 Disclosure Requirements," (co-authored) published in *Securities Litigation Report*, Thomson Reuters, March 2009.

"The Economic Effects of IFRS Adoption," *The CPA Journal*, published by The New York State Society of Certified Public Accountants, March, 2009.

"Efforts to Bail Out the U.S. Economy Could Impede Legitimate Uses of Securitization," (co-authored) published in *MEALEY's Emerging Securities Litigation*, Vol 7, #8, February 2009.

"The Madoff Matter," (co-authored) published in *National Law Journal*, January 26, 2009.

"Joining the world: US companies adopting IFRS," (co-authored) published in *Butterworths Journal of International Banking and Financial Law*, December 2008.

"O Canada! Changing accounting standards to impact Ohio businesses," *Business First of Columbus*, June 6, 2008.

"Interest Capitalization: One Small Step Toward Convergence," (co-authored) published in *Journal of Accountancy*, May 2008, International Issue.

"Broader acceptance of IFRS in US capital markets: implications for attorneys," (co-authored) published in *Securities Law Newsletter*, a publication of the International Bar Association, April 2008, pp 21-23, Vol. 14, No. 1.

"Global Financial Reporting - The Growing Prominence of IFRS: Implications for Transactional Attorneys," [PDF] (co-authored) published in the International Bar Association *Business Law International*, Vol. 9, No. 1, January 2008.

"Accounting Pitfalls for Buyers and Sellers," [PDF] published in the *CBA Record* by the Chicago Bar Association, November 2007.

"International Standards for Small and Medium-Sized Entities: Analyzing the IASB Exposure Draft," (co-authored) published in *The CPA Journal*, a publication of the New York State Society of CPAs, October 2007.

"The IFRS are Coming! International Accounting Convergence: Implications for Securities Lawyers and Other Professionals," [PDF] published in *Bloomberg Securities Law Reports*, July 23, 2007.

"Minimizing Information Asymmetry Risk in Acquisitions with Contingent Pay-Outs: An Accountant's Perspective," [PDF] published in the Illinois State Bar Association's Corporation, *Securities & Business Law Forum* newsletter, April 2007.

"Wrong-Headed Reactions to Information Overload Threaten Sound Decision-Making," published in *The CPA Journal*, a publication of the New York State Society of CPAs, March 2007.

"Early Warning: Recent and Forthcoming Financial Reporting Developments That May Spur Business Litigation," [PDF] published by Thomson/West in the October 2006 issue of *Securities Litigation Report*.

"Accounting Policy Options in IFRS," (co-authored) *CPA Journal*, a publication of the New York State Society of CPAs, August 2011.

"Chinese RTO Issuers' Audits and U.S. CPA Firms' Auditor Liability Exposure," JD Supra, August 2011.

"Accountants Urged to Consider Information Overload: Is It Time For A "Laffer Curve" Extension to Explain Financial Reporting Effects?" (co-authored) (under editorial review).

### BARRY JAY EPSTEIN, Ph.D., CPA, CFF
Litigation Consulting Matters

**Divorce of Mesirow** -- re: the divorce of Richard Mesirow, an executive of Mesirow and Company; this involved business valuation issues peculiar to the brokerage and financial services industry; I prepared the valuation, gave a deposition and testified at trial.  Muller Davis, of Davis, Friedman Zavett Kane & MacRae was the attorney.

**Clyde Savings and Loan** -- re: a failed Chicago-area savings and loan association which had engaged in derivatives trading as part of its hedging program; the primary concern was with directors' liability (at last report, the government is still pursuing this case against U.S. representative Henry Hyde and the other directors), use of complex derivatives and hedging activities; I consulted with fee counsel, Karen Levine, of Novack and Macey and advised that there was not a strong case for directors' malfeasance.

**Franklin Savings and Loan of Ottawa Kansas** -- re: an institution which was taken o
ver by the regulators for allegedly unsafe and unsound practices, later returned to the owner by the courts, then seized again; this case involved the most complex use of derivatives by any savings and loan in the country, as well as audit issues concerning the understanding and testing of these transactions, and financial reporting issues related thereto; I consulted with fee counsel (Russell Jones of Gage & Tucker, Kansas City), assisted with depositions of defendant's witnesses (working with other Gage & Tucker attorneys as well), and prepared a detailed analysis of the audit work which had been performed by two different firms over several years; the case was ultimately disposed of as part of a global settlement.

**Crest Savings and Loan** -- re: a failed Chicago area savings association and the work done by a local CPA firm; the case involved audit issues, particularly with regard to the use of complex derivatives; I performed analyses, consulted with RTC attorneys in Chicago; the case was ultimately dropped based on my recommendations.

**Prospect Savings and Loan** -- re: a failed New Jersey savings association which was heavily involved in real estate transactions, auditing matters; performed analyses, consulted with attorneys and worked for the RTC with a large group of Checkers' litigation consultants in developing the accounting malfeasance of a small New Jersey firm.

**Cabrillo Savings and Loan** -- re: use of derivatives and hedging activities by a failed savings association in San Francisco area, and related audit issues; I consulted on financial reporting matters; performed analyses, consulted with fee counsel, and participated in depositions of defendant's witnesses, working with Thomas Makris of the firm Rosenblum, Parish & Issacs of San Francisco; the case was ultimately resolved as part of global agreement.

**Budget Rent-A-Car** -- re: antitrust action against the larger car rental companies which had allegedly conspired to keep Budget out of airport terminal locations; I consulted regarding

economic damages, developing a model of lost business and profits, computed damages, and consulted with attorneys and with other experts on the case.

**Nation of Islam** -- re: accounting matters affecting disposition of the estate of founder Elijah Muhammad; I advised on contractual matters and accounting practices, and testified at trial for attorney Ross Bricker, of Jenner & Block in Chicago.

**Tandy (Radio Shack)** -- re: contractual issues involving the application of generally accepted accounting principles, specifically with regard to inter divisional transfer pricing; I performed analyses, advised counsel of trial strategy, and testified at an arbitration in Pittsburgh; the attorney was Jonathon Solish of Jenkens & Gilchrist, Los Angeles.

**Guaranty Federal** -- re: contractual issues arising from the application of generally accepted accounting principles, specifically with regard to the then-evolving GAAP for investments in securities held by a savings institution; I performed analyses, provided deposition testimony, and testified at the arbitration trial (attorney Jeffrey Tillotson, formerly with Baker & Botts, now with Lynn Tillotson & Pinkler, LLP, in Dallas).

**Mocatta** -- re: sampling matters, interpretation of economic data; I provided analyses and consulted with attorney Kenneth Wexler, then of Miller, Faucher, Chertow, Cafferty & Wexler in Chicago.

**Security Savings** -- re: responsibility of officers and directors of failed savings association for unsafe and unsound practices in making certain loans and in violating terms of agreement with the FDIC; I prepared a Rule 26 report and testified as expert in a deposition on this matter brought by the FDIC; the matter was later resolved.  The lead outside attorney was Steven Miller of Sachnoff & Weaver (now Reed Smith) in Chicago.

**In re: Potts** (SEC administrative law case) -- re: the responsibility of technical review partner for accounting and financial reporting problems; consulted with SEC attorneys Sarah Smith and Carl Tibbitts, and testified at administrative law trial; the decision supporting the SEC established that the second partner reviewer can be held liable and sanctioned for audit failure.

**TRW Corp.** -- re: calculation of damages, and accounting matters, arising from a defalcation by a mortgage insurance agency and the responsibility there for attributable to the principal; I reviewed testimony and other documents, and consulted with attorneys; the case ultimately was tried and the client prevailed.

**Legris** -- re: contractual matters, and the application of generally accepted accounting principles, arising from sale of a division of a large U.S. industrial concern to a foreign company and the subsequent losses which were incurred; consulted with attorneys Ray Rezner and Elyse Tish of Barack Ferrazzano Kirschbaum & Perlman on this matter.

**Home-Stake Production** -- re: auditor responsibility for detection of fraud in a famous tax shelter oil drilling scheme from the late 1960s and early 1970s (the civil case is still in court after twenty years); I consulted with attorneys, developed the expert report, and was deposed as the expert in defense of the estate of the former outside accountant and his insurer; Julian C.

Campbell, of Hinshaw & Culbertson in Chicago, was the lead attorney for this matter. The case settled at the outset of the trial.

**Dr. Margolis** -- re: economic damages arising from a contractual dispute between a doctor and a hospital in Florida; I computed damages, prepared an expert's report, consulted with attorneys on this matter, and provided deposition testimony.

**Congress Hotel** -- re: accountants' liability for economic damages arising from a fraud perpetrated by employees of the hotel; I reviewed files and consulted with attorneys, who decided, consistent with my recommendation, that the case was not strong enough to proceed.

**SEC v. Sands (First Pacific)** -- re: fraudulent financial reporting and the application of generally accepted accounting principles; I performed analyses, consulted with SEC attorneys, and provided deposition testimony for attorney Thomas Sjoblom of the SEC. The SEC prevailed at trial and throughout the appellate process.

**Midisoft** -- re: auditor liability for misstatements of information contained in a public offering document; I consulted with the insurers and performed certain damages analyses; the matter was later settled.

**City of Milwaukee disparity study** -- re: the necessity, following the *City of Richmond v. Croson* decision, to document the need for remediation of past discrimination in order to support affirmative action programs by local governmental agencies; I was responsible for the statistical design of the study which was conducted, and participated in presenting the results to the Milwaukee City Council; the attorney in charge was Jewel Klein of former Chicago firm Holstein, Mack and Klein.

**Aaron Israel** -- re: a claim against a mid-sized local CPA firm for failing to detect a very substantial defalcation and for mischaracterizing the nature of the services being provided to its client over a period of many years; the attorneys were Ellen Chapelle and Richard Reizen of Kubasiak, Cremieux, Fylstra Reizen & Rotunno in Chicago; the case was litigated to favorable determination. A subsequent case involving the same plaintiff in a contractual dispute with a former partner was also favorably resolved after an in-depth financial analysis and reconstruction of records demonstrated malfeasance by the partner. The attorney for the later matter was Michael Rothstein of Quinlan & Crisham.

**Hyatt Corp.** -- a suit against Hyatt was brought by a successor owner of the subject property for contractual breach; the issues related to the financial reporting by Hyatt, the auditing conducted by its outside accountants, and internal cost apportionments by the defendant, as well as economic modeling of the damages suffered by plaintiff. The case was settled on the eve of trial, after my deposition was given. The lead attorney was Clyde Montgomery of Phillips, Lytle, Hitchcock, Blaine & Huber, LLP (currently with Salans, of New York). Prepared expert report, was deposed, and testified in court on a related matter. The suit settled on eve of trial.

**Slattery v. United States** -- this was in defense of the Government in one of the so-called *Winstar* cases; the specific matter is a claim brought by a failed savings bank which is arguing that it was closed as a consequence of a breach concerning supervisory goodwill. We

demonstrated through extensive financial analysis that the institution was operating in an "unsafe and unsound" manner as defined by the banking laws and regulations, and that closure of this particular institution was fully warranted. I prepared an expert report, was deposed, and testified at both liability and (bifurcated) damages trials. I also assisted the client with several depositions of plaintiff's experts and in preparing cross examination materials for trial, as well as extensive trial exhibits. The lead trial attorney was F. Jefferson Hughes of the U.S. Department of Justice.

**Houston Light & Power** -- This was a class action by a number of municipalities which claim that franchise fees payable by Houston Light & Power were miscalculated over many years, due to an inappropriate application of accounting principles. I consulted with the attorney on this matter. The attorney was Benjamin Hall of O'Quinn & Laminack.

**College District No. 508** -- This matter involved defense of an independent auditing firm for an alleged failure to notify trustees of the community college district that the treasurer had invested in a number of speculative, derivative financial instruments which, allegedly, caused the plaintiff to eventually suffer large financial losses. Our role related to the defendants' adherence to generally accepted auditing standards. The attorneys on this matter were Linton Childs and Jeffrey Tone of Sidley Austin Brown & Wood, Chicago.

**Lloyd's of London** -- This was an insurance claim defense matter involving an alleged theft by an employee of a large insurance brokerage firm, through the trading of a large number of positions in complex financial derivatives. This primarily involved development of a damages model and the addressing of certain other issues. Norbert Wegerzyn of Peterson & Ross (now Boundas Skarzynski Walsh & Black LLC) was the primary contact for this work.

**Cohabaco Cigar** -- A breach of contract case by a cigar distributor versus a manufacturer. A damages model was developed for the plaintiff's expert's report, and deposition testimony was given. The case was subsequently settled. The attorneys for this matter were John Sopuch III and Jeffrey Nouhan, of Sopuch Nouhan Higgins & Arnette. (Mr. Sopuch is currently with Collins Law Firm, of Naperville IL.)

**Lazarz v. Gainey Transportation** -- This involved the development of a damage model pertaining to a personal injury. An expert report was provided, and deposition testimony was given. The case was then settled. The attorney was Perrin Rhynders of Varnum, Riddering, Schmidt & Howlett, LLP in Grand Rapids, Michigan.

**Michigan Education Association** -- This case involved defense of the work done by the MEA and by its independent auditors, regarding record keeping in support of the assessment of agency fees to nonmember participants in collective bargaining units, consistent with legal requirements. An expert report was prepared and extensive deposition testimony was provided. A settlement agreement was then concluded. The attorney was James J. Chiodini, of the firm White, Przybylowicz, Schneider & Baird.

**United Golf v. Kemper Management** -- This was a contractual dispute concerning record keeping by a golf course management firm. Records had been reviewed and preliminary

opinions were rendered in this matter, and the case was later settled.  The attorney was Helen K. Pope, Esq. of the firm Hill, Gilstrap & Balson.

**Babson Brothers Co. v. Westfalia Landtechnik GmbH, et al.** -- This was a contractual dispute arising over the sale of a business and concerning the requirement under generally accepted accounting principles that certain contingencies be accrued.  The matter was successfully arbitrated.  The attorneys were Benjamin C. Weinberg and David J. Bradford, of Jenner & Block.

**BakerMarke** -- re: a contractual dispute and consequent economic damages; I consulted with attorneys Dennis Waldon and Steven Lavin of Lavin & Waldon, P.C.

**Skokie Central Traditional Synagogue** -- This was a forensic accounting matter, arising from the theft by a synagogue officer, which resulted in state and Federal criminal investigations and civil legal actions being taken.  Defendant was sentenced to five years imprisonment.  The attorney was Howard Herman of Chicago.

**Huizinga Manufacturing/Ameritech Leasing v. Industrial Belting** -- Conducted forensic review of financial data to ascertain causes for overstatement of assets and earnings in connection with suits for recovery by creditors of defunct enterprise.  Statement submitted to court.  The attorneys were Steven Lustig and Michael O'Rourke of O'Rourke, McCloskey & Moody.

**In re: 1350 Lake Shore Drive** -- Provided court testimony regarding auditing and accounting standards; the attorney was Robert C. Newman, of Holland & Knight.

**In the matter of Scott E. Edwards, CPA** -- This was an accountant's malpractice matter brought by the US Securities and Exchange Commission.  An expert report in support of the SEC's position was submitted, and trial testimony was provided before an administrative law judge in October 2000.  The SEC prevailed.

**PSI Industries, Inc. v. Feldman Sherb & Co., CPAs** -- This involved assisting plaintiff (debtor in possession) in a suit against the former outside auditors, in a matter which involved forensic accounting as well as GAAP and GAAS expertise.  I provided the materials for the depositions of the defendants, prepared an expert report and provided deposition testimony. The case settled before trial commenced.  The lead attorney was Bruce Katzen of Kluger, Peretz, Kaplan & Berlin (Miami, Florida).  The liquidating trustee was Barry Shear of Morris Anderson.  LaSalle Bank was the lead lender and recovered all, or most, of its loan.

**ShareAmerica v. Ernst & Young** -- This matter involved a suit by a defunct entity against its former auditors, in a matter arising from a failed initial public offering.  An expert report was filed; the matter was later resolved.  Kenneth Wexler of Kenneth A. Wexler and Associates was the attorney for ShareAmerica.

**In the matter of: Fall Creek Partners** -- Performed forensic accounting and expert work in support of defendant in suit by former employee, involving alleged agreement to share in entity's earnings; matter was later resolved.  Michael Sher of Neal, Gerber & Eisenberg was the attorney for Fall Creek.

**Town of Cicero, Illinois v. Pandolfi, Topolski & Weiss, Ltd.** -- This was an accounting malpractice matter against the independent auditors for a municipality, involving the failure to detect improper payments made over a period of years to a third-party insurance program administrator.  Documents were reviewed and indexed, a detailed analysis of the auditors' work was conducted, and assistance was provided to attorneys in preparing deposition outlines.  The matter settled before trial.

**Village of Maywood v. Unison-Maximus** -- This involved the preparation of a damages claim against the former financial consultants to a municipality, for failure to perform and consequent damages suffered.  Assisted attorney Kenneth Wexler in early phase of this case.

**In re: Ty Inc.** -- This involved litigation consultation including an extensive review of accounting and reporting systems and testing of transactions, in defense against suits by former commission salespersons of the company. Systems analyses and limited testing were performed for the attorneys.

**Charter Federal (U.S. Department of Justice)** -- This was a *Winstar*-related matter, in regard to which we served as an accounting expert for the Government. Document review was performed, an expert report was prepared and deposition testimony was provided. The case was later disposed of by summary judgement for the Government.  The attorneys were Kenneth Dintzer and Arlene Groner (U.S. DOJ).

**Heartland (U.S. Department of Justice)** -- This was a *Winstar*-related matter, in regard to which I was engaged as an accounting expert by the Government. Extensive document review was performed; the matter was later dismissed by plaintiffs.  The attorney was F. Jefferson Hughes (U.S. DOJ).

**Independence (U.S. Department of Justice)** -- This was a *Winstar*-related matter, in regard to which I was engaged as an accounting expert by the Government. Extensive document review was performed and a preliminary report was provided; the matter was later dismissed by plaintiffs..  The principal attorney was Robert Leidenheimer (U.S. DOJ).

**U.S. v. Buettner, et al.** – This was a fraud case, brought by the Securities and Exchange Commission, against CPAs who served as partner and managers on engagement to audit a large health care organization that subsequently filed for bankruptcy protection.  Extensive document review was conducted, expert report prepared, deposition and Daubert hearing were held.  Immediately following successful Daubert testimony, defendants settled.  Attorneys for the SEC included Catherine Pappas (Philadelphia district office).

**Asche Transportation** – We provided assistance to bankruptcy trustee with regard to possible audit failure in matter of company which had extensive related party and other questionable dealings.  A report was prepared and litigation against accountants commenced, and I served as accounting expert on malpractice at arbitration.  Attorneys included Craig Willette (Yalden, Olsen & Willette of Rockford, Illinois) and Richard Reizen (Kubasiak, Fylstra, Reizen & Rotunno of Chicago).

**Katz v. Walpert Smulian –** This was an accountants' malpractice defense matter, involving audits of an entity which suffered from management fraud and later filed for bankruptcy protection. Prepared defense materials; the case settled prior to trial. The attorney was Aron Raskas (Kramon & Graham, of Baltimore).

**List v. List –** This case pertained to a family dispute regarding the fiscal mismanagement of a business operation over an extended period of time. We are accounting experts for the plaintiff, reviewed substantial amounts of documentary evidence, submitted an expert report and testified at deposition. The matter settled before trial. The attorney was Kenneth Wexler of Chicago.

**Florida Department of Transportation v. Broyles & Rooks, P.A. and Ronald David Rooks, Individually --** An accountants' malpractice matter involving the failure of a state road construction contractor in Florida. We served as experts for FDOT, which was pursuing action against former auditors. In connection therewith, we examined the auditors' working papers, participated in settlement discussions, prepared expert report and other materials. The case was settled. Attorney was Arthur L. Berger, of the Office of the General Counsel, Florida Department of Transportation.

**Okoboji Trading --** This is a matter pertaining to dispute between options trading firm and former employee/contractor regarding financial malfeasance. We prepared an expert report on damages, and an arbitration hearing was held. David Genelly of Vanasco Genelly & Miller was the attorney.

**In the Matter of John J. Canepa, CPA –** This is an administrative action by the SEC against an accountant under Rule 102(e). An expert report was submitted and the case was then settled. The senior counsel for the SEC on this matter was Linda Bridgman of the Boston office.

**In the Matter of Gary L. Seidelman, CPA, Robert R. Ross, CPA, and PricewaterhouseCoopers, LLP --** This was an action by the US Securities and Exchange Commission against the auditors of Anicom, a company which experienced management fraud and which filed for bankruptcy protection. We were experts for the plaintiff SEC, in which capacity we examined the working papers and prepared an expert report draft. The case was settled. Attorney was Kara Washington of the SEC.

**Slattery v. United States (Slattery II) –** the damages phase of the trial took place in July 2003; an expert report was submitted, and deposition and trial testimony were provided. The lead trial attorney was F. Jefferson Hughes of the DOJ.

**APCC Services, Inc., et al. v. American Telephone and Telegraph –** This was a matter involving several actions to recover commissions due to independent pay phone operators from AT&T and other carriers, under the Communications Act of 1996. I prepared a number of statistical analyses and testified in a mediation hearing for the plaintiffs. Various attorneys, including Dickstein Shapiro Morin & Oshinsky, LLP, of Washington DC.

**GMAC v. KGN Financial Group** – This was an accountants' liability defense matter, in which we were engaged by attorney Peter Sullivan of Hinshaw & Culbertson in Chicago. We reviewed the accountants' working papers and the related financial reporting and auditing issues and were to be named testifying experts for the defense. The matter was settled.

**State of Missouri v. Douglas Hamilton** – This was an a criminal defense matter involving a CPA accused of fraud in connection with a state securities law violation. We prepared extensive deposition materials for defense attorneys' examination of the plaintiff's expert witness and attended the deposition. Shortly thereafter, the plaintiff offered a settlement by dropping most of the charges. Attorney was John Hannah of Hoidal & Hannah, of Phoenix AZ.

**Walker Partnerships v. Clifton Gunderson** -- An accountants' malpractice matter involving fraud by the management of a large grain elevator operation near Joliet, involving complex grain hedging and other financial transactions. We served as experts for the plaintiffs, prepared an experts report, and were to be deposed. The case settled. Attorneys were John M. Spesia and Kent Ayers, of the firm Spesia , Ayres & Ardaugh (Joliet, IL).

**Trustee for Purely Cotton, Inc. v. Ernst & Young** -- An accountants' malpractice matter involving fraudulent financial reporting by a company in a start-up mode, which reported a large amount of cash resources which in fact did not exist. We served as experts for the Trustee. The attorneys were Rachel Feldstein and Scott Schreiber, formerly of Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C.

**US v. William Hagstrom, et al. (Uro-Cor)** -- We served as consulting and testifying expert in criminal matter tried in Oklahoma City, OK in mid-2006, assisting with defense of Messrs. Hagstom and McDonald, charged with conspiracy to commit securities fraud. We prepared extensive materials (outlines, reports), prepared defendants, assisted with cross examinations of Government experts, and testified at trial. All defendants were acquitted. Attorneys included Reid Robison and Richard Mullins (McAfee Taft - OKC), Scott Peeler and Steven Kimelman (Arent Fox - NYC), Kevin Krahl (Hornbeek Krahl Vitali & Braun - OKC), and Harold Murry (Baker & Botts - DC).

**Murphy v. BDO Seidman** -- An accountants' malpractice matter involving fraudulent financial reporting by a company filing with the SEC; the financial statements, which subsequently needed to be restated, reported over $100 million of non-existent assets (as of the reporting date) and contained significant valuation irregularities. We assisted the plaintiffs' attorneys, John Frye and Randall David Smith, both of whom have practices in California. Settlements were received by all of the plaintiffs, although a related attorney's malpractice is ongoing, for which we are continuing to assist as expert.

**Bi-Rite Acquisition Corp. v. Bi-Rite Corp.** -- We served as testifying expert in Cook County IL on this dispute arising from a business acquisition and involving various GAAP accounting issues as well as other matters. We prepared an expert report, assisted attorneys in depositions, and provided deposition and trial testimony. Attorneys included Andrew Zahaykevich, formerly of Chicago and Gerald Miller of the firm Vanasco, Genelly and Miller. Trial was held and decision rendered in mid-2005.

15

**In the Matter of Chancellor Corp. –** We assisted the US Securities and Exchange Commission regarding alleged financial reporting improprieties by a publicly held corporation. Expert report prepared and deposition testimony given. Trial held in early 2008, with the SEC being successful.

**In the Matter of Applix Corp. –** We assisted the US Securities and Exchange Commission regarding alleged financial reporting improprieties by a publicly held corporation. Expert report prepared and deposition testimony given. Trial held in early 2008, partial victory for SEC.

**In the Matter of Exotics.com. –** An ongoing matter, in which we are assisting the US Securities and Exchange Commission regarding alleged financial reporting improprieties by a publicly held corporation. Expert report has been submitted.

**U.S. v. Conrad Black, et al. –** We assisted the defense of Conrad Black, accused of a variety of charges arising from his former service as chief executive of Hollinger International, Inc., a publicly held corporation, and other companies. Defendant was acquitted of charges to which we gave attention. Attorneys in this matter include Edward M. Genson (Genson & Gillespie, Chicago), Patrick A. Tuite (Arnstein & Lehr, Chicago) and Gustave H. Newman (Newman & Greenberg, New York).

**Indeck v. Black Hills –** A matter involving alleged accounting and financial reporting fraud by entity presumptively perpetrated in order to avoid earn-out obligation arising from business acquisition. I prepared expert analysis and testified at mediation hearing. Attorneys include Michael Freeborn and Todd Ohlms (Freeborn & Peters, Chicago).

**Travelers Casualty and Surety Company of American v. Deloitte & Touche LLP –** A subrogation matter arising from an embezzlement at a publicly held company, for which we evaluated the evidence and presented our findings to the insurer. The attorney was Craig Penrose (Tressler Soderstrom, Maloney & Priess, in Chicago). The matter was later settled.

**Trustee v. Rome Associates LLP, et al. –** We assisted the attorneys for LaSalle Bank in a matter arising from the bankruptcy and fraud by a major borrower. Our work involved review of working papers for the audits of several related entities, and the creation of extensive outlines for depositions of audit firm personnel and others. The attorneys included Richard Schultz, Richard Bendix and Frank Schwerin (Schwartz, Cooper, Greenberger & Krauss, of Chicago). The case was settled for policy limits.

**American National Bank & Trust Company of Chicago, as Trustee v. Potash Corporation of Saskatchewan Sales Ltd., et al. –** An ongoing matter, this action arises from the bankruptcy of a commercial building resulting from a default by its major tenant. Our efforts have been primarily to develop a damages model based on industry and local economic data and other materials. Attorney is Philip Nathanson of Chicago.

**Commodities Futures Trading Commission v. McGladrey & Pullen** – A matter arising from the insolvency of a futures commission merchant (Sentinel) and the fraudulent financial reporting by the entity over a period of years. This was a regulatory action against the independent accountant and the accounting firm; settlements were obtained from both parties. Attorney was David Terrell of the CFTC (Chicago office).

**American Hardware Manufacturers Association v. Reed Elsevier.** – A matter that arose from a contractual dispute between the owner of a trade show and a major sponsor. Lead attorney is Michael Rothstein (Tabet DiVito Rothstein, Chicago). We assisted defendant, preparing several expert reports, being deposed twice, and testifying at trial in Federal court in Chicago. The case settled during jury deliberations.

**In the Matter of AA Capital Partners** – An ongoing matter, we are assisting attorneys for receiver of a registered investment advisor which was closed by SEC action, regarding allegations of accounting fraud. We were retained by Wendi Sloane (Barack Ferrazzano Kirschbaum & Nagelberg).

**Schein, et al. v. Ernst & Young** – A matter on which we assisted attorneys for plaintiff in accountants' malpractice matter arising from seizure of Superior Bank following significant disputes over appropriate accounting for financial instruments. Jack Scarola (Searcy Denny Scarola Barnhart & Shipley; West Palm Beach FL) is lead attorney. Testified at jury trial in Ft. Lauderdale, with verdict and damages in favor of plaintiff.

**Associated Third Party Administrators v. Western Conference of Teamsters Legal Services Fund** – A matter that involved possible auditor negligence for examinations of financial statements of service provider. We have analyzed certain financial accounting data; the matter was later settled. Virginia Perkins (Trucker Huss, San Francisco) was the attorney.

**L. Thomas Baldwin v. PricewaterhouseCoopers** – A matter arising from a business failure and the auditors' possible responsibilities for the economic harm suffered by a major investor. Stephen Phillips (Chicago) was the attorney for plaintiff.

**Enrico Bondi, Trustee for Parmalat SpA, v. Grant Thornton** – An ongoing matter, involving accountants' liability claim arising from massive financial reporting fraud at Parmalat. We are assisting plaintiff (Terry Wit, of Quinn Emanuel, lead attorney) with this case; a report and a rebuttal report have been submitted and deposition taken; trial is scheduled for mid-2009.

**Hanesbrands Inc. v. Sara Lee Corporation** – An ongoing matter, arising from the spin-off of Hanesbrands Inc. by Sara Lee, involving accounting for certain deferred tax items amounting to some $90 million, which is the settlement being sought by claimant. We represent the claimant, Hanesbrands, and prepared expert reports and testified at arbitration, on which decision remains pending. If claimant is successful in the liability case, we will be experts on the damages arbitration, which was bifurcated. Sarah Wilson and Tony Herman (Covington & Burling) are lead attorneys for Hanesbrands.

**Mirabilis Ventures, Inc. v. Rachlin Cohen Holtz LLP and Laurie Holtz –** An ongoing matter, arising from the fraud and bankruptcy of Mirabilis Ventures, a Florida-based conglomerate with major operations in employee outsourcing. An expert report was prepared and deposition taken; trial scheduled for July, 2011. We represent the bankruptcy trustee for Mirabilis Ventures.

**Owens Corning/Fibreboard Asbestos Personal Injury Trust v. The Continental Insurance Company –** A currently ongoing matter, in which we represent respondent Continental Insurance. Attorney is Alan P. Jacobus, Esq. (Carroll, Burdick & McDonough, LLP).

**In the Matter of MasterCard International Incorporated's Proceedings Relating to The Years 1998 – 2003 With the Illinois Department of Revenue –** We are assisting the IDOR in a dispute over accounting for apportionable income by MasterCard International.

**Texas State Board of Public Accountancy v. John A. Blakeway & John Andrew Blakeway, CPA –** We are currently representing respondents in this professional licensure disciplinary matter arising from audits of HUD-assisted housing programs.

**AG Investments LP v. Builder Funding, LLC, et al. –** We are representing plaintiff in actions against accounting firms McGladrey & Pullen and Crowe Chisek for negligence regarding financial reporting of related party transactions by a fund organized to provide mezzanine financing to South Florida condominium projects. Jonathan M. Streisfeld, Esq. (Kopelowitz Ostrow Ferguson Weiselberg Keechl) is lead attorney.

**Dyadic International, Inc., v. Ernst & Young, LLP and Ernst & Young Hong Kong, L.P. –** We currently represent plaintiff in a matter arising from the audits of plaintiff and a Hong Kong-based subsidiary of plaintiff. Reports were prepared and testimony was given at arbitration; outcome unknown at this date.

**In the matter of Brian Donovan DDS –** We represented Allstate Insurance in defense of claim arising from automobile accident. Report was prepared and deposition testimony was provided; case was then settled. John E. Norton (John E. Norton & Associates) was the attorney.

**Securities and Exchange Commission v. Microtune, Inc., et al. –** We represented defendant Douglas Bartek in this complaint arising from alleged back-dating of stock options granted by Microtune, Inc. over a period of several years. A report was prepared and deposition given; case was dismissed with prejudice thereafter.

**U.S. v. Henry T. Nicholas and William J. Ruehle –** We represented defendant William J. Ruehle, former CFO of Broadcom, Inc., in a matter arising from alleged back-dating of employee stock option grants made over a period of years. We prepared expert report in this matter, which was subsequently dismissed.

**United HealthCare Class Action Litigation –** We represented United HealthCare defending against class action suit arising from alleged back-dating of employee stock option grants made over a period of years. An expert report was prepared and deposition testimony was taken; the case then settled before trial.

**In the matter of United Central Bank v. Kanan Fashions, Inc. –** We currently represent the plaintiff bank in this complaint arising from default of loans by Kanan Fashions, Inc.  Our assignment involves forensic investigation and serving as expert witness to provide testimony at trial.  Detailed analyses have been produced and some testimony has been provided to date.  Lead attorney is Vilia Dedinas (Boodell & Domanskis, Chicago).

**In the matter of The Bristol Condominium Association –** We assisted the board of the condominium association in a forensic review and analysis of back-billing of condominium assessments to a commercial tenant.

**In the matter of Stop-N-Go Stores, et al. v. Virchow Krause, et al. –** We represented the plaintiff in this complaint in an accountants' malpractice matter arising from the failed audits of plaintiff.  Analyses were completed, and the matter was settled out of court prior to deposition.  Lead attorney was Michael Hanrahan (Fox, O'Neill & Shannon, Milwaukee, WI).

**In the matter of DVI, Inc. Securities Litigation –** We assisted the plaintiff in an accountants' malpractice matter arising from the failed audits of a publicly-held finance company.  A report was prepared and extensive testimony was given at deposition; trial may occur in 2012. Lead attorney is Clinton Krislov (Krislov & Associates, Chicago).

**Brian Chubboy v. Best Buy Co. Inc., et al. –** We currently represent the plaintiff in this complaint against Best Buy, for being improperly discharged after "blowing the whistle" numerous times over a three-year period.  Lead attorney is Steven Sondrall (Jensen, Sondrall & Persellin, Brooklyn Park, MN).

**U.S. v. Armando Gutierrez, et al. –** We currently represent the defendant, Armando Gutierrez in this criminal complaint alleging conspiracy and misuse of federal Help America Vote Act (HAVA) funds for election administration in the State of New Mexico .  Our assignment involves forensic analysis and serving as expert witness to provide testimony at trial.  Lead attorney is Ahmad Assed (Assed & Associates, Albuquerque, NM).

**In the Matter of Cardiac Catheterization and Stent Placement –** We currently represent the plaintiffs in their complaints arising from the negligent care and treatment relating to cardiac catheterization and stent placement by the defendants.  Our assignment involves forensic analysis and serving as expert witness to provide testimony at trial.  Lead attorney is based in Baltimore, MD.

**In the Matter of Retaliation in Violation of the Sarbanes-Oxley Act, and Illinois Whistleblowers Act and Discrimination in Violation of the Americans with Disabilities Act –** We currently represent the plaintiffs in their complaints arising from wrongful termination in violation of certain laws.  The plaintiffs alleged that their former employer, a public-traded entity engaged in fraudulent billing and reporting, thereby misrepresented the company's financial condition.  Lead attorney is based in Chicago, IL.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X    No. 11 Civ. 2279 (CM)
In re ADVANCED BATTERY TECHNOLOGIES, INC.
SECURITIES LITIGATION                                CLASS ACTION

THIS DOCUMENT RELATES TO:                            ALL ACTIONS
_____X


**DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE A
SECOND AMENDED COMPLAINT**

McMahon, J.:

Before the Court is the consolidated Plaintiffs' motion for leave to file a Second

Amended Complaint ("SAC") in this securities fraud action against Advanced Battery

Technologies, Inc. ("ABAT"), two of its officers (together with ABAT, the "ABAT

Defendants"), and the auditors Bagell, Josephs, Levine & Co., Friedman LLP, and EFP

Rotenberg ("EFP"). Due to their merger, I refer to Bagell, Josephs, Levine & Co. and Friedman

LLP together as "Bagell Josephs." I refer to Bagell Josephs and EFP together as the "Auditor

Defendants."

In a decision and order dated August 29, 2012, I denied the ABAT Defendants' motion to

dismiss Plaintiffs' First Amended Complaint ("FAC") and granted the Auditor Defendants'

motion to dismiss, but without prejudice. *See In re Advanced Battery Technologies, Inc. Sec.*

*Litig.*, No. 11 Civ. 2279, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ("*ABAT I*"). I gave

Plaintiffs 20 days to file a motion for leave to amend and a proposed amended complaint, which

they did.

The Auditor Defendants now move, in effect, to dismiss the Second Amended Complaint

on the grounds that it would not survive a Rule 12(b)(6) motion. For the reasons set forth herein,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/18/13

1

I agree with the Auditor Defendants and deny Plaintiffs' motion for leave to file a Second Amended Complaint.

## BACKGROUND

The reader is referred to *ABAT I* for a more thorough description of the background of this case. This decision focuses on the changes that Plaintiffs have made to their allegations with respect to the following "red flags" that the Auditor Defendants allegedly missed or ignored: (1) the discrepancy between ABAT's filings with the Chinese Administration of Industry and Commerce ("AIC") and the Securities and Exchange Commission ("SEC"); (2) ABAT's re-characterization of its ownership interest in a company called Heilonjiang ZhongQuiang Power-Tech Co., Ltd. ("HLJ ZQPT"); and (3) ABAT's failure to disclose that its purchase of a company called Shenzhen ZhongQiang New Energy Science & Technology Co., Ltd. ("Shenzhen") was a "related-party" transaction.

The Auditor Defendants argue that Plaintiffs have not adequately pleaded scienter or loss causation, both of which are required for securities fraud liability. As in *ABAT I*, 2012 WL 3758085, at *15, I agree with the Auditor Defendants that Plaintiffs have not sufficiently pleaded scienter, and therefore I need not reach the issue of loss causation.

## I.    The AIC-SEC Discrepancy

One of Plaintiffs' chief allegations in this case is that ABAT grossly overstated its revenue and operating margins in a series of publicly filed documents. In particular, Plaintiffs allege that the revenue and net income that ABAT reported to the AIC differs greatly from that reported in its SEC filings, and that this discrepancy is not attributable to differences between AIC and SEC accounting practices. Plaintiffs allege that this was a red flag signaling ABAT's fraud that Bagell Josephs should have caught.

2

In *ABAT I*, I found that the alleged AIC-SEC discrepancy did not "support a strong inference of scienter because it omits a critical premise: that Bagell Josephs was actually aware of the AIC filings and the discrepancies they reflected, and chose to disregard them. Nowhere in the [First Amended] Complaint is it alleged that Bagell Josephs actually reviewed the AIC filings at all." *ABAT I*, 2012 WL 3758085, at *17. Furthermore, allegations of mere "access to documents that reveal fraudulent financial reporting . . . [are] not sufficient to plead the recklessness necessary to give rise to a strong inference of auditor scienter." *Id.*

I also found that the First Amended Complaint did not give rise to an inference that Bagell Josephs "must have" reviewed the documents that would have revealed the AIC-SEC discrepancy. Specifically, I noted that "Plaintiffs do not allege, for example, that Bagell Joseph was involved in preparing ABAT's AIC filings, or that it advised ABAT with respect to its overseas subsidiary's accounting. Plaintiffs even fail to allege that no reasonable auditor would fail to obtain these filings and reconcile them with SEC filings." *Id.* (internal citation omitted).

I concluded that Plaintiffs had alleged no more than negligence (i.e., a "shoddy audit") with respect to the AIC-SEC discrepancy, which was insufficient to support a strong inference of scienter under a "red flag" theory. *Id.* at *17-18.

In their Second Amended Complaint, Plaintiffs attempt to bolster their allegations with respect to the AIC-SEC discrepancy in two principal ways.

First, Plaintiffs have incorporated the expert opinion of Dr. Barry Jay Epstein (*see* SAC ¶ 148) into the Second Amended Complaint:

> According to Dr. Epstein, no reasonable auditor would have failed to obtain ABAT's AIC filings and reconcile them with ABAT's wildly divergent SEC filings. Bagell Josephs' failure to do so was an extreme departure from the reasonable standards of care it was obligated to meet as ABAT's auditor and constituted a willful disregard of the professional standards and a breach of the

3

duty to conduct the examination with due professional care and attitude of professional skepticism. . . .

Had Bagell Josephs undertaken the basic task of reviewing AIC filings it would have discovered that [ABAT] was reporting – *for the same entity and operations* – significantly lower revenues and assets, and large losses, for those same periods to the AIC. The discovery of the disparate financial reports would have obligated Bagell Josephs to expand its audit work. Had it done so, it would have uncovered a gross and longstanding fraud by the ABAT Defendants.

(*Id.* ¶¶ 149, 152; *see also id.* ¶¶ 164-65, 175) (emphasis in original.)

Second, Plaintiffs allege that "Bagell Josephs employees were personally present at ABAT's Chinese offices during the audit work for ABAT, and presumably relied on the same underlying financial records and data, such as documents necessary to substantiate ABAT's claimed revenues, that had formed the basis for ABAT's AIC filings. However, the same underlying financial records and data inexplicably yielded dramatically different results for ABAT's U.S. SEC filings." (*Id.* ¶ 166; *see also id.* ¶¶ 150-51.)

On the basis of the foregoing, Plaintiffs argue that "If Bagell had done its job in China at all, it 'must have' reviewed the AIC filings." (Pls.' Reply. (Docket No. 102) at 5.)

## II.    The Re-Characterization of ABAT's Interest in HLJ ZQPT

The gist of this allegation is that, from 2004 to early 2010, ABAT misrepresented that HLJ ZQPT was a wholly-owned subsidiary of one of ABAT's wholly-owned subsidiaries, when in fact HLJ ZQPT was actually owned by ABAT Defendant Zhiguo Fu ("Fu") and several other investors and always had been. ABAT corrected the alleged misrepresentation in its 2009 10-K, which was published in March 2010.

In *ABAT I*, I noted that this allegation was "probably [Plaintiffs'] likeliest candidate for a bona fide red flag." *Id.* at *21. "The question on [the motion to dismiss the First Amended Complaint therefore was] whether learning that Fu and his co-investors were the record owners

4

of HLJ ZQPT should have led Bagell Josephs to suspect that ABAT was" engaging in the other

fraudulent activity alleged by Plaintiffs. inflating its earnings, or that Fu was also the secret

owner of Shenzhen, or that Fu had 'secret side deals' with the owners of Wuxi." *Id.* at *22. In

short, I held that the answer to that question was no:

> One missed red flag can perhaps be enough to conclude that an accountant's audit
> was a 'farce.' But in this case, this particular red flag is not sufficiently egregious
> to raise that inference. . . . Bagell Josephs could have reasonably taken the HLJ
> ZQPT re-characterization as evidence that ABAT was committed to accurately
> describing its interests in subsidiaries and revealing any related party transactions,
> and so was unlikely to be planning or concealing others. Certainly, that inference
> is at least as compelling as the inference that ABAT came clean about HLJ ZQPT
> as a ruse to hide other related party deals or adverse earnings information from the
> public.

*Id.*

Here, too, I concluded that Plaintiffs' allegations amounted to no more than negligence

and thus were insufficient to support a strong inference of auditor scienter. *Id.*

Plaintiffs have added no new allegations to their Second Amended Complaint with

respect to the HLJ ZQPT re-characterization. Rather, they claim that their existing allegations

"have been strengthened through Dr. Epstein's findings . . . that [Bagell Joseph's alleged failure

to review documentation that would have revealed the truth about HLJ ZQPT] represents such a

drastic departure from auditors' ordinary standard of care as to be actionable." (Pls.' Reply at 8;

*see also* SAC ¶ 148 ("Dr. Epstein's analyses are incorporated with respect to all allegations

regarding the Auditor Defendants set forth below.").)

### III.    The Shenzhen Transaction

Plaintiffs' sole surviving allegation against EFP is that it failed to disclose that ABAT's

acquisition of Shenzhen was an instance of self-dealing. ABAT Defendant Fu, the company's

5

Chairman and CEO, owned Shenzhen and allegedly pocketed a $19 million profit from its sale to

ABAT.

In *ABAT I*, 2012 WL 3758085, at \*19-20, I found Plaintiffs' allegations with respect to

the Shenzhen transaction meritless as to Bagell Josephs in light of the fact that the critical parts

of the transaction all occurred after Bagell Josephs' relationship with ABAT had ended.  I also

noted that "the only allegation going to . . . Shenzhen [in the First Amended Complaint was] . . .

that top management concealed secret interests in ABAT's acquisitions that would enrich them

personally.  The inference that Bagell Josephs was kept as much in the dark as the investors is

more compelling than the inference that Bagell Josephs recklessly disregarded clear signs of

fraud." *Id*. at \*21.

As to EFP, I noted that its "duty to familiarize itself with the particulars of that

transaction . . . differ in important respects from Bagell Josephs' duty," because "EFP, unlike

Bagell Josephs, audited ABAT's 2010 financial statements that announced the Shenzhen

acquisition." *Id*. at \*22.

Ultimately, however, I did not reach the merits of any of Plaintiffs' allegations against

EFP.  Although "Plaintiffs' allegations of scienter against EFP [were] deficient for many of the

same reasons" as those against Bagell Josephs, I dismissed Plaintiffs' claims against EFP on

standing grounds, because no named plaintiff had purchased ABAT stock *after* EFP issued its

2010 audit on March 16, 2011, and thus no plaintiff could have been injured by EFP's alleged

misconduct. *Id*. \*22-23.  I granted Plaintiffs leave to replead in order to identify such a plaintiff,

which they have now done – Plaintiff Frederico Schmid.  (SAC ¶ 14.)

I concluded my analysis of Plaintiffs' claims against EFP with the following:

[I]n view of the Complaint's additional deficiencies with respect to the issue of
EFP's scienter – which, as noted, are largely the same as those identified with

respect to Bagell Josephs – I will not grant leave to replead against EFP unless Plaintiffs demonstrate that amendment would not be futile. . . . [I]f, as I suspect will prove to be the case, they are unable to bolster significantly their allegations, so that they allege more than a negligent audit, amendment will be deemed futile.

*ABAT I*, 2012 WL 3758085, at *23.

Plaintiffs' allegations regarding the Shenzhen transaction in the Second Amended Complaint are essentially identical to those in the First Amended Complaint. (*Compare* SAC ¶¶ 78-82, 155, 157, 168, 185-87 *to* FAC ¶¶ 77-84, 144, 149, 157, 159.) The core of Plaintiffs' claim against EFP remains the following:

> Had EPF Rotenberg conducted the most basic of audit duties with professional skepticism it was required to apply, for instance, reviewing the relevant documentation concerning the transaction and verified actual counterparties to the Shenzhen transaction, it would have easily uncovered that ABAT had in fact acquired Shenzhen from Defendant Fu, who had himself acquired the company in 2008 for millions less than what ABAT was paying to acquire it, and that the Shenzhen "acquisition" was in fact a related party transaction designed to siphon millions of dollars from ABAT to Defendant Fu.

(SAC ¶ 187.)

And, as above, "Dr. Epstein's analyses are incorporated with respect to all allegations regarding the Auditor Defendants." (*Id.* ¶ 148.)

## DISCUSSION

**I.    Standard of Review**

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, the "court should freely give leave [to amend a pleading] when justice so requires." Leave to replead should be denied, however, when amendment would be "futile." *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 127 (2d Cir. 2007). Amendment is considered futile when the proposed new pleading would not withstand a motion to dismiss for failure to state a claim pursuant to

Rule 12(b)(6). *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 846, 184 L. Ed. 2d 655 (U.S. 2013).

In light of the foregoing, the parties treat Plaintiff's motion for leave to file a second amended complaint as a motion to dismiss, and so too does the Court. The reader is once again referred to *ABAT I* for the familiar standard on a motion to dismiss. 2012 WL 3758085, at *6.

## II.    Auditor Scienter

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Among the elements of a securities fraud claim that the plaintiff must plead with particularity is the defendant's scienter – i.e., the "defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007).

Under the PSLRA, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In *Tellabs*, the Supreme Court articulated the relevant standard for determining whether a plaintiff has sufficiently pleaded scienter for the purposes of a securities fraud claim:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the most plausible of competing inferences. . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

551 U.S. at 323-24 (internal citation and quotation marks omitted).

8

As courts in this District have repeatedly recognized, "The standard for pleading auditor scienter is demanding." *In re Beacon Assoc. Litig.*, 745 F. Supp. 2d 386, 415 (S.D.N.Y. 2010) (quoting *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007)). Meeting this demanding standard requires the plaintiff to either (1) show that the defendant had motive and opportunity to commit fraud, or (2) provide evidence of the defendant's conscious recklessness. *See id.* at 404 (citing *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108–09 (2d Cir. 2009)). Plaintiff has added no allegations with respect to motive to his proposed Second Amended Complaint, so, as in *ABAT I*, the Court focuses solely on the Auditor Defendants' alleged recklessness.

Where a securities fraud claim against an auditor is premised on the auditor's recklessness, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Indeed, the plaintiff must allege reckless conduct so egregious as to approximate an actual intent to aid the fraud being committed by the audited company. *See Beacon*, 745 F. Supp. 2d at 415 (citing *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)); *see also Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 571-72 (S.D.N.Y. 2011). As the Second Circuit explained in *Rothman*, 220 F.3d at 98,

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

Or, as another common formulation has it:

> [P]laintiff must allege that the accounting practices were so deficient that the "audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."

9

*In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010) (quoting *Scottish Re*, 524 F. Supp. 2d at 385); *see also Beacon*, 745 F. Supp. 2d at 415-16; *In re IMAX Secs. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008)); *In re MRU Holdings Secs. Litig.*, 769 F. Supp. 2d 500, 518 (S.D.N.Y. 2011).

Negligence alone, or a "shoddy audit," does not suffice to plead auditor scienter. *MRU*, 769 F. Supp. 2d at 518 (citing *Tremont*, 703 F. Supp. 2d at 371).

Nor are "'failures to comply with [GAAP] or other such irregularities . . . []sufficient to establish recklessness.'" *Stephenson*, 768 F. Supp. 2d at 572 (quoting *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 Fed. Appx. 717, 720 (2d Cir. 2009)); *see also IMAX*, 587 F. Supp. 2d at 483. "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (internal citation and quotation marks omitted). For instance, alleged violations of professional standards may support a strong inference of scienter if coupled with so-called "reds flags" that the auditor ignored. *See Beacon*, 745 F. Supp. 2d at 416 (citing *In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004)). "'A complaint might reach the 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" *Stephenson*, 768 F. Supp. 2d at 573 (quoting *Tremont*, 703 F. Supp. 2d at 370).

But scienter is not sufficiently alleged simply because an auditor failed to detect a fraud. Rather, a red flag will support a strong inference of scienter only if the auditor was actually aware of its existence, or if the court can reasonably infer that the auditor "must have" been aware of it. *See, e.g., In re Philip Servs. Corp. Secs. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y.

2004); *see also Kalnit*, 264 F.3d at 142 (citing *In Re Carter–Wallace, Inc. Secs. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).  By contrast, "merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient." *IMAX*, 587 F. Supp. 2d at 484.  After all, "an unseen red flag cannot be heeded," *Stephenson*, 768 F. Supp. 2d at 573; and, as another court put it, "merely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library." *In re aaiPharma Inc. Secs. Litig.*, 521 F.Supp.2d 507, 513 (E.D.N.C. 2007) (quoted in *Tremont*, 703 F. Supp. 2d at 370-71).

### III.    Plaintiffs' Allegations Based on Dr. Epstein's Opinion Fail

As an initial matter, it was arguably inappropriate for Plaintiffs to incorporate expert testimony into their Second Amended Complaint as a means of bolstering their allegations against the Auditor Defendants.  Indeed, I would be within my rights to disregard these allegations completely.[1] *See Highland Capital Mgmt., L.P. v. Schneider*, No. 02 Civ. 8098, 2004 WL 2029406, at *4 (S.D.N.Y. Sept. 9, 2004).

However, Plaintiffs' allegations based on Dr. Epstein's expert opinion fail for another reason:  all that Dr. Epstein attests to is that the Auditor Defendants violated professional standards, which, standing alone, is insufficient to support a strong inference of recklessness approximating an actual intent to aid ABAT's underlying fraud. *Stephenson*, 768 F. Supp. 2d at 572.  Furthermore, these allegations are pleaded in terms of negligence,[2] and thus necessarily do

---

[1] What I would not be within my rights to do is to discount Dr. Epstein's expert opinion at the pleadings stage based on Bagell Josephs' list of securities fraud cases purporting to demonstrate that a reasonable auditor need not necessarily reconcile a company's AIC and SEC filings.  (*See* Bagell Josephs' Opp'n (Docket No. 101), Ex. A.) That list – to the extent it proves anything at all, which is doubtful – is extraneous to the pleadings and therefore completely improper.

[2] For instance, Plaintiffs make the following allegations:

"According to Dr. Epstein, *no reasonable auditor would have* failed to obtain ABAT's AIC filings and reconcile them with ABAT's wildly divergent SEC filings." (SAC ¶ 149) (emphasis added.)  "According to Dr. Epstein,

11

not rise to the level of recklessness. *See Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp.

2d 1003, 1012 (S.D. Cal. 2000) ("Plaintiffs' purported 'red flags' consist of Pricewaterhouse's

possession of documentation which, if properly reviewed pursuant to GAAP and GAAS, would

have revealed improperly recognized revenue. At most, these allegations raise an inference of

gross negligence, but not fraud.") *aff'd sub nom. DSAM Global Value Fund v. Altris Software,*

*Inc.*, 288 F.3d 385 (9th Cir. 2002). Nothing in the case law suggests that a plaintiff can avoid

these rules of law simply by retaining an expert willing to label an auditor's alleged misconduct

under the applicable professional standards "extreme" or "willful." *Cf. Stephenson*, 768 F. Supp.

2d at 574 ("[F]lags are not red merely because the plaintiff calls them red.")

Nor are Plaintiffs' professional negligence allegations any stronger because they are

coupled with  allegations of red flags that the Auditor Defendants purportedly ignored. *See*

*Beacon*, 745 F. Supp. 2d at 416. As discussed below, Plaintiffs have not sufficiently alleged that

the Auditor Defendants were aware of the red flags at issue in this case. In other words,

Plaintiffs have not sufficiently pleaded a corresponding fraudulent intent on the part of the

Auditor Defendants. *Novak*, 216 F.3d at 309.

---

Bagell Josephs *should have* included ABAT's AIC filings in its compilation of audit evidence, and its failure to do so constituted an extreme departure from the standards of reasonable care for this auditor." (*Id.* ¶ 164; *see also id.* ¶¶ 168-69) (emphasis added.)

As this Court has held elsewhere, "Merely alleging that [a defendant] 'would' or 'could' or even 'should' have known of [a]fraud if only it had paid attention to the 'red flags' is insufficient to make out a 10(b) claim." *In re J.P. Jeanneret Associates, Inc.*, 769 F. Supp. 2d 340, 377 (S.D.N.Y. 2011) (citing *South Cherry*, 573 F.3d at 109). Indeed, "the Second Circuit has affirmed the dismissal of a complaint 'replete with allegations that [a firm] 'would' have learned the truth as to those aspects of the [fraudulent] funds if [it] had performed the 'due diligence' it promised' and that '[i]f [the firm] had asked various questions earlier, it would have further questioned the [fraudulent fund's] financial records or recognized the need to ask further questions.'" *Stephenson*, 768 F.Supp.2d at 573–74 (quoting *South Cherry*, 573 F.3d at 112).

## IV.  Plaintiffs' Allegations Against Bagell Josephs

### A.  Plaintiffs Have Not Sufficiently Alleged Bagell Josephs' Awareness of the AIC-SEC Discrepancy

Plaintiffs do not allege in the Second Amended Complaint that Bagell Josephs was "actually aware" of ABAT's AIC filings.  Plaintiffs rely instead on a theory that Bagell Josephs "must have" reviewed the AIC filings, *see Kalnit*, 264 F.3d at 142, because, (1) according to their expert, it would have been an extreme departure from professional standards not to do so, and (2) Bagell Josephs sent auditors to ABAT's Chinese offices in connection with ABAT's SEC filing, where they "presumably" (SAC ¶ 166) relied on the same financial information used in the AIC filings.  These allegations fail.

As to Plaintiffs' reliance on Dr. Epstein's expert opinion in support of their "must have" theory, the most that Dr. Epstein attests to is that Bagell Josephs *should have* reviewed ABAT's AIC filings.  "Should have" does not mean "must have" – the former is a normative proposition, the latter a positive one.  *Cf. Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 369 (S.D.N.Y. 2001).  Accordingly, Dr. Epstein's expert opinion is irrelevant in this context.

Plaintiffs' allegation that Bagell Josephs must have reviewed ABAT's AIC filings when it sent auditors to China also fails, because Plaintiffs have alleged no more than Bagell Josephs' *access* to the AIC filings, which is insufficient to support a strong inference of auditor scienter. *IMAX*, 587 F. Supp. 2d at 484.  Alleging access to certain documents is just another way of alleging that an auditor could or should have reviewed those documents.  Nor are Plaintiffs' entitled to the "presum[ption]" (SAC ¶ 166) that Bagell Josephs' auditors must have relied on the same financials used in the AIC filings in generating ABAT's SEC filing; that, too, is just another way of alleging that Bagell Josephs should have incorporated those documents into its analysis.

In *ABAT I*, 2012 WL 3758085, at \*17, I illustrated circumstances from which I could infer that Bagell Josephs must have reviewed the documents upon which ABAT's AIC filings were based.  For example, if Bagell Josephs had prepared ABAT's AIC filings or advised ABAT with respect to its overseas subsidiary's accounting, I could easily infer that Bagell Josephs must have reviewed the relevant documents.  Both of these examples are scenarios in which Bagell Josephs *necessarily* would have reviewed the documents that would have revealed the discrepancy between ABAT's AIC and SEC filings.  Plaintiffs' allegations, by contrast, boil down to the following:  "If Bagell had done its job in China at all, it 'must have' reviewed the AIC filings."  (Pls.' Reply at 5.)  Not so.  As already stated, "should have" does not mean "necessarily did."

In *Scott v. ZST Digital Networks, Inc.*, No. 11 Civ. 3531, 2012 WL 538279, at \*10-11 (C.D. Cal. Feb. 14, 2012), the plaintiff also improperly conflated the "must have" rule with the "should have" standard in connection with an AIC-SEC discrepancy that the auditor defendant allegedly missed.  There, the district court held that "Plaintiff's allegations that [the auditor defendant] was an experienced auditor of Chinese issuers' financials, and must have been aware of the existence of the [AIC] filings, 'a mere glance [at which] would have readily lead to the discovery of' the discrepancies, is insufficient to constitute the 'reckless indifference' required by the case law."  *Id*. at \*10 (citing *New Mexico Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)).  In other words, the plaintiff asked the court to make the impermissible inferential leap that, because the auditor defendant should have been aware of the AIC-SEC discrepancy based on its experience with Chinese companies, it therefore must have been aware of the discrepancy.  Here, Plaintiffs ask this Court to make a similar leap.  I cannot under the law.

14

In sum, because Plaintiffs have not sufficiently alleged that Bagell Josephs was or must

have been aware of the financial information underlying ABAT's AIC filings, Plaintiffs have

failed to allege a strong inference of scienter under their "red flag" theory of securities fraud

liability. Accordingly, I deem Plaintiffs' proposed amendments to their allegations with respect

to the AIC-SEC discrepancy futile and deny Plaintiffs' motion for leave to file a Second

Amended Complaint as to those allegations.

### B.   Plaintiffs' Allegations with respect to the HLJ ZQPT Re-Characterization Fail for the Same Reasons Articulated in *ABAT I*

As noted above, Plaintiffs have added no new allegations to their Second Amended

Complaint that are specific to the HLJ ZQPT re-characterization.

Plaintiffs argue that Bagell Josephs "fails to comprehend that the HLJ ZQPT allegation is

predicated on Bagell's failure to 'review . . . relevant documentation [which] would have shown

that ABAT did not own HLJ ZQPT between 2004 and 2009, despite representations to the

contrary in its filings.'" (Pls.' Reply at 8 (quoting SAC ¶ 169.)) Plaintiffs argue further that

their "failure-to-review documents claim has been strengthened through Dr. Epstein's findings –

reflected in the SAC – that such conduct represents such a drastic departure from auditors'

ordinary standard of care as to be actionable." (*Id*. (citing SAC ¶ 148))

Plaintiffs' reliance on paragraph 169 of the Second Amended Complaint is misplaced, as

it is a near verbatim reproduction of paragraph 149 of the First Amended Complaint, which this

Court found lacking in *ABAT I*. In any event, paragraph 169 merely alleges professional

negligence, which does not rise to the level of recklessness approximating an intent to aid in

ABAT's fraud. *See In re Longtop Fin. Technologies Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 575

(S.D.N.Y. 2012) ("At its core the Complaint alleges that, had DTTC performed a better audit, it

would have uncovered Longtop's fraud. At most this describes negligence by DTTC, not the

15

recklessness approaching actual intent required by the PSLRA."); *see also MRU*, 769 F. Supp. 2d at 518; *Stephenson*, 768 F. Supp. 2d at 571-2.  And as already discussed *supra*, Plaintiffs' allegations based on Dr. Epstein's expert opinion fail, and thus do not bolster Plaintiffs' HLJ ZQPT allegations.

Because Plaintiffs have failed to improve – or indeed to change in any meaningful way – their allegations against Bagell Josephs with respect to the HLJ ZQPT re-characterization, I find those allegations deficient for all of the reasons discussed in *ABAT I*.  Accordingly, Plaintiffs' motion for leave to file a Second Amended Complaint as to those allegations is denied.

## IV.    Plaintiffs' Allegations Against EFP

### A.    Plaintiffs Have Alleged No More Than EFP's Negligence In Connection With The Shenzhen Transaction

While EFP arguably had more of a "duty to familiarize itself with the particulars of [the Shenzhen] transaction" than Bagell Josephs did in light of the fact that EFP audited ABAT's 2010 financial statements, *ABAT I*, 2012 WL 3758085, at *22, Plaintiffs' allegations against EFP with respect to that transaction (*see, e.g.,* SAC ¶ 187) are still deficient, because they amount to no more than allegations of professional negligence or shoddy auditing, and therefore do not support a strong inference of auditor scienter. *See Longtop*, 910 F. Supp. at 575; *MRU*, 769 F. Supp. 2d at 518; *Stephenson*, 768 F. Supp. 2d at 571-2.  Indeed, Plaintiffs' argument ultimately comes down to the following: "had EFP done the bare minimum and obtained the underlying documentation for Shenzhen, it would have observed that Defendant Zhiguo Fu, the Company's Chairman and CEO, was involved in the transaction and profiting mightily from it." (Pls.' Reply at 9.)  This argument echoes those asserted against Bagell Josephs, and fails for the same reasons.

Furthermore, I agree with EFP that the "inference that [EFP, like Bagell Josephs,] was kept as much in the dark as the investors is more compelling than the inference that [EFP] recklessly disregarded clear signs of fraud" with respect to the Shenzhen transaction. *ABAT I*, 2012 WL 3758085, at *21; *see also Tellabs*, 551 U.S. at 323-24; *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 Fed. Appx. 717, 720 (2d Cir. 2009).

Finally, as with Plaintiffs' allegations against Bagell Josephs, Dr. Epstein's expert opinion does not bolster Plaintiffs' allegations against EFP.

In sum, Plaintiffs' motion for leave to file a Second Amended Complaint as to its allegations against EFP is denied.

## CONCLUSION

For the reasons set forth above, Plaintiffs motion for leave to file a Second Amended Complaint is DENIED. Accordingly, no claims remain against the Auditor Defendants and they are dismissed from this case.

Plaintiffs have informed the Court that they have a settlement in principle with the ABAT Defendants. In light of the settlement and the dismissal of the Auditor Defendants from this action, it is my understanding that I need not reach Plaintiffs' class certification motion (Docket No. 94). The parties have one week to apprise the Court if this is not the case, or the motion will be stricken from the Court's calendar.

The Clerk of the Court is directed to remove the motion at Docket No. 96 from the Court's list of pending motions.

Dated: July 18, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

17

A-243

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re ADVANCED BATTERY TECHNOLOGIES, INC. SECURITIES LITIGATION | )<br>)<br>)<br>)<br>)<br>)     **Master File No.: 11 Civ. 2279 (CM)** |

      Notice is hereby given that Lead Plaintiff in the above-captioned action, individually and on behalf of all others similarly situated, hereby appeals to the United States Court of Appeals for the Second Circuit from the Decision, Order and Judgment denying Plaintiffs' Motion For Leave To File A Second Amended Complaint, entered in this action on July 18, 2013. For the purposes of this appeal, this action was dismissed finally pursuant to a partial settlement by Order dated March 24, 2014.

Dated:   April 22, 2014

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Murielle Steven Walsh*

Marc I. Gross
Murielle Steven Walsh
Star M. Tyner
600 Third Avenue
New York, N.Y. 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
migross@pomlaw.com
mjsteven@pomlaw.com
smtyner@pomlaw.com

William B. Federman
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK  73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com


- and -

2926 Maple Avenue, Suite 200
Dallas, TX 75201

Laurence Rosen
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, N.Y. 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com

2

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 22, 2014, I electronically filed the foregoing ***Notice of Appeal*** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record. A copy of this document is available for viewing at the court's PACER/ECF site.

*/s/ Murielle Steven Walsh*
Murielle Steven Walsh
