# 14-1410-CV

## United States Court of Appeals

*for the*

## Second Circuit

In Re: ADVANCED BATTERY TECHNOLOGIES, INCORPORATED

RUBLE SANDERSON,

*Plaintiff-Appellant,*

JAMES QUAN, JAMES M. BURNS, ARNOLD COHEN, GEOFF CONNORS, GREGORY BONIN, Individually and on behalf of all others similarly situated,

*Plaintiffs,*

– v. –

ADVANCED BATTERY TECHNOLOGIES, INCORPORATED, ZHIGUO FU, GUOHUA WAN, DAN CHANG, BAGELL, JOSEPHS, LEVINE & CO., LLC, FRIEDMAN LLP, EFP ROTENBERG, LLP,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
(405) 235-1560

POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

THE ROSEN LAW FIRM P.A.
275 Madison Avenue, 34th Floor
New York, New York 10016
(212) 686-1060

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................i

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ....................................................2

STANDARD OF REVIEW .................................................................3

ISSUES PRESENTED FOR REVIEW ................................................4

STATEMENT OF THE CASE.............................................................6

     A.    Procedural History..............................................................6

     B.    Summary of the Factual Allegations...................................8

          1.    Misrepresentations by ABAT during the Class Period.............9

          2.    Misrepresentations by the Auditor Defendants during the Class Period..................................................12

          3.    The Truth Emerges..................................................14

          4.    The District Court's Opinions.................................15

SUMMARY OF THE ARGUMENT ..................................................21

ARGUMENT .....................................................................................24

     A.    The Standard of Review on Appeal ................................24

     B.    The District Court Erred in Finding that Plaintiff's Amended Complaint Was Futile as to the Auditor Defendants' *Scienter*.........25

     C.    The Related-Party Transactions Are Indicative of the Auditor Defendants' Recklessness ...............................................40

i

1.      The Shenzhen Transaction ......................................................40

2.      Re-Characterization of ABAT's Interest in HLJ ZQPT .........42

CONCLUSION ..................................................................................43

CERTIFICATE OF COMPLIANCE..................................................45

CERTIFICATE OF SERVICE ..........................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ........................................................24

*Highland Capital Mgmt., L.P. v. Schneider*,
    No. 02 Civ. 8098, 2004 WL 2029406 (S.D.N.Y. Sept. 9, 2004) ...............39

*In re Advanced Battery Tech., Inc. Sec. Litig.*,
    No. 11 Civ. 2279, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)................7

*In re Advanced Battery Tech., Inc. Sec. Litig.*,
    No. 11 Civ. 2279, 2013 WL 3784134 (S.D.N.Y. July 18, 2013)................7

*In re Advanced Battery Tech., Inc. Sec. Litig.*,
    No. 11 Civ. 2279, 2014 WL 1243799 (S.D.N.Y. Mar. 24, 2014)................7

*In re Cendant Corp. Litig.*,
    60 F. Supp. 2d 354 (D.N.J. 1999)................................................33

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001) ........................................25

*In re Doral Fin. Corp. Sec. Litig.*,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008) ............................36, 41, 42

*In re First Merchants Acceptance Corp. Sec. Litig.*,
    No. 97 C 2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998) .................25, 26

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ........................................34

*In re Health Mgmt., Inc. Sec. Litig.*,
    970 F. Supp. 192 (E.D.N.Y. 1977)..............................................35

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008) ....................................26, 35

*In re the Leslie Fay Cos., Inc., Sec. Litig.*,
    871 F. Supp. 686 (S.D.N.Y. 1995) ............................................................36

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012) ..........................................27, 34, 35

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    No. 13 CV 214, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .........30, 31, 32

*In re Medicis Pharm. Corp. Sec. Litig.*,
    No. CV-08-1821, 2010 WL 3154863 (D. Ariz. Aug. 9, 2010) .............34, 39

*In re Microstrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................33

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) ............................... 25, 26, 31, 35, 36

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................... 26, 31, 35, 40, 41

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ................................................................31, 32

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
    694 F. Supp. 2d 1192 (W.D. Wash. 2009) .................................................39

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288, 2003 WL 21488087 (S.D.N.Y. June 25, 2003) .............35

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008) .......................................................32

*Lewin v. Lipper Convertibles, LP*,
    No. 03 CV 1117, 2004 WL 1077930 (S.D.N.Y. May 13, 2004) ..........33, 34

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
    142 F. Supp. 2d 589 (D.N.J. 2001)............................................................33

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
    681 F.3d 114 (2d Cir. 2012) ...................................................3, 24

*SEC v. Gold*,
    No. 05-CV-4713, 2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006)..............26

*Stephenson v. PricewaterhouseCoopers, LLP*,
    768 F. Supp. 2d 562 (S.D.N.Y. 2011) ........................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................24, 25

*The Mannkind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011)...................................38, 39

### Statutes and Rules:

17 C.F.R. § 240.10b-5..........................................................6

15 U.S.C. § 78..............................................................2, 6

28 U.S.C. § 1291................................................................2

28 U.S.C. § 1331................................................................2

Fed. R. App. P. 28..............................................................i

Fed. R. App. P. 32.............................................................45

Fed. R. Civ. P. 8..............................................................39

Fed. R. Civ. P. 9..............................................................39

Fed. R. Civ. P. 12(b)(6).......................................................24

Private Securities Litigation Reform Act of 1995 ("PSLRA") ............................39

**Other Authorities:**

Paragon Financial Limited,
  *Advanced Battery Technologies and Ener1—Delisted and Pushing for
  Credibility*, Yahoo Finance, (Dec. 2, 2011 8:16 AM),
  http://finance.yahoo.com/news/Advanced-Battery-Technologies-iw-
  3784257514.html. ........................................................................15

## INTRODUCTION

This appeal arises from the district court's dismissal of securities law violations asserted against a primary gatekeeper responsible for protecting investors from corporate fraud, independent auditors. In this case, the court held that the pleadings failed to allege that auditors acted with requisite *scienter* even though, *inter alia*, the company's reported revenues were overstated by 97%; a $3.9 million loss was reported as a $21.8 million profit; and these incredible discrepancies were hiding in plain sight, *i.e.*, would have been uncovered by simply comparing reports that the company filed with regulatory authorities in China (where the company operated) and in the United States (where the company's stock traded as a result of a "reverse merger").

In dismissing the complaint, the district court held that just because (i) the auditors visited the company's offices in China, and (ii) the regulatory reports filed in China were available to the auditors, doesn't mean that they "must" have looked at the reports, or at the underlying discrepant data. In so doing, the court ignored allegations of the complaint, which were supported by an expert in international audits who opined that the auditors' conduct in this instance was "an extreme departure from reasonable standards of care" and a "willful disregard of the professional standards."

1

## <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction over the subject matter of this action pursuant to § 27 of the Securities and Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331. This Court has jurisdiction to review the final orders entered by the district court dismissing claims against the remaining auditor defendants. 28 U.S.C. § 1291. Plaintiff timely filed the Notice of Appeal on March 22, 2014 and the Corrected Notice of Appeal on April 23, 2013 (Dkt. No. 142), within 30 days of the district court's final order entered on March 24, 2014, dismissing this case in its entirety (Dkt. No. 139).

## <u>STANDARD OF REVIEW</u>

The district court's denial of leave to amend based on futility is reviewed *de novo*. *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

## ISSUES PRESENTED FOR REVIEW

(1)     Did the district court err by dismissing federal securities law claims against auditors who certified that the financial results of  Advanced Battery Technologies, Inc. ("ABAT" or the "Company") (a Chinese company listed on the NASDAQ) complied with Generally Accepted Accounting Principles ("GAAP") where the pleadings alleged:

(a)     ABAT reported financial results to Chinese regulators that were significantly lower than the results it reported to the Securities Exchange Commission  ("SEC") in the United States;

(b)     The auditors visited the Company's Chinese offices for their audits and presumably relied on the same underlying financial data used to prepare the AIC filings;

(c)     The auditors failed to obtain the reports ABAT filed with China regulators and/or compare those reports ABAT filed with the SEC;

(d)     The auditors' failure to compare  the reports filed in China and the United States was a reckless violation of auditing standards according to Plaintiff's expertized pleadings; and

(e)     In certifying ABAT's results were GAAP compliant, the auditors recklessly ignored other "red flags," including: (i) ABAT's listing on the NASDAQ was a result of its "reverse merger" with a previous

4

publically traded "shell" company, and (ii) ABAT reported profit margins that multiples of those of its competitors.

(2)     Did the district court err in dismissing claims against the auditors where ABATs' reports failed to disclose material "related party transactions."

(3)     Did the district court err in denying Plaintiff's motion to amend the pleadings on grounds that amendment was futile.

## STATEMENT OF THE CASE

### A. Procedural History

On April 1, 2011 and thereafter, several securities class action complaints were filed in the United States District Court for the Southern District of New York against ABAT, individual defendants Zhiguo Fu and Guohua Wan (collectively, the "ABAT Defendants"), and others. Dkt. No. 1. The complaint asserted claims under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (17 C.F.R. § 240.10b-5), alleging that the ABAT Defendants made material misstatements and omissions concerning the Company's financial results and misrepresented the related party nature of certain business transactions. Dkt. No. 1. On September 9, 2011, the Court consolidated the related securities class actions, appointed Mr. Ruble Sanderson as Lead Plaintiff and approved Lead Plaintiff's choice of Pomerantz LLP as Lead Counsel. Dkt. No. 50.

On September 29, 2011, Plaintiff filed the Corrected First Amended Consolidated Class Action Complaint (the "Consolidated Complaint"), naming as defendants the ABAT Defendants, as well as ABAT's outside auditors, Bagell, Josephs, Levine & Co., LLC and Friedman LLP (collectively, "Bagell Josephs"), and EFP Rotenberg, LLP ("EFP") (collectively, Bagell Josephs and EFP are referred to as the "Auditor Defendants"). Dkt. No. 52. By Decision and Order

6

dated August 29, 2012, the Honorable Judge Colleen McMahon denied the ABAT Defendants' motion to dismiss the Consolidated Complaint, but granted the Auditor Defendants' motions to dismiss. Dkt. No. 90; *see also In re Advanced Battery Tech., Inc. Sec. Litig.*, No. 11 Civ. 2279, 2012 WL 3758085, at *23-24 (S.D.N.Y. Aug. 29, 2012).

On September 25, 2012, Plaintiff filed a Motion for Leave to File a Second Amended Consolidated Class Action Complaint (the "Amended Complaint") (Dkt. Nos. 96, 97), which the Auditor Defendants opposed. Dkt Nos. 100 and 101. On July 18, 2013, the district court denied Plaintiff's request to file the Amended Complaint. Dkt. No. 106; *see also In re Advanced Battery Tech., Inc. Sec. Litig.*, No. 11 Civ. 2279, 2013 WL 3784134, at *1 (S.D.N.Y. July 18, 2013).

Plaintiff and the ABAT Defendants subsequently entered into a stipulation of settlement, and on March 24, 2014, the district court granted final approval of the settlement. Dkt. No. 139; *see also In re Advanced Battery Tech., Inc. Sec. Litig.*, No. 11 Civ. 2279, 2014 WL 1243799, at *15 (S.D.N.Y. Mar. 24, 2014).

On August 19, 2013, Plaintiff filed a notice of appeal, appealing Judge McMahon's denial of leave to amend the complaint with respect to the Auditor Defendants. Dkt. No. 108. Plaintiff and the Auditor Defendants thereafter stipulated to the dismissal of the appeal as premature due to the pending settlement with the ABAT Defendants. Dkt. No. 140.

On April 23, 2014, Plaintiff filed a corrected notice of appeal, appealing both the district court's dismissal of the claims against the Auditor Defendants and its denial of leave to amend the complaint with respect to the claims against the Auditor Defendants. Dkt. No. 142.

**B. Summary of the Factual Allegations**

Defendant ABAT, based in China, is a Delaware corporation with offices in New York. A-137. The Company's primary operations and subsidiaries are located in China. A-137-38. ABAT designs, manufactures, and markets rechargeable lithium batteries used in consumer products, such as portable computers, personal digital assistants, cellular telephones, and various types of electric vehicles. A-134, 137.

ABAT went public in the United States in 2004 through a "reverse merger" (whereby a private operating company is purchased by a public shell company), thereby getting immediate "back door" access to the U.S. securities market. A-139-43. Reverse mergers have been criticized as a ploy to avoid the scrutiny of a traditional U.S. initial public offering. A-140-41. In fact, Chinese companies that engage in reverse mergers are considered especially high-risk for audits by outside accounting firms. A-140-42.

### 1. Misrepresentations by ABAT during the Class Period

During the Class Period, the ABAT Defendants reported robust, steadily increasing revenues and net income in SEC filings for fiscal years 2007, 2008 and 2009. A-134-35. Bagell Josephs issued audit opinions blessing the Company's financial statements for each of these years. A-138-39, 165-69, 178.

The fraud alleged was self-evident given the comparison of the Company's Chinese and United States financial filings. A-151-52. Simply put, while claiming high profits and revenues in its U.S. filings, ABAT reported dramatically lower financial results to its Chinese regulatory authority, the Chinese Administrations of Industry and Commerce (the "AIC"). A-151-52. Indeed, in dramatic contrast to consistently growing profits claimed in U.S. filings, ABAT reported losses to the AIC every year from 2007 to 2009:

**DISCREPANCIES BETWEEN U.S. AND CHINESE FILINGS**

| (in USD) | Chinese Filings | U.S. Filings | Overstatement in U.S. Filings | Chinese Amount as Percentage of U.S. Reported |
|---|---|---|---|---|
| 2007 Revenue | $145,116 | $31,897,618 | $31,752,502 | 0.46% |
| 2007 Net Income | -$1,006,269 | $10,205,406 | $11,211,675 | n/a |
| 2008 Revenue | $938,154 | $45,172,111 | $44,233,957 | 2.08% |
| 2008 Net Income | -$912,171 | $20,186,932 | $21,099,103 | n/a |
| 2009 Revenue | $1,891,976 | $63,561,925 | $61,669,949 | 2.98% |
| 2009 Net Income | -$3,938,921 | $21,802,052 | $25,740,973 | n/a |

A-152. The discrepancies in the Company's U.S. and Chinese financial reports are staggering. For 2009 alone, ABAT reported over $61 million more in revenue in its

9

SEC filings than it did in its AIC filings. A-152. None of these discrepancies can be explained away by any material differences in U.S. and Chinese accounting standards. A-185-86.

ABAT also reported suspiciously high profit margins—multiples of those reported by its Chinese competitors—margins that were entirely unrealistic given that the Company sells a commodity and admittedly has no distinct competitive advantage in the market:

| Company | 2010 Operating Profit Margins |
|---------|-------------------------------|
| **ABAT** | **39.0%** |
| China BAK Battery, Inc. | -9.7% |
| BYD Company | 7.3% |
| SCUD Group Ltd. | 5.8% |
| Coslight Technology | 9.1% |
| Tianneng Power | 14.3% |

A-152-53. Similarly, ABAT reported substantially higher profit margins than its international competitors:

| Company | Operating Profit Margins |
|---------|--------------------------|
| **ABAT** | **39.0%** |
| Fabric NAC ET-1 | 28.8% |
| New Energy State | 22.1% |
| Eve Energy –A | 21.8% |
| China TMK Batter | 18.3% |
| Dry Cell & Stora | 13.1% |

A-153.

In addition to reporting grossly inflated financial results, ABAT also misrepresented key transactions, at least one of which was a sham related-party

transaction designed to siphon money out of the Company and into Defendant Fu's pockets. A-156-64.

First, ABAT represented that it purchased Shenzhen Zhongqiang New Energy Science & Technology Co., Ltd. ("Shenzhen") in 2010 for $20 million; however, the Company failed to disclose that this was a related-party transaction designed to improperly benefit Defendant Fu. A-156-57. Evidence indicates that Fu purchased Shenzhen in 2008 for only $1 million, and then sold it to ABAT for $20 million, earning Fu a $19 million undisclosed profit. A-157-58. In fact, ABAT stated in U.S. court filings that Defendant Fu acquired Shenzhen in 2008 for $1 million (A-157-58), and the AIC registration website states that Defendant Fu became Shenzhen's legal representative that year (A-158). The sham nature of this transaction is buttressed by the fact that ABAT paid $20 million in 2010 for a Company that generated revenues of less than $450,000 in 2009; and lost money each year since its inception in 2007. A-159.

The ABAT Defendants further misrepresented the ownership of a key subsidiary, Heilongjiang ZhongQiang Power-Tech Co., Ltd. ("HLJ ZQPT"); in fact, this subsidiary was also related to Defendant Fu. A-164-65. As late as August 2009, ABAT represented that it completely owned HLJ ZQPT. A-164. The Company's 2009 Form 10-K, however, suddenly revealed that Defendant Fu individually owned the subsidiary. A-164.

11

### 2. Misrepresentations by the Auditor Defendants during the Class Period

Defendant Bagell Josephs served as the Company's outside auditor from 2006 through December 14, 2010, when ABAT dismissed the firm as its auditor. A-178. Defendant EFP took over as ABAT's auditor at that time. A-178.

The Amended Complaint sets forth with the requisite particularity the misleading statements made by the Auditor Defendants during the Class Period. Bagell Josephs issued audit reports for fiscal years 2007, 2008 and 2009, certifying that it conducted its audit in accordance with Public Company Accounting Oversight Board ("PCAOB") standards and that ABAT's financial statements fairly presented the financial position of the Company. A-165-69.

The Amended Complaint also details EFP's misleading statements in its audit report concerning the Company's financial statements for the 2010 fiscal year—despite noting several material internal control weaknesses, EFP nonetheless opined that it conducted its audit in accordance with PCAOB, that ABAT's financial statements were free of material misstatements, and that the Company's financial statements fairly presented the financial position of the Company. A-168-69.

Furthermore, the Amended Complaint alleges a precise timeline relevant to each Auditor Defendant (A-71), and describes in detail the occurrences of red flags outing them on notice of ABAT's fraud. A-178, 181. During its tenure, Bagell

12

Josephs ignored or recklessly disregarded numerous red flags alerting it to ABAT's fraudulent financial statements, including: (1) ABAT's reported SEC and AIC filings differed materially for 2007, 2008 and 2009 (A-169, 181); (2) the characterization of ABAT's ownership of HLJ ZQPT changed in the 2009 Form 10-K (A-164-65); and (3) ABAT reported unrealistically high profit margins for the relevant period (A-153-56).

Bagell Josephs' employees were personally present at ABAT's Chinese offices during their audit work for ABAT, yet inexplicably failed to account for the significant differential between (1) the data in the books and records in China, which formed the basis for the AIC filings, as compared to results reported in the SEC filings; and (2) reports filed with the Chinese regulatory authority which were presumably available at ABAT's offices and the financials reported to the SEC. The same underlying financial records and data used to generate the Company's AIC filings inexplicably yielded dramatically different results for its U.S. SEC filings. A-178-80.

Similarly, EFP ignored red flags that alerted it to the fraud: (1) ABAT executed the agreement to acquire Shenzhen on December 20, 2010, and the transaction closed on January 6, 2011 (A-156-57); and (2) ABAT reported unrealistically high profit margins in its 2010 Form 10-K (A-152-53).

### 3. The Truth Emerges

On March 30, 2011, Variant View Research ("Variant"), which had a short position in ABAT securities, published a report entitled, "Advanced Battery Technologies: An Egregious Chinese RTO" (the "Variant Report"), concluding that "the financial statements and management of ABAT cannot be trusted" (A-135), and citing: (i) unrealistic profit margins in what is an admittedly commodity market; (ii) that the Shenzhen transaction was a sham; (iii) that Defendant Fu had appeared to have transferred ownership of HLJ ZQPT to himself without explanation or compensation; and (iv) that ABAT claimed distribution relationships that could not be substantiated. A-170.

The market reacted dramatically—ABAT shares plummeted from $3.51 to $2.01 per share, nearly 43%, on unusually heavy trading volume. A-135, 170.

On May 5, 2011, Prescience Investment Group, LLC and Kerrisdale Capital Management, LLC (collectively, "Prescience") published a report about ABAT based on numerous interviews of ABAT customers, investigator visits to ABAT's production sites, and a comparison of ABAT's SEC filings with the significantly different AIC filings that it had obtained. A-135, 170-71.

By year end 2011, the Company's stock price traded at $0.30, down 96% from its Class Period high, and the stock was subsequently delisted when the

Company failed to comply with a simple request by NASDAQ to confirm the Company's stated cash reserves in the presence of the Company's auditors.[1]

### 4. The District Court's Opinions

In its August 29, 2012 opinion (A-92-131), the district court held that the Amended Complaint stated a claim against the ABAT Defendants, but dismissed the claims against the Auditor Defendants. A-107.

The district court held that the Amended Complaint sufficiently alleged the falsity of ABAT's financial statements issued during the Class Period. A-108. Specifically, the district court pointed to the Company's AIC filings as evidence that ABAT's SEC filings were materially false when made, because the AIC filings reflected far lower earnings and revenues than those reported to the SEC. A-108.

The district court also held that Plaintiff adequately alleged a material omission with respect to the Shenzhen transaction. A-109. The court found a "compelling" inference that Defendant Fu engaged in a related party transaction with Shenzhen. A-109.

The district court also held that Plaintiff adequately pled a strong inference of *scienter* with respect to the ABAT Defendants. A-111. Taking it as true that

---

[1] *See* Paragon Financial Limited, *Advanced Battery Technologies and Ener1—Delisted and Pushing for Credibility*, Yahoo Finance, (Dec. 2, 2011 8:16 AM), http://finance.yahoo.com/news/Advanced-Battery-Technologies-iw-3784257514.html.

ABAT grossly overstated its earnings and used shareholder money to fund undisclosed related-party transactions, the court found:

> [T]he inference that it did so with fraudulent intent is not merely strong, it is inescapable. This is not the securities fraud complaint that alleges that poor business decisions were made, leading to a drop in the price of the stock. Rather, the theory underlying Plaintiffs' well-pleaded allegations is that ABAT itself was a fraud, backdoored into the U.S. equity markets in order to raise money that it promptly diverted to a handful of insiders.

A-111. Thus, a strong inference of *scienter* arose because "[t[hese are not far-fetched or absurd allegations… they are well supported by the specific allegations of fact in the Complaint." A-111.

The lower court also held that Plaintiff sufficiently pled loss causation. A-114-15. The court correctly discerned that Plaintiff's theory of loss causation rested solely on the Variant Report revealing the fraud, which directly preceded the drop in ABAT's stock price. A-111-12. The other reports relied on in the Amended Complaint simply offered additional evidence that the Variant Report's conclusions were correct—and constituted merely confirmatory information not relied upon in the Amended Complaint for loss causation purposes. A-112-13.

In contrast, the district court found that the Amended Complaint did not state a claim against the Auditor Defendants. A-116-17. As to Bagell Josephs, the court held that the Amended Complaint's *scienter* allegations failed because "the 'red flags' on which Plaintiffs rely are either (1) not red flags at all, or (2) not alleged to

16

have been known to, and disregarded by, Bagell Josephs. And the one possible exception—the re-characterization of ABAT's interest in HLJ ZQPT—[was] not sufficient, even in combination with alleged violations of professional standards, to support a 'strong inference' of fraudulent intent." A-120.

While acknowledging the significant discrepancies between the SEC and AIC financial results, the district court held that such differences did not support the Auditor Defendants' *scienter* because the Amended Complaint failed to allege that Bagell Josephs was actually aware of the AIC filings. A-120. Instead, the court found that Plaintiff alleged, at most, that had Bagell Josephs been more diligent it "would have" seen the AIC filings—which the court found constituted mere negligence. A-121.

With respect to the Company's suspiciously high profit margins, the court held that, although these allegations supported an inference of *scienter* with respect to the ABAT Defendants, they did not support *scienter* with respect to the Auditor Defendants because they did not alert them to the fraud. A-123-24.

As to the suspicious Shenzhen transaction, the court held that no inference of *scienter* could be drawn because the transaction closed in January 2011, a year after the last period audited by Bagell Josephs. A-124-25. In addition, the court held that the deposit made toward the Shenzhen acquisition in 2009 was "not

17

sufficient to put Bagell Josephs on notice of the suspicious circumstances surrounding the acquisition." A-125.

Though Plaintiff argued that ABAT's formation through a reverse merger transaction was suspicious, the court held that there was no industry standard to review such mergers with skepticism during Bagell Joseph's tenure. A-126.

The district court did find that the HLJ ZQPT transaction constituted a red flag. A-127. However, while admitting that "[o]ne missed red flag can perhaps be enough to conclude that an accountant's audit was a 'farce,'" and finding that the Company's re-characterization of the transaction was "questionable," the court found that this red flag was "not sufficiently egregious to raise that inference" of *scienter*.  A-128-129.

With respect to EFP, the district court held that the named plaintiff purchased ABAT shares before EFP issued its fiscal year 2010 audit results, and thus could not have relief on the alleged misrepresentations when purchasing the securities. A-129-30. However, the court recognized that Plaintiff could re-plead to name an additional plaintiff who purchased ABAT shares after March 16, 2011 in reliance on EFP's false statements. A-130-31. The court also generally held that the deficiencies with respect to EFP's *scienter* were "largely the same as those identified with respect to Bagell Josephs." A-131.

18

Upon dismissing the claims against the Auditor Defendants, the court directed Plaintiff to file a motion for leave to amend the pleadings, and to demonstrate that such amendment would not be futile. A-131.

Plaintiff thus requested leave to file the Amended Complaint. A-132-225. The Amended Complaint included two new allegations: (1) that Bagell Josephs personnel visited ABAT's offices during its audits and thus had access to and presumably reviewed the data showing that, *inter alia*, the Company had generated only $1.89 million in revenues and a loss of $3.9 million for 2009, as reported to the AIC in China, in contrast to the $63 million in revenues and $21 million in profits the Company had reported to the SEC; and (2) the expert analysis of Dr. Barry Epstein, an accounting expert, who concluded that the auditors' failure to include the Company's AIC filings in the scope of their review constituted an extreme departure from the reasonable standard of care for auditors.

The district court denied Plaintiff's motion for leave to file the Amended Complaint on the grounds that amendment was futile. A-226-42. The court dismissed the analysis of Dr. Epstein out of hand, questioning whether the inclusion of the expert analysis was proper. A-236. Regardless, the court determined that Dr. Epstein's findings did not cure the deficiencies in Plaintiff's *scienter* allegations because, at most, they supported an inference of negligence, not recklessness. A-236-37. Similarly, the court dismissed Plaintiff's "underlying

19

data" allegations on the reasoning that Plaintiff was not entitled to a "presumption" that the Auditor Defendants reviewed the Company's underlying books and records, and that the failure to do so merely amounted to negligence. A-238.

In addition, the district court held that, while EFP had a duty to familiarize itself with the details of the Shenzhen transaction, its failure to do so amounted to no more than "professional negligence or shoddy auditing." A-241.

## SUMMARY OF THE ARGUMENT

The district court erred finding that the proposed Amended Complaint was futile, even though it specifically addressed the alleged deficiencies raised by the district court. Specifically, in response to the district court's concerns, the Amended Complaint alleged that: (1) Bagell Josephs personnel visited ABAT's Chinese offices during their audit, and presumably reviewed the underlying data for the financial results, which was the same for the AIC and SEC filings; thus, these auditors *must* have seen the evidence of fraud; and (2) expert analysis concluded that an auditors' failure to include the Company's AIC filings in the scope of their review constituted an extreme departure from the reasonable standard of care for auditors.The district court erred in finding that Plaintiff failed to sufficiently allege *scienter* as to the Auditor Defendants, because it required that the Auditor Defendants "actually reviewed" or "must have reviewed" the evidence of falsity. In doing so, the Court disregarded well-settled law that auditors are liable in situations such as this one, where the auditing processes were so utterly deficient so as to amount to no audit at all. Indeed, had the Auditor Defendants conducted the bare minimum of audits, they would have uncovered blatant misstatements in ABAT's financials. The facts contradicting ABAT's SEC filings (*i.e.*, its vastly different financial reports to Chinese regulators) were hiding in plain sight.

21

The AIC and SEC filings showed wildly divergent financial results. Thus, had Bagell Josephs fulfilled even its most basic audit duties, and simply compared reports filed with key regulatory agencies, or requested them when visiting ABAT's Chinese offices during their audits, it would have tripped right over the true facts. Similarly, the related-party nature of the Shenzhen transaction was open and obvious—had EFP conducted basic audit procedures, such as verifying relevant counterparties and confirming deposits, it would have known that Defendant Fu improperly benefitted from this transaction. A-74, 81.

Even assuming, as the district court did, that Bagell Josephs was not required to obtain ABAT's Chinese filings, the Amended Complaint alleges that they must have reviewed the underlying data for those filings because it was the same underlying data that would have been used to generate the SEC reports. By way of example, in 2009, the AIC filings showed only $1.89 million in revenue, but the SEC filings showed over $63 million. Because the underlying data would have been the same, the auditors must have noticed the absence of contracts needed to evidence the tens of millions of dollars of additional revenues reported in the SEC filings. The district court found that Plaintiff was not entitled to a "presumption" that Bagell Josephs reviewed this information, but the court misapprehended this allegation. However, even if the auditors failed to review such basic information, then they failed to comply with PCAOB requirements to such an

22

extent that the effectively conducted "no audit at all." Such allegations meet the requisite threshold for imposing auditor liability.

# ARGUMENT

## A. The Standard of Review on Appeal

The district court's denial of Plaintiff's request for leave to amend, which was based on its finding that amendment would be futile, is reviewed *de novo*. *Panther Partners Inc.*, 681 F.3d at 119 ("We review a district court's denial of leave to amend for abuse of discretion, unless the denial was based on an interpretation of law, such as futility, in which case we review the legal conclusion *de novo*.") (citation omitted).

The district court treated Plaintiff's motion for leave to amend as a motion to dismiss. A-233. When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citation omitted). This Court "uphold[s] a dismissal only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (quotation omitted).

In addition, the allegations must "give rise to a 'strong' inference of scienter." *Tellabs*, 551 U.S. at 323. Thus, the relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

24

whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (citations omitted). Accordingly, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citation omitted). Instead, a complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Thus, if the inferences for and against *scienter* are in "equipoise," the complaint survives. *Id.* at 331.

## B. The District Court Erred in Finding that Plaintiff's Amended Complaint Was Futile as to the Auditor Defendants' *Scienter*.

In an action alleging § 10(b) claims against auditors, the *scienter* requirement is met by alleging, as it is alleged here, that "[t]he accounting practices were so deficient that the audit amounted to *no audit at all*, or an *egregious refusal to see the obvious, or to investigate the doubtful*, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 474 (S.D.N.Y. 2004) (quotations omitted) (emphasis added) (brackets in original); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334-35 (S.D.N.Y. 2001) (finding that auditor ignored multiple flags); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *11 (N.D. Ill. Nov. 4, 1998) ("[T]he allegations in the complaint, including the

25

magnitude of the misstatements, the specific GAAP and GAAS violations and the 'red flags' together support an inference that Deloitte's audit amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful.").

Moreover, where red flags are present, "the red flags must be viewed in the aggregate; defendants 'cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007) (quoting *Philip Servs.*, 383 F. Supp. 2d at 476).

Taking the *scienter* allegations of the Amended Complaint as a whole, the Auditor Defendants' egregious and pervasive failure to follow basic auditing maxims both facilitated and condoned the alleged material misstatements. Indeed, had the Auditor Defendants performed basic audit duties, for instance by conducting even a cursory examination of ABAT's filings, they would have discovered not just red flags, but also actual evidence of the fraud.[2]

---

[2] "Red flags" are facts that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483-84 (S.D.N.Y. 2008) (citation omitted); *SEC v. Gold*, No. 05-CV-4713, 2006 WL 3462103, at *4 (E.D.N.Y. Aug. 18, 2006) ("A 'red flag' is a relative concept, dependent upon any number of variables. Indeed, what a 'reasonable accountant' would have done in response to specific figures uncovered in the course of an audit seems an issue best broached at some point after the pleadings have been exchanged.").

Here, Plaintiff's proposed Amended Complaint cured the deficiencies raised by the district court with respect to the Auditor Defendants' *scienter*.[3] The Amended Complaint included two key new allegations: (1) Bagell Josephs auditing staff were at the Company's Chinese offices and relied on the same underlying data for their audit of the SEC filings that was used in the generation of AIC filings (A-185); and (2) the analysis of accounting expert Dr. Barry Jay Epstein concluded that an auditor's failure to review and obtain the Company's AIC filings constituted an extreme departure from the standards of reasonable care (A-185). Accordingly, the Auditor Defendants must have seen the evidence of fraud, absent severe recklessness.

Here, ABAT reported earnings to the Chinese regulators that were exponentially lower than those reported to the SEC—for example, there was a 97% disparity in the 2009 results alone. ABAT also reported suspiciously high profit margins—multiple times those reported by its Chinese competitors—margins that were unreal given that the Company had no distinct competitive advantage in the market.

The Amended Complaint alleges that Bagell Josephs' staff auditors, including some native Chinese-speaking auditors, travelled to ABAT's facilities in

---

[3] Leave to amend may be denied where the amendment would be futile. *In re Longtop Fin. Tech. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 572 (S.D.N.Y. 2012). Here, however, the proposed Amended Complaint was not futile because it specifically addressed the district court's *scienter* concerns with respect to the Auditor Defendants.

China to conduct their audits. A-178-79. The Amended Complaint further alleges that these auditors "presumably relied on the same underlying financial records and data, such as documents necessary to substantiate ABAT's claimed revenues, that had formed the basis for ABAT's AIC filings," but that "the same underlying financial records and data inexplicably yielded dramatically different results for ABAT's U.S. SEC filings." A-185.

The district court misconstrued this allegation as simply another way of implying that the auditors only had access to this information (as opposed to actual knowledge), and that Plaintiff is not entitled to a "presumption" that the auditors relied on the same underlying data that the Company used to generate its AIC filings. The court's erroneous finding on this point appears to derive from its finding on the motion to dismiss that "[t]he AIC filings strongly suggest that ABAT kept two sets of books—one for its Chinese regulator and one for the Americans." A-108.

However, the Amended Complaint alleged that the Company's regulatory filings were inconsistent, not that the Company kept two sets of underlying books and records. The Amended Complaint makes the allegation that the opposite was true—that the fraud was open and obvious had the Defendants paid any attention. Plaintiff should be afforded the sensible and plausible inference that only one set of

raw financial data, such as ledgers and customer contracts, was available and reviewed by the auditors.

However, that *same* underlying financial data generated two wildly inconsistent sets of regulatory filings in terms of the reported financials. This is a practical impossibility absent fraud, particularly given the lack of any material differences between U.S. and Chinese accounting standards with respect to the areas at issue here. A-185-86. Only one of these financial reports is accurate—and the court accepted, for pleading purposes—that the AIC filings were the accurate ones. A-108-109. Therefore, it defies common sense to infer that, absent severe recklessness, Bagell Josephs did not see evidence making it obvious that ABAT was reporting different financial results to different regulators.

Moreover, ABAT was not a multi-national conglomerate with numerous sets of international regulatory filings. The Company's primary operations were in China—where all of its manufacturing occurred and where its revenues were generated. Thus, there is no reason to believe that the information used to generate the AIC filings was different from that used in the preparation of the U.S. reports.

For example, the 2009 AIC filings showed only $1.89 million in revenue. Assuming that the AIC filings are the true ones, the Company only had underlying data supporting $1.89 million in revenues for that year. The Auditor Defendants were not entitled to rely on management's representations about revenues. They

29

were required to test that assertion by obtaining sufficient evidence, such as contracts.[4] Here, contracts evidencing the additional $61 million in revenues simply ***did not exist***. This is true for each year during the Class Period—for 2007, the Company's AIC filings reported only $145,116 in revenue, while its SEC filings reported $31 million in revenue. No underlying information evidencing the $31 million in revenues that year could exist.

The district court erroneously concluded that these auditors cannot be liable absent proof that they were aware of the misstatements and reviewed the AIC filings, labeling Plaintiff's allegations as mere "access to AIC filings." However, actual awareness is not necessary for auditor liability to attach if an auditor's actions lack reasonable basis, where, as here, the Amended Complaint alleges facts strongly suggesting that the audits at issue amounted to no audit at all.

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 13 CV 214 HB, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014), is particularly on-point here. There, the court upheld *scienter* allegations against auditors of a China-based company based

---

[4] In addition, AU Section 316.53 required the Auditor Defendants to substantiate ABAT's claimed customer relationships by "making oral inquiries of major customers and suppliers in addition to sending written confirmations, or sending written confirmation requests to a specific party within an organization." A-186. Similarly, had Bagell Josephs and EFP exercised any diligence in this area, they would have seen ABAT's reporting of profit margins that were at least double its competitors, despite its admitted lack of edge over these other companies, as well as other evidence undermining ABAT's claims. Indeed, when Variant, Prescience, and Plaintiff's investigators made similar inquiries, they uncovered evidence that certain customer relationships did not exist (A-154-56, 170-71), and ABAT's empty scooter factories were a "joke." A-155-56.

on substantially similar facts, including that the company had reported different earnings to the SEC than it did to the Chinese regulators:

> Plaintiffs successfully allege the scienter of the auditors by pleading a combination of "red flags" that should have raised the auditors' suspicion, the enormous scale of the fraud, the auditors' failure to follow generally accepted auditing standards (GAAS), and the fact that they had been rebuked for audit deficiencies in the past by the Public Company Accounting Oversight Board (PCAOB). Failing to follow GAAS standards alone would not establish recklessness, but a combination of inadequate procedures and ignoring red flags is sufficient. Both factors are present here and are enough to establish a strong inference that the auditors behaved recklessly.

*Id.* at *5 (internal citations omitted).

Significantly, the *Longwei* defendants' arguments echo those made here, that they were unaware of the claimed red flags, and "an unseen red flag cannot be heeded." The *Longwei* court flatly rejected this claim, recognizing that where "'red flags' would be clearly evident to any auditor performing its duties' it is reasonable to infer that the auditor 'must have noticed the 'red flags,' but deliberately chose to disregard them.'" Id. at *6 (quoting *Philip Servs.*, 383 F. Supp. 2d at 475); *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 658 (finding that auditor's ignorance of fraud could only have happened as a result of audit procedures that were "so substandard that the auditors would have to have known they were sub-standard"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 80 (3d Cir. 2006) (finding that financial shenanigans were "hiding in plain sight," and "*[e]ven*

*a cursory inquiry* would have disclosed" the "financial foul play") (emphasis added).

The *Longwei* court also noted that "record revenues" and a "sudden upward trajectory" were red flags necessitating further inquiry. 2014 WL 285103, at *6. Again, similarly, ABAT's claim of huge profit margins larger than its competitors was an additional red flag ignored by the Auditor Defendants, as was the Company's unexpected announcement regarding the Defendant Fu's ownership interest in the HLJ ZQPT subsidiary.

The court's decision in *Katz Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 275 (S.D.N.Y. 2008), is also instructive. There, the plaintiffs alleged that the auditor defendant was in a position at the time of the original audit to validate sales based on shipping documentation, invoices, and other available information. *Id.* Yet, an investigation revealed that "most of the sales lacked shipping documentation and many purported customers had no knowledge of the sales." *Id.* at 271. The court upheld the plaintiffs' *scienter* allegations, finding that "the lack of documentation to substantiate sales was among the red flags that "alerted or should have alerted [the auditor], absent recklessness, to the fictitious sales." *Id.* at 275.

Here, similarly, the Company reported tens of millions in revenues to the SEC, but its AIC filings showed a tiny fraction of this amount. If the Auditor

Defendants had done the barest of audits with respect to the Company's reported revenues, for instance by asking to review the underlying customer contracts and requesting verification from customers, they would have uncovered a glaring lack of documentation for the reported numbers. *See P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 607 (D.N.J. 2001) ("This Court found that '[p]laintiffs' allegations that [the auditor] failed to obtain direct evidence to support CUC's and Cendant's financial statements but relied instead on the representations of management evidences recklessness.'") (citing *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 373 (D.N.J. 1999)). In fact, "plaintiffs have plead numerous detailed facts to show both that the magnitude of the fraud enhanced the suspiciousness of identified transactions or made the overall fraud glaringly conspicuous." *P. Schoenfeld Asset Mgmt.*, 142 F. Supp. 2d at 609.

That the disparities were so massive makes the inference even less plausible. The Auditor Defendants' violations of applicable auditing standards are even more egregious given the "number, size, timing, nature, frequency, and context" of the misapplication of GAAP and misstatements at issue. *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 653, 637-38 (E.D. Va. 2000) (denying motion to dismiss and concluding that the "magnitude," "pervasiveness," and "repetitiveness" of the company's violations of "simple" accounting principles "served to amplify the inference of scienter"); *Lewin v. Lipper Convertibles, L.P.*,

No. 03 CV 1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (holding that GAAP violations supported finding auditor's *scienter* because "the accounting violations alleged are on such a repeated and pervasive scale that, if proven, they could provide strong circumstantial evidence of recklessness"); *In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) (finding that, where defendants are familiar with "relatively straightforward or basic" GAAP provisions, "the inference of scienter may be much stronger") (citations omitted); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 346-47 (S.D.N.Y. 2004) ("In short, plaintiffs have alleged a fraud of a magnitude only rarely seen – at least until recent years. In such cases, the scope of the fraud alleged may appropriately be considered in determining whether scienter has been adequately pled.") (citations omitted).

Here, the size of the misstatements, coupled with the Auditor Defendants' disregard of other red flags, such as the Company's entirely unrealistic profit margins and Chinese reverse merger, further support the strong inference of *scienter*, as recognized in case law cited by the district court:

> Naturally, failing to detect a fraud of large magnitude provides some circumstantial evidence of scienter, just as failing to detect a large boulder in front of your face qualifies as circumstantial evidence of blindness.

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 578 (S.D.N.Y. 2012) (Scheindlin, J.);[5] *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 657; *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1977) (rejecting the defendant's objections that "plaintiffs do not allege that [defendant] had actual knowledge of the implications of the alleged [fraudulent] scheme on particular statements made in [defendant's] filings, that [defendant] had actual knowledge of the scope of the scheme, or that [defendant] was informed the scheme had been carried out."); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d at 484 ("[A]llegations of particularly large frauds might go far toward creating a compelling inference of auditor scienter based on recklessness even where actual knowledge of the fraud by the defendant auditor is not alleged.") (citing *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2003 WL 21488087 (S.D.N.Y. June 25, 2003)).

In *Philip Services*, the court concluded that certain red flags, including the timing of a "highly suspicious" and "massive" increase in Philip's copper

---

[5] The district court cited *Longtop*, 910 F. Supp. 2d at 575, for the proposition that the Amended Complaint alleges merely negligence, not recklessness. However, there, the plaintiffs did not allege that hugely different financial results were available to the auditors via Chinese regulatory filings. Instead, the only red flag that existed was a related entity through which the defendants were siphoning losses from the books. *Id.* at 570. Moreover, the only facts that might have tipped the auditors to the relationship between the companies were that the companies shared a building, a website and a server and had similar names—information into which the auditors had no duty to inquire. *Id.* In contrast, here, the Auditor Defendants ignored glaring information that they actually had a duty to review.

inventories, "obvious simplicity" of certain fraudulent practices, and lack of adequate financial reporting system, "'would be clearly evident to any auditor performing its duties,'" and therefore "'one could reasonably conclude that [the defendant auditor] must have noticed the 'red flags,' but deliberately chose to disregard them....'" 383 F. Supp. 2d at 475 (quoting *In re the Leslie Fay Cos., Inc., Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995)). Such conclusions are warranted here. Taking into account the obvious simplicity of the fraud, the Company's highly suspicious financial results and the lack of adequate financial reporting, the Auditor Defendants must have noticed these red flags and chose to ignore them.[6]

Further, there is no evidence that ABAT withheld the true facts or the underlying financial data from its auditors. This was not a situation excusing the auditor from liability based on client deception. *See In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465-66 (S.D.N.Y. 2008).

It is undisputed that the Auditor Defendants were duty-bound to conduct careful diligence and collect and inspect competent audit evidence. A-181-95

---

[6] The district court's reliance on *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 579-80 (S.D.N.Y. 2011), for the proposition that "unprecedented operating success alone" did not constitute a red flag, was misplaced. A-125. In that case, auditors of feeder funds in the Madoff Ponzi scheme "were kept in the dark" as to the scheme, as were their clients. *Id.* at 580. Moreover, the court recognized that the auditor could not have uncovered fraud at a firm it was not hired to audit. *Id.* Here, in stark contrast, the facts attesting to the fraud were immediately available to the Auditor Defendants, if they had only chosen to look.

36

(citing applicable auditing standards). Dr. Epstein's analysis confirms that it was critical for the Auditor Defendants to include the AIC filings in their audit evidence.

Specifically, according to Dr. Epstein, the Auditor Defendants had the duty to inquire and inspect documents,[7] including regulatory filings and documents concerning compliance with the laws and regulations to which ABAT was subject, including those of Chinese regulatory agencies. A-183. ABAT's compliance with the Chinese regulatory scheme was paramount, given that all of its primary operations are in China.

The Auditor Defendants were duty-bound to obtain the AIC filings because, among other things, issues concerning ABAT's compliance could have materially affected the Company's disclosure of contingencies, and even thrown into question the applicability of the going concern evaluation. A-183. For example, AU 326.15(b)(iii) requires evidence addressing the completeness of all presented liabilities—including the need for accrual of fines or penalties that could be levied by regulatory authorities like those in China, if required filings were not timely and accurately made. A-183-84. In order to assure themselves that ABAT complied with applicable standards (and that the fundamental GAAP going concern

---

[7] *See* AU § 326.31, 326.27. A-184-85.

37

assumption was valid), the Auditor Defendants were required to obtain and examine the Company's Chinese AIC filings.

Dr. Epstein thus concluded that the Auditor Defendants' failure to collect and review ABAT's Chinese filings thus constituted an extreme departure from the standards of ordinary care for this auditor:

> No reasonable auditor would have failed to obtain ABAT's AIC filings and reconcile them with ABAT's wildly divergent SEC filings. Bagell Josephs' failure to do so was an ***extreme departure from the reasonable standards of care*** it was obligated to meet as ABAT's auditor and constituted a ***willful disregard of the professional standards*** and a breach of the duty to conduct the examinations with due professional care and attitude of professional skepticism.

A-180 (emphasis added). In sum, "[a]s a result of the Auditor Defendants' failure to perform its audits in accordance with PCAOB standards, its audits did not provide a reasonable basis for its opinions." A-169. If Bagell Josephs had done its job in China at all, it "must have" reviewed the AIC filings.[8]

Although the court implied that it was inappropriate to include Dr. Epstein's analysis in the Amended Complaint to bolster allegations against the Auditor Defendants (A-237), in fact, many courts consider expert opinions incorporated in securities fraud complaints. Indeed, "there exists 'no inflexible rule' governing the sort of 'written instruments' that may be attached to a pleading." *The Mannkind*

---

[8] Further, it is unfathomable that ABAT's auditors did not obtain this information, when they were personally present at ABAT's Chinese offices, and the AIC information was easily obtainable by Prescience and Plaintiff's agents, who did not have ready access to ABAT's offices or its management.

*Sec. Actions*, 835 F. Supp. 2d 797, 820-21 (C.D. Cal. 2011) (holding that expert report attached to securities fraud complaint buttressed the allegations and should not be stricken) (citation omitted); *see also In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1212 (W.D. Wash. 2009) (holding that expert analysis incorporated into allegations of complaint supported a finding of falsity); *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *2 (finding that amended complaint adequately pled *scienter* with more particularized allegations, including opinion testimony from an accounting expert).[9]

The district court further found that, even affording the expert allegations any weight, the additional allegations only amounted to mere negligence:

> [A]ll that Dr. Epstein attests to is that the Auditor Defendants violated professional standards, which, standing alone, is insufficient to support a strong inference of recklessness approximating an actual intent to aid ABAT's underlying fraud. Furthermore, these allegations are plead in terms of negligence, and thus necessarily do not rise to the level of recklessness.

A-236-37 at n.2 (citations omitted). The Court's characterization of the allegation that no reasonable auditor would ignore the AIC filings as mere negligence is at

---

[9] The district court's reliance on *Highland Capital Mgmt., L.P. v. Schneider*, No. 02 Civ. 8098, 2004 WL 2029406 (S.D.N.Y. Sept. 9, 2004), for the proposition that it could disregard the Amended Complaint's expertized allegations, is misplaced. A-236. *Highland Capital* was a breach of contract case not subject to the more exacting standards of the PSLRA and Rule 9(b). 2004 WL 2029406, at *4. Because the complaint was only subject to Rule 8 notice pleading standards, the pleading of additional evidence was unnecessary because "[s]uch information [was] available through discovery." *Id.* (quotation omitted).

odds with its own previous order, which suggested that such allegations may be supportive of recklessness. *C.f.* A-236 at n.2 *with* A-110-11.

In any event, the Court ignored the rest of this allegation, which specifically alleged that this failure was an "extreme departure from the reasonable standards of care it was obligated to meet as ABAT's auditor," which is the relevant standard for auditor liability to attach. A-236-37 at n.2.

## C. The Related-Party Transactions Are Indicative of the Auditor Defendants' Recklessness.

As with the Chinese filings, the underlying facts regarding the related-party transactions showed actual evidence of fraud; at the same time, these transactions operated as red flags to the Auditor Defendants.

### 1. The Shenzhen Transaction

EFP was duty-bound to collect basic documents concerning the Shenzhen transaction. A-181, 186. The Shenzhen transaction was a highly material transaction—ABAT reported that it paid $20 million for Shenzhen in 2010 A-49-50), an amount approximating 21% of ABAT's purported $97 million in 2010 revenues. A-156-57.

The importance of this transaction strengthens the inference that EFP's failure to uncover the related party nature of the deal was not mere negligence, but rather, extreme recklessness. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 659 ("Given the size of the transactions, the fact that at least some of [the company's]

officers were allegedly involved in orchestrating it, and the volume of documentation allegedly created, however, this allegation—together with the others—contributes to a strong inference of scienter on [the auditor's] part.").

The district court recognized that liability for the Shenzhen transaction could attach to EFP because this firm audited the 2010 financial statements that announced the transaction. Nonetheless, the court accepted EFP's claim that it was kept in dark regarding the fraud. The inflated purchase price paid by ABAT—$20 million for a profitless company—was a red flag that EFP failed to heed. A-159, 186. Moreover, EFP was required to collect and evaluate basic documentation concerning the Shenzhen transaction and to verify relevant details with third parties. A-186. Had EFP obtained basic underlying documentation, such as confirmation of bank statements reflecting the payments for the acquisition, it would have observed that Defendant Fu was the recipient of the money paid by ABAT. In fact, the AIC filings reflected Fu's ownership stake. A-158.

The district court erroneously relied on *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d at 461, in holding that "the only allegation going to … Shenzhen … is that top management concealed secret interests in ABAT's acquisitions that would enrich them personally." A-126. In *Doral*, the "side deals and oral agreements" complained of were concealed from everyone except management.

41

563 F. Supp. 2d at 465. On the contrary, Plaintiff did not allege that the facts underlying the red flag transactions were concealed from the Auditor Defendants.

## 2. Re-Characterization of ABAT's Interest in HLJ ZQPT

Finally, the district court correctly held that the Company's re-characterization of HLJ ZQPT constituted a red flag. A-127. Inexplicably, however, the court found that, though "[o]ne missed red flag can perhaps be enough to conclude that an accountant's audit was a 'farce' … this particular red flag is not sufficiently egregious to raise that inference." A-128. This finding completely belies the facts.

First, this transaction was yet another red flag, in addition to the others, a related-party transaction benefitting Defendant Fu. Second, the misrepresentation was open and obvious to the Auditor Defendants. As a result, it constituted a red flag that triggered the Auditor Defendants' duty to dig deeper into the Company's representation—an investigation that clearly would have revealed the extent of the fraud.

Thus, the Amended Complaint cured any identified pleading deficiencies with respect to the Auditor Defendants' *scienter*, and the proposed amendment was not futile.

42

## <u>CONCLUSION</u>

Based on the foregoing, this Court should reverse the district court's order denying Plaintiff's Motion to File a Second Amended Complaint.

DATED: June 27, 2014

*/s/ Murielle J. Steven Walsh*
Marc I. Gross
Murielle J. Steven Walsh
Star M. Tyner
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212.661.1100
Facsimile: 212.661.8665

William B. Federman
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: 405.235.1560
Facsimile: 405.239.2112

Laurence Rosen
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: 212.686.1060
Facsimile: 212.202.3827

*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(C) because it contains 8,936 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using 14-point Times New Roman font.

DATED: June 27, 2014

*/s/ Murielle J. Steven Walsh*
Murielle J. Steven Walsh
Of Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2014, a true and correct copy of the foregoing brief of Plaintiff-Appellant was served via electronic filing with the Clerk of Court which will send notice of such filing to all counsel of record.

DATED: June 27, 2014

*/s/ Murielle J. Steven Walsh*
Murielle J. Steven Walsh
Of Counsel
